# EXHIBIT F

BEFORE THE AMERICAN ARBITRATION ASSOCIATION
SAN FRANCISCO, CALIFORNIA

| | |
|---|---|
| JESSICA FULLER,<br><br>               Claimant,<br><br>     v.<br><br>BLOOM INSTITUTE OF TECHNOLOGY,<br>formerly d/b/a LAMBDA SCHOOL;<br>AUSTEN ALLRED, in his individual<br>capacity; and JOHN DOES 1-9,<br><br>               Respondents. | AAA Case No. _____ |

## DEMAND FOR ARBITRATION

1.      Pursuant to the American Arbitration Association's Consumer Rules, Claimant Jessica Fuller submits this Demand for Arbitration against Bloom Institute of Technology, formerly d/b/a Lambda School ("Lambda"), Austin Allred, in his individual capacity, and John Does 1–9 (collectively, "Respondents") for violations of the California Consumer Legal Remedies Act ("CLRA"), California Civil Code § 1750, *et seq.*, Unfair Competition Law ("UCL"), California Business and Professional Code §17200, *et seq.*, and False Advertising Law ("FAL"), California Business and Professional Code § 17500, *et seq.*, as well as for intentional and negligent misrepresentation.

2.      Ms. Fuller is a former student of Lambda School and brings this action to hold Respondents accountable for: (i) falsifying and misrepresenting Lambda's job placement rates; (ii) misrepresenting and concealing that, until August 17, 2020, Lambda did not have the necessary approval from the California Bureau for Postsecondary Education ("BPPE") to operate as a school, and was under order by the BPPE to cease operations, stop enrolling students, cease all instructional services, and submit a closure plan; (iii) in violation of California law, enrolling, signing tuition payment plans with and providing educational services to students before Lambda obtained the BPPE's approval to operate; (iv) in violation of California law, engaging in the

unlawful business practice of unlicensed lending; and (v) misrepresenting and concealing the true nature of Lambda's financial interest in students' success, including by falsely representing that Lambda only got paid after students found employment and got paid.

      3.    Claimant would not have enrolled at Lambda had Plaintiff known the truth about Lambda's job placement rates, its lack of approval from BPPE, or the true nature of Lambda's financial interest in Claimant's success (or lack thereof). Through this action, Claimant seeks declaratory and injunctive relief to cancel Claimant's tuition payment plan and declare that payment plan null and void; a refund of any payments Claimant has made under that payment plan; damages; and additional relief.

## I.    __THE PARTIES__

      4.    Claimant Jessica Fuller is a resident of Lakewood, Pierce County, Washington. Claimant signed a tuition payment plan on April 22, 2020. Claimant was enrolled as a student at Lambda from June 2020 until September 2020, at which point Claimant withdrew from Lambda's program. Claimant's tuition payment plan is attached as Exhibit A.

      5.    Respondent Lambda is a corporation organized and existing under the laws of the State of Delaware, having its principal place of business at 250 Montgomery Street, Floor 16, San Francisco, California 94104 and/or 149 New Montgomery Street, 4th floor, San Francisco, CA 94101.

      6.    Respondent Austen Allred is Lambda's founder and CEO. Upon information and belief, Mr. Allred resides in San Francisco, California, and/or did so during times relevant to the events described herein.

      7.    Respondents John Does 1-9 are officers and/or directors of Lambda as well as individuals, corporations, or other entities who may own all or a portion of Claimant's tuition payment plan or any other financial interest in that tuition payment plan.

## II.    __JURISDICTION AND VENUE__

      8.    The American Arbitration Association ("AAA") has jurisdiction over this action pursuant to Claimant's tuition payment plan, which specifies:

As the exclusive means of initiating adversarial proceedings to resolve any dispute arising out of this agreement, your Lambda School tuition, or your payments to Lambda School (other than any proceeding commenced by either party seeking an injunction, a restraining order, or any other equitable remedy or a proceeding commenced by either party in small claims court), either party may demand that the dispute be resolved by binding arbitration administered by the American Arbitration Association in accordance with its Consumer Arbitration Rules available at www.adr.org.

9.      Claimant's tuition payment plan further specifies, "Any such arbitration must be conducted by one arbitrator and must be conducted in San Francisco, California, the county with a major commercial airport nearest to where you live, or another mutually agreed location."

## III.    FACTUAL ALLEGATIONS

### A.    LAMBDA BACKGROUND

10.     Lambda is a private, for-profit online coding school founded in 2017 by its current CEO, Austen Allred. Mr. Allred was the Company's primary decision-maker, controlled its daily operations, and regularly promoted Lambda on social media and through other media. He benefitted financially from the tuition paid to Lambda by Claimant and all other students.

11.     Lambda provides online computer science courses of varying lengths. It is not a degree-granting institution, and is not accredited. Students cannot take out federal student loans to attend Lambda.

12.     Lambda marketed itself as a place where students learn the skills necessary to obtain employment in the competitive computer technology job market. In Mr. Allred's words, most students come to Lambda with "no network" and are "from either inner cities or rural areas."[1]

13.     Lambda touted its "experienced industry expert" instructors and a top-of-the-line curriculum that is "designed to get you hired." On April 3, 2019, Mr. Allred stated in an interview that Lambda's "educational experience is, I think, among the best in the world."[2]

---

[1] *See* Y Combinator, *A CS Education That's Free Until You Get a Job - Austen Allred of LambdaSchool*, YouTube (Apr. 3, 2019) at 9:10 (hereinafter "Y Combinator Interview"), https://www.youtube.com/watch?v=_yIAYZtdrfI&t=551s.
[2] *Id.* at 15:05.

14.   At all times relevant to this complaint, Lambda charged tens of thousands of dollars for its program, more than double the reported average price of online coding bootcamps.[3]

15.   Part of Lambda's business model has been predicated on convincing prospective students to agree to pay a large amount of tuition by promising them that they will not owe anything unless and until they find a job that pays $50,000 or more per year.

16.   Lambda carries out this model by entering into tuition payment plans with students. For example, as Lambda describes one of its tuition payment plan offerings, Income Share Agreements (ISAs): "A Lambda School ISA is a contract under which you agree to pay 17% of your post-Lambda School salary for 24 months, but only once you're making more than $50,000 per year (or the equivalent of $4,166.67 per month). The ISA is capped at a maximum repayment of $30,000, so you won't pay more than $30,000 under any circumstances."[4]

17.   Over time, Lambda expanded its tuition payment plan offerings to include, for example, retail installment contracts, deferred tuition plans, multi-part installment payment plans, financing through a third-party loan, a pre-instruction lump sum payment, or ISA varieties that combine an initial lump sum payment with payments from a proportion of future earnings.

18.   Some Lambda tuition payment plans are managed by third-party servicers who handle origination and payment processing.[5] Meratas, a loan-servicing company headquartered in Stamford, Connecticut, services Claimant's ISA.

19.   By April 2019, Lambda was growing at "an insane pace." As Mr. Allred explained:

> We agreed as a team to no longer share the number of students that we have enrolled, but it is not a small number and it is growing at an insane pace. We'll soon

---

[3] *See* Cecilia Clark, *How Much is Coding Boot Camp?* Nerdwallet (June 21, 2022, 10:53 AM), https://www.nerdwallet.com/article/loans/student-loans/how-much-is-coding-bootcamp.

[4] *The Lambda School Income Share Agreement*, Lambda School Website (scroll to FAQs "What is an ISA and how does it work"), [archived by the Wayback Machine (Dec. 16, 2020), https://web.archive.org/web/20201216131833/https://lambdaschool.com/tuition/isa].

[5] *The Lambda School Income Share Agreement*, Lambda School Website (scroll to FAQs "Who are Meratas and Leif"), [archived by the Wayback Machine (Dec. 16, 2020), https://web.archive.org/web/20201216131833/https://lambdaschool.com/tuition/isa].

be measuring Lambda School scale by percentage of the overall number of students learning to program every year, to give you some context. And being able to support that kind of scale effectively is what keeps me up at night. Mostly specifically hiring, mostly hiring executives right now who can build out 100, 150 person teams beneath them . . . and we need like 5 of them yesterday.[6]

20.     Mr. Allred attributed Lambda's growth in part to his active personal Twitter account, stating in January 2020 that his frequent tweets have "certainly helped Lambda school grow."[7]

21.     Mr. Allred also stated: "If there's one thing I'm good at in life, it's growing something quickly, building hype for something quickly. That's kind of my superpower."[8]

22.     As described below, Lambda's rapid growth was fueled by the School's, and Mr. Allred's, public misrepresentations about the School's approval status and job placement rates.

**B.     UNTIL AUGUST 17, 2020, LAMBDA OPERATED WITHOUT STATE APPROVAL, IN VIOLATION OF CALIFORNIA LAW**

23.     As a California company with its headquarters and principal place of business in San Francisco, Lambda is subject to the laws of the state of California. One of those laws, California Education Code § 94886, bars private postsecondary educational intuitions from doing business without "approval to operate."

24.     Another, Section 94917, provides that when educational institutions violate this law, any "note, instrument, or other evidence of indebtedness relating to payment" for its programs is "void and not enforceable."

25.     All Lambda tuition payment plans, including ISAs, are a "note, instrument, or other evidence of indebtedness relating to payment for educational program[s]," under the California Education Code.

26.     On March 20, 2019, the BPPE issued a "Citation: Assessment of Fine and Order of Abatement" ("Citation") to Lambda. The Citation found that Lambda was "operating without

---

[6] Y Combinator Interview at 47:50.
[7] Vincent Woo, *Interview with Austen Allred*, Soundcloud (Jan. 22, 2020) at 42:10 (hereinafter "Woo Interview"), https://soundcloud.com/vwoo/interview-with-austen-allred.
[8] Y Combinator Interview at 22:25.

Bureau approval," in violation of the California Education Code. A copy of the Citation is attached hereto as Exhibit B.

27.     In the Citation, the BPPE ordered that Lambda "cease to operate as a private postsecondary educational institution" and "submit a school closure plan." The Citation further required Lambda to "discontinue recruiting or enrolling students and cease all instructional services and advertising in any form or type of media, including the https://lambdaschool.com and any other websites not identified here that are associated with the Institution, until such time as an approval to operate is obtained from the Bureau."

28.     On May 14, 2019, Lambda submitted its application to the BPPE seeking approval to operate.

29.     Lambda appealed the Citation and, on July 24, 2019, the BPPE issued an "Appeal of Citation Informal Conference Decision: Citation Affirmed" (the "Citation Affirmance"). The BPPE affirmed the Citation because "[n]o new substantive facts were presented," and thus, Lambda was required to "comply with the orders described in the 'Violation Code Sections' of this document and submit evidence of compliance within 30 days from the date of this decision." Citation Affirmance at 1–3. A copy of the Citation Affirmance is attached hereto as Exhibit C.

30.     In direct violation of California law, the Citation, and the Citation Affirmance, Lambda continued to operate, advertise its educational services to the public, and enroll students.

31.     On August 21, 2019, the BPPE denied Lambda's May 14, 2019 application, stating in a letter to Lambda that it was "unable to grant approval." A copy of the August 21 order is attached hereto as Exhibit D.

32.     On November 25, 2019, the BPPE issued an order denying Lambda's updated application for approval, explaining that "at this time the Bureau is unable to grant approval, based on the requirements of the California Education Code." A copy of the November 25 order is attached hereto as Exhibit E.

33.    On June 22, 2020, the BPPE issued yet another order denying Lambda's further updated application for approval to operate, stating that "the Bureau cannot at this time approve Lambda's application." A copy of the June 22 order is attached hereto as Exhibit F.

34.    The June 22, 2020 order also found that Lambda's ISAs constitute "an instrument or evidence of indebtedness" under the California Education Code. *Id.* at 5.

35.    On August 17, 2020, the BPPE issued an order approving Lambda's application. The approval letter stated that the BPPE had completed its review of Lambda's "Application for Approval to Operate," including "supplemental documentation" received on August 14, 2020. The BPPE found that "[a]pproval to operate is granted *effective August 17, 2020*." (emphasis added). A copy of the August 17 order is attached hereto as Exhibit G.

36.    From at least May 2019 until Lambda was approved on August 17, 2020, Lambda's publicly available course catalogs falsely stated that Lambda was approved by the BPPE. In at least three versions of the 2019 and 2020 catalogs—revised in May 2019, September 2019, and July 2020 (all prior to Lambda's approval)—Lambda falsely stated the following:

> **APPROVALS**
> Lambda School is a private institution *approved to operate* by the California Bureau for Private Postsecondary Education. Approval to operate means the institution is compliant with the minimum standards contained in the California Private Postsecondary Education Act of 2009 (as amended) and Division 7.5 of Title 5 of the California Code of Regulations.

*See* Exhibit H (Excerpts of Three Versions of Lambda Course Catalogs for 2019 and 2020 at 5) (emphasis added).

37.    During the time Lambda was seeking the BPPE's approval, Mr. Allred engaged in a public misinformation campaign about Lambda's legal status. For example, in August 2019, Mr. Allred told Business Insider that Lambda was working with the BPPE to obtain approval and

that the order had been stayed while the application was pending. Mr. Allred stated that "[b]ecause we're talking with BPPE, it doesn't affect students at all."[9] This was false.

38.    In truth, the Citation and Citation Affirmance were not stayed, multiple of Lambda's applications had been denied, and Lambda's future was uncertain. In August 2020, a public information officer with California's Department of Consumer Affairs told Business Insider "that there is no stay on the order, and that if Lambda School is still operating while its registration is pending, it would be in violation of state law."[10]

39.    Upon information and belief, Mr. Allred further commented to Lambda students over the Lambda Slack channel that any regulatory issues were mere technicalities that did not affect the school's ability to operate.

40.    At all times Mr. Allred knew or should have known that ISAs and other financing instruments issued by Lambda were void and unenforceable under California Law due to Lambda's lack of approval to operate.

41.    Throughout 2019 and 2020, prior to Lambda's August 17, 2020 approval, Lambda and Mr. Allred further misrepresented Lambda's approval status by using a number of recognized attributes of an approved academic institution in its advertising and promotional materials. During this period, Lambda's name, website, and the website URL itself – lambdaschool.com – used the term "school", and Lambda's website, ads, and social media continuously displayed the following school crest:

*Screenshot from Lambda's website on April 22, 2020.*



---

[9] Rosalie Chan, *The hot Silicon Valley coding bootcamp Lambda School is paying a $75,000 fine for not registering properly with the state of California*, Business Insider (Aug. 29, 2019, 6:32 PM), https://www.businessinsider.com/lambda-school-coding-bootcamp-california-bppe-2019-8.

[10] Rosalie Chan, *A California official says red-hot coding bootcamp Lambda School is violating state law if it operates without the right registration — but the company insists classes can go on*, Business Insider (Aug. 30, 2019, 8:54 PM), https://www.businessinsider.com/lambda-school-california-state-law-coding-bootcamp-y-combinator-2019-8.

42.    During this period, Lambda's website, online ads, and social media continuously and repeatedly referred to various features of an approved academic institution, including, for example, a "curriculum," "tuition," "students," "student body," being "enrolled," an academic "schedule," "graduates," "mentors," "grades," "lectures," "homework," and "career support": [11]

*Screenshot from Lambda's website on May 6, 2020.*





---

[11] *See, e.g.*, Lambda School (@LambdaSchool), Twitter (Dec. 10, 2019, 9:52 PM), https://twitter.com/bloomtech/status/1204609786718801922; Lambda School Instagram (Mar. 16, 2020), https://www.instagram.com/p/B9zG7NvjhyS/; *Curriculum*, Lambda School Website, [archived by the Wayback Machine (May 6, 2020), https://web.archive.org/web/20200506051614/https://lambdaschool.com/curriculum].

*Screenshot of a March 16, 2020 Lambda Instagram post.*



43.    Mr. Allred furthered the appearance that Lambda was approved to operate in similar terms. In his "Letter from the CEO" at the beginning of Lambda's March 2020 outcomes report (which was publicly available on the Lambda website), he refers to the Lambda "student body" growing to 2,900, with Lambda staff growing to 200, and moving the Lambda headquarters to an office building in downtown San Francisco based on that growth. He refers to a "curriculum" that is "mastery-based," "graduation," "career support," and "the school." He acknowledged that Lambda "students place great trust in Lambda School when they enroll, and they make incredible investments of time and energy while engaged in our programs."[12]

44.    Had Claimant been aware that Lambda was operating without a license, was not approved to operate, and that its future legal status was uncertain, Claimant would not have signed a tuition payment plan that indebted Claimant for up to $30,000 to Lambda. Indeed, no

---

[12] *See* Austen Allred, *Announcing the Release of Our H1 2019 Student Outcomes Report*, Lambda School Website (Mar. 27, 2020), [archived by the Wayback Machine (Apr. 23, 2020), https://web.archive.org/web/20200423031203/https://lambdaschool.com/the-commons/announcing-the-release-of-our-h1-2019-student-outcomes-report] (last visited November 27, 2023).

reasonable consumer would enroll and indebt themselves to a program operating unlawfully and under orders to close.

45.    Claimant's tuition payment plan constitutes a "note, instrument, or other evidence of indebtedness relating to payment for [students'] educational program," under the California Education Code, and therefore, as a matter of law, is "void and not enforceable." California Education Code § 94917.

## C.    LAMBDA'S FALSE AND MISLEADING JOB PLACEMENT RATES

46.    Lambda's selling point to Claimant and other students was that it would land them a job—and thus bring financial success. Mr. Allred described Lambda as "entirely vocational, we're a trade school basically, and we want to help you make as much money as you can."[13]

47.    Lambda's record of placing students in computer technology jobs was therefore a critical piece of information for Claimant and others considering attending Lambda. Respondents knew that students would only enroll if Lambda would help them secure a job. As Lambda described it, job placement is "the most critical component of Lambda's operations, not only in the School's obligation to its students, but to the prosperity of the company as a whole." *See* ¶ 53, *infra*.

48.    To that end, for the past six years, since Lambda's inception, and continuously through today, Lambda and Mr. Allred have engaged in an extensive and long-term campaign to advertise false and misleading job placement rates, intending that potential students like Claimant would review those rates and enroll at Lambda as a result of those rates.

49.    Lambda and Mr. Allred have prominently displayed false and misleading information on Lambda's purported record of job placement on the Lambda website, in marketing materials and outcomes reports, in a variety of online and social media advertisements (upon information and belief, including Google, YouTube, and various social media), and

---

[13] Y Combinator Interview at 13:00.

through social media postings and comments, including Mr. Allred's personal social media accounts.

          **1.**     **False and misleading job placement rates on Lambda's website and outcomes reports**

     50.     Throughout 2018 and 2019, Lambda's website advertised job placement rates of over 80%. Lambda and its executive leadership, including Mr. Allred, knew that these widely disseminated rates were false and misleading.

     51.     On August 2, 2018, Mr. Allred, Ben Nelson (co-founder and CTO), and Ryan Holdaway (VP of Outcomes), stated the following in a post on the Lambda School Blog: *"[E]very single* Lambda School graduate who has been on the job market for six months is either employed in a full-time role as a software engineer or has joined an early startup working for equity."[14]

     52.     Yet on August 3, 2018—the very next day—Lambda's executive leadership team reprimanded Lambda's Director of Career Readiness for poor job placement rate performance, sending her an "Employee Corrective Action Form." The form stated that the employee's "performance in recent months has not met the expectations for the Career Coach/Director of Career Readiness role at Lambda School. Overall placement numbers are low and the time to placement is much higher than desired."

     53.     The Corrective Action Form continued:

> Placements are the most critical component of Lambda's operations, not only in the School's obligation to its students, but to the prosperity of the company as a whole. A common discussion point in regards to Outcomes is that current placement rates are too low and time to placement is too high. Creative tactics and adjustments to current careers processes as well as follow through are needed to improve both of these measurements. . . .
>
> CS1 students graduated on 1/19/18. Since then we've had a new class graduate approximately every five weeks. As of 8/1/18, only 16 students of the 48 graduated students assigned to [the Lambda career placement employee] have been placed.

---

[14] Austen Allred, *Introducing Lambda Next — Our Revolutionary New Job Search and Placement Program*, Medium: Lambda School Blog (Aug. 2, 2018), https://medium.com/lambda-school-blog/introducing-lambda-next-our-revolutionary-new-job-search-and-placement-program-603ef12f7d37 (emphasis added).

54. Two months later, on October 8, 2018, Lambda continued to tout its high job placement rates, announcing on its website: "Since Lambda School's inception in April 2017, over 75 Lambda School graduates have been hired, including 83% of early cohorts, with an average salary increase of over $47,000 per hired graduate."

55. Lambda's website contained the following statement across the top of the page:

*Screenshot from Lambda's website on December 13, 2018.*



56. The representation of an 83% job placement rate remained on the Lambda website until on or about February 2019.

57. From on or about April 2019 until at least December 2019, Lambda's website advertised an ever higher job placement rate: over 85%. For example, on April 18, 2019, Lambda's website contained the following statement across the top of the page:

*Screenshot from Lambda's website on April 18, 2019.*



58. Yet in May of 2019—at the same time Lambda was advertising an 85.9% job placement rate on its website—Lambda executives sent a private memorandum to investor Y Combinator confirming the falsity of the rates it was publicly promoting. *See* Lambda

Memorandum to Investors, *Human Capital: The Last Unoptimized Asset Class* at 10 (May 2019), attached hereto as Exhibit I. The May 2019 memo stated:

> **We're unable to place students at scale**
> - We're at roughly 50% placement for cohorts that are 6 months graduated
> - Placement to date has been manual and one-off, which isn't possible at scale

Ex. I at 10.

59.    After the memorandum was published in news accounts two years later, Mr. Allred confirmed in a tweet from his personal account that he had told investors that Lambda had a 50% placement rate, stating: "The 50% came from me telling investors about what % of enrolled students get jobs that require repayment."

60.    Despite Mr. Allred's contrary statement to investors, Lambda's website continued to promote a 85.9% or 86% placement rate through the end of 2019. These rates were false and misleading.

61.    On December 14, 2019, Lambda's homepage stated:



*Screenshot from Lambda's website on December 14, 2019.*

62.    This statement was false and directly contrary to the true facts known to Lambda and Mr. Allred, which had privately been disclosed to investors, as described above.

63.    When asked in an interview to explain the discrepancy between the representations on Lambda's website and representations to its investors, Mr. Allred explained:

14

"I mean you're literally looking at what are the risks, right? Like, we're going to pick our lowest number for that – there are cohorts that have been at 50% placed within 6 months, yes."[15]

64.     When asked whether the advertised 86% job placement rate was accurate, he stated: "the way that that number was measured was an average across cohorts at a specific time. I don't know what it is right now, but that's directionally correct."[16]

65.     On February 19, 2020, New York Magazine published an article titled "Lambda School's Misleading Promises," in which the writer concluded that Lambda was "selling unprepared students an incomplete education, fueled by overpromising marketing and misleading, if not downright fraudulent, figures."[17] The story described Lambda's job placement rate misrepresentations and also recounted an interview with a former employee who "confirmed . . . that the company's own internal numbers, which the interviewee was provided as part of their interview process, seem to indicate a roughly 50 percent or lower placement rate."[18]

66.     Lambda nonetheless persisted in promoting false and misleading job placement statistics on its website and elsewhere.

67.     In 2020, Lambda started to promote its placement rates through "outcomes reports" published on its website and shared through social media. Multiple outcomes reports included an "Independent Accountants' Report" directed "To the Management" of "Lambda Inc." located at "250 Montgomery Street[,] San Francisco, CA 94104".

68.     The first outcomes report, titled "H1 2019 Outcomes Report," was published on March 27, 2020,[19] and reported a 79% placement rate.[20]

---

[15] Woo Interview at 13:00-14:30.

[16] *Id.* at 11:13-11:26.

[17] Vincent Woo, *Lambda School's Misleading Promises*, New York Magazine (Feb. 19, 2020), https://nymag.com/intelligencer/2020/02/lambda-schools-job-placement-rate-is-lower-than-claimed.html.

[18] *Id.*

[19] *See* Austen Allred, *Announcing the Release of Our H1 2019 Student Outcomes Report*, Lambda School Website (Mar. 27, 2020), [archived by the Wayback Machine (Apr. 23, 2020), https://web.archive.org/web/20200423031203/https://lambdaschool.com/the-commons/announcing-the-release-of-our-h1-2019-student-outcomes-report].

[20] *See H1 2019 Report Lambda School Outcomes Report*, Lambda School Website, [archived by

69.     The 79% placement rate remained up on Lambda's website until December 3, 2020, when Lambda published its "H2 2019 Outcomes Report."[21] The H2 2019 report showed a 74% placement rate.[22]

70.     The 74% rate announced in the H2 2019 report remained up on Lambda's website until November 7, 2021, when Lambda announced its 2020 outcomes.[23] In the 2020 outcomes report, Lambda announced that the placement rate remained at 74%.

71.     Until November 1, 2022, Lambda continued to report the 74% placement rate from the 2020 outcomes report on its website:

# 74%

Job placement rate for BloomTech graduates

**BloomTech 2020 Outcomes Report**

*Screenshot from Lambda's homepage on September 30, 2022.*[24]

---

the Wayback Machine (Sept. 3, 2020),
https://web.archive.org/web/20200903023542/https://lambdaschool.com/reports/2019-outcomes-report].

[21] *See* Austen Allred, *Announcing the Release of Our H2 2019 Student Outcomes Report*, Lambda School Website (Dec. 3, 2020), [archived by the Wayback Machine (Dec. 14, 2020), https://web.archive.org/web/20201214214247/https://lambdaschool.com/the-commons/announcing-lambda-school-h2-2019-student-outcomes-report].

[22] *Id. See also H2 2019 Report Lambda School Outcomes Report*, Lambda School Website [archived by the Wayback Machine (Dec. 3, 2020), https://web.archive.org/web/20201203230224/https://lambdaschool.com/reports/h2-2019-outcomes-report].

[23] *See Bloom Institute of Technology 2020 Outcomes Report,* Bloom Institute of Technology, [archived by the Wayback Machine (Nov. 25, 2021), https://web.archive.org/web/20211125162824/https://www.bloomtech.com/reports/outcomes-report].
It appears that Lambda only published one outcomes report in 2020. *See BloomTech Reports*, Bloom Institute of Technology Website, https://www.bloomtech.com/reports/archive (last visited Mar. 14, 2023).

[24] *See Built For Your Success*, Bloom Institute of Technology Website, [archived by the Wayback Machine (Sept. 30, 2022) https://web.archive.org/web/20220930032702/https://www.bloomtech.com/outcomes].

72.     On November 2, 2022, Lambda published the "BloomTech 2021 Outcomes Report," advertising a 90% placement rate. As of November 2, 2022, Lambda's website provided:

# 90%

Job placement rate for BloomTech graduates

**BloomTech 2021 Outcomes Report**

*Screenshot from Lambda's homepage on November 27, 2022.*[25]

73.     In a "Letter from the CEO" dated November 2, 2022, Mr. Allred wrote: "In this independently examined report, you'll gain a transparent view of how our learners and graduates fared in 2021. Our biggest takeaway: A full **90% of our 2021 graduates have landed jobs**, which is the highest rate in our company's history."[26]

74.     Lambda's homepage continued to advertise a 90% placement rate until January 2024, when it updated the rate, touting an "86% job placement rate in 2022 for job-seeking grads."[27]

75.     Like the earlier rates from 2018 and 2019, the rates Lambda published from 2020 to the present (including, but not limited to, the 79%, 74%, 90%, and 86% rates from the Lambda website and outcomes reports) were, and continue to be, false and misleading. Lambda and its executive leadership, including Mr. Allred, knew that these widely disseminated rates were false and misleading.

---

[25] *See Built For Your Success,* Bloom Institute of Technology Website, [archived by the Wayback Machine (Nov. 27, 2022), https://web.archive.org/web/20221127122732/https://www.bloomtech.com/outcomes].
[26] *See* Austen Allred, *Letter from the CEO*, Bloom Institute of Technology Website (Nov. 2, 2022), https://www.bloomtech.com/reports/outcomes-report#letter (last visited Mar. 14, 2023) (emphasis in original, internal citation omitted).
[27] *See* Bloom Institute of Technology Home Page, https://www.bloomtech.com/ (last visited December 6, 2023).

76.    Business Insider reported in October 2021 that documents from a Lambda "all-hands" staff meeting in January 2021 "showed that Lambda School placed only around 30% of its 2020 graduates in qualifying jobs during the first half of 2020. This figure is in stark contrast to the 74% placement rate it advertised for its 2019 graduates, the latest figure the school has made publicly available. . . ."[28]

77.    This "all hands" meeting took place one month after Lambda published the 74% placement rate in the H2 2019 Outcomes Report.

78.    A slide prepared by Lambda reveals that the H1 2020 placement rate was only 33% and the H2 2020 rate was 40%, a far cry from the 74% listed on the Lambda website until November 2, 2022. According to the same slide, Lambda's H1 2021 *goal* was 60% placement and H2 2021 *goal* was 80%:

## Long-Term Student Success Goals

|  | H1 2020 | H2 2020 | H1 2021 | H2 2021 | Metric | Description |
|---|---|---|---|---|---|---|
| **Admissions** | 1277 | 1450 | TBD | TBD | Unit 2 Starts | # students starting Unit 2. |
| **School** | 52% | 56% | 60% | 80% | % Graduating within 11 Units | % of students who start Unit 2 complete coursework within 11 units. |
| **Outcomes** | 33% | 40% | 60% | 80% | % Qualified Placement within 180 days | % of graduates get high paying jobs within 180 days. |
| **Repayment** | 72% | 79% | 85% | 87% | % Repaying within 60 days | % of qualified placed graduates have made a first payment within 60 days. |

79.    On information and belief, a Lambda executive presented the slide at the "all-hands" meeting at Lambda's headquarters in San Francisco, California.

---

[28] *See* Vincent Woo, *Lambda School promised a fast and cheap path to a lucrative tech career. Leaked documents and former students cast doubt on that claim*. Business Insider (Oct. 25, 2021, 7:30 AM), https://www.businessinsider.com/lambda-school-promised-lucrative-tech-coding-career-low-job-placement-2021-10.

80.    Another slide, titled "Lambda H1 Company OKRs," provided that the "actual" placement rate for H1 2020 was 33% of graduates placed within 180 days, and the actual rate for H2 2020 (as of October 2020) was 27% of graduates placed within 180 days. This slide also listed the H1 2021 goal as 60%:

## Lambda H1 Company OKRs

| | H1 2020 | H2 2020 | H1 2021 | Metric | Description |
|---|---|---|---|---|---|
| **Admissions Goal**<br>Admissions Actual | n/a<br>1277 | 1450<br>~850 | 1500 | Unit 2 Starts | # students starting Unit 2. |
| **School Goal**<br>School Actual | n/a<br>52% | 56%<br>52% | 60% | Extended Grad Rate % | % of students who start Unit 2 complete coursework within expected time window |
| **Outcomes Goal**<br>Outcomes Actual | n/a<br>33% | 40%<br>27% | 60% | % Qualified Placement within 180 days | % of graduates get high paying jobs within 180 days. |
| **Repayment Goal**<br>Repayment Actual | n/a<br>41% | 75%<br>73% | 85% | % Repaying within 60 days | % of qualified placed graduates have made a first payment within 60 days. |
| **Alumni Goal** | n/a | n/a | 40% | % Alumni Giving back | % of hired alumni giving back |

*H2 2020 Actuals as of October 2020

81.    Another slide, reportedly used at another all-hands meeting in February 2021, broke out the 180-day placement rates by month, from February to July 2020, as follows:

| Graduation Month | Qualified Placed % (days elapsed since graduation) | | |
|---|---|---|---|
| Month | +90d | +180d | QP Now |
| Feb - 2020 | 20% | 31% | 41% |
| Mar - 2020 | 19% | 30% | 36% |
| April - 2020 | 17% | 24% | 32% |
| May - 2020 | 13% | 27% | 32% |
| Jun - 2020 | 15% | 25% | 27% |
| Jul - 2020 | 18% | 24% | 25% |
| Aug - 2020 | 16% | | 21% |
| Sept - 2020 | 13% | | 14% |
| Oct - 2020 | 10% | | 11% |
| Nov - 2020 | | | 11% |
| Jan - 2021 | | | 11% |
| **Weighted Avg.** | 16% | 27% | |
| **H2 Goal** | | 40% | |

19

82.     In yet another slide, reportedly also used at the "all hands" meeting on January 28, 2021, Lambda's H1 2021 "goal" was to enroll 500 students a month and place 50% to 70% in qualifying jobs. The graph also shows that, if Lambda enrolled 2,000 students per month, it could become profitable even if fewer than half of its students found jobs:



83.     Prior to signing a tuition payment plan, Claimant read Respondents' representations that Lambda's job placement rate was above 70%. Lambda's purported record of successfully placing students was critical to Claimaint's decision to enroll.

### 2.     Lambda's false and misleading statements about job placement in social media postings and comments.

84.     In addition to advertising job placement rates on its website and in outcomes reports, Lambda's job placement marketing campaign aimed at potential students expanded to social media posts and comments, including Twitter, Facebook, and Instagram. Like the rates on its website and in outcomes reports, these rates, ranging from 71% to at least 91%, were false and misleading. Lambda and its executive leadership, including Mr. Allred, knew that these widely disseminated rates were false and misleading, and intended that potential students like Claimant would review those rates and enroll at Lambda as a result of those rates.

85.    Examples of false and misleading job placement rates on Lambda's Twitter, Facebook, and Instagram accounts include:

a) April 6, 2018, Lambda Twitter: "Time for another update on placement. Students hired by Lambda School are not included. Cs1: 75% hired within first two months of search."[29]

b) March 5, 2019, Lambda's Twitter account linked to a report touting an 85.9% job placement rate and stated: "Lambda only succeeds when our students succeed, and we're committed to a transparent, no-surprises approach to education."[30]

c) April 22, 2020, Lambda Instagram: "Percentage of H1 2019 graduates that have been placed into jobs. → 71%"[31]



---

[29] Lambda School (@LambdaSchool), Twitter (Apr. 6, 2018, 12:39 PM), https://twitter.com/bloomtech/status/982311747301330944.

[30] Lambda School (@LambdaSchool), Twitter (Mar. 5, 2019, 7:02 PM), https://twitter.com/bloomtech/status/1103083315945328640.

[31] Lambda School (@LambdaSchool), Instagram (Apr. 22, 2020), https://www.instagram.com/p/B_S2M-Llm2y/.

d) September 27, 2021, Lambda Instagram: "77% of H2 2019 job-seeking Data Science graduates were hired. 94% [o]f those hired graduates go the job in the first 180 days"[32]



e) November 3, 2022, Lambda Instagram: "90% of our 2021 alumni gained in-demand skills and landed great jobs—our highest placement rates *ever*!"[33]



---

[32] Lambda School (@LambdaSchool), Instagram (Sept. 27, 2021), https://www.instagram.com/p/CUWJM1qJlEB/?img_index=4.

[33] Bloom Tech (@Bloomtechofficial), Instagram (Nov. 3, 2022), https://www.instagram.com/p/CkgVeHBrmP9/.

f)  November 3, 2022: Lambda Facebook: "90% of our 2021 alumni gained in-demand skills and landed great jobs—our highest placement rates *ever*!"[34]

g)  November 3, 2022, Lambda Twitter: "90% of our 2021 alumni gained in-demand skills and landed great jobs—our highest placement rates *ever*!"[35]

h)  November 4, 2022, Lambda Facebook: "Fun Fact: Did you know, 90% of our 2021 full Stack Web job-seeking graduates found a job after BloomTech?"[36]

i)  November 7, 2022, Lambda Facebook: "91% of our 2021 job-seeking Data Science graduates found a job 😮"[37]

j)  November 9, 2022, Lambda Instagram: "91% of 2021 job-seeking Data Science grads found a job after BloomTech"[38]

### 3.    Mr. Allred's false and misleading statements about job placement were a driving force behind Lambda's job placement rate marketing campaign.

86.    At all times relevant to this complaint, Mr. Allred was the driving force behind Lambda's job placement rate marketing campaign. Rather than passively overseeing the campaign, he personally spearheaded Lambda's dissemination of false and misleading rates, oftentimes promoting the rates himself on his own social media accounts.

87.    For example, since March 2020, when Lambda first promoted its job placement rates through outcomes reports, each outcomes report has begun with a personalized letter from Mr. Allred titled "Letter from the CEO," vouching for the rates in the report. The reports end with Mr. Allred's signature.

---

[34]Bloom Tech (@BloomTech), Facebook (Nov. 3, 2022), https://www.facebook.com/BloomTech/posts/pfbid0C9MRRryV1zaMpSXa35QnogkPDAR984b js9xmen4WJB4SWMtkWAn2kxZ7BRC11Kdhl.

[35] Bloom Tech (@BloomTech), Twitter (Nov. 3, 2022, 11:15 AM), https://twitter.com/bloomtech/status/1588203108013850629.

[36] Bloom Tech (@BloomTech), Facebook (Nov. 4, 2022), https://www.facebook.com/BloomTech/posts/pfbid025d3iVN2usd1eLKfwTMCh78a3kVNpsmU cRCsMXWinqtYX4tHqLbkDHQz9mhqUZuanl.

[37] Bloom Tech (@BloomTech), Facebook (Nov. 7, 2022), https://www.facebook.com/BloomTech/posts/pfbid0UpByQ5eFsctoNH51QuK1DPrTXYXvaU9 cPbE2H6weYnnvR2YbpWF2m8vLGbuuoUhol.

[38] Bloom Tech (@Bloomtechofficial), Instagram (Nov. 9, 2022), https://www.instagram.com/p/CkwHe8ivDND/.

88.    Mr. Allred also advertised false and misleading rates on his personal Twitter
account:

a)    March 13, 2019: In response to a commenter asking about a $60,000 median
salary and 83% 6-month employment rate for Lambda's main web track, Mr.
Allred responded, "That's low now, but our average student increases his or her
income by $47,000."[39]

b)    March 15, 2019: "Lambda School's first iOS class graduates today. 66% of them
are already **hired.**"[40]

c)    November 16, 2019: "First track just graduated. Hit 100% hired but was VERY
small sample size." Subsequent reporting revealed that this small sample size
consisted of a single student.[41]

d)    November 3, 2022: "I am so incredibly excited to finally be able to share
BloomTech's 2021 Outcomes Report. Highlights: *All-time high 90%
placement rate for job-seeking grads".[42]

89.    Other examples of false, misleading, and exaggerated claims on Mr. Allred's
Twitter account include:

a)    January 24, 2021: "I think we're like 2-3 solvable problems being solved away
from 100% of Lambda School grads being hired. Still a lot of unknowns, but I
think it will be possible." When a commenter asked what the problems were, Mr.
Allred responded: "Boring stuff."[43]

b)    April 22, 2021: "When I started Lambda School early detractors gave me hell
because I said that Lambda School would cause thousands of people to become
millionaires who wouldn't have otherwise been. It's now pretty clear that was
very conservative."[44]

---

[39] Austen Allred (@Austen), Twitter (Mar. 13, 2019, 12:14 PM),
https://twitter.com/Austen/status/1105879911036665856.
[40] Austen Allred (@Austen), Twitter (Mar. 15, 2019, 5:20 PM),
https://twitter.com/Austen/status/1106681485275205634.
[41] *See* Zoe Schiffer & Megan Farokhmanesh, *The High Cost of a Free Coding Bootcamp*, The
Verge (Feb. 11, 2020, 11:15 EST), https://www.theverge.com/2020/2/11/21131848/lambda-
school-coding-bootcamp-isa-tuition-cost-free; Ryan Mac (@RMac18), Twitter (Feb. 11, 2020,
1:59 PM), https://twitter.com/RMac18/status/1227306243733295108.
[42] Austen Allred (@Austen), Twitter (Nov. 3, 2022, 12:20 PM),
https://twitter.com/Austen/status/1588219699157905408.
[43] Austen Allred (@Austen), Twitter (Jan. 24, 2021, 1:55 AM),
https://twitter.com/austen/status/1353234915643568128.
[44] Austen Allred (@Austen), Twitter (Apr. 22, 2021, 10:24 AM),
https://twitter.com/Austen/status/1385238109185396740.

   c) May 4, 2021: "I get to watch a bunch of people double their income (or more) every single day. Even the worst days are punctuated by a bunch of people changing their lives and the lives of their families forever."[45]

   d) May 4, 2021: "You can go from near poverty to huge future wealth in just a few months."[46]

   e) November 24, 2022: "Thankful today for all those who have worked so hard for BloomTech (by current name or by Lambda School). So many people working so diligently. Thousands of lives changed, billions in increased earnings."[47]

90.    Mr. Allred and Lambda acted willfully and knowingly to disseminate Lambda's job placement representations to the public—including applicants to their school such as Claimant—with knowledge that they were, and continue to be, false and misleading.

.

### D. LAMBDA MISREPRESENTS THAT IT ONLY GETS PAID ONCE STUDENTS DO

91.    In addition to the placement rates, Lambda and Mr. Allred misled potential students like Claimant with the frequently repeated declaration that: "We don't get paid until you do, so we're in this together, from your first day of classes to your first day on the job."[48] For example, on June 27, 2019, Lambda's homepage stated:



## Higher learning. Higher earning.

Lambda is designed for student success. We don't get paid until you do, so we're in this together, from your first day of classes to your first day on the job — and beyond.

*Screenshot from Lambda's homepage on June 27, 2019.*

---

[45] Austen Allred (@Austen), Twitter (May 4, 2021, 11:50 PM), https://twitter.com/Austen/status/1389789532761956352.
[46] Austen Allred (@Austen), Twitter (May 4, 2021, 11:53 PM), https://twitter.com/Austen/status/1389790386659364868.
[47] Austen Allred (@Austen), Twitter (Nov. 24, 2022, 9:51 AM), https://twitter.com/austen/status/1595822473781485568.
[48] *See, e.g.*, Apply Now Pages, Lambda School Website [archived by the Wayback Machine (June 27, 2019), https://web.archive.org/web/20190627024024/https://lambdaschool.com/].

92.    Mr. Allred regularly touted that Lambda only gets paid when students do on his personal social media accounts and the Lambda website, describing Lambda's business as based on shared and aligned incentives between Lambda and its students:

a)  "The main directive in everything we did can be summed up in two words: incentive alignment."[49]

b)  "Our mission from day one has been to **align the incentives of school and student**, giving more people the opportunity they deserve to land a great job with a higher income. If our students don't succeed, our school shouldn't either."[50]

93.    In reality, Lambda packaged and sold its tuition payment plans, including ISAs, to investors long before students obtained employment. As early as May 2019, Lambda privately told investor Y Combinator: "Currently we sell some income share agreements to hedge funds." Exhibit I at 2.

94.    To facilitate the sale of ISAs, Lambda partnered with Edly, a digital marketplace that helps schools sell ISAs to third-party investors. On December 11, 2019, Edly tweeted: "Pleased to announce our latest offering [–] a Lambda School ISA Pool. We @edlyISA are excited to work with the amazing team @LambdaSchool[], one of the most impactful ISA programs in the country."[51] To learn how to participate, Edly invited interested investors to join a webinar that night with Mr. Allred.[52]

---

[49] Austen Allred, LinkedIn (2019), https://www.linkedin.com/posts/austenallred_announcing-our-new-isa-financing-blueprint-activity-6636140633306333184-dkOh?utm_source=share&utm_medium=member_desktop.

[50] *See* Austen Allred, *Announcing the Release of Our H1 2019 Student Outcomes Report*, Lambda School Website (Mar. 27, 2020), [archived by the Wayback Machine (Apr. 23, 2020), https://web.archive.org/web/20200423031203/https:/lambdaschool.com/the-commons/announcing-the-release-of-our-h1-2019-student-outcomes-report] (emphasis in original).

[51] @edlyISA, Twitter (Dec. 11, 2019, 3:01 PM), https://twitter.com/edlyISA/status/1204853625459216385 (on file with Claimant's counsel).

[52] @edlyISA, Twitter (Dec. 11, 2019, 3:02 PM), https://twitter.com/edlyISA/status/1204853900177743872 (on file with Claimant's counsel).

95.     Lambda did not disclose this fact to students until public reporting exposed it, and for many months Mr. Allred flatly denied it, stating in October 2019 on Twitter that "We never, ever get paid up front for ISAs."[53]

96.     Claimant read the false and misleading statement on the Lambda website that Lambda only got paid once the student does and, as a result, believed that Lambda would only get paid once Claimant secured a qualifying job. Knowing that Lambda only got paid if Claimant obtained employment was important to Claimant's decision to attend.

**E.      LAMBDA ENGAGED—AND STILL ENGAGES—IN THE UNLAWFUL BUSINESS PRACTICE OF UNLICENSED LENDING**

97.     The California Financing Law "shall be liberally construed and applied to promote its underlying purposes and policies," which include "protect[ing] borrowers against unfair practices by some lenders, having due regard for the interests of legitimate and scrupulous lenders." Cal. Fin. Code § 22001(a)(4).

98.     Pursuant to the California Financing Law: "No person shall engage in the business of a finance lender or broker without obtaining a license from the commissioner." Cal. Fin. Code § 22100(a).

99.     Lambda is not and never has been registered in California as a finance lender or broker under the Financing Law.

100.    Since its inception, Lambda has operated as a "finance lender" because its tuition payment plans qualify as either consumer or commercial loans under the Financing Law. *See generally* Cal. Fin. Code § 22203-04 (defining consumer loans); Cal. Fin. Code § 22502 (defining commercial loans).

101.    Lambda's Meratas ISA provides:

> THIS IS NOT A LOAN
> In making monthly payments to Lambda School, you will not be repaying a student loan. In the case of a student loan, a student borrows a set amount and repays the principal amount of the loan plus interest or a finance charge, or both. Under this agreement, you

---

[53] Woo Interview at 6:30 (wherein Mr. Allred confirms that this tweet was "totally correct").

will instead pay a fixed percentage of your income each month for
up to a maximum number of payments.

102.    Contrary to this representation, ISAs are a form of student loan.

103.    According to the United States Consumer Financial Protection Bureau ("CFPB"),
a representation that an ISA is "not a loan" is deceptive and misleading under the Consumer
Financial Protection Act because "ISAs are loans and do create debt."[54]

104.    The California Department of Financial Protection and Innovation ("DFPI")
agrees, holding that ISAs are student loans: "ISAs made solely for use to finance a postsecondary
education are 'student loans' for the purposes of the SLSA [California Student Loan Servicing
Act]."[55]

105.    The United States Department of Education concurs, finding that ISAs "used to
finance expenses for postsecondary education are private education loans under 34 C.F.R.
601.2(b)."[56]

106.    The BPPE also found in its June 22, 2020, order denying Lambda approval to
operate that Lambda's ISA is "an instrument or evidence of indebtedness" under the California
Education Code. *See* June 22, 2020 Letter from BPPE to Lambda at 5, attached hereto as Exhibit
F.

---

[54] *See* Better Future Forward, Inc., et al., CFPB No. 2021-CFPB-0005, Consent Order at ¶ 23
(Sept. 7, 2021) (finding *available at:* https://files.consumerfinance.gov/f/documents/cfpb_better-
future-forward-inc_consent-order_2021-09.pdf).
[55] *See In the Matter of Student Loan Servicing Act License Application of Meratas Inc.* NMLS
No. 2120180, Consent Order at ¶ M (Ca. Dep't of Fin. Prot. and Innovation Aug. 5, 2021),
*available at:* https://dfpi.ca.gov/wp-content/uploads/sites/337/2021/08/Meratas-Consent-
Order.pdf; *see also* Press Release, California Dep't of Fin. Prot. and Innovation, "California
DFPI Enters Groundbreaking Consent Order with NY-Based Income Share Agreements
Servicer" (Aug. 5, 2020), https://dfpi.ca.gov/2021/08/05/california-dfpi-enters-groundbreaking-
consent-order-with-ny-based-income-share-agreements-servicer/.
[56] *See* FSA Announcement, General-22-12, *Income Share Agreements and Private Education
Loan Requirements* (Mar. 2, 2022), https://fsapartners.ed.gov/knowledge-
center/library/electronic-announcements/2022-03-02/income-share-agreements-and-private-
education-loan-requirements. *See also* 87 Fed. Reg. 65,453 ("[T]he Department clarifies that
ISAs and other alternative financing products should be treated like institutional loans.").

107.    Because Lambda is in the business of making ISAs and other tuition payment plans, it is operating as a finance lender under the California Financing Law.

108.    Lambda's failure to register as a finance lender deprived Claimant of the borrower protections provided by the California Financing Law.

109.    Lambda has therefore engaged in the unlawful business practice of making a loan without a license in violation of California Financial Code § 22100, and, in turn, in violation of the unlawful prong of the UCL.

110.    Had Claimant been aware that Lambda was acting as an unlicensed finance lender, Claimant would not have signed a tuition payment plan that indebted Claimant for up to $30,000 to Lambda.

**F.    CLAIMANT'S ENROLLMENT AND ATTENDANCE AT LAMBDA, AND THE AFTERMATH**

111.    Claimant Fuller has long been interested in coding, back to when she learned website design as a hobby as a kid. She aspired to eventually turn her hobby into a career, but the time commitment and expense of college curricula made them a nonstarter.

112.    Once Ms. Fuller experienced a lull in her work as a fitness trainer during the onset of the COVID-19 pandemic, she thought she had an opportunity to revisit a tech career after seeing Lambda advertisements in March and April of that year. Lambda was immediately appealing to Claimant, with a slew of Facebook, Instagram, and YouTube ads promising a career without college. After seeing the ads, Ms. Fuller visited Lambda's website and watched YouTube videos about the program to learn more throughout March and April 2020. She was drawn to the job placement rate of 79% on the Lambda website outcomes report and at least the same rate on Lambda social media ads during March and April 2020.

113.    Ms. Fuller also liked that Lambda did not require tuition payments up front, and that, through an ISA, Lambda was invested in student outcomes. She saw the statement on the Lambda website that Lambda did not get paid until the student did, convincing her that Lambda was equally invested in student outcomes, including hers.

114.    The high 79% placement rate and the representation that Lambda only got paid once students do were critical to Ms. Fuller's decision to enroll, convincing her that enrolling at Lambda would maximize her chance of landing a tech job after completing Lambda coursework.

115.    But both the 79% job placement rate and the statement that Lambda only got paid once students do were false and misleading, and both Lambda and Mr. Allred knew these representations were false and misleading. (*See* ¶¶ 46–90, *supra*.)

116.    Ms. Fuller further believed that Lambda was approved to operate due to Respondents' continuous and repeated descriptions on the Lambda website, Lambda ads, and social media of various features of Lambda that gave the appearance that it was a credible, legitimate, and lawfully operating school. These included, but were not limited to, descriptions of Lambda's curriculum, tuition, students, student body, enrollment, academic schedule, graduates, mentors, grades, lectures, homework, and career support. After she enrolled, and during her ISA revocability period, she continued to believe that Lambda was approved to operate, and Mr. Allred reinforced that belief with comments over the Lambda Slack channel that any regulatory issues were mere technicalities that did not affect the school's ability to operate.

117.    Swayed by Respondents' false job placement rates, their false statements that they only got paid once students do, and their false representations that Lambda was a government-approved school, Ms. Fuller signed an ISA with Lambda on April 22, 2020 (Exhibit A).

118.    Had Respondents truthfully represented Lambda's job placement rates, or had they truthfully represented their actual financial interest in students' success, or had Ms. Fuller known that Lambda was not lawfully approved to operate, she would not have enrolled in Lambda's educational services, or signed an ISA that indebted her up to $30,000 of tuition to Lambda.

119.    Ms. Fuller began attending Lambda part-time in June 2020 and immediately found the instruction confusing and unhelpful. Recognizing that she could not rely on Lambda exclusively, she resorted to buying supplemental courses.

120.     Soon thereafter, in early September 2020, Lambda made a surprise announcement that it was restructuring Ms. Fuller's program. Lambda would no longer take attendance, provide grading, or offer one-on-one team leads. Feeling like Lambda was eliminating the program she originally enrolled in, and with her ISA tuition amount of $30,000 still partially refundable, Ms. Fuller took a hiatus for the rest of 2020. With no sign that Lambda would improve its program, she permanently withdrew in January 2021.

121.     Following her withdrawal, Ms. Fuller researched other avenues for obtaining a job in the tech field. She eventually found a free coding bootcamp called #100Devs, designed for students without degrees or coding experience. She felt like the program was the right fit for her, and could provide her with the skills, experience, and opportunities Lambda did not.

122.     Indeed, the #100Devs program taught Ms. Fuller what she needed to ultimately get a job. Her new coding skills enabled her to apply for and accept a position as Director of Software Development with ThriveDX.

123.     Lambda played no role in her success in the #100Devs program, finding out about ThriveDX, or ultimately getting hired there.

124.     Since the fall of 2023, Ms. Fuller has reduced her hours at ThriveDX and started a university-based IT program—something she believes would be unnecessary had Lambda lived up to its promises. She has not made an ISA payment based on her post-Lambda employment because she has not met the ISA income threshold.

## IV.    CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### Violations of California's Consumer Legal Remedies Act
### Cal. Civ. Code §§ 1750, *et seq.*
### (All Respondents)

125.     Claimant hereby reincorporates the allegations in the foregoing paragraphs as though fully set forth herein.

126.    The CLRA makes unlawful "unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or that results in the sale or lease of goods or services to any consumer." Cal. Civ. Code § 1770(a).

127.    The CLRA covers transactions involving the sale of services—such as education—to consumers.

128.    Claimant is a "consumer" within the meaning of Section 1761(d) of the CLRA, seeking Lambda's education services for personal, family, or household purposes, and Claimant engaged in "transactions" within the meaning of sections 1761(e)and 1770 of the CLRA.

129.    Education is a "service" within the meaning of Section 1761(b) of the CLRA.

130.    The CLRA enumerates numerous unlawful acts or practices, including:

   a)    "Misrepresenting the source, sponsorship, approval, or certification of goods or services." Cal. Civ. Code § 1770(a)(2).

   b)    "Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that the person does not have." *Id.* § 1770(a)(5).

   c)    "Representing that goods or services are of a particular standard, quality, or grade" when they are not. *Id.* § 1770(a)(7).

   d)    "Advertising goods or services with intent not to sell them as advertised." *Id.* § 1770(a)(9).

131.    In violation of these provisions, Respondents misrepresented to the public, prospective students, and current students, including Claimant, at least the following: (i) its job placement rates; and (ii) that it had approval to operate and enroll students.

132.    Respondents did so in order to induce prospective students, like Claimant, to enroll in Lambda's program—Claimant did so enroll as a result of Respondents' misrepresentations.

**SECOND CAUSE OF ACTION**
**Violations of California's Unfair Competition Law**
**Cal. Bus. & Prof. Code §§ 17200,** *et seq.*
**(All Respondents)**

133.    Claimant hereby reincorporates the allegations in the foregoing paragraphs as though fully set forth herein.

134.    Respondents have engaged in business acts or practices that constitute unfair competition as defined in the UCL, in that such business acts and practices are unlawful, unfair, and fraudulent within the meaning of that statute.

135.    The business acts and practices include:

a)    publishing and/or providing the public, prospective students, and current students, including Claimant, with false, misleading, unreliable, and/or inaccurate job placement rate information;

b)    conducting business without BPPE approval and in violation of multiple BPPE orders requiring it to cease operations;

c)    knowingly operating a private postsecondary institution without approval to do so and knowingly conveying to the public that it is an approved institution;

d)    misrepresenting to the public, prospective students, and current students that in March and July of 2019, the BPPE ordered Lambda to cease operations, stop enrolling students, cease all instructional services, and submit a closure plan, and misrepresenting material facts related to those BPPE orders, including representing that they were stayed when they were not.

136.    Claimant's tuition payment plans constitute "lost money or property" within the meaning of the UCL.

Unlawful Prong

137.    The UCL bars business practices that are forbidden by law. If a business practice violates any law, it is *per se* a UCL violation.

138.    The business acts and practices described above are unlawful because they violate numerous state and federal laws, including but not limited to:

a)  The Federal Trade Commission Act ("FTC Act"), which prohibits "unfair or deceptive acts or practices."[57]

b)  Cal Educ. Code § 94897(b), which provides that institutions shall not "[p]romise or guarantee employment, or otherwise overstate the availability of jobs upon graduation."

c)  The CLRA, *see supra*;

d)  The FAL, *see infra*;

e)  Cal. Educ. Code § 94886, which provides in relevant part that "a person shall not open, conduct, or do business as a private postsecondary educational institution in this state without obtaining an approval to operate under this chapter." Lambda violated this provision, and therefore the UCL's unlawful prong, when it enrolled Claimant without obtaining approval to operate.

f)  Cal. Educ. Code § 94943, which provides that it is a crime to "[k]nowingly operat[e] a private postsecondary institution without an approval to operate." Lambda violated this provision, and therefore the UCL's unlawful prong, when it knowingly enrolled Claimant without approval by the BPPE to operate.

g)  Cal. Educ. Code § 94917, which provides that "[a] note, instrument, or other evidence of indebtedness relating to payment for an educational program is void and not enforceable unless, at the time of execution of the note, instrument, or other evidence of indebtedness, the institution held an approval to operate … ."

h)  Cal. Educ. Code § 94902(b)(2), which provides that an enrollment agreement is enforceable only if "[a]t the time of the execution of the enrollment agreement, the institution held a valid approval to operate.

---

[57] *See* U.S.C.§ 45(a)(I); 15 U.S.C. § 52(a).

i) The California Financing Law, which provides that "[n]o person shall engage in the business of a finance lender or broker without obtaining a license from the commissioner." Cal. Fin. Code § 22100(a).

j) The Consumer Financial Protection Act of 2010, 12 U.S.C. §§ 5531(a), 5536(a)(1)(B), which prohibits covered persons from engaging in unfair, deceptive, or abusive acts or practices.

139.    By violating these and other state and federal laws, Lambda violated the unlawful prong of the UCL.

Fraud Prong

140.    To show that a business practice is fraudulent, it is necessary only to show that members of the public are likely to be deceived.

141.    Respondents' business acts and practices—including its false job placement rate representations and false representations to the Subclass about BPPE approval—are fraudulent in that they are likely to deceive the public.

142.    Each of these false and misleading representations, all of which were material, were substantial factors influencing Claimant to attend Lambda and take out a tuition payment plan that indebted Claimant for up to $30,000.

**THIRD CAUSE OF ACTION**
**Violations of California's False Advertising Law**
**Cal. Bus. & Prof. Code §§ 17500, *et seq.***
**(All Respondents)**

143.    Claimant hereby reincorporates the allegations in the foregoing paragraphs as though fully set forth herein.

144.    Respondents have also engaged in acts or practices that constitute violations of the FAL, Business and Professions Code section 17500, *et seq.*, by making or causing to be made untrue or misleading statements with the intent to induce members of the public to purchase Lambda's services. Respondents' untrue or misleading representations include, but are not limited to, the following:

a) Respondents' statements regarding job placement rates, including but not limited to the published job placement rates prominently displayed on its website, social media, and advertisements;

b) Respondents' statements, prominently displayed on Lambda's website and elsewhere, that Lambda does not get paid until students do;

c) Respondents' statements and appearance to the public, prospective students, and current students that its operations were lawful, that BPPE had not ordered Lambda to cease advertising and instructional activities, and that it could lawfully enroll students. Lambda's and Mr. Allred's advertisements and marketing implicitly and explicitly misrepresented the lawfulness of its operations by encouraging the public and prospective students to apply for enrollment.

145.    At the time these representations were made, Respondents knew or by the exercise of reasonable care should have known that the representations were untrue or misleading.

**FOURTH CAUSE OF ACTION**
**Intentional Misrepresentation**
**(All Respondents)**

146.    Claimant hereby reincorporates the allegations in the foregoing paragraphs as though fully set forth herein.

147.    Respondents made statements to Claimant: (a) that were false representations of material fact; (b) that Respondents knew were false or were made recklessly and without regard for their truth; (c) that Respondents intended Claimant to rely upon; (d) that Claimant reasonably relied upon; (e) that Claimant's reliance upon was a substantial factor in causing Claimant damage; and (f) that caused Claimant damage.

148.    The intentional misrepresentations and omissions by Respondents consist of at least the following:

a)  Respondents' job placement rate statements, prominently displayed on the Lambda website, in outcomes reports, and on social media. Respondents knew these statements were false.

b)  Respondents' statements, prominently displayed on Lambda's website and elsewhere, that Lambda does not get paid until students do; Lambda knew this statement was false because it sold ISAs to investors long before students were placed in jobs.

c)  Respondents' representations, both implied and explicit, that it was approved to operate, advertise, enroll, and teach students prior to August 2020. Respondents knew these representations were false because the BPPE had ordered Lambda to cease all operations (including all advertising and instructional activities) and submit a school closure plan. Respondents also knew that they were concealing from students that Lambda was barred from advertising and from enrolling and teaching students.

149.    Respondents intended Claimant to rely on these misrepresentations, as evidenced by Lambda prominently featuring them on its website and on other widely disseminated platforms, as well as by its efforts to avoid disclosing the truth.

150.    Claimant reasonably relied on these widely disseminated representations. Had Claimant known the truth, Claimant would not have enrolled at Lambda.

151.    Lambda, Mr. Allred, and members of his executive leadership team acted willfully and knowingly to disseminate these representations to the public with knowledge that they were false and misleading.

152.    Claimant has been substantially harmed by Lambda's misconduct, which caused Claimant to attend Lambda and take out an ISA that indebted Claimant for up to $30,000 in tuition.

**FIFTH CAUSE OF ACTION**
**Negligent Misrepresentation**
**(All Respondents)**

37

153.    Claimant hereby reincorporates the allegations in the foregoing paragraphs as though fully set forth herein.

154.    Respondents have also engaged in acts or practices that constitute negligent misrepresentation. *See supra* ¶¶ 146-52.

155.    Respondents prominently displayed these representations on the Lambda website, in outcomes reports, on social media, and in advertisements for the purpose of encouraging members of the public, like Claimant, to apply for enrollment.

156.    Respondents had no reasonable grounds to believe that these representations were true.

157.    Respondents intended to induce Claimant to rely on these misrepresentations, as evidenced by Lambda prominently featuring them on its website and on other widely disseminated platforms, as well as by its efforts to avoid disclosing the truth.

158.    Claimant was justified in relying upon these widely disseminated representations. Had Claimant known the truth, Claimant would not have enrolled at Lambda.

159.    Claimant has been substantially harmed by Lambda's misconduct, which caused Claimant to attend Lambda and take out an ISA that indebted Claimant for up to $30,000 in tuition.

## V.    PRAYER FOR RELIEF

WHEREFORE, in accordance with the above claims, Claimant requests that the Arbitrator:

1.    Declare and order that the tuition payment plan entered into by Claimant is unlawful, void, and unenforceable pursuant to Cal. Educ. Code §§ 94886, 94902, 94917, and 94943, and the UCL, CLRA, and FAL.

2.    Declare that Respondents conducted business as a private postsecondary educational institution in California without obtaining approval to operate, in violation of Cal. Educ. Code § 94886 and the UCL.

3.     Declare that Respondents knowingly operated a private postsecondary institution without approval to operate, in violation of Cal. Educ. Code § 94943 and the UCL.

4.     Declare that Respondents' job placement rate representations at all times relevant to this Complaint were fraudulent and misleading, in violation of the UCL, FAL, and CLRA, and were intentional and/or negligence misrepresentations.

5.     Declare that Lambda "engage[d] in the business of a finance lender or broker without obtaining a license from the commissioner," and continues to do so, in violation of the California Financing Law, Cal. Fin. Code § 22100(a).

6.     Order Respondents—including Lambda, Mr. Allred, and any other owner of all or part of the tuition payment plans—to cancel Claimant's tuition payment plan and enjoin any effort to collect upon or otherwise enforce it.

7.     Order Respondents to pay restitution in the form of refunds for any and all payments made.

8.     Order prejudgment and post-judgment interest on any refunds for tuition payment plan payments to the maximum extent allowed by law.

9.     Order Respondents to pay reasonable attorneys' fees and costs.

10.    Award damages to Claimant in an amount to be determined, including punitive damages pursuant to Cal. Civ. Code § 3294(a).

11.    Order all such further relief as the Arbitrator deems just and proper.


Dated: February 14, 2024              **MINER, BARNHILL & GALLAND, P.C.**


                                      By:    /s/ *Ryan Miller*
                                             Deanna N. Pihos
                                             David Baltmanis
                                             Ryan Miller

                                             *Attorneys for Claimant*

**BEFORE THE AMERICAN ARBITRATION ASSOCIATION**
**SAN FRANCISCO, CALIFORNIA**

|  |  |
|---|---|
| ROB BENNETT, <br><br>                    Claimant, <br><br>          v. <br><br> BLOOM INSTITUTE OF TECHNOLOGY, formerly d/b/a LAMBDA SCHOOL; AUSTEN ALLRED, in his individual capacity; and JOHN DOES 1-9, <br><br>                    Respondents. | AAA Case No. _____ |

## <u>DEMAND FOR ARBITRATION</u>

1.      Pursuant to the American Arbitration Association's Consumer Rules, Claimant Rob Bennett submits this Demand for Arbitration against Bloom Institute of Technology, formerly d/b/a Lambda School ("Lambda"), Austin Allred, in his individual capacity, and John Does 1–9 (collectively, "Respondents") for violations of the California Consumer Legal Remedies Act ("CLRA"), California Civil Code § 1750, *et seq.*, Unfair Competition Law ("UCL"), California Business and Professional Code §17200, *et seq.*, and False Advertising Law ("FAL"), California Business and Professional Code § 17500, *et seq.*, as well as for intentional and negligent misrepresentation.

2.      Mr. Bennett is a former student of Lambda School and brings this action to hold Respondents accountable for: (i) falsifying and misrepresenting Lambda's job placement rates; (ii) misrepresenting and concealing that, until August 17, 2020, Lambda did not have the necessary approval from the California Bureau for Postsecondary Education ("BPPE") to operate as a school, and was under order by the BPPE to cease operations, stop enrolling students, cease all instructional services, and submit a closure plan; (iii) in violation of California law, enrolling, signing tuition payment plans with and providing educational services to students before Lambda obtained the BPPE's approval to operate; (iv) in violation of California law, engaging in the

1

unlawful business practice of unlicensed lending; and (v) misrepresenting and concealing the true nature of Lambda's financial interest in students' success, including by falsely representing that Lambda only got paid after students found employment and got paid.

3.      Claimant would not have enrolled at Lambda had Plaintiff known the truth about Lambda's job placement rates, its lack of approval from BPPE, or the true nature of Lambda's financial interest in Claimant's success (or lack thereof). Through this action, Claimant seeks declaratory and injunctive relief to cancel Claimant's tuition payment plan and declare that payment plan null and void; a refund of any payments Claimant has made under that payment plan; damages; and additional relief.

**I.      THE PARTIES**

4.      Claimant Rob Bennett is a resident of Everett, Snohomish County, Washington. Claimant signed a tuition payment plan on April 9, 2020. Claimant was enrolled as a student at Lambda from April 2020 until November 2020, at which point Claimant completed Lambda's program. Claimant's tuition payment plan is attached as Exhibit A.

5.      Respondent Lambda is a corporation organized and existing under the laws of the State of Delaware, having its principal place of business at 250 Montgomery Street, Floor 16, San Francisco, California 94104 and/or 149 New Montgomery Street, 4th floor, San Francisco, CA 94101.

6.      Respondent Austen Allred is Lambda's founder and CEO. Upon information and belief, Mr. Allred resides in San Francisco, California, and/or did so during times relevant to the events described herein.

7.      Respondents John Does 1-9 are officers and/or directors of Lambda as well as individuals, corporations, or other entities who may own all or a portion of Claimant's tuition payment plan or any other financial interest in that tuition payment plan.

**II.     JURISDICTION AND VENUE**

8.      The American Arbitration Association ("AAA") has jurisdiction over this action pursuant to Claimant's tuition payment plan, which specifies:

As the exclusive means of initiating adversarial proceedings to resolve any dispute arising out of this agreement, your Lambda School tuition, or your payments to Lambda School (other than any proceeding commenced by either party seeking an injunction, a restraining order, or any other equitable remedy or a proceeding commenced by either party in small claims court), either party may demand that the dispute be resolved by binding arbitration administered by the American Arbitration Association in accordance with its Consumer Arbitration Rules available at www.adr.org.

9.    Claimant's tuition payment plan further specifies, "Any such arbitration must be conducted by one arbitrator and must be conducted in San Francisco, California, the county with a major commercial airport nearest to where you live, or another mutually agreed location."

## III.    FACTUAL ALLEGATIONS

### A.    LAMBDA BACKGROUND

10.    Lambda is a private, for-profit online coding school founded in 2017 by its current CEO, Austen Allred. Mr. Allred was the Company's primary decision-maker, controlled its daily operations, and regularly promoted Lambda on social media and through other media. He benefitted financially from the tuition paid to Lambda by Claimant and all other students.

11.    Lambda provides online computer science courses of varying lengths. It is not a degree-granting institution, and is not accredited. Students cannot take out federal student loans to attend Lambda.

12.    Lambda marketed itself as a place where students learn the skills necessary to obtain employment in the competitive computer technology job market. In Mr. Allred's words, most students come to Lambda with "no network" and are "from either inner cities or rural areas."[1]

13.    Lambda touted its "experienced industry expert" instructors and a top-of-the-line curriculum that is "designed to get you hired." On April 3, 2019, Mr. Allred stated in an interview that Lambda's "educational experience is, I think, among the best in the world."[2]

---

[1] *See* Y Combinator, *A CS Education That's Free Until You Get a Job - Austen Allred of LambdaSchool*, YouTube (Apr. 3, 2019) at 9:10 (hereinafter "Y Combinator Interview"), https://www.youtube.com/watch?v=_yIAYZtdrfI&t=551s.
[2] *Id.* at 15:05.

3

14.     At all times relevant to this complaint, Lambda charged tens of thousands of dollars for its program, more than double the reported average price of online coding bootcamps.[3]

15.     Part of Lambda's business model has been predicated on convincing prospective students to agree to pay a large amount of tuition by promising them that they will not owe anything unless and until they find a job that pays $50,000 or more per year.

16.     Lambda carries out this model by entering into tuition payment plans with students. For example, as Lambda describes one of its tuition payment plan offerings, Income Share Agreements (ISAs): "A Lambda School ISA is a contract under which you agree to pay 17% of your post-Lambda School salary for 24 months, but only once you're making more than $50,000 per year (or the equivalent of $4,166.67 per month). The ISA is capped at a maximum repayment of $30,000, so you won't pay more than $30,000 under any circumstances."[4]

17.     Over time, Lambda expanded its tuition payment plan offerings to include, for example, retail installment contracts, deferred tuition plans, multi-part installment payment plans, financing through a third-party loan, a pre-instruction lump sum payment, or ISA varieties that combine an initial lump sum payment with payments from a proportion of future earnings.

18.     Some Lambda tuition payment plans are managed by third-party servicers who handle origination and payment processing.[5] Meratas, a loan-servicing company headquartered in Stamford, Connecticut, services Claimant's ISA.

19.     By April 2019, Lambda was growing at "an insane pace." As Mr. Allred explained:

> We agreed as a team to no longer share the number of students that we have enrolled, but it is not a small number and it is growing at an insane pace. We'll soon

---

[3] *See* Cecilia Clark, *How Much is Coding Boot Camp?* Nerdwallet (June 21, 2022, 10:53 AM), https://www.nerdwallet.com/article/loans/student-loans/how-much-is-coding-bootcamp.

[4] *The Lambda School Income Share Agreement*, Lambda School Website (scroll to FAQs "What is an ISA and how does it work"), [archived by the Wayback Machine (Dec. 16, 2020), https://web.archive.org/web/20201216131833/https:/lambdaschool.com/tuition/isa].

[5] *The Lambda School Income Share Agreement*, Lambda School Website (scroll to FAQs "Who are Meratas and Leif"), [archived by the Wayback Machine (Dec. 16, 2020), https://web.archive.org/web/20201216131833/https:/lambdaschool.com/tuition/isa].

be measuring Lambda School scale by percentage of the overall number of students learning to program every year, to give you some context. And being able to support that kind of scale effectively is what keeps me up at night. Mostly specifically hiring, mostly hiring executives right now who can build out 100, 150 person teams beneath them . . . and we need like 5 of them yesterday.[6]

20.     Mr. Allred attributed Lambda's growth in part to his active personal Twitter account, stating in January 2020 that his frequent tweets have "certainly helped Lambda school grow."[7]

21.     Mr. Allred also stated: "If there's one thing I'm good at in life, it's growing something quickly, building hype for something quickly. That's kind of my superpower."[8]

22.     As described below, Lambda's rapid growth was fueled by the School's, and Mr. Allred's, public misrepresentations about the School's approval status and job placement rates.

## B.     UNTIL AUGUST 17, 2020, LAMBDA OPERATED WITHOUT STATE APPROVAL, IN VIOLATION OF CALIFORNIA LAW

23.     As a California company with its headquarters and principal place of business in San Francisco, Lambda is subject to the laws of the state of California. One of those laws, California Education Code § 94886, bars private postsecondary educational intuitions from doing business without "approval to operate."

24.     Another, Section 94917, provides that when educational institutions violate this law, any "note, instrument, or other evidence of indebtedness relating to payment" for its programs is "void and not enforceable."

25.     All Lambda tuition payment plans, including ISAs, are a "note, instrument, or other evidence of indebtedness relating to payment for educational program[s]," under the California Education Code.

26.     On March 20, 2019, the BPPE issued a "Citation: Assessment of Fine and Order of Abatement" ("Citation") to Lambda. The Citation found that Lambda was "operating without

---

[6] Y Combinator Interview at 47:50.

[7] Vincent Woo, *Interview with Austen Allred*, Soundcloud (Jan. 22, 2020) at 42:10 (hereinafter "Woo Interview"), https://soundcloud.com/vwoo/interview-with-austen-allred.

[8] Y Combinator Interview at 22:25.

Bureau approval," in violation of the California Education Code. A copy of the Citation is attached hereto as Exhibit B.

27.    In the Citation, the BPPE ordered that Lambda "cease to operate as a private postsecondary educational institution" and "submit a school closure plan." The Citation further required Lambda to "discontinue recruiting or enrolling students and cease all instructional services and advertising in any form or type of media, including the https://lambdaschool.com and any other websites not identified here that are associated with the Institution, until such time as an approval to operate is obtained from the Bureau."

28.    On May 14, 2019, Lambda submitted its application to the BPPE seeking approval to operate.

29.    Lambda appealed the Citation and, on July 24, 2019, the BPPE issued an "Appeal of Citation Informal Conference Decision: Citation Affirmed" (the "Citation Affirmance"). The BPPE affirmed the Citation because "[n]o new substantive facts were presented," and thus, Lambda was required to "comply with the orders described in the 'Violation Code Sections' of this document and submit evidence of compliance within 30 days from the date of this decision." Citation Affirmance at 1–3. A copy of the Citation Affirmance is attached hereto as Exhibit C.

30.    In direct violation of California law, the Citation, and the Citation Affirmance, Lambda continued to operate, advertise its educational services to the public, and enroll students.

31.    On August 21, 2019, the BPPE denied Lambda's May 14, 2019 application, stating in a letter to Lambda that it was "unable to grant approval." A copy of the August 21 order is attached hereto as Exhibit D.

32.    On November 25, 2019, the BPPE issued an order denying Lambda's updated application for approval, explaining that "at this time the Bureau is unable to grant approval, based on the requirements of the California Education Code." A copy of the November 25 order is attached hereto as Exhibit E.

33.     On June 22, 2020, the BPPE issued yet another order denying Lambda's further updated application for approval to operate, stating that "the Bureau cannot at this time approve Lambda's application." A copy of the June 22 order is attached hereto as Exhibit F.

34.     The June 22, 2020 order also found that Lambda's ISAs constitute "an instrument or evidence of indebtedness" under the California Education Code. *Id.* at 5.

35.     On August 17, 2020, the BPPE issued an order approving Lambda's application. The approval letter stated that the BPPE had completed its review of Lambda's "Application for Approval to Operate," including "supplemental documentation" received on August 14, 2020. The BPPE found that "[a]pproval to operate is granted *effective August 17, 2020*." (emphasis added). A copy of the August 17 order is attached hereto as Exhibit G.

36.     From at least May 2019 until Lambda was approved on August 17, 2020, Lambda's publicly available course catalogs falsely stated that Lambda was approved by the BPPE. In at least three versions of the 2019 and 2020 catalogs—revised in May 2019, September 2019, and July 2020 (all prior to Lambda's approval)—Lambda falsely stated the following:

> **APPROVALS**
> Lambda School is a private institution *approved to operate* by the California Bureau for Private Postsecondary Education. Approval to operate means the institution is compliant with the minimum standards contained in the California Private Postsecondary Education Act of 2009 (as amended) and Division 7.5 of Title 5 of the California Code of Regulations.

*See* Exhibit H (Excerpts of Three Versions of Lambda Course Catalogs for 2019 and 2020 at 5) (emphasis added).

37.     During the time Lambda was seeking the BPPE's approval, Mr. Allred engaged in a public misinformation campaign about Lambda's legal status. For example, in August 2019, Mr. Allred told Business Insider that Lambda was working with the BPPE to obtain approval and

that the order had been stayed while the application was pending. Mr. Allred stated that "[b]ecause we're talking with BPPE, it doesn't affect students at all."[9] This was false.

38.    In truth, the Citation and Citation Affirmance were not stayed, multiple of Lambda's applications had been denied, and Lambda's future was uncertain. In August 2020, a public information officer with California's Department of Consumer Affairs told Business Insider "that there is no stay on the order, and that if Lambda School is still operating while its registration is pending, it would be in violation of state law."[10]

39.    Upon information and belief, Mr. Allred further commented to Lambda students over the Lambda Slack channel that any regulatory issues were mere technicalities that did not affect the school's ability to operate.

40.    At all times Mr. Allred knew or should have known that ISAs and other financing instruments issued by Lambda were void and unenforceable under California Law due to Lambda's lack of approval to operate.

41.    Throughout 2019 and 2020, prior to Lambda's August 17, 2020 approval, Lambda and Mr. Allred further misrepresented Lambda's approval status by using a number of recognized attributes of an approved academic institution in its advertising and promotional materials. During this period, Lambda's name, website, and the website URL itself – lambdaschool.com – used the term "school", and Lambda's website, ads, and social media continuously displayed the following school crest:

*Screenshot from Lambda's website on April 22, 2020.*



---

[9] Rosalie Chan, *The hot Silicon Valley coding bootcamp Lambda School is paying a $75,000 fine for not registering properly with the state of California*, Business Insider (Aug. 29, 2019, 6:32 PM), https://www.businessinsider.com/lambda-school-coding-bootcamp-california-bppe-2019-8.

[10] Rosalie Chan, *A California official says red-hot coding bootcamp Lambda School is violating state law if it operates without the right registration — but the company insists classes can go on*, Business Insider (Aug. 30, 2019, 8:54 PM), https://www.businessinsider.com/lambda-school-california-state-law-coding-bootcamp-y-combinator-2019-8.

42.     During this period, Lambda's website, online ads, and social media continuously and repeatedly referred to various features of an approved academic institution, including, for example, a "curriculum," "tuition," "students," "student body," being "enrolled," an academic "schedule," "graduates," "mentors," "grades," "lectures," "homework," and "career support": [11]

*Screenshot from Lambda's website on May 6, 2020.*



---

[11] *See, e.g.*, Lambda School (@LambdaSchool), Twitter (Dec. 10, 2019, 9:52 PM), https://twitter.com/bloomtech/status/1204609786718801922; Lambda School Instagram (Mar. 16, 2020), https://www.instagram.com/p/B9zG7NvjhyS/; *Curriculum*, Lambda School Website, [archived by the Wayback Machine (May 6, 2020), https://web.archive.org/web/20200506051614/https://lambdaschool.com/curriculum].

*Screenshot of a March 16, 2020 Lambda Instagram post.*



43.     Mr. Allred furthered the appearance that Lambda was approved to operate in similar terms. In his "Letter from the CEO" at the beginning of Lambda's March 2020 outcomes report (which was publicly available on the Lambda website), he refers to the Lambda "student body" growing to 2,900, with Lambda staff growing to 200, and moving the Lambda headquarters to an office building in downtown San Francisco based on that growth. He refers to a "curriculum" that is "mastery-based," "graduation," "career support," and "the school." He acknowledged that Lambda "students place great trust in Lambda School when they enroll, and they make incredible investments of time and energy while engaged in our programs."[12]

44.     Had Claimant been aware that Lambda was operating without a license, was not approved to operate, and that its future legal status was uncertain, Claimant would not have signed a tuition payment plan that indebted Claimant for up to $30,000 to Lambda. Indeed, no

---

[12] *See* Austen Allred, *Announcing the Release of Our H1 2019 Student Outcomes Report*, Lambda School Website (Mar. 27, 2020), [archived by the Wayback Machine (Apr. 23, 2020), https://web.archive.org/web/20200423031203/https://lambdaschool.com/the-commons/announcing-the-release-of-our-h1-2019-student-outcomes-report] (last visited November 27, 2023).

reasonable consumer would enroll and indebt themselves to a program operating unlawfully and under orders to close.

45.    Claimant's tuition payment plan constitutes a "note, instrument, or other evidence of indebtedness relating to payment for [students'] educational program," under the California Education Code, and therefore, as a matter of law, is "void and not enforceable." California Education Code § 94917.

### C.    LAMBDA'S FALSE AND MISLEADING JOB PLACEMENT RATES

46.    Lambda's selling point to Claimant and other students was that it would land them a job—and thus bring financial success. Mr. Allred described Lambda as "entirely vocational, we're a trade school basically, and we want to help you make as much money as you can."[13]

47.    Lambda's record of placing students in computer technology jobs was therefore a critical piece of information for Claimant and others considering attending Lambda. Respondents knew that students would only enroll if Lambda would help them secure a job. As Lambda described it, job placement is "the most critical component of Lambda's operations, not only in the School's obligation to its students, but to the prosperity of the company as a whole." *See* ¶ 53, *infra*.

48.    To that end, for the past six years, since Lambda's inception, and continuously through today, Lambda and Mr. Allred have engaged in an extensive and long-term campaign to advertise false and misleading job placement rates, intending that potential students like Claimant would review those rates and enroll at Lambda as a result of those rates.

49.    Lambda and Mr. Allred have prominently displayed false and misleading information on Lambda's purported record of job placement on the Lambda website, in marketing materials and outcomes reports, in a variety of online and social media advertisements (upon information and belief, including Google, YouTube, and various social media), and

---

[13] Y Combinator Interview at 13:00.

through social media postings and comments, including Mr. Allred's personal social media accounts.

### 1.    False and misleading job placement rates on Lambda's website and outcomes reports

50.    Throughout 2018 and 2019, Lambda's website advertised job placement rates of over 80%. Lambda and its executive leadership, including Mr. Allred, knew that these widely disseminated rates were false and misleading.

51.    On August 2, 2018, Mr. Allred, Ben Nelson (co-founder and CTO), and Ryan Holdaway (VP of Outcomes), stated the following in a post on the Lambda School Blog: *"[E]very single* Lambda School graduate who has been on the job market for six months is either employed in a full-time role as a software engineer or has joined an early startup working for equity."[14]

52.    Yet on August 3, 2018—the very next day—Lambda's executive leadership team reprimanded Lambda's Director of Career Readiness for poor job placement rate performance, sending her an "Employee Corrective Action Form." The form stated that the employee's "performance in recent months has not met the expectations for the Career Coach/Director of Career Readiness role at Lambda School. Overall placement numbers are low and the time to placement is much higher than desired."

53.    The Corrective Action Form continued:

Placements are the most critical component of Lambda's operations, not only in the School's obligation to its students, but to the prosperity of the company as a whole. A common discussion point in regards to Outcomes is that current placement rates are too low and time to placement is too high. Creative tactics and adjustments to current careers processes as well as follow through are needed to improve both of these measurements. . . .

CS1 students graduated on 1/19/18. Since then we've had a new class graduate approximately every five weeks. As of 8/1/18, only 16 students of the 48 graduated students assigned to [the Lambda career placement employee] have been placed.

---

[14] Austen Allred, *Introducing Lambda Next — Our Revolutionary New Job Search and Placement Program*, Medium: Lambda School Blog (Aug. 2, 2018), https://medium.com/lambda-school-blog/introducing-lambda-next-our-revolutionary-new-job-search-and-placement-program-603ef12f7d37 (emphasis added).

54.    Two months later, on October 8, 2018, Lambda continued to tout its high job placement rates, announcing on its website: "Since Lambda School's inception in April 2017, over 75 Lambda School graduates have been hired, including 83% of early cohorts, with an average salary increase of over $47,000 per hired graduate."

55.    Lambda's website contained the following statement across the top of the page:

*Screenshot from Lambda's website on December 13, 2018.*



56.    The representation of an 83% job placement rate remained on the Lambda website until on or about February 2019.

57.    From on or about April 2019 until at least December 2019, Lambda's website advertised an ever higher job placement rate: over 85%. For example, on April 18, 2019, Lambda's website contained the following statement across the top of the page:

*Screenshot from Lambda's website on April 18, 2019.*



58.    Yet in May of 2019—at the same time Lambda was advertising an 85.9% job placement rate on its website—Lambda executives sent a private memorandum to investor Y Combinator confirming the falsity of the rates it was publicly promoting. *See* Lambda

Memorandum to Investors, *Human Capital: The Last Unoptimized Asset Class* at 10 (May 2019), attached hereto as <u>Exhibit I</u>. The May 2019 memo stated:

> **We're unable to place students at scale**
> - We're at roughly 50% placement for cohorts that are 6 months graduated
> - Placement to date has been manual and one-off, which isn't possible at scale

Ex. I at 10.

59.     After the memorandum was published in news accounts two years later, Mr. Allred confirmed in a tweet from his personal account that he had told investors that Lambda had a 50% placement rate, stating: "The 50% came from me telling investors about what % of enrolled students get jobs that require repayment."

60.     Despite Mr. Allred's contrary statement to investors, Lambda's website continued to promote a 85.9% or 86% placement rate through the end of 2019. These rates were false and misleading.

61.     On December 14, 2019, Lambda's homepage stated:



*Screenshot from Lambda's website on December 14, 2019.*

62.     This statement was false and directly contrary to the true facts known to Lambda and Mr. Allred, which had privately been disclosed to investors, as described above.

63.     When asked in an interview to explain the discrepancy between the representations on Lambda's website and representations to its investors, Mr. Allred explained:

"I mean you're literally looking at what are the risks, right? Like, we're going to pick our lowest number for that – there are cohorts that have been at 50% placed within 6 months, yes."[15]

64.    When asked whether the advertised 86% job placement rate was accurate, he stated: "the way that that number was measured was an average across cohorts at a specific time. I don't know what it is right now, but that's directionally correct."[16]

65.    On February 19, 2020, New York Magazine published an article titled "Lambda School's Misleading Promises," in which the writer concluded that Lambda was "selling unprepared students an incomplete education, fueled by overpromising marketing and misleading, if not downright fraudulent, figures."[17] The story described Lambda's job placement rate misrepresentations and also recounted an interview with a former employee who "confirmed . . . that the company's own internal numbers, which the interviewee was provided as part of their interview process, seem to indicate a roughly 50 percent or lower placement rate."[18]

66.    Lambda nonetheless persisted in promoting false and misleading job placement statistics on its website and elsewhere.

67.    In 2020, Lambda started to promote its placement rates through "outcomes reports" published on its website and shared through social media. Multiple outcomes reports included an "Independent Accountants' Report" directed "To the Management" of "Lambda Inc." located at "250 Montgomery Street[,] San Francisco, CA 94104".

68.    The first outcomes report, titled "H1 2019 Outcomes Report," was published on March 27, 2020,[19] and reported a 79% placement rate.[20]

---

[15] Woo Interview at 13:00-14:30.

[16] *Id.* at 11:13-11:26.

[17] Vincent Woo, *Lambda School's Misleading Promises*, New York Magazine (Feb. 19, 2020), https://nymag.com/intelligencer/2020/02/lambda-schools-job-placement-rate-is-lower-than-claimed.html.

[18] *Id.*

[19] *See* Austen Allred, *Announcing the Release of Our H1 2019 Student Outcomes Report*, Lambda School Website (Mar. 27, 2020), [archived by the Wayback Machine (Apr. 23, 2020), https://web.archive.org/web/20200423031203/https://lambdaschool.com/the-commons/announcing-the-release-of-our-h1-2019-student-outcomes-report].

[20] *See H1 2019 Report Lambda School Outcomes Report*, Lambda School Website, [archived by

69.     The 79% placement rate remained up on Lambda's website until December 3, 2020, when Lambda published its "H2 2019 Outcomes Report."[21] The H2 2019 report showed a 74% placement rate.[22]

70.     The 74% rate announced in the H2 2019 report remained up on Lambda's website until November 7, 2021, when Lambda announced its 2020 outcomes.[23] In the 2020 outcomes report, Lambda announced that the placement rate remained at 74%.

71.     Until November 1, 2022, Lambda continued to report the 74% placement rate from the 2020 outcomes report on its website:

# 74%

Job placement rate for BloomTech graduates

**BloomTech 2020 Outcomes Report**

*Screenshot from Lambda's homepage on September 30, 2022.*[24]

---

the Wayback Machine (Sept. 3, 2020),
https://web.archive.org/web/20200903023542/https:/lambdaschool.com/reports/2019-outcomes-report].

[21] *See* Austen Allred, *Announcing the Release of Our H2 2019 Student Outcomes Report*, Lambda School Website (Dec. 3, 2020), [archived by the Wayback Machine (Dec. 14, 2020), https://web.archive.org/web/20201214214247/https:/lambdaschool.com/the-commons/announcing-lambda-school-h2-2019-student-outcomes-report].

[22] *Id. See also H2 2019 Report Lambda School Outcomes Report*, Lambda School Website [archived by the Wayback Machine (Dec. 3, 2020), https://web.archive.org/web/20201203230224/https:/lambdaschool.com/reports/h2-2019-outcomes-report].

[23] *See Bloom Institute of Technology 2020 Outcomes Report,* Bloom Institute of Technology, [archived by the Wayback Machine (Nov. 25, 2021), https://web.archive.org/web/20211125162824/https:/www.bloomtech.com/reports/outcomes-report].
It appears that Lambda only published one outcomes report in 2020. *See BloomTech Reports*, Bloom Institute of Technology Website, https://www.bloomtech.com/reports/archive (last visited Mar. 14, 2023).

[24] *See Built For Your Success*, Bloom Institute of Technology Website, [archived by the Wayback Machine (Sept. 30, 2022) https://web.archive.org/web/20220930032702/https:/www.bloomtech.com/outcomes].

72.     On November 2, 2022, Lambda published the "BloomTech 2021 Outcomes Report," advertising a 90% placement rate. As of November 2, 2022, Lambda's website provided:

# 90%

Job placement rate for BloomTech graduates

**BloomTech 2021 Outcomes Report**

*Screenshot from Lambda's homepage on November 27, 2022.*[25]

73.     In a "Letter from the CEO" dated November 2, 2022, Mr. Allred wrote: "In this independently examined report, you'll gain a transparent view of how our learners and graduates fared in 2021. Our biggest takeaway: A full **90% of our 2021 graduates have landed jobs**, which is the highest rate in our company's history."[26]

74.     Lambda's homepage continued to advertise a 90% placement rate until January 2024, when it updated the rate, touting an "86% job placement rate in 2022 for job-seeking grads."[27]

75.     Like the earlier rates from 2018 and 2019, the rates Lambda published from 2020 to the present (including, but not limited to, the 79%, 74%, 90%, and 86% rates from the Lambda website and outcomes reports) were, and continue to be, false and misleading. Lambda and its executive leadership, including Mr. Allred, knew that these widely disseminated rates were false and misleading.

---

[25] *See Built For Your Success,* Bloom Institute of Technology Website, [archived by the Wayback Machine (Nov. 27, 2022), https://web.archive.org/web/20221127122732/https://www.bloomtech.com/outcomes].
[26] *See* Austen Allred, *Letter from the CEO*, Bloom Institute of Technology Website (Nov. 2, 2022), https://www.bloomtech.com/reports/outcomes-report#letter (last visited Mar. 14, 2023) (emphasis in original, internal citation omitted).
[27] *See* Bloom Institute of Technology Home Page, https://www.bloomtech.com/ (last visited December 6, 2023).

76.    Business Insider reported in October 2021 that documents from a Lambda "all-hands" staff meeting in January 2021 "showed that Lambda School placed only around 30% of its 2020 graduates in qualifying jobs during the first half of 2020. This figure is in stark contrast to the 74% placement rate it advertised for its 2019 graduates, the latest figure the school has made publicly available. . . ."[28]

77.    This "all hands" meeting took place one month after Lambda published the 74% placement rate in the H2 2019 Outcomes Report.

78.    A slide prepared by Lambda reveals that the H1 2020 placement rate was only 33% and the H2 2020 rate was 40%, a far cry from the 74% listed on the Lambda website until November 2, 2022. According to the same slide, Lambda's H1 2021 *goal* was 60% placement and H2 2021 *goal* was 80%:

## Long-Term Student Success Goals

|  | H1 2020 | H2 2020 | H1 2021 | H2 2021 | Metric | Description |
|---|---|---|---|---|---|---|
| **Admissions** | 1277 | 1450 | TBD | TBD | Unit 2 Starts | # students starting Unit 2. |
| **School** | 52% | 56% | 60% | 80% | % Graduating within 11 Units | % of students who start Unit 2 complete coursework within 11 units. |
| **Outcomes** | 33% | 40% | 60% | 80% | % Qualified Placement within 180 days | % of graduates get high paying jobs within 180 days. |
| **Repayment** | 72% | 79% | 85% | 87% | % Repaying within 60 days | % of qualified placed graduates have made a first payment within 60 days. |

79.    On information and belief, a Lambda executive presented the slide at the "all-hands" meeting at Lambda's headquarters in San Francisco, California.

---

[28] *See* Vincent Woo, *Lambda School promised a fast and cheap path to a lucrative tech career. Leaked documents and former students cast doubt on that claim*. Business Insider (Oct. 25, 2021, 7:30 AM), https://www.businessinsider.com/lambda-school-promised-lucrative-tech-coding-career-low-job-placement-2021-10.

80.    Another slide, titled "Lambda H1 Company OKRs," provided that the "actual" placement rate for H1 2020 was 33% of graduates placed within 180 days, and the actual rate for H2 2020 (as of October 2020) was 27% of graduates placed within 180 days. This slide also listed the H1 2021 goal as 60%:

## Lambda H1 Company OKRs

|  | H1 2020 | H2 2020 | H1 2021 | Metric | Description |
|---|---|---|---|---|---|
| **Admissions Goal** <br> Admissions Actual | n/a <br> 1277 | 1450 <br> ~850 | 1500 | Unit 2 Starts | # students starting Unit 2. |
| **School Goal** <br> School Actual | n/a <br> 52% | 56% <br> 52% | 60% | Extended Grad Rate % | % of students who start Unit 2 complete coursework within expected time window |
| **Outcomes Goal** <br> Outcomes Actual | n/a <br> 33% | 40% <br> 27% | 60% | % Qualified Placement within 180 days | % of graduates get high paying jobs within 180 days. |
| **Repayment Goal** <br> Repayment Actual | n/a <br> 41% | 75% <br> 73% | 85% | % Repaying within 60 days | % of qualified placed graduates have made a first payment within 60 days. |
| **Alumni Goal** | n/a | n/a | 40% | % Alumni Giving back | % of hired alumni giving back |

*H2 2020 Actuals as of October 2020

81.    Another slide, reportedly used at another all-hands meeting in February 2021, broke out the 180-day placement rates by month, from February to July 2020, as follows:

| Graduation Month | Qualified Placed % <br> (days elapsed since graduation) | | |
|---|---|---|---|
| **Month** | **+90d** | **+180d** | **QP Now** |
| Feb - 2020 | 20% | 31% | 41% |
| Mar - 2020 | 19% | 30% | 36% |
| April - 2020 | 17% | 24% | 32% |
| May - 2020 | 13% | 27% | 32% |
| Jun - 2020 | 15% | 25% | 27% |
| Jul - 2020 | 18% | 24% | 25% |
| Aug - 2020 | 16% | | 21% |
| Sept - 2020 | 13% | | 14% |
| Oct - 2020 | 10% | | 11% |
| Nov - 2020 | | | 11% |
| Jan - 2021 | | | 11% |
| **Weighted Avg.** | 16% | 27% | |
| **H2 Goal** | | 40% | |

82.    In yet another slide, reportedly also used at the "all hands" meeting on January 28, 2021, Lambda's H1 2021 "goal" was to enroll 500 students a month and place 50% to 70% in qualifying jobs. The graph also shows that, if Lambda enrolled 2,000 students per month, it could become profitable even if fewer than half of its students found jobs:



83.    Prior to signing a tuition payment plan, Claimant read Respondents' representations that Lambda's job placement rate was above 70%. Lambda's purported record of successfully placing students was critical to Claimaint's decision to enroll.

### 2.    Lambda's false and misleading statements about job placement in social media postings and comments.

84.    In addition to advertising job placement rates on its website and in outcomes reports, Lambda's job placement marketing campaign aimed at potential students expanded to social media posts and comments, including Twitter, Facebook, and Instagram. Like the rates on its website and in outcomes reports, these rates, ranging from 71% to at least 91%, were false and misleading. Lambda and its executive leadership, including Mr. Allred, knew that these widely disseminated rates were false and misleading, and intended that potential students like Claimant would review those rates and enroll at Lambda as a result of those rates.

85.    Examples of false and misleading job placement rates on Lambda's Twitter, Facebook, and Instagram accounts include:

a)  April 6, 2018, Lambda Twitter: "Time for another update on placement. Students hired by Lambda School are not included. Cs1: 75% hired within first two months of search."[29]

b)  March 5, 2019, Lambda's Twitter account linked to a report touting an 85.9% job placement rate and stated: "Lambda only succeeds when our students succeed, and we're committed to a transparent, no-surprises approach to education."[30]

c)  April 22, 2020, Lambda Instagram: "Percentage of H1 2019 graduates that have been placed into jobs. → 71%"[31]



---

[29] Lambda School (@LambdaSchool), Twitter (Apr. 6, 2018, 12:39 PM), https://twitter.com/bloomtech/status/982311747301330944.

[30] Lambda School (@LambdaSchool), Twitter (Mar. 5, 2019, 7:02 PM), https://twitter.com/bloomtech/status/1103083315945328640.

[31] Lambda School (@LambdaSchool), Instagram (Apr. 22, 2020), https://www.instagram.com/p/B_S2M-Llm2y/.

d)  September 27, 2021, Lambda Instagram: "77% of H2 2019 job-seeking Data Science graduates were hired. 94% [o]f those hired graduates go the job in the first 180 days"[32]



e)  November 3, 2022, Lambda Instagram: "90% of our 2021 alumni gained in-demand skills and landed great jobs—our highest placement rates *ever*!"[33]



---

[32] Lambda School (@LambdaSchool), Instagram (Sept. 27, 2021), https://www.instagram.com/p/CUWJM1qJlEB/?img_index=4.

[33] Bloom Tech (@Bloomtechofficial), Instagram (Nov. 3, 2022), https://www.instagram.com/p/CkgVeHBrmP9/.

f)  November 3, 2022: Lambda Facebook: "90% of our 2021 alumni gained in-demand skills and landed great jobs—our highest placement rates *ever*!"[34]

g)  November 3, 2022, Lambda Twitter: "90% of our 2021 alumni gained in-demand skills and landed great jobs—our highest placement rates *ever*!"[35]

h)  November 4, 2022, Lambda Facebook: "Fun Fact: Did you know, 90% of our 2021 full Stack Web job-seeking graduates found a job after BloomTech?"[36]

i)  November 7, 2022, Lambda Facebook: "91% of our 2021 job-seeking Data Science graduates found a job 😮"[37]

j)  November 9, 2022, Lambda Instagram: "91% of 2021 job-seeking Data Science grads found a job after BloomTech"[38]

### 3.  **Mr. Allred's false and misleading statements about job placement were a driving force behind Lambda's job placement rate marketing campaign.**

86.    At all times relevant to this complaint, Mr. Allred was the driving force behind Lambda's job placement rate marketing campaign. Rather than passively overseeing the campaign, he personally spearheaded Lambda's dissemination of false and misleading rates, oftentimes promoting the rates himself on his own social media accounts.

87.    For example, since March 2020, when Lambda first promoted its job placement rates through outcomes reports, each outcomes report has begun with a personalized letter from Mr. Allred titled "Letter from the CEO," vouching for the rates in the report. The reports end with Mr. Allred's signature.

---

[34]Bloom Tech (@BloomTech), Facebook (Nov. 3, 2022), https://www.facebook.com/BloomTech/posts/pfbid0C9MRRryV1zaMpSXa35QnogkPDAR984b js9xmen4WJB4SWMtkWAn2kxZ7BRC11Kdhl.

[35] Bloom Tech (@BloomTech), Twitter (Nov. 3, 2022, 11:15 AM), https://twitter.com/bloomtech/status/1588203108013850629.

[36] Bloom Tech (@BloomTech), Facebook (Nov. 4, 2022), https://www.facebook.com/BloomTech/posts/pfbid025d3iVN2usd1eLKfwTMCh78a3kVNpsmU cRCsMXWinqtYX4tHqLbkDHQz9mhqUZuanl.

[37] Bloom Tech (@BloomTech), Facebook (Nov. 7, 2022), https://www.facebook.com/BloomTech/posts/pfbid0UpByQ5eFsctoNH51QuK1DPrTXYXvaU9 cPbE2H6weYnnvR2YbpWF2m8vLGbuuoUhol.

[38] Bloom Tech (@Bloomtechofficial), Instagram (Nov. 9, 2022), https://www.instagram.com/p/CkwHe8ivDND/.

88.    Mr. Allred also advertised false and misleading rates on his personal Twitter account:

a)    March 13, 2019: In response to a commenter asking about a $60,000 median salary and 83% 6-month employment rate for Lambda's main web track, Mr. Allred responded, "That's low now, but our average student increases his or her income by $47,000."[39]

b)    March 15, 2019: "Lambda School's first iOS class graduates today. 66% of them are already **hired.**"[40]

c)    November 16, 2019: "First track just graduated. Hit 100% hired but was VERY small sample size." Subsequent reporting revealed that this small sample size consisted of a single student.[41]

d)    November 3, 2022: "I am so incredibly excited to finally be able to share BloomTech's 2021 Outcomes Report. Highlights: *All-time high 90% placement rate for job-seeking grads".[42]

89.    Other examples of false, misleading, and exaggerated claims on Mr. Allred's Twitter account include:

a)    January 24, 2021: "I think we're like 2-3 solvable problems being solved away from 100% of Lambda School grads being hired. Still a lot of unknowns, but I think it will be possible." When a commenter asked what the problems were, Mr. Allred responded: "Boring stuff."[43]

b)    April 22, 2021: "When I started Lambda School early detractors gave me hell because I said that Lambda School would cause thousands of people to become millionaires who wouldn't have otherwise been. It's now pretty clear that was very conservative."[44]

---

[39] Austen Allred (@Austen), Twitter (Mar. 13, 2019, 12:14 PM), https://twitter.com/Austen/status/1105879911036665856.

[40] Austen Allred (@Austen), Twitter (Mar. 15, 2019, 5:20 PM), https://twitter.com/Austen/status/1106681485275205634.

[41] *See* Zoe Schiffer & Megan Farokhmanesh, *The High Cost of a Free Coding Bootcamp*, The Verge (Feb. 11, 2020, 11:15 EST), https://www.theverge.com/2020/2/11/21131848/lambda-school-coding-bootcamp-isa-tuition-cost-free; Ryan Mac (@RMac18), Twitter (Feb. 11, 2020, 1:59 PM), https://twitter.com/RMac18/status/1227306243733295108.

[42] Austen Allred (@Austen), Twitter (Nov. 3, 2022, 12:20 PM), https://twitter.com/Austen/status/1588219699157905408.

[43] Austen Allred (@Austen), Twitter (Jan. 24, 2021, 1:55 AM), https://twitter.com/austen/status/1353234915643568128.

[44] Austen Allred (@Austen), Twitter (Apr. 22, 2021, 10:24 AM), https://twitter.com/Austen/status/1385238109185396740.

      c)  May 4, 2021: "I get to watch a bunch of people double their income (or more) every single day. Even the worst days are punctuated by a bunch of people changing their lives and the lives of their families forever."[45]

      d)  May 4, 2021: "You can go from near poverty to huge future wealth in just a few months."[46]

      e)  November 24, 2022: "Thankful today for all those who have worked so hard for BloomTech (by current name or by Lambda School). So many people working so diligently. Thousands of lives changed, billions in increased earnings."[47]

90.     Mr. Allred and Lambda acted willfully and knowingly to disseminate Lambda's job placement representations to the public—including applicants to their school such as Claimant—with knowledge that they were, and continue to be, false and misleading.
.

### D.    LAMBDA MISREPRESENTS THAT IT ONLY GETS PAID ONCE STUDENTS DO

91.     In addition to the placement rates, Lambda and Mr. Allred misled potential students like Claimant with the frequently repeated declaration that: "We don't get paid until you do, so we're in this together, from your first day of classes to your first day on the job."[48] For example, on June 27, 2019, Lambda's homepage stated:



## Higher learning. Higher earning.

Lambda is designed for student success. We don't get paid until you do, so we're in this together, from your first day of classes to your first day on the job — and beyond.

*Screenshot from Lambda's homepage on June 27, 2019.*

---

[45] Austen Allred (@Austen), Twitter (May 4, 2021, 11:50 PM), https://twitter.com/Austen/status/1389789532761956352.

[46] Austen Allred (@Austen), Twitter (May 4, 2021, 11:53 PM), https://twitter.com/Austen/status/1389790386659364868.

[47] Austen Allred (@Austen), Twitter (Nov. 24, 2022, 9:51 AM), https://twitter.com/austen/status/1595822473781485568.

[48] *See, e.g.*, Apply Now Pages, Lambda School Website [archived by the Wayback Machine (June 27, 2019), https://web.archive.org/web/20190627024024/https://lambdaschool.com/].

92.     Mr. Allred regularly touted that Lambda only gets paid when students do on his personal social media accounts and the Lambda website, describing Lambda's business as based on shared and aligned incentives between Lambda and its students:

    a)  "The main directive in everything we did can be summed up in two words: incentive alignment."[49]

    b)  "Our mission from day one has been to **align the incentives of school and student**, giving more people the opportunity they deserve to land a great job with a higher income. If our students don't succeed, our school shouldn't either."[50]

93.     In reality, Lambda packaged and sold its tuition payment plans, including ISAs, to investors long before students obtained employment. As early as May 2019, Lambda privately told investor Y Combinator: "Currently we sell some income share agreements to hedge funds." Exhibit I at 2.

94.     To facilitate the sale of ISAs, Lambda partnered with Edly, a digital marketplace that helps schools sell ISAs to third-party investors. On December 11, 2019, Edly tweeted: "Pleased to announce our latest offering [–] a Lambda School ISA Pool. We @edlyISA are excited to work with the amazing team @LambdaSchool[], one of the most impactful ISA programs in the country."[51] To learn how to participate, Edly invited interested investors to join a webinar that night with Mr. Allred.[52]

---

[49] Austen Allred, LinkedIn (2019), https://www.linkedin.com/posts/austenallred_announcing-our-new-isa-financing-blueprint-activity-6636140633306333184-dkOh?utm_source=share&utm_medium=member_desktop.

[50] *See* Austen Allred, *Announcing the Release of Our H1 2019 Student Outcomes Report*, Lambda School Website (Mar. 27, 2020), [archived by the Wayback Machine (Apr. 23, 2020), https://web.archive.org/web/20200423031203/https://lambdaschool.com/the-commons/announcing-the-release-of-our-h1-2019-student-outcomes-report] (emphasis in original).

[51] @edlyISA, Twitter (Dec. 11, 2019, 3:01 PM), https://twitter.com/edlyISA/status/1204853625459216385 (on file with Claimant's counsel).

[52] @edlyISA, Twitter (Dec. 11, 2019, 3:02 PM), https://twitter.com/edlyISA/status/1204853900177743872(on file with Claimant's counsel).

95.    Lambda did not disclose this fact to students until public reporting exposed it, and for many months Mr. Allred flatly denied it, stating in October 2019 on Twitter that "We never, ever get paid up front for ISAs."[53]

96.    Claimant read the false and misleading statement on the Lambda website that Lambda only got paid once the student does and, as a result, believed that Lambda would only get paid once Claimant secured a qualifying job. Knowing that Lambda only got paid if Claimant obtained employment was important to Claimant's decision to attend.

E.    **LAMBDA ENGAGED—AND STILL ENGAGES—IN THE UNLAWFUL BUSINESS PRACTICE OF UNLICENSED LENDING**

97.    The California Financing Law "shall be liberally construed and applied to promote its underlying purposes and policies," which include "protect[ing] borrowers against unfair practices by some lenders, having due regard for the interests of legitimate and scrupulous lenders." Cal. Fin. Code § 22001(a)(4).

98.    Pursuant to the California Financing Law: "No person shall engage in the business of a finance lender or broker without obtaining a license from the commissioner." Cal. Fin. Code § 22100(a).

99.    Lambda is not and never has been registered in California as a finance lender or broker under the Financing Law.

100.    Since its inception, Lambda has operated as a "finance lender" because its tuition payment plans qualify as either consumer or commercial loans under the Financing Law. *See generally* Cal. Fin. Code § 22203-04 (defining consumer loans); Cal. Fin. Code § 22502 (defining commercial loans).

101.    Lambda's Meratas ISA provides:

THIS IS NOT A LOAN
In making monthly payments to Lambda School, you will not be repaying a student loan. In the case of a student loan, a student borrows a set amount and repays the principal amount of the loan plus interest or a finance charge, or both. Under this agreement, you

---

[53] Woo Interview at 6:30 (wherein Mr. Allred confirms that this tweet was "totally correct").

will instead pay a fixed percentage of your income each month for
up to a maximum number of payments.

102.    Contrary to this representation, ISAs are a form of student loan.

103.    According to the United States Consumer Financial Protection Bureau ("CFPB"),
a representation that an ISA is "not a loan" is deceptive and misleading under the Consumer
Financial Protection Act because "ISAs are loans and do create debt."[54]

104.    The California Department of Financial Protection and Innovation ("DFPI")
agrees, holding that ISAs are student loans: "ISAs made solely for use to finance a postsecondary
education are 'student loans' for the purposes of the SLSA [California Student Loan Servicing
Act]."[55]

105.    The United States Department of Education concurs, finding that ISAs "used to
finance expenses for postsecondary education are private education loans under 34 C.F.R.
601.2(b)."[56]

106.    The BPPE also found in its June 22, 2020, order denying Lambda approval to
operate that Lambda's ISA is "an instrument or evidence of indebtedness" under the California
Education Code. *See* June 22, 2020 Letter from BPPE to Lambda at 5, attached hereto as Exhibit
F.

---

[54] *See* Better Future Forward, Inc., et al., CFPB No. 2021-CFPB-0005, Consent Order at ¶ 23
(Sept. 7, 2021) (finding *available at:* https://files.consumerfinance.gov/f/documents/cfpb_better-
future-forward-inc_consent-order_2021-09.pdf).
[55] *See In the Matter of Student Loan Servicing Act License Application of Meratas Inc.* NMLS
No. 2120180, Consent Order at ¶ M (Ca. Dep't of Fin. Prot. and Innovation Aug. 5, 2021),
*available at:* https://dfpi.ca.gov/wp-content/uploads/sites/337/2021/08/Meratas-Consent-
Order.pdf; *see also* Press Release, California Dep't of Fin. Prot. and Innovation, "California
DFPI Enters Groundbreaking Consent Order with NY-Based Income Share Agreements
Servicer" (Aug. 5, 2020), https://dfpi.ca.gov/2021/08/05/california-dfpi-enters-groundbreaking-
consent-order-with-ny-based-income-share-agreements-servicer/.
[56] *See* FSA Announcement, General-22-12, *Income Share Agreements and Private Education
Loan Requirements* (Mar. 2, 2022), https://fsapartners.ed.gov/knowledge-
center/library/electronic-announcements/2022-03-02/income-share-agreements-and-private-
education-loan-requirements. *See also* 87 Fed. Reg. 65,453 ("[T]he Department clarifies that
ISAs and other alternative financing products should be treated like institutional loans.").

107.    Because Lambda is in the business of making ISAs and other tuition payment plans, it is operating as a finance lender under the California Financing Law.

108.    Lambda's failure to register as a finance lender deprived Claimant of the borrower protections provided by the California Financing Law.

109.    Lambda has therefore engaged in the unlawful business practice of making a loan without a license in violation of California Financial Code § 22100, and, in turn, in violation of the unlawful prong of the UCL.

110.    Had Claimant been aware that Lambda was acting as an unlicensed finance lender, Claimant would not have signed a tuition payment plan that indebted Claimant for up to $30,000 to Lambda.

F.    **CLAIMANT'S ENROLLMENT AND ATTENDANCE AT LAMBDA, AND THE AFTERMATH**

111.    Claimant Rob Bennett was looking to make a career transition in 2019. In his late 30s, he had spent his career in hospitality management but was increasingly interested in data science and machine learning. He researched his options for continuing education in tech and first heard of Lambda through a friend.

112.    As he was weighing various educational options, Mr. Bennett reviewed the Lambda website for more information throughout November and December 2019. He reviewed, and was impressed by, the 86% job placement rate featured prominently on the Lambda homepage, as well as Lambda's self-described robust job placement program. Mr. Bennett also liked that Lambda did not require tuition payments up front, and that, through an ISA, Lambda was invested in student outcomes. He saw the statement on the Lambda website that Lambda did not get paid until the student did, convincing Mr. Bennett that Lambda was equally invested in student outcomes, including his.

113.    Mr. Bennett further saw Lambda advertisements on Facebook and listened to a podcast with Mr. Allred, all of which reinforced the information from the website and Mr. Bennett's interest in applying.

114.     The high 86% placement rate and the representation that Lambda only got paid once students do were critical to Mr. Bennett's decision to enroll, convincing him that enrolling at Lambda would maximize his chance of landing a data science job after completing Lambda coursework.

115.     But both the 86% job placement rate and the statement that Lambda only got paid once students do were false and misleading, and both Lambda and Mr. Allred knew these representations were false and misleading. (*See* ¶¶ 46–90, *supra*.)

116.     Mr. Bennett further believed that Lambda was approved to operate due to Respondents' continuous and repeated descriptions of the school and its programs on the Lambda website, Lambda ads, and social media of various features of Lambda that conveyed that it was a credible, legitimate, and lawfully operating school. These included, but were not limited to, descriptions of Lambda's curriculum, students, graduates, grades, attendance requirements, cohort style classrooms, lectures, homework, and career support.

117.     Swayed by Respondents' false job placement rates, their false statements that they only got paid once students do, and their false representations that Lambda was a government-approved school, Mr. Bennett signed an ISA with Lambda on April 9, 2020 (Exhibit A).

118.     Had Respondents truthfully represented Lambda's job placement rates, or had they truthfully represented their actual financial interest in students' success, or had Mr. Bennett known that Lambda was not lawfully approved to operate, he would not have enrolled in Lambda's educational services, or signed an ISA that indebted him up to $30,000 of tuition to Lambda.

119.     Mr. Bennett began attending Lambda soon after signing his ISA. Although he completed the program in November 2020, his education was nothing like he imagined when researching Lambda. Students in his cohort dropped from dozens to a handful, support from instructors was minimal, instructors repeatedly disappeared after Lambda let them go, Lambda arbitrarily reduced the program length, and Lambda changed their web portal—effectively cutting off students' access to their prior work and material.

120.    Lambda's job placement support was also a shell of what it had promised. Although Lambda provided a job portal, it lacked useful leads. Lambda's data science career support staff were also cut from two to one soon after Mr. Bennett began his job search. Worse, Mr. Bennett and his peer data science grads nearly uniformly found that their coursework at Lambda did not carry weight with employers who did not appear to trust their skills and experience. Mr. Bennett applied to hundreds of jobs with no callbacks.

121.    After several months of looking, he got a one-year, limited-term ticketing support job with Amazon through a temp agency. It was not a coding/tech job, none of his Lambda coursework related to or prepared him for the job, and his pay was significantly lower than his pre-Lambda work. While Lambda played no role in him getting the job, career support encouraged him to take it, having spent months looking for a data science job (or any tech job) without success.

122.    Mr. Bennett continued looking for tech jobs while working with Amazon, but again, without success. After his Amazon term ended, he found another limited-term, non-coding placement Microsoft, through a temp agency. When the Microsoft position ended a couple months later, he was unemployed for roughly six months, until he found another limited-term, non-coding position with Raytheon, again through a temp agency.

123.    Mr. Bennett ultimately found a permanent position doing project management— again, no coding or data science involved—with Precoa, through a friend's recommendation who worked for the company.

124.    Even though Mr. Bennett's position does not involve coding, data science, or utilizing any skills he learned from his coursework at Lambda, Meratas has required ISA payments—even after an unsuccessful appeal in which Meratas and Lambda refused to explain why his non-coding position triggered ISA payment obligations. He began making payments in April 2023, and as of February 14, 2024, he has made 11 payments totaling over $16,000.

**IV.    CAUSES OF ACTION**

**FIRST CAUSE OF ACTION**
**Violations of California's Consumer Legal Remedies Act**
**Cal. Civ. Code §§ 1750, *et seq.***
**(All Respondents)**

125.    Claimant hereby reincorporates the allegations in the foregoing paragraphs as though fully set forth herein.

126.    The CLRA makes unlawful "unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or that results in the sale or lease of goods or services to any consumer." Cal. Civ. Code § 1770(a).

127.    The CLRA covers transactions involving the sale of services—such as education—to consumers.

128.    Claimant is a "consumer" within the meaning of Section 1761(d) of the CLRA, seeking Lambda's education services for personal, family, or household purposes, and Claimant engaged in "transactions" within the meaning of sections 1761(e)and 1770 of the CLRA.

129.    Education is a "service" within the meaning of Section 1761(b) of the CLRA.

130.    The CLRA enumerates numerous unlawful acts or practices, including:

    a)    "Misrepresenting the source, sponsorship, approval, or certification of goods or services." Cal. Civ. Code § 1770(a)(2).

    b)    "Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that the person does not have." *Id.* § 1770(a)(5).

    c)    "Representing that goods or services are of a particular standard, quality, or grade" when they are not. *Id.* § 1770(a)(7).

    d)    "Advertising goods or services with intent not to sell them as advertised." *Id.* § 1770(a)(9).

131.    In violation of these provisions, Respondents misrepresented to the public, prospective students, and current students, including Claimant, at least the following: (i) its job placement rates; and (ii) that it had approval to operate and enroll students.

132.    Respondents did so in order to induce prospective students, like Claimant, to enroll in Lambda's program—Claimant did so enroll as a result of Respondents' misrepresentations.

**SECOND CAUSE OF ACTION**
**Violations of California's Unfair Competition Law**
**Cal. Bus. & Prof. Code §§ 17200, *et seq.***
**(All Respondents)**

133.    Claimant hereby reincorporates the allegations in the foregoing paragraphs as though fully set forth herein.

134.    Respondents have engaged in business acts or practices that constitute unfair competition as defined in the UCL, in that such business acts and practices are unlawful, unfair, and fraudulent within the meaning of that statute.

135.    The business acts and practices include:

   a)  publishing and/or providing the public, prospective students, and current students, including Claimant, with false, misleading, unreliable, and/or inaccurate job placement rate information;

   b)  conducting business without BPPE approval and in violation of multiple BPPE orders requiring it to cease operations;

   c)  knowingly operating a private postsecondary institution without approval to do so and knowingly conveying to the public that it is an approved institution;

   d)  misrepresenting to the public, prospective students, and current students that in March and July of 2019, the BPPE ordered Lambda to cease operations, stop enrolling students, cease all instructional services, and submit a closure plan, and misrepresenting material facts related to those BPPE orders, including representing that they were stayed when they were not.

136.    Claimant's tuition payment plans constitute "lost money or property" within the meaning of the UCL.

Unlawful Prong

137.    The UCL bars business practices that are forbidden by law. If a business practice violates any law, it is *per se* a UCL violation.

138.    The business acts and practices described above are unlawful because they violate numerous state and federal laws, including but not limited to:

a)    The Federal Trade Commission Act ("FTC Act"), which prohibits "unfair or deceptive acts or practices."[57]

b)    Cal Educ. Code § 94897(b), which provides that institutions shall not "[p]romise or guarantee employment, or otherwise overstate the availability of jobs upon graduation."

c)    The CLRA, *see supra*;

d)    The FAL, *see infra*;

e)    Cal. Educ. Code § 94886, which provides in relevant part that "a person shall not open, conduct, or do business as a private postsecondary educational institution in this state without obtaining an approval to operate under this chapter." Lambda violated this provision, and therefore the UCL's unlawful prong, when it enrolled Claimant without obtaining approval to operate.

f)    Cal. Educ. Code § 94943, which provides that it is a crime to "[k]nowingly operat[e] a private postsecondary institution without an approval to operate." Lambda violated this provision, and therefore the UCL's unlawful prong, when it knowingly enrolled Claimant without approval by the BPPE to operate.

g)    Cal. Educ. Code § 94917, which provides that "[a] note, instrument, or other evidence of indebtedness relating to payment for an educational program is void

---

[57] *See* U.S.C.§ 45(a)(I); 15 U.S.C. § 52(a).

and not enforceable unless, at the time of execution of the note, instrument, or other evidence of indebtedness, the institution held an approval to operate … ."

h) Cal. Educ. Code § 94902(b)(2), which provides that an enrollment agreement is enforceable only if "[a]t the time of the execution of the enrollment agreement, the institution held a valid approval to operate.

i) The California Financing Law, which provides that "[n]o person shall engage in the business of a finance lender or broker without obtaining a license from the commissioner." Cal. Fin. Code § 22100(a).

j) The Consumer Financial Protection Act of 2010, 12 U.S.C. §§ 5531(a), 5536(a)(1)(B), which prohibits covered persons from engaging in unfair, deceptive, or abusive acts or practices.

139.    By violating these and other state and federal laws, Lambda violated the unlawful prong of the UCL.

Fraud Prong

140.    To show that a business practice is fraudulent, it is necessary only to show that members of the public are likely to be deceived.

141.    Respondents' business acts and practices—including its false job placement rate representations and false representations to the Subclass about BPPE approval—are fraudulent in that they are likely to deceive the public.

142.    Each of these false and misleading representations, all of which were material, were substantial factors influencing Claimant to attend Lambda and take out a tuition payment plan that indebted Claimant for up to $30,000.

**THIRD CAUSE OF ACTION**
**Violations of California's False Advertising Law**
**Cal. Bus. & Prof. Code §§ 17500, *et seq.***
**(All Respondents)**

143.    Claimant hereby reincorporates the allegations in the foregoing paragraphs as though fully set forth herein.

144.    Respondents have also engaged in acts or practices that constitute violations of the FAL, Business and Professions Code section 17500, *et seq*., by making or causing to be made untrue or misleading statements with the intent to induce members of the public to purchase Lambda's services. Respondents' untrue or misleading representations include, but are not limited to, the following:

a)    Respondents' statements regarding job placement rates, including but not limited to the published job placement rates prominently displayed on its website, social media, and advertisements;

b)    Respondents' statements, prominently displayed on Lambda's website and elsewhere, that Lambda does not get paid until students do;

c)    Respondents' statements and appearance to the public, prospective students, and current students that its operations were lawful, that BPPE had not ordered Lambda to cease advertising and instructional activities, and that it could lawfully enroll students. Lambda's and Mr. Allred's advertisements and marketing implicitly and explicitly misrepresented the lawfulness of its operations by encouraging the public and prospective students to apply for enrollment.

145.    At the time these representations were made, Respondents knew or by the exercise of reasonable care should have known that the representations were untrue or misleading.

**FOURTH CAUSE OF ACTION**
**Intentional Misrepresentation**
**(All Respondents)**

146.    Claimant hereby reincorporates the allegations in the foregoing paragraphs as though fully set forth herein.

147.    Respondents made statements to Claimant: (a) that were false representations of material fact; (b) that Respondents knew were false or were made recklessly and without regard for their truth; (c) that Respondents intended Claimant to rely upon; (d) that Claimant reasonably

36

relied upon; (e) that Claimant's reliance upon was a substantial factor in causing Claimant damage; and (f) that caused Claimant damage.

148.    The intentional misrepresentations and omissions by Respondents consist of at least the following:

    a)  Respondents' job placement rate statements, prominently displayed on the Lambda website, in outcomes reports, and on social media. Respondents knew these statements were false.

    b)  Respondents' statements, prominently displayed on Lambda's website and elsewhere, that Lambda does not get paid until students do; Lambda knew this statement was false because it sold ISAs to investors long before students were placed in jobs.

    c)  Respondents' representations, both implied and explicit, that it was approved to operate, advertise, enroll, and teach students prior to August 2020. Respondents knew these representations were false because the BPPE had ordered Lambda to cease all operations (including all advertising and instructional activities) and submit a school closure plan. Respondents also knew that they were concealing from students that Lambda was barred from advertising and from enrolling and teaching students.

149.    Respondents intended Claimant to rely on these misrepresentations, as evidenced by Lambda prominently featuring them on its website and on other widely disseminated platforms, as well as by its efforts to avoid disclosing the truth.

150.    Claimant reasonably relied on these widely disseminated representations. Had Claimant known the truth, Claimant would not have enrolled at Lambda.

151.    Lambda, Mr. Allred, and members of his executive leadership team acted willfully and knowingly to disseminate these representations to the public with knowledge that they were false and misleading.

152.    Claimant has been substantially harmed by Lambda's misconduct, which caused Claimant to attend Lambda and take out an ISA that indebted Claimant for up to $30,000 in tuition.

## FIFTH CAUSE OF ACTION
### Negligent Misrepresentation
### (All Respondents)

153.    Claimant hereby reincorporates the allegations in the foregoing paragraphs as though fully set forth herein.

154.    Respondents have also engaged in acts or practices that constitute negligent misrepresentation. *See supra* ¶¶ 146-52.

155.    Respondents prominently displayed these representations on the Lambda website, in outcomes reports, on social media, and in advertisements for the purpose of encouraging members of the public, like Claimant, to apply for enrollment.

156.    Respondents had no reasonable grounds to believe that these representations were true.

157.    Respondents intended to induce Claimant to rely on these misrepresentations, as evidenced by Lambda prominently featuring them on its website and on other widely disseminated platforms, as well as by its efforts to avoid disclosing the truth.

158.    Claimant was justified in relying upon these widely disseminated representations. Had Claimant known the truth, Claimant would not have enrolled at Lambda.

159.    Claimant has been substantially harmed by Lambda's misconduct, which caused Claimant to attend Lambda and take out an ISA that indebted Claimant for up to $30,000 in tuition.

## V.    PRAYER FOR RELIEF

WHEREFORE, in accordance with the above claims, Claimant requests that the Arbitrator:

1.    Declare and order that the tuition payment plan entered into by Claimant is unlawful, void, and unenforceable pursuant to Cal. Educ. Code §§ 94886, 94902, 94917, and 94943, and the UCL, CLRA, and FAL.

2.    Declare that Respondents conducted business as a private postsecondary educational institution in California without obtaining approval to operate, in violation of Cal. Educ. Code § 94886 and the UCL.

3.    Declare that Respondents knowingly operated a private postsecondary institution without approval to operate, in violation of Cal. Educ. Code § 94943 and the UCL.

4.    Declare that Respondents' job placement rate representations at all times relevant to this Complaint were fraudulent and misleading, in violation of the UCL, FAL, and CLRA, and were intentional and/or negligence misrepresentations.

5.    Declare that Lambda "engage[d] in the business of a finance lender or broker without obtaining a license from the commissioner," and continues to do so, in violation of the California Financing Law, Cal. Fin. Code § 22100(a).

6.    Order Respondents—including Lambda, Mr. Allred, and any other owner of all or part of the tuition payment plans—to cancel Claimant's tuition payment plan and enjoin any effort to collect upon or otherwise enforce it.

7.    Order Respondents to pay restitution in the form of refunds for any and all payments made.

8.    Order prejudgment and post-judgment interest on any refunds for tuition payment plan payments to the maximum extent allowed by law.

9.    Order Respondents to pay reasonable attorneys' fees and costs.

10.    Award damages to Claimant in an amount to be determined, including punitive damages pursuant to Cal. Civ. Code § 3294(a).

11.    Order all such further relief as the Arbitrator deems just and proper.

Dated: February 14, 2024        **MINER, BARNHILL & GALLAND, P.C.**


By:    _/s/ Ryan Miller_          
         Deanna N. Pihos
         David Baltmanis
         Ryan Miller

         *Attorneys for Claimant*

**BEFORE THE AMERICAN ARBITRATION ASSOCIATION**
**SAN FRANCISCO, CALIFORNIA**

| | |
|---|---|
| ALEXANDER GONCALVES,<br><br>        Claimant,<br><br>    v.<br><br>BLOOM INSTITUTE OF TECHNOLOGY,<br>formerly d/b/a LAMBDA SCHOOL;<br>AUSTEN ALLRED, in his individual<br>capacity; and JOHN DOES 1-9,<br><br>        Respondents. | AAA Case No. _____ |

## DEMAND FOR ARBITRATION

1.      Pursuant to the American Arbitration Association's Consumer Rules, Claimant Alexander Goncalves submits this Demand for Arbitration against Bloom Institute of Technology, formerly d/b/a Lambda School ("Lambda"), Austin Allred, in his individual capacity, and John Does 1–9 (collectively, "Respondents") for violations of the California Consumer Legal Remedies Act ("CLRA"), California Civil Code § 1750, *et seq.*, Unfair Competition Law ("UCL"), California Business and Professional Code §17200, *et seq.*, and False Advertising Law ("FAL"), California Business and Professional Code § 17500, *et seq*., as well as for intentional and negligent misrepresentation.

2.      Mr. Goncalves is a former student of Lambda School and brings this action to hold Respondents accountable for: (i) falsifying and misrepresenting Lambda's job placement rates; (ii) misrepresenting and concealing that, until August 17, 2020, Lambda did not have the necessary approval from the California Bureau for Postsecondary Education ("BPPE") to operate as a school, and was under order by the BPPE to cease operations, stop enrolling students, cease all instructional services, and submit a closure plan; (iii) in violation of California law, enrolling, signing tuition payment plans with, and providing educational services to students before Lambda obtained the BPPE's approval to operate; and (iv) in violation of California law,

1

engaging in the unlawful business practice of unlicensed lending; and (v) misrepresenting and concealing the true nature of Lambda's financial interest in students' success, including by falsely representing that Lambda only got paid after students found employment and got paid.

    3.    Claimant would not have enrolled at Lambda had Plaintiff known the truth about Lambda's job placement rates, its lack of approval from BPPE, or the true nature of Lambda's financial interest in Claimant's success (or lack thereof). Through this action, Claimant seeks declaratory and injunctive relief to cancel Claimant's tuition payment plan and declare that payment plan null and void; a refund of any payments Claimant has made under that payment plan; damages; and additional relief.

## I.    __THE PARTIES__

    4.    Claimant Alexander Goncalves is a resident of Philadelphia, Philadelphia County, Pennsylvania. Claimant signed a tuition payment plan on May 20, 2020. Claimant was enrolled as a student at Lambda from June 2020 until January 2021, at which point Claimant completed Lambda's program. Claimant's tuition payment plan is attached as Exhibit A.

    5.    Respondent Lambda is a corporation organized and existing under the laws of the State of Delaware, having its principal place of business at 250 Montgomery Street, Floor 16, San Francisco, California 94104 and/or 149 New Montgomery Street, 4th floor, San Francisco, CA 94101.

    6.    Respondent Austen Allred is Lambda's founder and CEO. Upon information and belief, Mr. Allred resides in San Francisco, California, and/or did so during times relevant to the events described herein.

    7.    Respondents John Does 1-9 are officers and/or directors of Lambda as well as individuals, corporations, or other entities who may own all or a portion of Claimant's tuition payment plan or any other financial interest in that tuition payment plan.

## II.    __JURISDICTION AND VENUE__

    8.    The American Arbitration Association ("AAA") has jurisdiction over this action pursuant to Claimant's tuition payment plan, which specifies:

As the exclusive means of initiating adversarial proceedings to resolve any dispute arising out of this agreement, your Lambda School tuition, or your payments to Lambda School (other than any proceeding commenced by either party seeking an injunction, a restraining order, or any other equitable remedy or a proceeding commenced by either party in small claims court), either party may demand that the dispute be resolved by binding arbitration administered by the American Arbitration Association in accordance with its Consumer Arbitration Rules available at www.adr.org.

9.     Claimant's tuition payment plan further specifies, "Any such arbitration must be conducted by one arbitrator and must be conducted in San Francisco, California, the county with a major commercial airport nearest to where you live, or another mutually agreed location."

## III.    FACTUAL ALLEGATIONS

### A.    LAMBDA BACKGROUND

10.     Lambda is a private, for-profit online coding school founded in 2017 by its current CEO, Austen Allred. Mr. Allred was the Company's primary decision-maker, controlled its daily operations, and regularly promoted Lambda on social media and through other media. He benefitted financially from the tuition paid to Lambda by Claimant and all other students.

11.     Lambda provides online computer science courses of varying lengths. It is not a degree-granting institution, and is not accredited. Students cannot take out federal student loans to attend Lambda.

12.     Lambda marketed itself as a place where students learn the skills necessary to obtain employment in the competitive computer technology job market. In Mr. Allred's words, most students come to Lambda with "no network" and are "from either inner cities or rural areas."[1]

13.     Lambda touted its "experienced industry expert" instructors and a top-of-the-line curriculum that is "designed to get you hired." On April 3, 2019, Mr. Allred stated in an interview that Lambda's "educational experience is, I think, among the best in the world."[2]

---

[1] *See* Y Combinator, *A CS Education That's Free Until You Get a Job - Austen Allred of LambdaSchool*, YouTube (Apr. 3, 2019) at 9:10 (hereinafter "Y Combinator Interview"), https://www.youtube.com/watch?v=_yIAYZtdrfI&t=551s.
[2] *Id.* at 15:05.

14.    At all times relevant to this complaint, Lambda charged tens of thousands of dollars for its program, more than double the reported average price of online coding bootcamps.[3]

15.    Part of Lambda's business model has been predicated on convincing prospective students to agree to pay a large amount of tuition by promising them that they will not owe anything unless and until they find a job that pays $50,000 or more per year.

16.    Lambda carries out this model by entering into tuition payment plans with students. For example, as Lambda describes one of its tuition payment plan offerings, Income Share Agreements (ISAs): "A Lambda School ISA is a contract under which you agree to pay 17% of your post-Lambda School salary for 24 months, but only once you're making more than $50,000 per year (or the equivalent of $4,166.67 per month). The ISA is capped at a maximum repayment of $30,000, so you won't pay more than $30,000 under any circumstances."[4]

17.    Over time, Lambda expanded its tuition payment plan offerings to include, for example, retail installment contracts, deferred tuition plans, multi-part installment payment plans, financing through a third-party loan, a pre-instruction lump sum payment, or ISA varieties that combine an initial lump sum payment with payments from a proportion of future earnings.

18.    Some Lambda tuition payment plans are managed by third-party servicers who handle origination and payment processing.[5] Meratas, a loan-servicing company headquartered in Stamford, Connecticut, services Claimant's ISA.

19.    By April 2019, Lambda was growing at "an insane pace." As Mr. Allred explained:

> We agreed as a team to no longer share the number of students that we have enrolled, but it is not a small number and it is growing at an insane pace. We'll soon

---

[3] *See* Cecilia Clark, *How Much is Coding Boot Camp?* Nerdwallet (June 21, 2022, 10:53 AM), https://www.nerdwallet.com/article/loans/student-loans/how-much-is-coding-bootcamp.

[4] *The Lambda School Income Share Agreement*, Lambda School Website (scroll to FAQs "What is an ISA and how does it work"), [archived by the Wayback Machine (Dec. 16, 2020), https://web.archive.org/web/20201216131833/https://lambdaschool.com/tuition/isa].

[5] *The Lambda School Income Share Agreement*, Lambda School Website (scroll to FAQs "Who are Meratas and Leif"), [archived by the Wayback Machine (Dec. 16, 2020), https://web.archive.org/web/20201216131833/https://lambdaschool.com/tuition/isa].

be measuring Lambda School scale by percentage of the overall number of students learning to program every year, to give you some context. And being able to support that kind of scale effectively is what keeps me up at night. Mostly specifically hiring, mostly hiring executives right now who can build out 100, 150 person teams beneath them . . . and we need like 5 of them yesterday.[6]

20.    Mr. Allred attributed Lambda's growth in part to his active personal Twitter account, stating in January 2020 that his frequent tweets have "certainly helped Lambda school grow."[7]

21.    Mr. Allred also stated: "If there's one thing I'm good at in life, it's growing something quickly, building hype for something quickly. That's kind of my superpower."[8]

22.    As described below, Lambda's rapid growth was fueled by the School's, and Mr. Allred's, public misrepresentations about the School's approval status and job placement rates.

**B.    UNTIL AUGUST 17, 2020, LAMBDA OPERATED WITHOUT STATE APPROVAL, IN VIOLATION OF CALIFORNIA LAW**

23.    As a California company with its headquarters and principal place of business in San Francisco, Lambda is subject to the laws of the state of California. One of those laws, California Education Code § 94886, bars private postsecondary educational intuitions from doing business without "approval to operate."

24.    Another, Section 94917, provides that when educational institutions violate this law, any "note, instrument, or other evidence of indebtedness relating to payment" for its programs is "void and not enforceable."

25.    All Lambda tuition payment plans, including ISAs, are a "note, instrument, or other evidence of indebtedness relating to payment for educational program[s]," under the California Education Code.

26.    On March 20, 2019, the BPPE issued a "Citation: Assessment of Fine and Order of Abatement" ("Citation") to Lambda. The Citation found that Lambda was "operating without

---

[6] Y Combinator Interview at 47:50.
[7] Vincent Woo, *Interview with Austen Allred*, Soundcloud (Jan. 22, 2020) at 42:10 (hereinafter "Woo Interview"), https://soundcloud.com/vwoo/interview-with-austen-allred.
[8] Y Combinator Interview at 22:25.

Bureau approval," in violation of the California Education Code. A copy of the Citation is attached hereto as Exhibit B.

27.     In the Citation, the BPPE ordered that Lambda "cease to operate as a private postsecondary educational institution" and "submit a school closure plan." The Citation further required Lambda to "discontinue recruiting or enrolling students and cease all instructional services and advertising in any form or type of media, including the https://lambdaschool.com and any other websites not identified here that are associated with the Institution, until such time as an approval to operate is obtained from the Bureau."

28.     On May 14, 2019, Lambda submitted its application to the BPPE seeking approval to operate.

29.     Lambda appealed the Citation and, on July 24, 2019, the BPPE issued an "Appeal of Citation Informal Conference Decision: Citation Affirmed" (the "Citation Affirmance"). The BPPE affirmed the Citation because "[n]o new substantive facts were presented," and thus, Lambda was required to "comply with the orders described in the 'Violation Code Sections' of this document and submit evidence of compliance within 30 days from the date of this decision." Citation Affirmance at 1–3. A copy of the Citation Affirmance is attached hereto as Exhibit C.

30.     In direct violation of California law, the Citation, and the Citation Affirmance, Lambda continued to operate, advertise its educational services to the public, and enroll students.

31.     On August 21, 2019, the BPPE denied Lambda's May 14, 2019 application, stating in a letter to Lambda that it was "unable to grant approval." A copy of the August 21 order is attached hereto as Exhibit D.

32.     On November 25, 2019, the BPPE issued an order denying Lambda's updated application for approval, explaining that "at this time the Bureau is unable to grant approval, based on the requirements of the California Education Code." A copy of the November 25 order is attached hereto as Exhibit E.

33.     On June 22, 2020, the BPPE issued yet another order denying Lambda's further updated application for approval to operate, stating that "the Bureau cannot at this time approve Lambda's application." A copy of the June 22 order is attached hereto as Exhibit F.

34.     The June 22, 2020 order also found that Lambda's ISAs constitute "an instrument or evidence of indebtedness" under the California Education Code. *Id.* at 5.

35.     On August 17, 2020, the BPPE issued an order approving Lambda's application. The approval letter stated that the BPPE had completed its review of Lambda's "Application for Approval to Operate," including "supplemental documentation" received on August 14, 2020. The BPPE found that "[a]pproval to operate is granted *effective August 17, 2020*." (emphasis added). A copy of the August 17 order is attached hereto as Exhibit G.

36.     From at least May 2019 until Lambda was approved on August 17, 2020, Lambda's publicly available course catalogs falsely stated that Lambda was approved by the BPPE. In at least three versions of the 2019 and 2020 catalogs—revised in May 2019, September 2019, and July 2020 (all prior to Lambda's approval)—Lambda falsely stated the following:

> **APPROVALS**
> Lambda School is a private institution *approved to operate* by the California Bureau for Private Postsecondary Education. Approval to operate means the institution is compliant with the minimum standards contained in the California Private Postsecondary Education Act of 2009 (as amended) and Division 7.5 of Title 5 of the California Code of Regulations.

*See* Exhibit H (Excerpts of Three Versions of Lambda Course Catalogs for 2019 and 2020 at 5) (emphasis added).

37.     During the time Lambda was seeking the BPPE's approval, Mr. Allred engaged in a public misinformation campaign about Lambda's legal status. For example, in August 2019, Mr. Allred told Business Insider that Lambda was working with the BPPE to obtain approval and

that the order had been stayed while the application was pending. Mr. Allred stated that "[b]ecause we're talking with BPPE, it doesn't affect students at all."[9] This was false.

38.    In truth, the Citation and Citation Affirmance were not stayed, multiple of Lambda's applications had been denied, and Lambda's future was uncertain. In August 2020, a public information officer with California's Department of Consumer Affairs told Business Insider "that there is no stay on the order, and that if Lambda School is still operating while its registration is pending, it would be in violation of state law."[10]

39.    Upon information and belief, Mr. Allred further commented to Lambda students over the Lambda Slack channel that any regulatory issues were mere technicalities that did not affect the school's ability to operate.

40.    At all times Mr. Allred knew or should have known that ISAs and other financing instruments issued by Lambda were void and unenforceable under California Law due to Lambda's lack of approval to operate.

41.    Throughout 2019 and 2020, prior to Lambda's August 17, 2020 approval, Lambda and Mr. Allred further misrepresented Lambda's approval status by using a number of recognized attributes of an approved academic institution in its advertising and promotional materials. During this period, Lambda's name, website, and the website URL itself – lambdaschool.com – used the term "school", and Lambda's website, ads, and social media continuously displayed the following school crest:

*Screenshot from Lambda's website on April 22, 2020.*



---

[9] Rosalie Chan, *The hot Silicon Valley coding bootcamp Lambda School is paying a $75,000 fine for not registering properly with the state of California*, Business Insider (Aug. 29, 2019, 6:32 PM), https://www.businessinsider.com/lambda-school-coding-bootcamp-california-bppe-2019-8.

[10] Rosalie Chan, *A California official says red-hot coding bootcamp Lambda School is violating state law if it operates without the right registration — but the company insists classes can go on*, Business Insider (Aug. 30, 2019, 8:54 PM), https://www.businessinsider.com/lambda-school-california-state-law-coding-bootcamp-y-combinator-2019-8.

42.     During this period, Lambda's website, online ads, and social media continuously and repeatedly referred to various features of an approved academic institution, including, for example, a "curriculum," "tuition," "students," "student body," being "enrolled," an academic "schedule," "graduates," "mentors," "grades," "lectures," "homework," and "career support": [11]

*Screenshot from Lambda's website on May 6, 2020.*



---

[11] *See, e.g.*, Lambda School (@LambdaSchool), Twitter (Dec. 10, 2019, 9:52 PM), https://twitter.com/bloomtech/status/1204609786718801922; Lambda School Instagram (Mar. 16, 2020), https://www.instagram.com/p/B9zG7NvjhyS/; *Curriculum*, Lambda School Website, [archived by the Wayback Machine (May 6, 2020), https://web.archive.org/web/20200506051614/https://lambdaschool.com/curriculum].

*Screenshot of a March 16, 2020 Lambda Instagram post.*



43.     Mr. Allred furthered the appearance that Lambda was approved to operate in similar terms. In his "Letter from the CEO" at the beginning of Lambda's March 2020 outcomes report (which was publicly available on the Lambda website), he refers to the Lambda "student body" growing to 2,900, with Lambda staff growing to 200, and moving the Lambda headquarters to an office building in downtown San Francisco based on that growth. He refers to a "curriculum" that is "mastery-based," "graduation," "career support," and "the school." He acknowledged that Lambda "students place great trust in Lambda School when they enroll, and they make incredible investments of time and energy while engaged in our programs."[12]

44.     Had Claimant been aware that Lambda was operating without a license, was not approved to operate, and that its future legal status was uncertain, Claimant would not have signed a tuition payment plan that indebted Claimant for up to $30,000 to Lambda. Indeed, no

---

[12] *See* Austen Allred, *Announcing the Release of Our H1 2019 Student Outcomes Report*, Lambda School Website (Mar. 27, 2020), [archived by the Wayback Machine (Apr. 23, 2020), https://web.archive.org/web/20200423031203/https://lambdaschool.com/the-commons/announcing-the-release-of-our-h1-2019-student-outcomes-report] (last visited November 27, 2023).

reasonable consumer would enroll and indebt themselves to a program operating unlawfully and under orders to close.

45.    Claimant's tuition payment plan constitutes a "note, instrument, or other evidence of indebtedness relating to payment for [students'] educational program," under the California Education Code, and therefore, as a matter of law, is "void and not enforceable." California Education Code § 94917.

### C.    LAMBDA'S FALSE AND MISLEADING JOB PLACEMENT RATES

46.    Lambda's selling point to Claimant and other students was that it would land them a job—and thus bring financial success. Mr. Allred described Lambda as "entirely vocational, we're a trade school basically, and we want to help you make as much money as you can."[13]

47.    Lambda's record of placing students in computer technology jobs was therefore a critical piece of information for Claimant and others considering attending Lambda. Respondents knew that students would only enroll if Lambda would help them secure a job. As Lambda described it, job placement is "the most critical component of Lambda's operations, not only in the School's obligation to its students, but to the prosperity of the company as a whole." *See* ¶ 53, *infra*.

48.    To that end, for the past six years, since Lambda's inception, and continuously through today, Lambda and Mr. Allred have engaged in an extensive and long-term campaign to advertise false and misleading job placement rates, intending that potential students like Claimant would review those rates and enroll at Lambda as a result of those rates.

49.    Lambda and Mr. Allred have prominently displayed false and misleading information on Lambda's purported record of job placement on the Lambda website, in marketing materials and outcomes reports, in a variety of online and social media advertisements (upon information and belief, including Google, YouTube, and various social media), and

---

[13] Y Combinator Interview at 13:00.

11

through social media postings and comments, including Mr. Allred's personal social media accounts.

### 1. False and misleading job placement rates on Lambda's website and outcomes reports

50.    Throughout 2018 and 2019, Lambda's website advertised job placement rates of over 80%. Lambda and its executive leadership, including Mr. Allred, knew that these widely disseminated rates were false and misleading.

51.    On August 2, 2018, Mr. Allred, Ben Nelson (co-founder and CTO), and Ryan Holdaway (VP of Outcomes), stated the following in a post on the Lambda School Blog: *"[E]very single* Lambda School graduate who has been on the job market for six months is either employed in a full-time role as a software engineer or has joined an early startup working for equity."[14]

52.    Yet on August 3, 2018—the very next day—Lambda's executive leadership team reprimanded Lambda's Director of Career Readiness for poor job placement rate performance, sending her an "Employee Corrective Action Form." The form stated that the employee's "performance in recent months has not met the expectations for the Career Coach/Director of Career Readiness role at Lambda School. Overall placement numbers are low and the time to placement is much higher than desired."

53.    The Corrective Action Form continued:

Placements are the most critical component of Lambda's operations, not only in the School's obligation to its students, but to the prosperity of the company as a whole. A common discussion point in regards to Outcomes is that current placement rates are too low and time to placement is too high. Creative tactics and adjustments to current careers processes as well as follow through are needed to improve both of these measurements. . . .

CS1 students graduated on 1/19/18. Since then we've had a new class graduate approximately every five weeks. As of 8/1/18, only 16 students of the 48 graduated students assigned to [the Lambda career placement employee] have been placed.

---

[14] Austen Allred, *Introducing Lambda Next — Our Revolutionary New Job Search and Placement Program*, Medium: Lambda School Blog (Aug. 2, 2018), https://medium.com/lambda-school-blog/introducing-lambda-next-our-revolutionary-new-job-search-and-placement-program-603ef12f7d37 (emphasis added).

54.    Two months later, on October 8, 2018, Lambda continued to tout its high job placement rates, announcing on its website: "Since Lambda School's inception in April 2017, over 75 Lambda School graduates have been hired, including 83% of early cohorts, with an average salary increase of over $47,000 per hired graduate."

55.    Lambda's website contained the following statement across the top of the page:

*Screenshot from Lambda's website on December 13, 2018.*



56.    The representation of an 83% job placement rate remained on the Lambda website until on or about February 2019.

57.    From on or about April 2019 until at least December 2019, Lambda's website advertised an ever higher job placement rate: over 85%. For example, on April 18, 2019, Lambda's website contained the following statement across the top of the page:

*Screenshot from Lambda's website on April 18, 2019.*



58.    Yet in May of 2019—at the same time Lambda was advertising an 85.9% job placement rate on its website—Lambda executives sent a private memorandum to investor Y Combinator confirming the falsity of the rates it was publicly promoting. *See* Lambda

Memorandum to Investors, *Human Capital: The Last Unoptimized Asset Class* at 10 (May 2019), attached hereto as <u>Exhibit I</u>. The May 2019 memo stated:

> **We're unable to place students at scale**
> - We're at roughly 50% placement for cohorts that are 6 months graduated
> - Placement to date has been manual and one-off, which isn't possible at scale

Ex. I at 10.

59.    After the memorandum was published in news accounts two years later, Mr. Allred confirmed in a tweet from his personal account that he had told investors that Lambda had a 50% placement rate, stating: "The 50% came from me telling investors about what % of enrolled students get jobs that require repayment."

60.    Despite Mr. Allred's contrary statement to investors, Lambda's website continued to promote a 85.9% or 86% placement rate through the end of 2019. These rates were false and misleading.

61.    On December 14, 2019, Lambda's homepage stated:



*Screenshot from Lambda's website on December 14, 2019.*

62.    This statement was false and directly contrary to the true facts known to Lambda and Mr. Allred, which had privately been disclosed to investors, as described above.

63.    When asked in an interview to explain the discrepancy between the representations on Lambda's website and representations to its investors, Mr. Allred explained:

14

"I mean you're literally looking at what are the risks, right? Like, we're going to pick our lowest number for that – there are cohorts that have been at 50% placed within 6 months, yes."[15]

64.    When asked whether the advertised 86% job placement rate was accurate, he stated: "the way that that number was measured was an average across cohorts at a specific time. I don't know what it is right now, but that's directionally correct."[16]

65.    On February 19, 2020, New York Magazine published an article titled "Lambda School's Misleading Promises," in which the writer concluded that Lambda was "selling unprepared students an incomplete education, fueled by overpromising marketing and misleading, if not downright fraudulent, figures."[17] The story described Lambda's job placement rate misrepresentations and also recounted an interview with a former employee who "confirmed . . . that the company's own internal numbers, which the interviewee was provided as part of their interview process, seem to indicate a roughly 50 percent or lower placement rate."[18]

66.    Lambda nonetheless persisted in promoting false and misleading job placement statistics on its website and elsewhere.

67.    In 2020, Lambda started to promote its placement rates through "outcomes reports" published on its website and shared through social media. Multiple outcomes reports included an "Independent Accountants' Report" directed "To the Management" of "Lambda Inc." located at "250 Montgomery Street[,] San Francisco, CA 94104".

68.    The first outcomes report, titled "H1 2019 Outcomes Report," was published on March 27, 2020,[19] and reported a 79% placement rate.[20]

---

[15] Woo Interview at 13:00-14:30.

[16] *Id.* at 11:13-11:26.

[17] Vincent Woo, *Lambda School's Misleading Promises*, New York Magazine (Feb. 19, 2020), https://nymag.com/intelligencer/2020/02/lambda-schools-job-placement-rate-is-lower-than-claimed.html.

[18] *Id.*

[19] *See* Austen Allred, *Announcing the Release of Our H1 2019 Student Outcomes Report*, Lambda School Website (Mar. 27, 2020), [archived by the Wayback Machine (Apr. 23, 2020), https://web.archive.org/web/20200423031203/https://lambdaschool.com/the-commons/announcing-the-release-of-our-h1-2019-student-outcomes-report].

[20] *See H1 2019 Report Lambda School Outcomes Report*, Lambda School Website, [archived by

69.    The 79% placement rate remained up on Lambda's website until December 3, 2020, when Lambda published its "H2 2019 Outcomes Report."[21] The H2 2019 report showed a 74% placement rate.[22]

70.    The 74% rate announced in the H2 2019 report remained up on Lambda's website until November 7, 2021, when Lambda announced its 2020 outcomes.[23] In the 2020 outcomes report, Lambda announced that the placement rate remained at 74%.

71.    Until November 1, 2022, Lambda continued to report the 74% placement rate from the 2020 outcomes report on its website:

# 74%

Job placement rate for BloomTech graduates

**BloomTech 2020 Outcomes Report**

*Screenshot from Lambda's homepage on September 30, 2022.*[24]

---

the Wayback Machine (Sept. 3, 2020),
https://web.archive.org/web/20200903023542/https:/lambdaschool.com/reports/2019-outcomes-report].

[21] *See* Austen Allred, *Announcing the Release of Our H2 2019 Student Outcomes Report*, Lambda School Website (Dec. 3, 2020), [archived by the Wayback Machine (Dec. 14, 2020), https://web.archive.org/web/20201214214247/https:/lambdaschool.com/the-commons/announcing-lambda-school-h2-2019-student-outcomes-report].

[22] *Id. See also H2 2019 Report Lambda School Outcomes Report*, Lambda School Website [archived by the Wayback Machine (Dec. 3, 2020), https://web.archive.org/web/20201203230224/https:/lambdaschool.com/reports/h2-2019-outcomes-report].

[23] *See Bloom Institute of Technology 2020 Outcomes Report,* Bloom Institute of Technology, [archived by the Wayback Machine (Nov. 25, 2021), https://web.archive.org/web/20211125162824/https:/www.bloomtech.com/reports/outcomes-report].
It appears that Lambda only published one outcomes report in 2020. *See BloomTech Reports*, Bloom Institute of Technology Website, https://www.bloomtech.com/reports/archive (last visited Mar. 14, 2023).

[24] *See Built For Your Success*, Bloom Institute of Technology Website, [archived by the Wayback Machine (Sept. 30, 2022) https://web.archive.org/web/20220930032702/https:/www.bloomtech.com/outcomes].

72.     On November 2, 2022, Lambda published the "BloomTech 2021 Outcomes Report," advertising a 90% placement rate. As of November 2, 2022, Lambda's website provided:

# 90%

Job placement rate for BloomTech graduates

**BloomTech 2021 Outcomes Report**

*Screenshot from Lambda's homepage on November 27, 2022.*[25]

73.     In a "Letter from the CEO" dated November 2, 2022, Mr. Allred wrote: "In this independently examined report, you'll gain a transparent view of how our learners and graduates fared in 2021. Our biggest takeaway: A full **90% of our 2021 graduates have landed jobs**, which is the highest rate in our company's history."[26]

74.     Lambda's homepage continued to advertise a 90% placement rate until January 2024, when it updated the rate, touting an "86% job placement rate in 2022 for job-seeking grads."[27]

75.     Like the earlier rates from 2018 and 2019, the rates Lambda published from 2020 to the present (including, but not limited to, the 79%, 74%, 90%, and 86% rates from the Lambda website and outcomes reports) were, and continue to be, false and misleading. Lambda and its executive leadership, including Mr. Allred, knew that these widely disseminated rates were false and misleading.

---

[25] *See Built For Your Success,* Bloom Institute of Technology Website, [archived by the Wayback Machine (Nov. 27, 2022), https://web.archive.org/web/20221127122732/https://www.bloomtech.com/outcomes].
[26] *See* Austen Allred, *Letter from the CEO*, Bloom Institute of Technology Website (Nov. 2, 2022), https://www.bloomtech.com/reports/outcomes-report#letter (last visited Mar. 14, 2023) (emphasis in original, internal citation omitted).
[27] *See* Bloom Institute of Technology Home Page, https://www.bloomtech.com/ (last visited December 6, 2023).

76.     Business Insider reported in October 2021 that documents from a Lambda "all-hands" staff meeting in January 2021 "showed that Lambda School placed only around 30% of its 2020 graduates in qualifying jobs during the first half of 2020. This figure is in stark contrast to the 74% placement rate it advertised for its 2019 graduates, the latest figure the school has made publicly available. . . ."[28]

77.     This "all hands" meeting took place one month after Lambda published the 74% placement rate in the H2 2019 Outcomes Report.

78.     A slide prepared by Lambda reveals that the H1 2020 placement rate was only 33% and the H2 2020 rate was 40%, a far cry from the 74% listed on the Lambda website until November 2, 2022. According to the same slide, Lambda's H1 2021 *goal* was 60% placement and H2 2021 *goal* was 80%:

## Long-Term Student Success Goals

| | H1 2020 | H2 2020 | H1 2021 | H2 2021 | Metric | Description |
|---|---|---|---|---|---|---|
| **Admissions** | 1277 | 1450 | TBD | TBD | Unit 2 Starts | # students starting Unit 2. |
| **School** | 52% | 56% | 60% | 80% | % Graduating within 11 Units | % of students who start Unit 2 complete coursework within 11 units. |
| **Outcomes** | 33% | 40% | 60% | 80% | % Qualified Placement within 180 days | % of graduates get high paying jobs within 180 days. |
| **Repayment** | 72% | 79% | 85% | 87% | % Repaying within 60 days | % of qualified placed graduates have made a first payment within 60 days. |

79.     On information and belief, a Lambda executive presented the slide at the "all-hands" meeting at Lambda's headquarters in San Francisco, California.

---

[28] *See* Vincent Woo, *Lambda School promised a fast and cheap path to a lucrative tech career. Leaked documents and former students cast doubt on that claim*. Business Insider (Oct. 25, 2021, 7:30 AM), https://www.businessinsider.com/lambda-school-promised-lucrative-tech-coding-career-low-job-placement-2021-10.

80.     Another slide, titled "Lambda H1 Company OKRs," provided that the "actual" placement rate for H1 2020 was 33% of graduates placed within 180 days, and the actual rate for H2 2020 (as of October 2020) was 27% of graduates placed within 180 days. This slide also listed the H1 2021 goal as 60%:

## Lambda H1 Company OKRs

| | H1 2020 | H2 2020 | H1 2021 | Metric | Description |
|---|---|---|---|---|---|
| **Admissions Goal** Admissions Actual | n/a 1277 | 1450 ~850 | 1500 | Unit 2 Starts | # students starting Unit 2. |
| **School Goal** School Actual | n/a 52% | 56% 52% | 60% | Extended Grad Rate % | % of students who start Unit 2 complete coursework within expected time window |
| **Outcomes Goal** Outcomes Actual | n/a 33% | 40% 27% | 60% | % Qualified Placement within 180 days | % of graduates get high paying jobs within 180 days. |
| **Repayment Goal** Repayment Actual | n/a 41% | 75% 73% | 85% | % Repaying within 60 days | % of qualified placed graduates have made a first payment within 60 days. |
| **Alumni Goal** | n/a | n/a | 40% | % Alumni Giving back | % of hired alumni giving back |

*H2 2020 Actuals as of October 2020

81.     Another slide, reportedly used at another all-hands meeting in February 2021, broke out the 180-day placement rates by month, from February to July 2020, as follows:

| Graduation Month | Qualified Placed % (days elapsed since graduation) | | |
|---|---|---|---|
| Month | +90d | +180d | QP Now |
| Feb - 2020 | 20% | 31% | 41% |
| Mar - 2020 | 19% | 30% | 36% |
| April - 2020 | 17% | 24% | 32% |
| May - 2020 | 13% | 27% | 32% |
| Jun - 2020 | 15% | 25% | 27% |
| Jul - 2020 | 18% | 24% | 25% |
| Aug - 2020 | 16% | | 21% |
| Sept - 2020 | 13% | | 14% |
| Oct - 2020 | 10% | | 11% |
| Nov - 2020 | | | 11% |
| Jan - 2021 | | | 11% |
| Weighted Avg. | 16% | 27% | |
| H2 Goal | | 40% | |

19

82.     In yet another slide, reportedly also used at the "all hands" meeting on January 28, 2021, Lambda's H1 2021 "goal" was to enroll 500 students a month and place 50% to 70% in qualifying jobs. The graph also shows that, if Lambda enrolled 2,000 students per month, it could become profitable even if fewer than half of its students found jobs:



83.     Prior to signing a tuition payment plan, Claimant read Respondents' representations that Lambda's job placement rate was above 70%. Lambda's purported record of successfully placing students was critical to Claimaint's decision to enroll.

### 2.     Lambda's false and misleading statements about job placement in social media postings and comments.

84.     In addition to advertising job placement rates on its website and in outcomes reports, Lambda's job placement marketing campaign aimed at potential students expanded to social media posts and comments, including Twitter, Facebook, and Instagram. Like the rates on its website and in outcomes reports, these rates, ranging from 71% to at least 91%, were false and misleading. Lambda and its executive leadership, including Mr. Allred, knew that these widely disseminated rates were false and misleading, and intended that potential students like Claimant would review those rates and enroll at Lambda as a result of those rates.

85.     Examples of false and misleading job placement rates on Lambda's Twitter, Facebook, and Instagram accounts include:

    a) April 6, 2018, Lambda Twitter: "Time for another update on placement. Students hired by Lambda School are not included. Cs1: 75% hired within first two months of search."[29]

    b) March 5, 2019, Lambda's Twitter account linked to a report touting an 85.9% job placement rate and stated: "Lambda only succeeds when our students succeed, and we're committed to a transparent, no-surprises approach to education."[30]

    c) April 22, 2020, Lambda Instagram: "Percentage of H1 2019 graduates that have been placed into jobs. → 71%"[31]



---

[29] Lambda School (@LambdaSchool), Twitter (Apr. 6, 2018, 12:39 PM), https://twitter.com/bloomtech/status/982311747301330944.

[30] Lambda School (@LambdaSchool), Twitter (Mar. 5, 2019, 7:02 PM), https://twitter.com/bloomtech/status/1103083315945328640.

[31] Lambda School (@LambdaSchool), Instagram (Apr. 22, 2020), https://www.instagram.com/p/B_S2M-Llm2y/.

d)  September 27, 2021, Lambda Instagram: "77% of H2 2019 job-seeking Data
Science graduates were hired. 94% [o]f those hired graduates go the job in the
first 180 days"[32]



e)  November 3, 2022, Lambda Instagram: "90% of our 2021 alumni gained in-
demand skills and landed great jobs—our highest placement rates *ever*!"[33]



---

[32] Lambda School (@LambdaSchool), Instagram (Sept. 27, 2021),
https://www.instagram.com/p/CUWJM1qJlEB/?img_index=4.
[33] Bloom Tech (@Bloomtechofficial), Instagram (Nov. 3, 2022),
https://www.instagram.com/p/CkgVeHBrmP9/.

f) November 3, 2022: Lambda Facebook: "90% of our 2021 alumni gained in-demand skills and landed great jobs—our highest placement rates *ever*!"[34]

g) November 3, 2022, Lambda Twitter: "90% of our 2021 alumni gained in-demand skills and landed great jobs—our highest placement rates *ever*!"[35]

h) November 4, 2022, Lambda Facebook: "Fun Fact: Did you know, 90% of our 2021 full Stack Web job-seeking graduates found a job after BloomTech?"[36]

i) November 7, 2022, Lambda Facebook: "91% of our 2021 job-seeking Data Science graduates found a job 😮"[37]

j) November 9, 2022, Lambda Instagram: "91% of 2021 job-seeking Data Science grads found a job after BloomTech"[38]

### 3.   Mr. Allred's false and misleading statements about job placement were a driving force behind Lambda's job placement rate marketing campaign.

86.    At all times relevant to this complaint, Mr. Allred was the driving force behind Lambda's job placement rate marketing campaign. Rather than passively overseeing the campaign, he personally spearheaded Lambda's dissemination of false and misleading rates, oftentimes promoting the rates himself on his own social media accounts.

87.    For example, since March 2020, when Lambda first promoted its job placement rates through outcomes reports, each outcomes report has begun with a personalized letter from Mr. Allred titled "Letter from the CEO," vouching for the rates in the report. The reports end with Mr. Allred's signature.

---

[34]Bloom Tech (@BloomTech), Facebook (Nov. 3, 2022), https://www.facebook.com/BloomTech/posts/pfbid0C9MRRryV1zaMpSXa35QnogkPDAR984b js9xmen4WJB4SWMtkWAn2kxZ7BRC11Kdhl.

[35] Bloom Tech (@BloomTech), Twitter (Nov. 3, 2022, 11:15 AM), https://twitter.com/bloomtech/status/1588203108013850629.

[36] Bloom Tech (@BloomTech), Facebook (Nov. 4, 2022), https://www.facebook.com/BloomTech/posts/pfbid025d3iVN2usd1eLKfwTMCh78a3kVNpsmU cRCsMXWinqtYX4tHqLbkDHQz9mhqUZuanl.

[37] Bloom Tech (@BloomTech), Facebook (Nov. 7, 2022), https://www.facebook.com/BloomTech/posts/pfbid0UpByQ5eFsctoNH51QuK1DPrTXYXvaU9 cPbE2H6weYnnvR2YbpWF2m8vLGbuuoUhol.

[38] Bloom Tech (@Bloomtechofficial), Instagram (Nov. 9, 2022), https://www.instagram.com/p/CkwHe8ivDND/.

88.     Mr. Allred also advertised false and misleading rates on his personal Twitter account:

a)   March 13, 2019: In response to a commenter asking about a $60,000 median salary and 83% 6-month employment rate for Lambda's main web track, Mr. Allred responded, "That's low now, but our average student increases his or her income by $47,000."[39]

b)   March 15, 2019: "Lambda School's first iOS class graduates today. 66% of them are already **hired.**"[40]

c)   November 16, 2019: "First track just graduated. Hit 100% hired but was VERY small sample size." Subsequent reporting revealed that this small sample size consisted of a single student.[41]

d)   November 3, 2022: "I am so incredibly excited to finally be able to share BloomTech's 2021 Outcomes Report. Highlights: *All-time high 90% placement rate for job-seeking grads".[42]

89.     Other examples of false, misleading, and exaggerated claims on Mr. Allred's Twitter account include:

a)   January 24, 2021: "I think we're like 2-3 solvable problems being solved away from 100% of Lambda School grads being hired. Still a lot of unknowns, but I think it will be possible." When a commenter asked what the problems were, Mr. Allred responded: "Boring stuff."[43]

b)   April 22, 2021: "When I started Lambda School early detractors gave me hell because I said that Lambda School would cause thousands of people to become millionaires who wouldn't have otherwise been. It's now pretty clear that was very conservative."[44]

---

[39] Austen Allred (@Austen), Twitter (Mar. 13, 2019, 12:14 PM), https://twitter.com/Austen/status/1105879911036665856.

[40] Austen Allred (@Austen), Twitter (Mar. 15, 2019, 5:20 PM), https://twitter.com/Austen/status/1106681485275205634.

[41] *See* Zoe Schiffer & Megan Farokhmanesh, *The High Cost of a Free Coding Bootcamp*, The Verge (Feb. 11, 2020, 11:15 EST), https://www.theverge.com/2020/2/11/21131848/lambda-school-coding-bootcamp-isa-tuition-cost-free; Ryan Mac (@RMac18), Twitter (Feb. 11, 2020, 1:59 PM), https://twitter.com/RMac18/status/1227306243733295108.

[42] Austen Allred (@Austen), Twitter (Nov. 3, 2022, 12:20 PM), https://twitter.com/Austen/status/1588219699157905408.

[43] Austen Allred (@Austen), Twitter (Jan. 24, 2021, 1:55 AM), https://twitter.com/austen/status/1353234915643568128.

[44] Austen Allred (@Austen), Twitter (Apr. 22, 2021, 10:24 AM), https://twitter.com/Austen/status/1385238109185396740.

c)  May 4, 2021: "I get to watch a bunch of people double their income (or more) every single day. Even the worst days are punctuated by a bunch of people changing their lives and the lives of their families forever."[45]

d)  May 4, 2021: "You can go from near poverty to huge future wealth in just a few months."[46]

e)  November 24, 2022: "Thankful today for all those who have worked so hard for BloomTech (by current name or by Lambda School). So many people working so diligently. Thousands of lives changed, billions in increased earnings."[47]

90.    Mr. Allred and Lambda acted willfully and knowingly to disseminate Lambda's job placement representations to the public—including applicants to their school such as Claimant—with knowledge that they were, and continue to be, false and misleading.

.

### D.    LAMBDA MISREPRESENTS THAT IT ONLY GETS PAID ONCE STUDENTS DO

91.    In addition to the placement rates, Lambda and Mr. Allred misled potential students like Claimant with the frequently repeated declaration that: "We don't get paid until you do, so we're in this together, from your first day of classes to your first day on the job."[48] For example, on June 27, 2019, Lambda's homepage stated:

## Higher learning. Higher earning.

Lambda is designed for student success. We don't get paid until you do, so we're in this together, from your first day of classes to your first day on the job — and beyond.

*Screenshot from Lambda's homepage on June 27, 2019.*

---

[45] Austen Allred (@Austen), Twitter (May 4, 2021, 11:50 PM), https://twitter.com/Austen/status/1389789532761956352.
[46] Austen Allred (@Austen), Twitter (May 4, 2021, 11:53 PM), https://twitter.com/Austen/status/1389790386659364868.
[47] Austen Allred (@Austen), Twitter (Nov. 24, 2022, 9:51 AM), https://twitter.com/austen/status/1595822473781485568.
[48] *See, e.g.*, Apply Now Pages, Lambda School Website [archived by the Wayback Machine (June 27, 2019), https://web.archive.org/web/20190627024024/https://lambdaschool.com/].

92.    Mr. Allred regularly touted that Lambda only gets paid when students do on his personal social media accounts and the Lambda website, describing Lambda's business as based on shared and aligned incentives between Lambda and its students:

    a)  "The main directive in everything we did can be summed up in two words: incentive alignment."[49]

    b)  "Our mission from day one has been to **align the incentives of school and student**, giving more people the opportunity they deserve to land a great job with a higher income. If our students don't succeed, our school shouldn't either."[50]

93.    In reality, Lambda packaged and sold its tuition payment plans, including ISAs, to investors long before students obtained employment. As early as May 2019, Lambda privately told investor Y Combinator: "Currently we sell some income share agreements to hedge funds." Exhibit I at 2.

94.    To facilitate the sale of ISAs, Lambda partnered with Edly, a digital marketplace that helps schools sell ISAs to third-party investors. On December 11, 2019, Edly tweeted: "Pleased to announce our latest offering [–] a Lambda School ISA Pool. We @edlyISA are excited to work with the amazing team @LambdaSchool[], one of the most impactful ISA programs in the country."[51] To learn how to participate, Edly invited interested investors to join a webinar that night with Mr. Allred.[52]

---

[49] Austen Allred, LinkedIn (2019), https://www.linkedin.com/posts/austenallred_announcing-our-new-isa-financing-blueprint-activity-6636140633306333184-dkOh?utm_source=share&utm_medium=member_desktop.

[50] *See* Austen Allred, *Announcing the Release of Our H1 2019 Student Outcomes Report*, Lambda School Website (Mar. 27, 2020), [archived by the Wayback Machine (Apr. 23, 2020), https://web.archive.org/web/20200423031203/https:/lambdaschool.com/the-commons/announcing-the-release-of-our-h1-2019-student-outcomes-report] (emphasis in original).

[51] @edlyISA, Twitter (Dec. 11, 2019, 3:01 PM), https://twitter.com/edlyISA/status/1204853625459216385 (on file with Claimant's counsel).

[52] @edlyISA, Twitter (Dec. 11, 2019, 3:02 PM), https://twitter.com/edlyISA/status/1204853900177743872(on file with Claimant's counsel).

95.     Lambda did not disclose this fact to students until public reporting exposed it, and for many months Mr. Allred flatly denied it, stating in October 2019 on Twitter that "We never, ever get paid up front for ISAs."[53]

96.     Claimant read the false and misleading statement on the Lambda website that Lambda only got paid once the student does and, as a result, believed that Lambda would only get paid once Claimant secured a qualifying job. Knowing that Lambda only got paid if Claimant obtained employment was important to Claimant's decision to attend.

### E.     LAMBDA ENGAGED—AND STILL ENGAGES—IN THE UNLAWFUL BUSINESS PRACTICE OF UNLICENSED LENDING

97.     The California Financing Law "shall be liberally construed and applied to promote its underlying purposes and policies," which include "protect[ing] borrowers against unfair practices by some lenders, having due regard for the interests of legitimate and scrupulous lenders." Cal. Fin. Code § 22001(a)(4).

98.     Pursuant to the California Financing Law: "No person shall engage in the business of a finance lender or broker without obtaining a license from the commissioner." Cal. Fin. Code § 22100(a).

99.     Lambda is not and never has been registered in California as a finance lender or broker under the Financing Law.

100.    Since its inception, Lambda has operated as a "finance lender" because its tuition payment plans qualify as either consumer or commercial loans under the Financing Law. *See generally* Cal. Fin. Code § 22203-04 (defining consumer loans); Cal. Fin. Code § 22502 (defining commercial loans).

101.    Lambda's Meratas ISA provides:

> THIS IS NOT A LOAN
> In making monthly payments to Lambda School, you will not be repaying a student loan. In the case of a student loan, a student borrows a set amount and repays the principal amount of the loan plus interest or a finance charge, or both. Under this agreement, you

---

[53] Woo Interview at 6:30 (wherein Mr. Allred confirms that this tweet was "totally correct").

will instead pay a fixed percentage of your income each month for
up to a maximum number of payments.

102.    Contrary to this representation, ISAs are a form of student loan.

103.    According to the United States Consumer Financial Protection Bureau ("CFPB"),
a representation that an ISA is "not a loan" is deceptive and misleading under the Consumer
Financial Protection Act because "ISAs are loans and do create debt."[54]

104.    The California Department of Financial Protection and Innovation ("DFPI")
agrees, holding that ISAs are student loans: "ISAs made solely for use to finance a postsecondary
education are 'student loans' for the purposes of the SLSA [California Student Loan Servicing
Act]."[55]

105.    The United States Department of Education concurs, finding that ISAs "used to
finance expenses for postsecondary education are private education loans under 34 C.F.R.
601.2(b)."[56]

106.    The BPPE also found in its June 22, 2020, order denying Lambda approval to
operate that Lambda's ISA is "an instrument or evidence of indebtedness" under the California
Education Code. *See* June 22, 2020 Letter from BPPE to Lambda at 5, attached hereto as Exhibit
F.

---

[54] *See* Better Future Forward, Inc., et al., CFPB No. 2021-CFPB-0005, Consent Order at ¶ 23
(Sept. 7, 2021) (finding *available at:* https://files.consumerfinance.gov/f/documents/cfpb_better-future-forward-inc_consent-order_2021-09.pdf).
[55] *See In the Matter of Student Loan Servicing Act License Application of Meratas Inc.* NMLS
No. 2120180, Consent Order at ¶ M (Ca. Dep't of Fin. Prot. and Innovation Aug. 5, 2021),
*available at:* https://dfpi.ca.gov/wp-content/uploads/sites/337/2021/08/Meratas-Consent-Order.pdf; *see also* Press Release, California Dep't of Fin. Prot. and Innovation, "California
DFPI Enters Groundbreaking Consent Order with NY-Based Income Share Agreements
Servicer" (Aug. 5, 2020), https://dfpi.ca.gov/2021/08/05/california-dfpi-enters-groundbreaking-consent-order-with-ny-based-income-share-agreements-servicer/.
[56] *See* FSA Announcement, General-22-12, *Income Share Agreements and Private Education
Loan Requirements* (Mar. 2, 2022), https://fsapartners.ed.gov/knowledge-center/library/electronic-announcements/2022-03-02/income-share-agreements-and-private-education-loan-requirements. *See also* 87 Fed. Reg. 65,453 ("[T]he Department clarifies that
ISAs and other alternative financing products should be treated like institutional loans.").

107.    Because Lambda is in the business of making ISAs and other tuition payment plans, it is operating as a finance lender under the California Financing Law.

108.    Lambda's failure to register as a finance lender deprived Claimant of the borrower protections provided by the California Financing Law.

109.    Lambda has therefore engaged in the unlawful business practice of making a loan without a license in violation of California Financial Code § 22100, and, in turn, in violation of the unlawful prong of the UCL.

110.    Had Claimant been aware that Lambda was acting as an unlicensed finance lender, Claimant would not have signed a tuition payment plan that indebted Claimant for up to $30,000 to Lambda.

**F.    CLAIMANT'S ENROLLMENT AND ATTENDANCE AT LAMBDA, AND THE AFTERMATH**

111.    Mr. Goncalves has long had an interest in working in the tech field. During college he completed coding coursework, on top of additional self-taught software development skills. After he was let go from his sales job at a tech startup during the onset of the COVID-19 pandemic, Mr. Goncalves began researching Lambda in April 2020 based on a friend's recommendation.

112.    When Mr. Goncalves reviewed Lambda's website, social media, YouTube ads, and other promotional materials for himself in April and May 2020, he was likewise attracted by Lambda's impressive—and prominently displayed—job placement rates, including in an Instagram post from that time with a 71% job placement rate. He was further attracted to being able to enroll without putting any money down. He corresponded and talked on the phone with Lambda representative Tommy Collison, based out of Lambda's San Francisco headquarters, who further touted likely career outcomes.

113.    Mr. Goncalves also liked that Lambda did not require tuition payments up front, and that, through an ISA, Lambda was invested in student outcomes. He saw the statement on

the Lambda website that Lambda did not get paid until the student did, convincing him that Lambda was equally invested in student outcomes, including his.

114.    The high job placement rates (including the Instagram post's 71% rate) and the representation that Lambda only got paid once students do were pivotal to Mr. Goncalves's decision to enroll, convincing him that enrolling at Lambda would maximize his chance of landing a tech job after completing Lambda coursework.

115.    But both the job placement rates and the statement that Lambda only got paid once students do were false and misleading, and both Lambda and Mr. Allred knew these representations were false and misleading. (*See* ¶¶ 56–99, *supra*.)

116.    Mr. Goncalves further believed that Lambda was approved to operate due to Respondents' continuous and repeated descriptions on the Lambda website, Lambda ads, and social media of various features of Lambda that gave the appearance that it was a credible, legitimate, and lawfully operating school. These included, but were not limited to, descriptions of Lambda's tuition, students, student body, enrollment, academic schedule, graduates, mentors, office hours, and lectures.

117.    Swayed by Respondents' false job placement rates, their false statements that they only got paid once students do, and their false representations that Lambda was a government-approved school, Mr. Goncalves signed an ISA with Lambda on May 20, 2020 (Exhibit A).

118.    Had Respondents truthfully represented Lambda's job placement rates, or had they truthfully represented their actual financial interest in students' success, or had Mr. Goncalves known that Lambda was not lawfully approved to operate, he would not have enrolled in Lambda's educational services, or signed an ISA that indebted him up to $30,000 of tuition to Lambda.

119.    Mr. Goncalves began attending Lambda full-time in June 2020. Lambda restructured Mr. Goncalves's program in September 2020, shortening it from a total of nine months to six months and eliminating team lead support. The loss of team leads was demoralizing. They were the primary means of communicating with Lambda, asking questions,

and getting essential debugging help. Still, he persevered and completed his coursework in December and received a certificate of completion in January 2021.

120.    Mr. Goncalves immediately went to work trying to find a job. He used Lambda's job portal, but its postings were either stale or for impractical positions. He ultimately found work through a friend unassociated with Lambda. He first worked as a limited-term front-end developer during the spring of 2021. The same friend then invited him to a different position with the organization Code Ninjas in Boston. During his time with Code Ninjas, between June and December 2021, Mr. Goncalves taught basic coding to kids and ran summer camps and day courses. Lambda played no role in Mr. Goncalves finding either his front-end developer or Code Ninjas positions.

121.    Mr. Goncalves then accepted a job as a software engineer for Virtually, an edtech company, and worked there until June 2022. After Virtually let him go to look for a more senior engineer, Mr. Goncalves found tech positions with design company MODerati, followed by educational tech company Navengage. As with his prior jobs, Lambda played no role in Mr. Goncalves finding these positions.

122.    Mr. Goncalves started making payments on his ISA while working for Code Ninjas and continued during his time with Virtually. In all, he has paid nearly $10,000 towards his ISA, even though Lambda did not have approval to operate when he signed his ISA. Mr. Goncalves would not have signed his ISA had Lambda truthfully represented its job placement rates, and Lambda played no role in him finding any of his post-Lambda employment.

## IV.    CAUSES OF ACTION

### FIRST CAUSE OF ACTION
#### Violations of California's Consumer Legal Remedies Act
#### Cal. Civ. Code §§ 1750, *et seq.*
#### (All Respondents)

123.    Claimant hereby reincorporates the allegations in the foregoing paragraphs as though fully set forth herein.

124.    The CLRA makes unlawful "unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or that results in the sale or lease of goods or services to any consumer." Cal. Civ. Code § 1770(a).

125.    The CLRA covers transactions involving the sale of services—such as education—to consumers.

126.    Claimant is a "consumer" within the meaning of Section 1761(d) of the CLRA, seeking Lambda's education services for personal, family, or household purposes, and Claimant engaged in "transactions" within the meaning of sections 1761(e)and 1770 of the CLRA.

127.    Education is a "service" within the meaning of Section 1761(b) of the CLRA.

128.    The CLRA enumerates numerous unlawful acts or practices, including:

   a)   "Misrepresenting the source, sponsorship, approval, or certification of goods or services." Cal. Civ. Code § 1770(a)(2).

   b)   "Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that the person does not have." *Id.* § 1770(a)(5).

   c)   "Representing that goods or services are of a particular standard, quality, or grade" when they are not. *Id.* § 1770(a)(7).

   d)   "Advertising goods or services with intent not to sell them as advertised." *Id.* § 1770(a)(9).

129.    In violation of these provisions, Respondents misrepresented to the public, prospective students, and current students, including Claimant, at least the following: (i) its job placement rates; and (ii) that it had approval to operate and enroll students.

130.    Respondents did so in order to induce prospective students, like Claimant, to enroll in Lambda's program—Claimant did so enroll as a result of Respondents' misrepresentations.

**SECOND CAUSE OF ACTION**
**Violations of California's Unfair Competition Law**
**Cal. Bus. & Prof. Code §§ 17200,** *et seq.*
**(All Respondents)**

131.    Claimant hereby reincorporates the allegations in the foregoing paragraphs as though fully set forth herein.

132.    Respondents have engaged in business acts or practices that constitute unfair competition as defined in the UCL, in that such business acts and practices are unlawful, unfair, and fraudulent within the meaning of that statute.

133.    The business acts and practices include:

    a)  publishing and/or providing the public, prospective students, and current students, including Claimant, with false, misleading, unreliable, and/or inaccurate job placement rate information;

    b)  conducting business without BPPE approval and in violation of multiple BPPE orders requiring it to cease operations;

    c)  knowingly operating a private postsecondary institution without approval to do so and knowingly conveying to the public that it is an approved institution;

    d)  misrepresenting to the public, prospective students, and current students that in March and July of 2019, the BPPE ordered Lambda to cease operations, stop enrolling students, cease all instructional services, and submit a closure plan, and misrepresenting material facts related to those BPPE orders, including representing that they were stayed when they were not.

134.    Claimant's tuition payment plans constitute "lost money or property" within the meaning of the UCL.

<u>Unlawful Prong</u>

135.    The UCL bars business practices that are forbidden by law. If a business practice violates any law, it is *per se* a UCL violation.

136.     The business acts and practices described above are unlawful because they violate numerous state and federal laws, including but not limited to:

    a)  The Federal Trade Commission Act ("FTC Act"), which prohibits "unfair or deceptive acts or practices."[57]

    b)  Cal Educ. Code § 94897(b), which provides that institutions shall not "[p]romise or guarantee employment, or otherwise overstate the availability of jobs upon graduation."

    c)  The CLRA, *see supra*;

    d)  The FAL, *see infra*;

    e)  Cal. Educ. Code § 94886, which provides in relevant part that "a person shall not open, conduct, or do business as a private postsecondary educational institution in this state without obtaining an approval to operate under this chapter." Lambda violated this provision, and therefore the UCL's unlawful prong, when it enrolled Claimant without obtaining approval to operate.

    f)  Cal. Educ. Code § 94943, which provides that it is a crime to "[k]nowingly operat[e] a private postsecondary institution without an approval to operate." Lambda violated this provision, and therefore the UCL's unlawful prong, when it knowingly enrolled Claimant without approval by the BPPE to operate.

    g)  Cal. Educ. Code § 94917, which provides that "[a] note, instrument, or other evidence of indebtedness relating to payment for an educational program is void and not enforceable unless, at the time of execution of the note, instrument, or other evidence of indebtedness, the institution held an approval to operate … ."

    h)  Cal. Educ. Code § 94902(b)(2), which provides that an enrollment agreement is enforceable only if "[a]t the time of the execution of the enrollment agreement, the institution held a valid approval to operate.

---

[57] *See* U.S.C.§ 45(a)(I); 15 U.S.C. § 52(a).

i)  The California Financing Law, which provides that "[n]o person shall engage in the business of a finance lender or broker without obtaining a license from the commissioner." Cal. Fin. Code § 22100(a).

j)  The Consumer Financial Protection Act of 2010, 12 U.S.C. §§ 5531(a), 5536(a)(1)(B), which prohibits covered persons from engaging in unfair, deceptive, or abusive acts or practices.

137.    By violating these and other state and federal laws, Lambda violated the unlawful prong of the UCL.

Fraud Prong

138.    To show that a business practice is fraudulent, it is necessary only to show that members of the public are likely to be deceived.

139.    Respondents' business acts and practices—including its false job placement rate representations and false representations to the Subclass about BPPE approval—are fraudulent in that they are likely to deceive the public.

140.    Each of these false and misleading representations, all of which were material, were substantial factors influencing Claimant to attend Lambda and take out a tuition payment plan that indebted Claimant for up to $30,000.

**THIRD CAUSE OF ACTION**
**Violations of California's False Advertising Law**
**Cal. Bus. & Prof. Code §§ 17500, *et seq.***
**(All Respondents)**

141.    Claimant hereby reincorporates the allegations in the foregoing paragraphs as though fully set forth herein.

142.    Respondents have also engaged in acts or practices that constitute violations of the FAL, Business and Professions Code section 17500, *et seq.*, by making or causing to be made untrue or misleading statements with the intent to induce members of the public to purchase Lambda's services. Respondents' untrue or misleading representations include, but are not limited to, the following:

a)  Respondents' statements regarding job placement rates, including but not limited to the published job placement rates prominently displayed on its website, social media, and advertisements;

b)  Respondents' statements, prominently displayed on Lambda's website and elsewhere, that Lambda does not get paid until students do;

c)  Respondents' statements and appearance to the public, prospective students, and current students that its operations were lawful, that BPPE had not ordered Lambda to cease advertising and instructional activities, and that it could lawfully enroll students. Lambda's and Mr. Allred's advertisements and marketing implicitly and explicitly misrepresented the lawfulness of its operations by encouraging the public and prospective students to apply for enrollment.

143.    At the time these representations were made, Respondents knew or by the exercise of reasonable care should have known that the representations were untrue or misleading.

## FOURTH CAUSE OF ACTION
### Intentional Misrepresentation
### (All Respondents)

144.    Claimant hereby reincorporates the allegations in the foregoing paragraphs as though fully set forth herein.

145.    Respondents made statements to Claimant: (a) that were false representations of material fact; (b) that Respondents knew were false or were made recklessly and without regard for their truth; (c) that Respondents intended Claimant to rely upon; (d) that Claimant reasonably relied upon; (e) that Claimant's reliance upon was a substantial factor in causing Claimant damage; and (f) that caused Claimant damage.

146.    The intentional misrepresentations and omissions by Respondents consist of at least the following:

a) Respondents' job placement rate statements, prominently displayed on the Lambda website, in outcomes reports, and on social media. Respondents knew these statements were false.

b) Respondents' statements, prominently displayed on Lambda's website and elsewhere, that Lambda does not get paid until students do; Lambda knew this statement was false because it sold ISAs to investors long before students were placed in jobs.

c) Respondents' representations, both implied and explicit, that it was approved to operate, advertise, enroll, and teach students prior to August 2020. Respondents knew these representations were false because the BPPE had ordered Lambda to cease all operations (including all advertising and instructional activities) and submit a school closure plan. Respondents also knew that they were concealing from students that Lambda was barred from advertising and from enrolling and teaching students.

147.    Respondents intended Claimant to rely on these misrepresentations, as evidenced by Lambda prominently featuring them on its website and on other widely disseminated platforms, as well as by its efforts to avoid disclosing the truth.

148.    Claimant reasonably relied on these widely disseminated representations. Had Claimant known the truth, Claimant would not have enrolled at Lambda.

149.    Lambda, Mr. Allred, and members of his executive leadership team acted willfully and knowingly to disseminate these representations to the public with knowledge that they were false and misleading.

150.    Claimant has been substantially harmed by Lambda's misconduct, which caused Claimant to attend Lambda and take out an ISA that indebted Claimant for up to $30,000 in tuition.

**FIFTH CAUSE OF ACTION**
**Negligent Misrepresentation**
**(All Respondents)**

151.    Claimant hereby reincorporates the allegations in the foregoing paragraphs as though fully set forth herein.

152.    Respondents have also engaged in acts or practices that constitute negligent misrepresentation. *See supra* ¶144-50.

153.    Respondents prominently displayed these representations on the Lambda website, in outcomes reports, on social media, and in advertisements for the purpose of encouraging members of the public, like Claimant, to apply for enrollment.

154.    Respondents had no reasonable grounds to believe that these representations were true.

155.    Respondents intended to induce Claimant to rely on these misrepresentations, as evidenced by Lambda prominently featuring them on its website and on other widely disseminated platforms, as well as by its efforts to avoid disclosing the truth.

156.    Claimant was justified in relying upon these widely disseminated representations. Had Claimant known the truth, Claimant would not have enrolled at Lambda.

157.    Claimant has been substantially harmed by Lambda's misconduct, which caused Claimant to attend Lambda and take out an ISA that indebted Claimant for up to $30,000 in tuition.

## V.    **PRAYER FOR RELIEF**

WHEREFORE, in accordance with the above claims, Claimant requests that the Arbitrator:

1.    Declare and order that the tuition payment plan entered into by Claimant is unlawful, void, and unenforceable pursuant to Cal. Educ. Code §§ 94886, 94902, 94917, and 94943, and the UCL, CLRA, and FAL.

2.    Declare that Respondents conducted business as a private postsecondary educational institution in California without obtaining approval to operate, in violation of Cal. Educ. Code § 94886 and the UCL.

3.    Declare that Respondents knowingly operated a private postsecondary institution without approval to operate, in violation of Cal. Educ. Code § 94943 and the UCL.

4.    Declare that Respondents' job placement rate representations at all times relevant to this Complaint were fraudulent and misleading, in violation of the UCL, FAL, and CLRA, and were intentional and/or negligence misrepresentations.

5.    Declare that Lambda "engage[d] in the business of a finance lender or broker without obtaining a license from the commissioner," and continues to do so, in violation of the California Financing Law, Cal. Fin. Code § 22100(a).

6.    Order Respondents—including Lambda, Mr. Allred, and any other owner of all or part of the tuition payment plans—to cancel Claimant's tuition payment plan and enjoin any effort to collect upon or otherwise enforce it.

7.    Order Respondents to pay restitution in the form of refunds for any and all payments made.

8.    Order prejudgment and post-judgment interest on any refunds for tuition payment plan payments to the maximum extent allowed by law.

9.    Order Respondents to pay reasonable attorneys' fees and costs.

10.    Award damages to Claimant in an amount to be determined, including punitive damages pursuant to Cal. Civ. Code § 3294(a).

11.    Order all such further relief as the Arbitrator deems just and proper.


Dated: March 12, 2024                **MINER, BARNHILL & GALLAND, P.C.**


By:  ___/s/ *Ryan Miller*_____
        Deanna N. Pihos
        David Baltmanis
        Ryan Miller

        *Attorneys for Claimant*

39

**BEFORE THE AMERICAN ARBITRATION ASSOCIATION**
**SAN FRANCISCO, CALIFORNIA**

| | |
|---|---|
| HARRISON AGUIAR, | AAA Case No. _____ |
| Claimant, | |
| v. | |
| BLOOM INSTITUTE OF TECHNOLOGY, formerly d/b/a LAMBDA SCHOOL; AUSTEN ALLRED, in his individual capacity; and JOHN DOES 1-9, | |
| Respondents. | |

## DEMAND FOR ARBITRATION

1.     Pursuant to the American Arbitration Association's Consumer Rules, Claimant Harrison Aguiar submits this Demand for Arbitration against Bloom Institute of Technology, formerly d/b/a Lambda School ("Lambda"), Austin Allred, in his individual capacity, and John Does 1–9 (collectively, "Respondents") for violations of the California Consumer Legal Remedies Act ("CLRA"), California Civil Code § 1750, *et seq.*, Unfair Competition Law ("UCL"), California Business and Professional Code §17200, *et seq.*, and False Advertising Law ("FAL"), California Business and Professional Code § 17500, *et seq.*, as well as for intentional and negligent misrepresentation.

2.     Mr. Aguiar is a former student of Lambda School and brings this action to hold Respondents accountable for: (i) falsifying and misrepresenting Lambda's job placement rates; (ii) misrepresenting and concealing that, until August 17, 2020, Lambda did not have the necessary approval from the California Bureau for Postsecondary Education ("BPPE") to operate as a school, and was under order by the BPPE to cease operations, stop enrolling students, cease all instructional services, and submit a closure plan; (iii) in violation of California law, enrolling, signing tuition payment plans with, and providing educational services to students before Lambda obtained the BPPE's approval to operate; and (iv) in violation of California law,

1

engaging in the unlawful business practice of unlicensed lending; and (v) misrepresenting and concealing the true nature of Lambda's financial interest in students' success, including by falsely representing that Lambda only got paid after students found employment and got paid.

3.     Claimant would not have enrolled at Lambda had Plaintiff known the truth about Lambda's job placement rates, its lack of approval from BPPE, or the true nature of Lambda's financial interest in Claimant's success (or lack thereof). Through this action, Claimant seeks declaratory and injunctive relief to cancel Claimant's tuition payment plan and declare that payment plan null and void; a refund of any payments Claimant has made under that payment plan; damages; and additional relief.

## I.     THE PARTIES

4.     Claimant Harrison Aguiar is a resident of Yarmouth Port, Barnstable County, Massachusetts. Claimant signed a tuition payment plan on May 19, 2020. Claimant was enrolled as a student at Lambda from May 2020 until December 2020, at which point Claimant withdrew from  Lambda's program. Claimant's tuition payment plan is attached as Exhibit A.

5.     Respondent Lambda is a corporation organized and existing under the laws of the State of Delaware, having its principal place of business at 250 Montgomery Street, Floor 16, San Francisco, California 94104 and/or 149 New Montgomery Street, 4th floor, San Francisco, CA 94101.

6.     Respondent Austen Allred is Lambda's founder and CEO. Upon information and belief, Mr. Allred resides in San Francisco, California, and/or did so during times relevant to the events described herein.

7.     Respondents John Does 1-9 are officers and/or directors of Lambda as well as individuals, corporations, or other entities who may own all or a portion of Claimant's tuition payment plan or any other financial interest in that tuition payment plan.

## II.     JURISDICTION AND VENUE

8.     The American Arbitration Association ("AAA") has jurisdiction over this action pursuant to Claimant's tuition payment plan, which specifies:

As the exclusive means of initiating adversarial proceedings to resolve any dispute arising out of this agreement, your Lambda School tuition, or your payments to Lambda School (other than any proceeding commenced by either party seeking an injunction, a restraining order, or any other equitable remedy or a proceeding commenced by either party in small claims court), either party may demand that the dispute be resolved by binding arbitration administered by the American Arbitration Association in accordance with its Consumer Arbitration Rules available at www.adr.org.

9.      Claimant's tuition payment plan further specifies, "Any such arbitration must be conducted by one arbitrator and must be conducted in San Francisco, California, the county with a major commercial airport nearest to where you live, or another mutually agreed location."

## III.   FACTUAL ALLEGATIONS

### A.     LAMBDA BACKGROUND

10.     Lambda is a private, for-profit online coding school founded in 2017 by its current CEO, Austen Allred. Mr. Allred was the Company's primary decision-maker, controlled its daily operations, and regularly promoted Lambda on social media and through other media. He benefitted financially from the tuition paid to Lambda by Claimant and all other students.

11.     Lambda provides online computer science courses of varying lengths. It is not a degree-granting institution, and is not accredited. Students cannot take out federal student loans to attend Lambda.

12.     Lambda marketed itself as a place where students learn the skills necessary to obtain employment in the competitive computer technology job market. In Mr. Allred's words, most students come to Lambda with "no network" and are "from either inner cities or rural areas."[1]

13.     Lambda touted its "experienced industry expert" instructors and a top-of-the-line curriculum that is "designed to get you hired." On April 3, 2019, Mr. Allred stated in an interview that Lambda's "educational experience is, I think, among the best in the world."[2]

---

[1] *See* Y Combinator, *A CS Education That's Free Until You Get a Job - Austen Allred of LambdaSchool*, YouTube (Apr. 3, 2019) at 9:10 (hereinafter "Y Combinator Interview"), https://www.youtube.com/watch?v=_yIAYZtdrfI&t=551s.
[2] *Id.* at 15:05.

3

14.     At all times relevant to this complaint, Lambda charged tens of thousands of dollars for its program, more than double the reported average price of online coding bootcamps.[3]

15.     Part of Lambda's business model has been predicated on convincing prospective students to agree to pay a large amount of tuition by promising them that they will not owe anything unless and until they find a job that pays $50,000 or more per year.

16.     Lambda carries out this model by entering into tuition payment plans with students. For example, as Lambda describes one of its tuition payment plan offerings, Income Share Agreements (ISAs): "A Lambda School ISA is a contract under which you agree to pay 17% of your post-Lambda School salary for 24 months, but only once you're making more than $50,000 per year (or the equivalent of $4,166.67 per month). The ISA is capped at a maximum repayment of $30,000, so you won't pay more than $30,000 under any circumstances."[4]

17.     Over time, Lambda expanded its tuition payment plan offerings to include, for example, retail installment contracts, deferred tuition plans, multi-part installment payment plans, financing through a third-party loan, a pre-instruction lump sum payment, or ISA varieties that combine an initial lump sum payment with payments from a proportion of future earnings.

18.     Some Lambda tuition payment plans are managed by third-party servicers who handle origination and payment processing.[5] Meratas, a loan-servicing company headquartered in Stamford, Connecticut, services Claimant's ISA.

19.     By April 2019, Lambda was growing at "an insane pace." As Mr. Allred explained:

> We agreed as a team to no longer share the number of students that we have enrolled, but it is not a small number and it is growing at an insane pace. We'll soon

---

[3] *See* Cecilia Clark, *How Much is Coding Boot Camp?* Nerdwallet (June 21, 2022, 10:53 AM), https://www.nerdwallet.com/article/loans/student-loans/how-much-is-coding-bootcamp.

[4] *The Lambda School Income Share Agreement*, Lambda School Website (scroll to FAQs "What is an ISA and how does it work"), [archived by the Wayback Machine (Dec. 16, 2020), https://web.archive.org/web/20201216131833/https:/lambdaschool.com/tuition/isa].

[5] *The Lambda School Income Share Agreement*, Lambda School Website (scroll to FAQs "Who are Meratas and Leif"), [archived by the Wayback Machine (Dec. 16, 2020), https://web.archive.org/web/20201216131833/https:/lambdaschool.com/tuition/isa].

be measuring Lambda School scale by percentage of the overall number of students learning to program every year, to give you some context. And being able to support that kind of scale effectively is what keeps me up at night. Mostly specifically hiring, mostly hiring executives right now who can build out 100, 150 person teams beneath them . . . and we need like 5 of them yesterday.[6]

20.    Mr. Allred attributed Lambda's growth in part to his active personal Twitter account, stating in January 2020 that his frequent tweets have "certainly helped Lambda school grow."[7]

21.    Mr. Allred also stated: "If there's one thing I'm good at in life, it's growing something quickly, building hype for something quickly. That's kind of my superpower."[8]

22.    As described below, Lambda's rapid growth was fueled by the School's, and Mr. Allred's, public misrepresentations about the School's approval status and job placement rates.

**B.    UNTIL AUGUST 17, 2020, LAMBDA OPERATED WITHOUT STATE APPROVAL, IN VIOLATION OF CALIFORNIA LAW**

23.    As a California company with its headquarters and principal place of business in San Francisco, Lambda is subject to the laws of the state of California. One of those laws, California Education Code § 94886, bars private postsecondary educational intuitions from doing business without "approval to operate."

24.    Another, Section 94917, provides that when educational institutions violate this law, any "note, instrument, or other evidence of indebtedness relating to payment" for its programs is "void and not enforceable."

25.    All Lambda tuition payment plans, including ISAs, are a "note, instrument, or other evidence of indebtedness relating to payment for educational program[s]," under the California Education Code.

26.    On March 20, 2019, the BPPE issued a "Citation: Assessment of Fine and Order of Abatement" ("Citation") to Lambda. The Citation found that Lambda was "operating without

---

[6] Y Combinator Interview at 47:50.

[7] Vincent Woo, *Interview with Austen Allred*, Soundcloud (Jan. 22, 2020) at 42:10 (hereinafter "Woo Interview"), https://soundcloud.com/vwoo/interview-with-austen-allred.

[8] Y Combinator Interview at 22:25.

Bureau approval," in violation of the California Education Code. A copy of the Citation is attached hereto as Exhibit B.

27.    In the Citation, the BPPE ordered that Lambda "cease to operate as a private postsecondary educational institution" and "submit a school closure plan." The Citation further required Lambda to "discontinue recruiting or enrolling students and cease all instructional services and advertising in any form or type of media, including the https://lambdaschool.com and any other websites not identified here that are associated with the Institution, until such time as an approval to operate is obtained from the Bureau."

28.    On May 14, 2019, Lambda submitted its application to the BPPE seeking approval to operate.

29.    Lambda appealed the Citation and, on July 24, 2019, the BPPE issued an "Appeal of Citation Informal Conference Decision: Citation Affirmed" (the "Citation Affirmance"). The BPPE affirmed the Citation because "[n]o new substantive facts were presented," and thus, Lambda was required to "comply with the orders described in the 'Violation Code Sections' of this document and submit evidence of compliance within 30 days from the date of this decision." Citation Affirmance at 1–3. A copy of the Citation Affirmance is attached hereto as Exhibit C.

30.    In direct violation of California law, the Citation, and the Citation Affirmance, Lambda continued to operate, advertise its educational services to the public, and enroll students.

31.    On August 21, 2019, the BPPE denied Lambda's May 14, 2019 application, stating in a letter to Lambda that it was "unable to grant approval." A copy of the August 21 order is attached hereto as Exhibit D.

32.    On November 25, 2019, the BPPE issued an order denying Lambda's updated application for approval, explaining that "at this time the Bureau is unable to grant approval, based on the requirements of the California Education Code." A copy of the November 25 order is attached hereto as Exhibit E.

33.    On June 22, 2020, the BPPE issued yet another order denying Lambda's further updated application for approval to operate, stating that "the Bureau cannot at this time approve Lambda's application." A copy of the June 22 order is attached hereto as Exhibit F.

34.    The June 22, 2020 order also found that Lambda's ISAs constitute "an instrument or evidence of indebtedness" under the California Education Code. *Id.* at 5.

35.    On August 17, 2020, the BPPE issued an order approving Lambda's application. The approval letter stated that the BPPE had completed its review of Lambda's "Application for Approval to Operate," including "supplemental documentation" received on August 14, 2020. The BPPE found that "[a]pproval to operate is granted *effective August 17, 2020*." (emphasis added). A copy of the August 17 order is attached hereto as Exhibit G.

36.    From at least May 2019 until Lambda was approved on August 17, 2020, Lambda's publicly available course catalogs falsely stated that Lambda was approved by the BPPE. In at least three versions of the 2019 and 2020 catalogs—revised in May 2019, September 2019, and July 2020 (all prior to Lambda's approval)—Lambda falsely stated the following:

> **APPROVALS**
> Lambda School is a private institution *approved to operate* by the California Bureau for Private Postsecondary Education. Approval to operate means the institution is compliant with the minimum standards contained in the California Private Postsecondary Education Act of 2009 (as amended) and Division 7.5 of Title 5 of the California Code of Regulations.

*See* Exhibit H (Excerpts of Three Versions of Lambda Course Catalogs for 2019 and 2020 at 5) (emphasis added).

37.    During the time Lambda was seeking the BPPE's approval, Mr. Allred engaged in a public misinformation campaign about Lambda's legal status. For example, in August 2019, Mr. Allred told Business Insider that Lambda was working with the BPPE to obtain approval and

that the order had been stayed while the application was pending. Mr. Allred stated that "[b]ecause we're talking with BPPE, it doesn't affect students at all."[9] This was false.

38.    In truth, the Citation and Citation Affirmance were not stayed, multiple of Lambda's applications had been denied, and Lambda's future was uncertain. In August 2020, a public information officer with California's Department of Consumer Affairs told Business Insider "that there is no stay on the order, and that if Lambda School is still operating while its registration is pending, it would be in violation of state law."[10]

39.    Upon information and belief, Mr. Allred further commented to Lambda students over the Lambda Slack channel that any regulatory issues were mere technicalities that did not affect the school's ability to operate.

40.    At all times Mr. Allred knew or should have known that ISAs and other financing instruments issued by Lambda were void and unenforceable under California Law due to Lambda's lack of approval to operate.

41.    Throughout 2019 and 2020, prior to Lambda's August 17, 2020 approval, Lambda and Mr. Allred further misrepresented Lambda's approval status by using a number of recognized attributes of an approved academic institution in its advertising and promotional materials. During this period, Lambda's name, website, and the website URL itself – lambdaschool.com – used the term "school", and Lambda's website, ads, and social media continuously displayed the following school crest:

*Screenshot from Lambda's website on April 22, 2020.*



---

[9] Rosalie Chan, *The hot Silicon Valley coding bootcamp Lambda School is paying a $75,000 fine for not registering properly with the state of California*, Business Insider (Aug. 29, 2019, 6:32 PM), https://www.businessinsider.com/lambda-school-coding-bootcamp-california-bppe-2019-8.
[10] Rosalie Chan, *A California official says red-hot coding bootcamp Lambda School is violating state law if it operates without the right registration — but the company insists classes can go on*, Business Insider (Aug. 30, 2019, 8:54 PM), https://www.businessinsider.com/lambda-school-california-state-law-coding-bootcamp-y-combinator-2019-8.

42.     During this period, Lambda's website, online ads, and social media continuously and repeatedly referred to various features of an approved academic institution, including, for example, a "curriculum," "tuition," "students," "student body," being "enrolled," an academic "schedule," "graduates," "mentors," "grades," "lectures," "homework," and "career support": [11]

*Screenshot from Lambda's website on May 6, 2020.*



---

[11] *See, e.g.*, Lambda School (@LambdaSchool), Twitter (Dec. 10, 2019, 9:52 PM), https://twitter.com/bloomtech/status/1204609786718801922; Lambda School Instagram (Mar. 16, 2020), https://www.instagram.com/p/B9zG7NvjhyS/; *Curriculum*, Lambda School Website, [archived by the Wayback Machine (May 6, 2020), https://web.archive.org/web/20200506051614/https://lambdaschool.com/curriculum].

*Screenshot of a March 16, 2020 Lambda Instagram post.*



43.    Mr. Allred furthered the appearance that Lambda was approved to operate in similar terms. In his "Letter from the CEO" at the beginning of Lambda's March 2020 outcomes report (which was publicly available on the Lambda website), he refers to the Lambda "student body" growing to 2,900, with Lambda staff growing to 200, and moving the Lambda headquarters to an office building in downtown San Francisco based on that growth. He refers to a "curriculum" that is "mastery-based," "graduation," "career support," and "the school." He acknowledged that Lambda "students place great trust in Lambda School when they enroll, and they make incredible investments of time and energy while engaged in our programs."[12]

44.    Had Claimant been aware that Lambda was operating without a license, was not approved to operate, and that its future legal status was uncertain, Claimant would not have signed a tuition payment plan that indebted Claimant for up to $30,000 to Lambda. Indeed, no

---

[12] *See* Austen Allred, *Announcing the Release of Our H1 2019 Student Outcomes Report*, Lambda School Website (Mar. 27, 2020), [archived by the Wayback Machine (Apr. 23, 2020), https://web.archive.org/web/20200423031203/https://lambdaschool.com/the-commons/announcing-the-release-of-our-h1-2019-student-outcomes-report] (last visited November 27, 2023).

reasonable consumer would enroll and indebt themselves to a program operating unlawfully and under orders to close.

45.    Claimant's tuition payment plan constitutes a "note, instrument, or other evidence of indebtedness relating to payment for [students'] educational program," under the California Education Code, and therefore, as a matter of law, is "void and not enforceable." California Education Code § 94917.

### C.    LAMBDA'S FALSE AND MISLEADING JOB PLACEMENT RATES

46.    Lambda's selling point to Claimant and other students was that it would land them a job—and thus bring financial success. Mr. Allred described Lambda as "entirely vocational, we're a trade school basically, and we want to help you make as much money as you can."[13]

47.    Lambda's record of placing students in computer technology jobs was therefore a critical piece of information for Claimant and others considering attending Lambda. Respondents knew that students would only enroll if Lambda would help them secure a job. As Lambda described it, job placement is "the most critical component of Lambda's operations, not only in the School's obligation to its students, but to the prosperity of the company as a whole." *See* ¶ 53, *infra*.

48.    To that end, for the past six years, since Lambda's inception, and continuously through today, Lambda and Mr. Allred have engaged in an extensive and long-term campaign to advertise false and misleading job placement rates, intending that potential students like Claimant would review those rates and enroll at Lambda as a result of those rates.

49.    Lambda and Mr. Allred have prominently displayed false and misleading information on Lambda's purported record of job placement on the Lambda website, in marketing materials and outcomes reports, in a variety of online and social media advertisements (upon information and belief, including Google, YouTube, and various social media), and

---

[13] Y Combinator Interview at 13:00.

through social media postings and comments, including Mr. Allred's personal social media accounts.

### 1. False and misleading job placement rates on Lambda's website and outcomes reports

50.     Throughout 2018 and 2019, Lambda's website advertised job placement rates of over 80%. Lambda and its executive leadership, including Mr. Allred, knew that these widely disseminated rates were false and misleading.

51.     On August 2, 2018, Mr. Allred, Ben Nelson (co-founder and CTO), and Ryan Holdaway (VP of Outcomes), stated the following in a post on the Lambda School Blog: *"[E]very single* Lambda School graduate who has been on the job market for six months is either employed in a full-time role as a software engineer or has joined an early startup working for equity."[14]

52.     Yet on August 3, 2018—the very next day—Lambda's executive leadership team reprimanded Lambda's Director of Career Readiness for poor job placement rate performance, sending her an "Employee Corrective Action Form." The form stated that the employee's "performance in recent months has not met the expectations for the Career Coach/Director of Career Readiness role at Lambda School. Overall placement numbers are low and the time to placement is much higher than desired."

53.     The Corrective Action Form continued:

Placements are the most critical component of Lambda's operations, not only in the School's obligation to its students, but to the prosperity of the company as a whole. A common discussion point in regards to Outcomes is that current placement rates are too low and time to placement is too high. Creative tactics and adjustments to current careers processes as well as follow through are needed to improve both of these measurements. . . .

CS1 students graduated on 1/19/18. Since then we've had a new class graduate approximately every five weeks. As of 8/1/18, only 16 students of the 48 graduated students assigned to [the Lambda career placement employee] have been placed.

---

[14] Austen Allred, *Introducing Lambda Next — Our Revolutionary New Job Search and Placement Program*, Medium: Lambda School Blog (Aug. 2, 2018), https://medium.com/lambda-school-blog/introducing-lambda-next-our-revolutionary-new-job-search-and-placement-program-603ef12f7d37 (emphasis added).

54.     Two months later, on October 8, 2018, Lambda continued to tout its high job placement rates, announcing on its website: "Since Lambda School's inception in April 2017, over 75 Lambda School graduates have been hired, including 83% of early cohorts, with an average salary increase of over $47,000 per hired graduate."

55.     Lambda's website contained the following statement across the top of the page:

*Screenshot from Lambda's website on December 13, 2018.*



56.     The representation of an 83% job placement rate remained on the Lambda website until on or about February 2019.

57.     From on or about April 2019 until at least December 2019, Lambda's website advertised an ever higher job placement rate: over 85%. For example, on April 18, 2019, Lambda's website contained the following statement across the top of the page:

*Screenshot from Lambda's website on April 18, 2019.*



58.     Yet in May of 2019—at the same time Lambda was advertising an 85.9% job placement rate on its website—Lambda executives sent a private memorandum to investor Y Combinator confirming the falsity of the rates it was publicly promoting. *See* Lambda

Memorandum to Investors, *Human Capital: The Last Unoptimized Asset Class* at 10 (May 2019), attached hereto as Exhibit I. The May 2019 memo stated:

> **We're unable to place students at scale**
> - We're at roughly 50% placement for cohorts that are 6 months graduated
> - Placement to date has been manual and one-off, which isn't possible at scale

Ex. I at 10.

59.     After the memorandum was published in news accounts two years later, Mr. Allred confirmed in a tweet from his personal account that he had told investors that Lambda had a 50% placement rate, stating: "The 50% came from me telling investors about what % of enrolled students get jobs that require repayment."

60.     Despite Mr. Allred's contrary statement to investors, Lambda's website continued to promote a 85.9% or 86% placement rate through the end of 2019. These rates were false and misleading.

61.     On December 14, 2019, Lambda's homepage stated:



*Screenshot from Lambda's website on December 14, 2019.*

62.     This statement was false and directly contrary to the true facts known to Lambda and Mr. Allred, which had privately been disclosed to investors, as described above.

63.     When asked in an interview to explain the discrepancy between the representations on Lambda's website and representations to its investors, Mr. Allred explained:

14

"I mean you're literally looking at what are the risks, right? Like, we're going to pick our lowest number for that – there are cohorts that have been at 50% placed within 6 months, yes."[15]

64.    When asked whether the advertised 86% job placement rate was accurate, he stated: "the way that that number was measured was an average across cohorts at a specific time. I don't know what it is right now, but that's directionally correct."[16]

65.    On February 19, 2020, New York Magazine published an article titled "Lambda School's Misleading Promises," in which the writer concluded that Lambda was "selling unprepared students an incomplete education, fueled by overpromising marketing and misleading, if not downright fraudulent, figures."[17] The story described Lambda's job placement rate misrepresentations and also recounted an interview with a former employee who "confirmed . . . that the company's own internal numbers, which the interviewee was provided as part of their interview process, seem to indicate a roughly 50 percent or lower placement rate."[18]

66.    Lambda nonetheless persisted in promoting false and misleading job placement statistics on its website and elsewhere.

67.    In 2020, Lambda started to promote its placement rates through "outcomes reports" published on its website and shared through social media. Multiple outcomes reports included an "Independent Accountants' Report" directed "To the Management" of "Lambda Inc." located at "250 Montgomery Street[,] San Francisco, CA 94104".

68.    The first outcomes report, titled "H1 2019 Outcomes Report," was published on March 27, 2020,[19] and reported a 79% placement rate.[20]

---

[15] Woo Interview at 13:00-14:30.

[16] *Id.* at 11:13-11:26.

[17] Vincent Woo, *Lambda School's Misleading Promises*, New York Magazine (Feb. 19, 2020), https://nymag.com/intelligencer/2020/02/lambda-schools-job-placement-rate-is-lower-than-claimed.html.

[18] *Id.*

[19] *See* Austen Allred, *Announcing the Release of Our H1 2019 Student Outcomes Report*, Lambda School Website (Mar. 27, 2020), [archived by the Wayback Machine (Apr. 23, 2020), https://web.archive.org/web/20200423031203/https://lambdaschool.com/the-commons/announcing-the-release-of-our-h1-2019-student-outcomes-report].

[20] *See H1 2019 Report Lambda School Outcomes Report*, Lambda School Website, [archived by

69.    The 79% placement rate remained up on Lambda's website until December 3, 2020, when Lambda published its "H2 2019 Outcomes Report."[21] The H2 2019 report showed a 74% placement rate.[22]

70.    The 74% rate announced in the H2 2019 report remained up on Lambda's website until November 7, 2021, when Lambda announced its 2020 outcomes.[23] In the 2020 outcomes report, Lambda announced that the placement rate remained at 74%.

71.    Until November 1, 2022, Lambda continued to report the 74% placement rate from the 2020 outcomes report on its website:

# 74%

Job placement rate for BloomTech graduates

**BloomTech 2020 Outcomes Report**

*Screenshot from Lambda's homepage on September 30, 2022.*[24]

---

the Wayback Machine (Sept. 3, 2020),
https://web.archive.org/web/20200903023542/https:/lambdaschool.com/reports/2019-outcomes-report].

[21] *See* Austen Allred, *Announcing the Release of Our H2 2019 Student Outcomes Report*, Lambda School Website (Dec. 3, 2020), [archived by the Wayback Machine (Dec. 14, 2020), https://web.archive.org/web/20201214214247/https:/lambdaschool.com/the-commons/announcing-lambda-school-h2-2019-student-outcomes-report].

[22] *Id. See also H2 2019 Report Lambda School Outcomes Report*, Lambda School Website [archived by the Wayback Machine (Dec. 3, 2020), https://web.archive.org/web/20201203230224/https:/lambdaschool.com/reports/h2-2019-outcomes-report].

[23] *See Bloom Institute of Technology 2020 Outcomes Report,* Bloom Institute of Technology, [archived by the Wayback Machine (Nov. 25, 2021), https://web.archive.org/web/20211125162824/https:/www.bloomtech.com/reports/outcomes-report].
It appears that Lambda only published one outcomes report in 2020. *See BloomTech Reports*, Bloom Institute of Technology Website, https://www.bloomtech.com/reports/archive (last visited Mar. 14, 2023).

[24] *See Built For Your Success*, Bloom Institute of Technology Website, [archived by the Wayback Machine (Sept. 30, 2022) https://web.archive.org/web/20220930032702/https:/www.bloomtech.com/outcomes].

72.      On November 2, 2022, Lambda published the "BloomTech 2021 Outcomes Report," advertising a 90% placement rate. As of November 2, 2022, Lambda's website provided:

# 90%

Job placement rate for BloomTech graduates

**BloomTech 2021 Outcomes Report**

*Screenshot from Lambda's homepage on November 27, 2022.*[25]

73.      In a "Letter from the CEO" dated November 2, 2022, Mr. Allred wrote: "In this independently examined report, you'll gain a transparent view of how our learners and graduates fared in 2021. Our biggest takeaway: A full **90% of our 2021 graduates have landed jobs**, which is the highest rate in our company's history."[26]

74.      Lambda's homepage continued to advertise a 90% placement rate until January 2024, when it updated the rate, touting an "86% job placement rate in 2022 for job-seeking grads."[27]

75.      Like the earlier rates from 2018 and 2019, the rates Lambda published from 2020 to the present (including, but not limited to, the 79%, 74%, 90%, and 86% rates from the Lambda website and outcomes reports) were, and continue to be, false and misleading. Lambda and its executive leadership, including Mr. Allred, knew that these widely disseminated rates were false and misleading.

---

[25] *See Built For Your Success,* Bloom Institute of Technology Website, [archived by the Wayback Machine (Nov. 27, 2022), https://web.archive.org/web/20221127122732/https://www.bloomtech.com/outcomes].
[26] *See* Austen Allred, *Letter from the CEO*, Bloom Institute of Technology Website (Nov. 2, 2022), https://www.bloomtech.com/reports/outcomes-report#letter (last visited Mar. 14, 2023) (emphasis in original, internal citation omitted).
[27] *See* Bloom Institute of Technology Home Page, https://www.bloomtech.com/ (last visited December 6, 2023).

76.     Business Insider reported in October 2021 that documents from a Lambda "all-hands" staff meeting in January 2021 "showed that Lambda School placed only around 30% of its 2020 graduates in qualifying jobs during the first half of 2020. This figure is in stark contrast to the 74% placement rate it advertised for its 2019 graduates, the latest figure the school has made publicly available. . . ."[28]

77.     This "all hands" meeting took place one month after Lambda published the 74% placement rate in the H2 2019 Outcomes Report.

78.     A slide prepared by Lambda reveals that the H1 2020 placement rate was only 33% and the H2 2020 rate was 40%, a far cry from the 74% listed on the Lambda website until November 2, 2022. According to the same slide, Lambda's H1 2021 *goal* was 60% placement and H2 2021 *goal* was 80%:

## Long-Term Student Success Goals

|  | H1 2020 | H2 2020 | H1 2021 | H2 2021 | Metric | Description |
|---|---|---|---|---|---|---|
| **Admissions** | 1277 | 1450 | TBD | TBD | Unit 2 Starts | # students starting Unit 2. |
| **School** | 52% | 56% | 60% | 80% | % Graduating within 11 Units | % of students who start Unit 2 complete coursework within 11 units. |
| **Outcomes** | 33% | 40% | 60% | 80% | % Qualified Placement within 180 days | % of graduates get high paying jobs within 180 days. |
| **Repayment** | 72% | 79% | 85% | 87% | % Repaying within 60 days | % of qualified placed graduates have made a first payment within 60 days. |

79.     On information and belief, a Lambda executive presented the slide at the "all-hands" meeting at Lambda's headquarters in San Francisco, California.

---

[28] *See* Vincent Woo, *Lambda School promised a fast and cheap path to a lucrative tech career. Leaked documents and former students cast doubt on that claim*. Business Insider (Oct. 25, 2021, 7:30 AM), https://www.businessinsider.com/lambda-school-promised-lucrative-tech-coding-career-low-job-placement-2021-10.

80.     Another slide, titled "Lambda H1 Company OKRs," provided that the "actual" placement rate for H1 2020 was 33% of graduates placed within 180 days, and the actual rate for H2 2020 (as of October 2020) was 27% of graduates placed within 180 days. This slide also listed the H1 2021 goal as 60%:

## Lambda H1 Company OKRs

| | H1 2020 | H2 2020 | H1 2021 | Metric | Description |
|---|---|---|---|---|---|
| **Admissions Goal**<br>Admissions Actual | n/a<br>1277 | 1450<br>~850 | 1500 | Unit 2 Starts | # students starting Unit 2. |
| **School Goal**<br>School Actual | n/a<br>52% | 56%<br>52% | 60% | Extended Grad Rate % | % of students who start Unit 2 complete coursework within expected time window |
| **Outcomes Goal**<br>Outcomes Actual | n/a<br>33% | 40%<br>27% | 60% | % Qualified Placement within 180 days | % of graduates get high paying jobs within 180 days. |
| **Repayment Goal**<br>Repayment Actual | n/a<br>41% | 75%<br>73% | 85% | % Repaying within 60 days | % of qualified placed graduates have made a first payment within 60 days. |
| **Alumni Goal** | n/a | n/a | 40% | % Alumni Giving back | % of hired alumni giving back |

*H2 2020 Actuals as of October 2020

81.     Another slide, reportedly used at another all-hands meeting in February 2021, broke out the 180-day placement rates by month, from February to July 2020, as follows:

| Graduation Month | Qualified Placed % (days elapsed since graduation) | | |
|---|---|---|---|
| Month | +90d | +180d | QP Now |
| Feb - 2020 | 20% | 31% | 41% |
| Mar - 2020 | 19% | 30% | 36% |
| April - 2020 | 17% | 24% | 32% |
| May - 2020 | 13% | 27% | 32% |
| Jun - 2020 | 15% | 25% | 27% |
| Jul - 2020 | 18% | 24% | 25% |
| Aug - 2020 | 16% | | 21% |
| Sept - 2020 | 13% | | 14% |
| Oct - 2020 | 10% | | 11% |
| Nov - 2020 | | | 11% |
| Jan - 2021 | | | 11% |
| **Weighted Avg.** | 16% | 27% | |
| **H2 Goal** | | 40% | |

82.     In yet another slide, reportedly also used at the "all hands" meeting on January 28, 2021, Lambda's H1 2021 "goal" was to enroll 500 students a month and place 50% to 70% in qualifying jobs. The graph also shows that, if Lambda enrolled 2,000 students per month, it could become profitable even if fewer than half of its students found jobs:



83.     Prior to signing a tuition payment plan, Claimant read Respondents' representations that Lambda's job placement rate was above 70%. Lambda's purported record of successfully placing students was critical to Claimaint's decision to enroll.

### 2.     Lambda's false and misleading statements about job placement in social media postings and comments.

84.     In addition to advertising job placement rates on its website and in outcomes reports, Lambda's job placement marketing campaign aimed at potential students expanded to social media posts and comments, including Twitter, Facebook, and Instagram. Like the rates on its website and in outcomes reports, these rates, ranging from 71% to at least 91%, were false and misleading. Lambda and its executive leadership, including Mr. Allred, knew that these widely disseminated rates were false and misleading, and intended that potential students like Claimant would review those rates and enroll at Lambda as a result of those rates.

85.     Examples of false and misleading job placement rates on Lambda's Twitter, Facebook, and Instagram accounts include:

a) April 6, 2018, Lambda Twitter: "Time for another update on placement. Students hired by Lambda School are not included. Cs1: 75% hired within first two months of search."[29]

b) March 5, 2019, Lambda's Twitter account linked to a report touting an 85.9% job placement rate and stated: "Lambda only succeeds when our students succeed, and we're committed to a transparent, no-surprises approach to education."[30]

c) April 22, 2020, Lambda Instagram: "Percentage of H1 2019 graduates that have been placed into jobs. → 71%"[31]



---

[29] Lambda School (@LambdaSchool), Twitter (Apr. 6, 2018, 12:39 PM), https://twitter.com/bloomtech/status/982311747301330944.

[30] Lambda School (@LambdaSchool), Twitter (Mar. 5, 2019, 7:02 PM), https://twitter.com/bloomtech/status/1103083315945328640.

[31] Lambda School (@LambdaSchool), Instagram (Apr. 22, 2020), https://www.instagram.com/p/B_S2M-Llm2y/.

d)  September 27, 2021, Lambda Instagram: "77% of H2 2019 job-seeking Data Science graduates were hired. 94% [o]f those hired graduates go the job in the first 180 days"[32]



e)  November 3, 2022, Lambda Instagram: "90% of our 2021 alumni gained in-demand skills and landed great jobs—our highest placement rates *ever*!"[33]



---

[32] Lambda School (@LambdaSchool), Instagram (Sept. 27, 2021), https://www.instagram.com/p/CUWJM1qJlEB/?img_index=4.
[33] Bloom Tech (@Bloomtechofficial), Instagram (Nov. 3, 2022), https://www.instagram.com/p/CkgVeHBrmP9/.

f)  November 3, 2022: Lambda Facebook: "90% of our 2021 alumni gained in-demand skills and landed great jobs—our highest placement rates *ever*!"[34]

g)  November 3, 2022, Lambda Twitter: "90% of our 2021 alumni gained in-demand skills and landed great jobs—our highest placement rates *ever*!"[35]

h)  November 4, 2022, Lambda Facebook: "Fun Fact: Did you know, 90% of our 2021 full Stack Web job-seeking graduates found a job after BloomTech?"[36]

i)  November 7, 2022, Lambda Facebook: "91% of our 2021 job-seeking Data Science graduates found a job 😲"[37]

j)  November 9, 2022, Lambda Instagram: "91% of 2021 job-seeking Data Science grads found a job after BloomTech"[38]

### 3. Mr. Allred's false and misleading statements about job placement were a driving force behind Lambda's job placement rate marketing campaign.

86.  At all times relevant to this complaint, Mr. Allred was the driving force behind Lambda's job placement rate marketing campaign. Rather than passively overseeing the campaign, he personally spearheaded Lambda's dissemination of false and misleading rates, oftentimes promoting the rates himself on his own social media accounts.

87.  For example, since March 2020, when Lambda first promoted its job placement rates through outcomes reports, each outcomes report has begun with a personalized letter from Mr. Allred titled "Letter from the CEO," vouching for the rates in the report. The reports end with Mr. Allred's signature.

[34]Bloom Tech (@BloomTech), Facebook (Nov. 3, 2022), https://www.facebook.com/BloomTech/posts/pfbid0C9MRRryV1zaMpSXa35QnogkPDAR984bjs9xmen4WJB4SWMtkWAn2kxZ7BRC11Kdhl.
[35] Bloom Tech (@BloomTech), Twitter (Nov. 3, 2022, 11:15 AM), https://twitter.com/bloomtech/status/1588203108013850629.
[36] Bloom Tech (@BloomTech), Facebook (Nov. 4, 2022), https://www.facebook.com/BloomTech/posts/pfbid025d3iVN2usd1eLKfwTMCh78a3kVNpsmUcRCsMXWinqtYX4tHqLbkDHQz9mhqUZuanl.
[37] Bloom Tech (@BloomTech), Facebook (Nov. 7, 2022), https://www.facebook.com/BloomTech/posts/pfbid0UpByQ5eFsctoNH51QuK1DPrTXYXvaU9cPbE2H6weYnnvR2YbpWF2m8vLGbuuoUhol.
[38] Bloom Tech (@Bloomtechofficial), Instagram (Nov. 9, 2022), https://www.instagram.com/p/CkwHe8ivDND/.

88.     Mr. Allred also advertised false and misleading rates on his personal Twitter

account:

a)  March 13, 2019: In response to a commenter asking about a $60,000 median
    salary and 83% 6-month employment rate for Lambda's main web track, Mr.
    Allred responded, "That's low now, but our average student increases his or her
    income by $47,000."[39]

b)  March 15, 2019: "Lambda School's first iOS class graduates today. 66% of them
    are already **hired.**"[40]

c)  November 16, 2019: "First track just graduated. Hit 100% hired but was VERY
    small sample size." Subsequent reporting revealed that this small sample size
    consisted of a single student.[41]

d)  November 3, 2022: "I am so incredibly excited to finally be able to share
    BloomTech's 2021 Outcomes Report. Highlights: *All-time high 90%
    placement rate for job-seeking grads".[42]

89.     Other examples of false, misleading, and exaggerated claims on Mr. Allred's

Twitter account include:

a)  January 24, 2021: "I think we're like 2-3 solvable problems being solved away
    from 100% of Lambda School grads being hired. Still a lot of unknowns, but I
    think it will be possible." When a commenter asked what the problems were, Mr.
    Allred responded: "Boring stuff."[43]

b)  April 22, 2021: "When I started Lambda School early detractors gave me hell
    because I said that Lambda School would cause thousands of people to become
    millionaires who wouldn't have otherwise been. It's now pretty clear that was
    very conservative."[44]

---

[39] Austen Allred (@Austen), Twitter (Mar. 13, 2019, 12:14 PM),
https://twitter.com/Austen/status/1105879911036665856.
[40] Austen Allred (@Austen), Twitter (Mar. 15, 2019, 5:20 PM),
https://twitter.com/Austen/status/1106681485275205634.
[41] *See* Zoe Schiffer & Megan Farokhmanesh, *The High Cost of a Free Coding Bootcamp*, The
Verge (Feb. 11, 2020, 11:15 EST), https://www.theverge.com/2020/2/11/21131848/lambda-
school-coding-bootcamp-isa-tuition-cost-free; Ryan Mac (@RMac18), Twitter (Feb. 11, 2020,
1:59 PM), https://twitter.com/RMac18/status/1227306243733295108.
[42] Austen Allred (@Austen), Twitter (Nov. 3, 2022, 12:20 PM),
https://twitter.com/Austen/status/1588219699157905408.
[43] Austen Allred (@Austen), Twitter (Jan. 24, 2021, 1:55 AM),
https://twitter.com/austen/status/1353234915643568128.
[44] Austen Allred (@Austen), Twitter (Apr. 22, 2021, 10:24 AM),
https://twitter.com/Austen/status/1385238109185396740.

c) May 4, 2021: "I get to watch a bunch of people double their income (or more) every single day. Even the worst days are punctuated by a bunch of people changing their lives and the lives of their families forever."[45]

d) May 4, 2021: "You can go from near poverty to huge future wealth in just a few months."[46]

e) November 24, 2022: "Thankful today for all those who have worked so hard for BloomTech (by current name or by Lambda School). So many people working so diligently. Thousands of lives changed, billions in increased earnings."[47]

90.    Mr. Allred and Lambda acted willfully and knowingly to disseminate Lambda's job placement representations to the public—including applicants to their school such as Claimant—with knowledge that they were, and continue to be, false and misleading.
.

### D.    LAMBDA MISREPRESENTS THAT IT ONLY GETS PAID ONCE STUDENTS DO

91.    In addition to the placement rates, Lambda and Mr. Allred misled potential students like Claimant with the frequently repeated declaration that: "We don't get paid until you do, so we're in this together, from your first day of classes to your first day on the job."[48] For example, on June 27, 2019, Lambda's homepage stated:



## Higher learning. Higher earning.

Lambda is designed for student success. We don't get paid until you do, so we're in this together, from your first day of classes to your first day on the job — and beyond.

*Screenshot from Lambda's homepage on June 27, 2019.*

---

[45] Austen Allred (@Austen), Twitter (May 4, 2021, 11:50 PM), https://twitter.com/Austen/status/1389789532761956352.
[46] Austen Allred (@Austen), Twitter (May 4, 2021, 11:53 PM), https://twitter.com/Austen/status/1389790386659364868.
[47] Austen Allred (@Austen), Twitter (Nov. 24, 2022, 9:51 AM), https://twitter.com/austen/status/1595822473781485568.
[48] *See, e.g.*, Apply Now Pages, Lambda School Website [archived by the Wayback Machine (June 27, 2019), https://web.archive.org/web/20190627024024/https://lambdaschool.com/].

92.    Mr. Allred regularly touted that Lambda only gets paid when students do on his personal social media accounts and the Lambda website, describing Lambda's business as based on shared and aligned incentives between Lambda and its students:

   a)   "The main directive in everything we did can be summed up in two words: incentive alignment."[49]

   b)   "Our mission from day one has been to **align the incentives of school and student**, giving more people the opportunity they deserve to land a great job with a higher income. If our students don't succeed, our school shouldn't either."[50]

93.    In reality, Lambda packaged and sold its tuition payment plans, including ISAs, to investors long before students obtained employment. As early as May 2019, Lambda privately told investor Y Combinator: "Currently we sell some income share agreements to hedge funds." Exhibit I at 2.

94.    To facilitate the sale of ISAs, Lambda partnered with Edly, a digital marketplace that helps schools sell ISAs to third-party investors. On December 11, 2019, Edly tweeted: "Pleased to announce our latest offering [–] a Lambda School ISA Pool. We @edlyISA are excited to work with the amazing team @LambdaSchool[], one of the most impactful ISA programs in the country."[51] To learn how to participate, Edly invited interested investors to join a webinar that night with Mr. Allred.[52]

---

[49] Austen Allred, LinkedIn (2019), https://www.linkedin.com/posts/austenallred_announcing-our-new-isa-financing-blueprint-activity-6636140633306333184-dkOh?utm_source=share&utm_medium=member_desktop.
[50] *See* Austen Allred, *Announcing the Release of Our H1 2019 Student Outcomes Report*, Lambda School Website (Mar. 27, 2020), [archived by the Wayback Machine (Apr. 23, 2020), https://web.archive.org/web/20200423031203/https:/lambdaschool.com/the-commons/announcing-the-release-of-our-h1-2019-student-outcomes-report] (emphasis in original).
[51] @edlyISA, Twitter (Dec. 11, 2019, 3:01 PM), https://twitter.com/edlyISA/status/1204853625459216385 (on file with Claimant's counsel).
[52] @edlyISA, Twitter (Dec. 11, 2019, 3:02 PM), https://twitter.com/edlyISA/status/1204853900177743872(on file with Claimant's counsel).

95.      Lambda did not disclose this fact to students until public reporting exposed it, and for many months Mr. Allred flatly denied it, stating in October 2019 on Twitter that "We never, ever get paid up front for ISAs."[53]

96.      Claimant read the false and misleading statement on the Lambda website that Lambda only got paid once the student does and, as a result, believed that Lambda would only get paid once Claimant secured a qualifying job. Knowing that Lambda only got paid if Claimant obtained employment was important to Claimant's decision to attend.

### E.      LAMBDA ENGAGED—AND STILL ENGAGES—IN THE UNLAWFUL BUSINESS PRACTICE OF UNLICENSED LENDING

97.      The California Financing Law "shall be liberally construed and applied to promote its underlying purposes and policies," which include "protect[ing] borrowers against unfair practices by some lenders, having due regard for the interests of legitimate and scrupulous lenders." Cal. Fin. Code § 22001(a)(4).

98.      Pursuant to the California Financing Law: "No person shall engage in the business of a finance lender or broker without obtaining a license from the commissioner." Cal. Fin. Code § 22100(a).

99.      Lambda is not and never has been registered in California as a finance lender or broker under the Financing Law.

100.     Since its inception, Lambda has operated as a "finance lender" because its tuition payment plans qualify as either consumer or commercial loans under the Financing Law. *See generally* Cal. Fin. Code § 22203-04 (defining consumer loans); Cal. Fin. Code § 22502 (defining commercial loans).

101.     Lambda's Meratas ISA provides:

> THIS IS NOT A LOAN
> In making monthly payments to Lambda School, you will not be repaying a student loan. In the case of a student loan, a student borrows a set amount and repays the principal amount of the loan plus interest or a finance charge, or both. Under this agreement, you

---

[53] Woo Interview at 6:30 (wherein Mr. Allred confirms that this tweet was "totally correct").

will instead pay a fixed percentage of your income each month for up to a maximum number of payments.

102.    Contrary to this representation, ISAs are a form of student loan.

103.    According to the United States Consumer Financial Protection Bureau ("CFPB"), a representation that an ISA is "not a loan" is deceptive and misleading under the Consumer Financial Protection Act because "ISAs are loans and do create debt."[54]

104.    The California Department of Financial Protection and Innovation ("DFPI") agrees, holding that ISAs are student loans: "ISAs made solely for use to finance a postsecondary education are 'student loans' for the purposes of the SLSA [California Student Loan Servicing Act]."[55]

105.    The United States Department of Education concurs, finding that ISAs "used to finance expenses for postsecondary education are private education loans under 34 C.F.R. 601.2(b)."[56]

106.    The BPPE also found in its June 22, 2020, order denying Lambda approval to operate that Lambda's ISA is "an instrument or evidence of indebtedness" under the California Education Code. *See* June 22, 2020 Letter from BPPE to Lambda at 5, attached hereto as Exhibit F.

---

[54] *See* Better Future Forward, Inc., et al., CFPB No. 2021-CFPB-0005, Consent Order at ¶ 23 (Sept. 7, 2021) (finding *available at:* https://files.consumerfinance.gov/f/documents/cfpb_better-future-forward-inc_consent-order_2021-09.pdf).

[55] *See In the Matter of Student Loan Servicing Act License Application of Meratas Inc.* NMLS No. 2120180, Consent Order at ¶ M (Ca. Dep't of Fin. Prot. and Innovation Aug. 5, 2021), *available at:* https://dfpi.ca.gov/wp-content/uploads/sites/337/2021/08/Meratas-Consent-Order.pdf; *see also* Press Release, California Dep't of Fin. Prot. and Innovation, "California DFPI Enters Groundbreaking Consent Order with NY-Based Income Share Agreements Servicer" (Aug. 5, 2020), https://dfpi.ca.gov/2021/08/05/california-dfpi-enters-groundbreaking-consent-order-with-ny-based-income-share-agreements-servicer/.

[56] *See* FSA Announcement, General-22-12, *Income Share Agreements and Private Education Loan Requirements* (Mar. 2, 2022), https://fsapartners.ed.gov/knowledge-center/library/electronic-announcements/2022-03-02/income-share-agreements-and-private-education-loan-requirements. *See also* 87 Fed. Reg. 65,453 ("[T]he Department clarifies that ISAs and other alternative financing products should be treated like institutional loans.").

107.    Because Lambda is in the business of making ISAs and other tuition payment plans, it is operating as a finance lender under the California Financing Law.

108.    Lambda's failure to register as a finance lender deprived Claimant of the borrower protections provided by the California Financing Law.

109.    Lambda has therefore engaged in the unlawful business practice of making a loan without a license in violation of California Financial Code § 22100, and, in turn, in violation of the unlawful prong of the UCL.

110.    Had Claimant been aware that Lambda was acting as an unlicensed finance lender, Claimant would not have signed a tuition payment plan that indebted Claimant for up to $30,000 to Lambda.

**F.    CLAIMANT'S ENROLLMENT AND ATTENDANCE AT LAMBDA, AND THE AFTERMATH**

111.    Claimant Harrison Aguiar studied web design and development in college and graduated in 2015. By 2020, he was not working in the tech field beyond freelancing a few websites. When he lost his primary job as a pool manager at the onset of the COVID-19 pandemic, he decided to try transitioning into a full-time tech career. A friend told him about Lambda, and Mr. Aguiar wondered whether the program could help him get his foot in the door.

112.    As he was weighing his options, Mr. Aguiar reviewed the Lambda website and advertisements for Lambda on social media during April and May 2020. He reviewed, and was impressed by, the 79% job placement rate on the website at the time, as well as similar rates on Facebook advertisements for Lambda.

113.    Mr. Aguiar saw that Lambda did not require tuition payments up front, and that, through an ISA, Lambda was invested in student outcomes. He reviewed the statement on the Lambda website that Lambda did not get paid until the student did, convincing Mr. Aguiar that Lambda was equally invested in student outcomes, including his.

114.    The high 79% job placement rate and the representation that Lambda only got paid once students do were critical to Mr. Aguiar's decision to enroll, convincing him that

enrolling at Lambda would maximize his chance of landing a tech job after completing Lambda coursework.

115.    But the 79% job placement rate and the statement that Lambda only got paid once students do were false and misleading, and both Lambda and Mr. Allred knew these representations were false and misleading. (*See* ¶¶ 46–90, *supra*.)

116.    Mr. Aguiar further believed that Lambda was approved to operate due to Respondents' continuous and repeated descriptions of the school and its programs on the Lambda website and Lambda ads of various features of Lambda that conveyed that it was a credible, legitimate, and lawfully operating school. These included, but were not limited to, descriptions of Lambda's job placement support, success in placing students in jobs, regular classes with experienced instructors, and an organized curriculum.

117.    Swayed by Respondents' false job placement rates, their false statements that they only got paid once students do, and their false representations that Lambda was a government-approved school, Mr. Aguiar signed an ISA with Lambda on May 19, 2020 (Exhibit A).

118.    Had Respondents truthfully represented Lambda's job placement rates, or had they truthfully represented their actual financial interest in students' success, or had Mr. Aguiar known that Lambda was not lawfully approved to operate, he would not have enrolled in Lambda's educational services, or signed an ISA that indebted him up to $30,000 of tuition to Lambda.

119.    Mr. Aguiar began attending Lambda in May 2020 and soon discovered that the program was not at all what he had anticipated based on his review of Lambda's website and promotional materials. Lambda removed experienced instructors and replaced them with current students further along in the program. Even then, Lambda regularly replaced these "instructors". Lambda also combined different student levels into the same classes, creating too much variation in experience for instruction to be effective. While he considered sticking with the program for Lambda's career services support, he understood from graduated students that Lambda did little to help students get jobs. Mr. Aguiar withdrew in 2020.

120.    After Lambda, Mr. Aguiar did not find a tech job until June 2021 when he started working as a part-time web developer for a marketing group. He found the position through a Facebook ad, not through Lambda, and he did not bother putting Lambda on his resume or cover letter when applying. He first learned the skills necessary for the position in college, not from Lambda. Since taking the job with the marketing group, he's averaged approximately six hours per week, while working primarily at his old job as a pool manager or as an Uber driver. Mr. Aguiar has not made any payments pursuant to his ISA.

## IV.    CAUSES OF ACTION

### FIRST CAUSE OF ACTION
**Violations of California's Consumer Legal Remedies Act
Cal. Civ. Code §§ 1750, *et seq.*
(All Respondents)**

121.    Claimant hereby reincorporates the allegations in the foregoing paragraphs as though fully set forth herein.

122.    The CLRA makes unlawful "unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or that results in the sale or lease of goods or services to any consumer." Cal. Civ. Code § 1770(a).

123.    The CLRA covers transactions involving the sale of services—such as education—to consumers.

124.    Claimant is a "consumer" within the meaning of Section 1761(d) of the CLRA, seeking Lambda's education services for personal, family, or household purposes, and Claimant engaged in "transactions" within the meaning of sections 1761(e)and 1770 of the CLRA.

125.    Education is a "service" within the meaning of Section 1761(b) of the CLRA.

126.    The CLRA enumerates numerous unlawful acts or practices, including:

a)    "Misrepresenting the source, sponsorship, approval, or certification of goods or services." Cal. Civ. Code § 1770(a)(2).

b)    "Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has

a sponsorship, approval, status, affiliation, or connection that the person does not have." *Id.* § 1770(a)(5).

   c)  "Representing that goods or services are of a particular standard, quality, or grade" when they are not. *Id.* § 1770(a)(7).

   d)  "Advertising goods or services with intent not to sell them as advertised." *Id.* § 1770(a)(9).

127.   In violation of these provisions, Respondents misrepresented to the public, prospective students, and current students, including Claimant, at least the following: (i) its job placement rates; and (ii) that it had approval to operate and enroll students.

128.   Respondents did so in order to induce prospective students, like Claimant, to enroll in Lambda's program—Claimant did so enroll as a result of Respondents' misrepresentations.

**SECOND CAUSE OF ACTION**
**Violations of California's Unfair Competition Law**
**Cal. Bus. & Prof. Code §§ 17200, *et seq.***
**(All Respondents)**

129.   Claimant hereby reincorporates the allegations in the foregoing paragraphs as though fully set forth herein.

130.   Respondents have engaged in business acts or practices that constitute unfair competition as defined in the UCL, in that such business acts and practices are unlawful, unfair, and fraudulent within the meaning of that statute.

131.   The business acts and practices include:

   a)  publishing and/or providing the public, prospective students, and current students, including Claimant, with false, misleading, unreliable, and/or inaccurate job placement rate information;

   b)  conducting business without BPPE approval and in violation of multiple BPPE orders requiring it to cease operations;

32

    c)   knowingly operating a private postsecondary institution without approval to do so and knowingly conveying to the public that it is an approved institution;

    d)   misrepresenting to the public, prospective students, and current students that in March and July of 2019, the BPPE ordered Lambda to cease operations, stop enrolling students, cease all instructional services, and submit a closure plan, and misrepresenting material facts related to those BPPE orders, including representing that they were stayed when they were not.

132.    Claimant's tuition payment plans constitute "lost money or property" within the meaning of the UCL.

<u>Unlawful Prong</u>

133.    The UCL bars business practices that are forbidden by law. If a business practice violates any law, it is *per se* a UCL violation.

134.    The business acts and practices described above are unlawful because they violate numerous state and federal laws, including but not limited to:

    a)   The Federal Trade Commission Act ("FTC Act"), which prohibits "unfair or deceptive acts or practices."[57]

    b)   Cal Educ. Code § 94897(b), which provides that institutions shall not "[p]romise or guarantee employment, or otherwise overstate the availability of jobs upon graduation."

    c)   The CLRA, *see supra*;

    d)   The FAL, *see infra*;

    e)   Cal. Educ. Code § 94886, which provides in relevant part that "a person shall not open, conduct, or do business as a private postsecondary educational institution in this state without obtaining an approval to operate under this chapter." Lambda violated this provision, and therefore the UCL's unlawful prong, when it enrolled Claimant without obtaining approval to operate.

---

[57] *See* U.S.C.§ 45(a)(I); 15 U.S.C. § 52(a).

f) Cal. Educ. Code § 94943, which provides that it is a crime to "[k]nowingly operat[e] a private postsecondary institution without an approval to operate." Lambda violated this provision, and therefore the UCL's unlawful prong, when it knowingly enrolled Claimant without approval by the BPPE to operate.

g) Cal. Educ. Code § 94917, which provides that "[a] note, instrument, or other evidence of indebtedness relating to payment for an educational program is void and not enforceable unless, at the time of execution of the note, instrument, or other evidence of indebtedness, the institution held an approval to operate … ."

h) Cal. Educ. Code § 94902(b)(2), which provides that an enrollment agreement is enforceable only if "[a]t the time of the execution of the enrollment agreement, the institution held a valid approval to operate.

i) The California Financing Law, which provides that "[n]o person shall engage in the business of a finance lender or broker without obtaining a license from the commissioner." Cal. Fin. Code § 22100(a).

j) The Consumer Financial Protection Act of 2010, 12 U.S.C. §§ 5531(a), 5536(a)(1)(B), which prohibits covered persons from engaging in unfair, deceptive, or abusive acts or practices.

135.    By violating these and other state and federal laws, Lambda violated the unlawful prong of the UCL.

Fraud Prong

136.    To show that a business practice is fraudulent, it is necessary only to show that members of the public are likely to be deceived.

137.    Respondents' business acts and practices—including its false job placement rate representations and false representations to the Subclass about BPPE approval—are fraudulent in that they are likely to deceive the public.

34

138.    Each of these false and misleading representations, all of which were material, were substantial factors influencing Claimant to attend Lambda and take out a tuition payment plan that indebted Claimant for up to $30,000.

**THIRD CAUSE OF ACTION**
**Violations of California's False Advertising Law**
**Cal. Bus. & Prof. Code §§ 17500,** *et seq.*
**(All Respondents)**

139.    Claimant hereby reincorporates the allegations in the foregoing paragraphs as though fully set forth herein.

140.    Respondents have also engaged in acts or practices that constitute violations of the FAL, Business and Professions Code section 17500, *et seq*., by making or causing to be made untrue or misleading statements with the intent to induce members of the public to purchase Lambda's services. Respondents' untrue or misleading representations include, but are not limited to, the following:

a)   Respondents' statements regarding job placement rates, including but not limited to the published job placement rates prominently displayed on its website, social media, and advertisements;

b)   Respondents' statements, prominently displayed on Lambda's website and elsewhere, that Lambda does not get paid until students do;

c)   Respondents' statements and appearance to the public, prospective students, and current students that its operations were lawful, that BPPE had not ordered Lambda to cease advertising and instructional activities, and that it could lawfully enroll students. Lambda's and Mr. Allred's advertisements and marketing implicitly and explicitly misrepresented the lawfulness of its operations by encouraging the public and prospective students to apply for enrollment.

141.   At the time these representations were made, Respondents knew or by the exercise of reasonable care should have known that the representations were untrue or misleading.

## FOURTH CAUSE OF ACTION
### Intentional Misrepresentation
### (All Respondents)

142.   Claimant hereby reincorporates the allegations in the foregoing paragraphs as though fully set forth herein.

143.   Respondents made statements to Claimant: (a) that were false representations of material fact; (b) that Respondents knew were false or were made recklessly and without regard for their truth; (c) that Respondents intended Claimant to rely upon; (d) that Claimant reasonably relied upon; (e) that Claimant's reliance upon was a substantial factor in causing Claimant damage; and (f) that caused Claimant damage.

144.   The intentional misrepresentations and omissions by Respondents consist of at least the following:

   a)   Respondents' job placement rate statements, prominently displayed on the Lambda website, in outcomes reports, and on social media. Respondents knew these statements were false.

   b)   Respondents' statements, prominently displayed on Lambda's website and elsewhere, that Lambda does not get paid until students do; Lambda knew this statement was false because it sold ISAs to investors long before students were placed in jobs.

   c)   Respondents' representations, both implied and explicit, that it was approved to operate, advertise, enroll, and teach students prior to August 2020. Respondents knew these representations were false because the BPPE had ordered Lambda to cease all operations (including all advertising and instructional activities) and submit a school closure plan. Respondents also knew that they were concealing

from students that Lambda was barred from advertising and from enrolling and teaching students.

145.     Respondents intended Claimant to rely on these misrepresentations, as evidenced by Lambda prominently featuring them on its website and on other widely disseminated platforms, as well as by its efforts to avoid disclosing the truth.

146.     Claimant reasonably relied on these widely disseminated representations. Had Claimant known the truth, Claimant would not have enrolled at Lambda.

147.     Lambda, Mr. Allred, and members of his executive leadership team acted willfully and knowingly to disseminate these representations to the public with knowledge that they were false and misleading.

148.     Claimant has been substantially harmed by Lambda's misconduct, which caused Claimant to attend Lambda and take out an ISA that indebted Claimant for up to $30,000 in tuition.

<u>FIFTH CAUSE OF ACTION</u>
**Negligent Misrepresentation**
**(All Respondents)**

149.     Claimant hereby reincorporates the allegations in the foregoing paragraphs as though fully set forth herein.

150.     Respondents have also engaged in acts or practices that constitute negligent misrepresentation. *See supra* ¶142–48.

151.     Respondents prominently displayed these representations on the Lambda website, in outcomes reports, on social media, and in advertisements for the purpose of encouraging members of the public, like Claimant, to apply for enrollment.

152.     Respondents had no reasonable grounds to believe that these representations were true.

153.     Respondents intended to induce Claimant to rely on these misrepresentations, as evidenced by Lambda prominently featuring them on its website and on other widely disseminated platforms, as well as by its efforts to avoid disclosing the truth.

154.    Claimant was justified in relying upon these widely disseminated representations. Had Claimant known the truth, Claimant would not have enrolled at Lambda.

155.    Claimant has been substantially harmed by Lambda's misconduct, which caused Claimant to attend Lambda and take out an ISA that indebted Claimant for up to $30,000 in tuition.

## V.    **PRAYER FOR RELIEF**

WHEREFORE, in accordance with the above claims, Claimant requests that the Arbitrator:

1.    Declare and order that the tuition payment plan entered into by Claimant is unlawful, void, and unenforceable pursuant to Cal. Educ. Code §§ 94886, 94902, 94917, and 94943, and the UCL, CLRA, and FAL.

2.    Declare that Respondents conducted business as a private postsecondary educational institution in California without obtaining approval to operate, in violation of Cal. Educ. Code § 94886 and the UCL.

3.    Declare that Respondents knowingly operated a private postsecondary institution without approval to operate, in violation of Cal. Educ. Code § 94943 and the UCL.

4.    Declare that Respondents' job placement rate representations at all times relevant to this Complaint were fraudulent and misleading, in violation of the UCL, FAL, and CLRA, and were intentional and/or negligence misrepresentations.

5.    Declare that Lambda "engage[d] in the business of a finance lender or broker without obtaining a license from the commissioner," and continues to do so, in violation of the California Financing Law, Cal. Fin. Code § 22100(a).

6.    Order Respondents—including Lambda, Mr. Allred, and any other owner of all or part of the tuition payment plans—to cancel Claimant's tuition payment plan and enjoin any effort to collect upon or otherwise enforce it.

7.    Order Respondents to pay restitution in the form of refunds for any and all payments made.

8.    Order prejudgment and post-judgment interest on any refunds for tuition payment plan payments to the maximum extent allowed by law.

9.    Order Respondents to pay reasonable attorneys' fees and costs.

10.    Award damages to Claimant in an amount to be determined, including punitive damages pursuant to Cal. Civ. Code § 3294(a).

11.    Order all such further relief as the Arbitrator deems just and proper.


Dated: March 12, 2024              **MINER, BARNHILL & GALLAND, P.C.**


By:    /s/ *Ryan Miller*
          Deanna N. Pihos
          David Baltmanis
          Ryan Miller

          *Attorneys for Claimant*

39

**BEFORE THE AMERICAN ARBITRATION ASSOCIATION**
**SAN FRANCISCO, CALIFORNIA**

| | |
|---|---|
| MATTHEW MEANS, <br><br>                  Claimant, <br><br>      v. <br><br> BLOOM INSTITUTE OF TECHNOLOGY, <br> formerly d/b/a LAMBDA SCHOOL; <br> AUSTEN ALLRED, in his individual <br> capacity; and JOHN DOES 1-9, <br><br>                 Respondents. | AAA Case No. \_\_\_\_\_ |

## DEMAND FOR ARBITRATION

1.      Pursuant to the American Arbitration Association's Consumer Rules, Claimant Matthew Means submits this Demand for Arbitration against Bloom Institute of Technology, formerly d/b/a Lambda School ("Lambda"), Austin Allred, in his individual capacity, and John Does 1–9 (collectively, "Respondents") for violations of the California Consumer Legal Remedies Act ("CLRA"), California Civil Code § 1750, *et seq.*, Unfair Competition Law ("UCL"), California Business and Professional Code §17200, *et seq.*, and False Advertising Law ("FAL"), California Business and Professional Code § 17500, *et seq*., as well as for intentional and negligent misrepresentation.

2.      Mr. Means is a former student of Lambda School and brings this action to hold Respondents accountable for: (i) falsifying and misrepresenting Lambda's job placement rates; (ii) misrepresenting and concealing that, until August 17, 2020, Lambda did not have the necessary approval from the California Bureau for Postsecondary Education ("BPPE") to operate as a school, and was under order by the BPPE to cease operations, stop enrolling students, cease all instructional services, and submit a closure plan; (iii) in violation of California law, enrolling, signing tuition payment plans with, and providing educational services to students before Lambda obtained the BPPE's approval to operate; and (iv) in violation of California law,

1

engaging in the unlawful business practice of unlicensed lending; and (v) misrepresenting and concealing the true nature of Lambda's financial interest in students' success, including by falsely representing that Lambda only got paid after students found employment and got paid.

3.      Claimant would not have enrolled at Lambda had Plaintiff known the truth about Lambda's job placement rates, its lack of approval from BPPE, or the true nature of Lambda's financial interest in Claimant's success (or lack thereof). Through this action, Claimant seeks declaratory and injunctive relief to cancel Claimant's tuition payment plan and declare that payment plan null and void; a refund of any payments Claimant has made under that payment plan; damages; and additional relief.

## I.      THE PARTIES

4.      Claimant Matthew Means is a resident of Portland, Multnomah County, Oregon. Claimant signed a tuition payment plan on May 20, 2020. Claimant was enrolled as a student at Lambda from June 2020 until May 2021, at which point Claimant finished Lambda's program. Claimant's tuition payment plan is attached as Exhibit A.

5.      Respondent Lambda is a corporation organized and existing under the laws of the State of Delaware, having its principal place of business at 250 Montgomery Street, Floor 16, San Francisco, California 94104 and/or 149 New Montgomery Street, 4th floor, San Francisco, CA 94101.

6.      Respondent Austen Allred is Lambda's founder and CEO. Upon information and belief, Mr. Allred resides in San Francisco, California, and/or did so during times relevant to the events described herein.

7.      Respondents John Does 1-9 are officers and/or directors of Lambda as well as individuals, corporations, or other entities who may own all or a portion of Claimant's tuition payment plan or any other financial interest in that tuition payment plan.

## II.      JURISDICTION AND VENUE

8.      The American Arbitration Association ("AAA") has jurisdiction over this action pursuant to Claimant's tuition payment plan, which specifies:

As the exclusive means of initiating adversarial proceedings to resolve any dispute arising out of this agreement, your Lambda School tuition, or your payments to Lambda School (other than any proceeding commenced by either party seeking an injunction, a restraining order, or any other equitable remedy or a proceeding commenced by either party in small claims court), either party may demand that the dispute be resolved by binding arbitration administered by the American Arbitration Association in accordance with its Consumer Arbitration Rules available at www.adr.org.

9.      Claimant's tuition payment plan further specifies, "Any such arbitration must be conducted by one arbitrator and must be conducted in San Francisco, California, the county with a major commercial airport nearest to where you live, or another mutually agreed location."

## III.   FACTUAL ALLEGATIONS

### A.    LAMBDA BACKGROUND

10.     Lambda is a private, for-profit online coding school founded in 2017 by its current CEO, Austen Allred. Mr. Allred was the Company's primary decision-maker, controlled its daily operations, and regularly promoted Lambda on social media and through other media. He benefitted financially from the tuition paid to Lambda by Claimant and all other students.

11.     Lambda provides online computer science courses of varying lengths. It is not a degree-granting institution, and is not accredited. Students cannot take out federal student loans to attend Lambda.

12.     Lambda marketed itself as a place where students learn the skills necessary to obtain employment in the competitive computer technology job market. In Mr. Allred's words, most students come to Lambda with "no network" and are "from either inner cities or rural areas."[1]

13.     Lambda touted its "experienced industry expert" instructors and a top-of-the-line curriculum that is "designed to get you hired." On April 3, 2019, Mr. Allred stated in an interview that Lambda's "educational experience is, I think, among the best in the world."[2]

---

[1] *See* Y Combinator, *A CS Education That's Free Until You Get a Job - Austen Allred of LambdaSchool*, YouTube (Apr. 3, 2019) at 9:10 (hereinafter "Y Combinator Interview"), https://www.youtube.com/watch?v=_yIAYZtdrfI&t=551s.
[2] *Id.* at 15:05.

14.    At all times relevant to this complaint, Lambda charged tens of thousands of dollars for its program, more than double the reported average price of online coding bootcamps.[3]

15.    Part of Lambda's business model has been predicated on convincing prospective students to agree to pay a large amount of tuition by promising them that they will not owe anything unless and until they find a job that pays $50,000 or more per year.

16.    Lambda carries out this model by entering into tuition payment plans with students. For example, as Lambda describes one of its tuition payment plan offerings, Income Share Agreements (ISAs): "A Lambda School ISA is a contract under which you agree to pay 17% of your post-Lambda School salary for 24 months, but only once you're making more than $50,000 per year (or the equivalent of $4,166.67 per month). The ISA is capped at a maximum repayment of $30,000, so you won't pay more than $30,000 under any circumstances."[4]

17.    Over time, Lambda expanded its tuition payment plan offerings to include, for example, retail installment contracts, deferred tuition plans, multi-part installment payment plans, financing through a third-party loan, a pre-instruction lump sum payment, or ISA varieties that combine an initial lump sum payment with payments from a proportion of future earnings.

18.    Some Lambda tuition payment plans are managed by third-party servicers who handle origination and payment processing.[5] Meratas, a loan-servicing company headquartered in Stamford, Connecticut, services Claimant's ISA.

19.    By April 2019, Lambda was growing at "an insane pace." As Mr. Allred explained:

> We agreed as a team to no longer share the number of students that we have enrolled, but it is not a small number and it is growing at an insane pace. We'll soon

---

[3] *See* Cecilia Clark, *How Much is Coding Boot Camp?* Nerdwallet (June 21, 2022, 10:53 AM), https://www.nerdwallet.com/article/loans/student-loans/how-much-is-coding-bootcamp.

[4] *The Lambda School Income Share Agreement*, Lambda School Website (scroll to FAQs "What is an ISA and how does it work"), [archived by the Wayback Machine (Dec. 16, 2020), https://web.archive.org/web/20201216131833/https://lambdaschool.com/tuition/isa].

[5] *The Lambda School Income Share Agreement*, Lambda School Website (scroll to FAQs "Who are Meratas and Leif"), [archived by the Wayback Machine (Dec. 16, 2020), https://web.archive.org/web/20201216131833/https://lambdaschool.com/tuition/isa].

be measuring Lambda School scale by percentage of the overall number of students learning to program every year, to give you some context. And being able to support that kind of scale effectively is what keeps me up at night. Mostly specifically hiring, mostly hiring executives right now who can build out 100, 150 person teams beneath them . . . and we need like 5 of them yesterday.[6]

20.     Mr. Allred attributed Lambda's growth in part to his active personal Twitter account, stating in January 2020 that his frequent tweets have "certainly helped Lambda school grow."[7]

21.     Mr. Allred also stated: "If there's one thing I'm good at in life, it's growing something quickly, building hype for something quickly. That's kind of my superpower."[8]

22.     As described below, Lambda's rapid growth was fueled by the School's, and Mr. Allred's, public misrepresentations about the School's approval status and job placement rates.

**B.      UNTIL AUGUST 17, 2020, LAMBDA OPERATED WITHOUT STATE APPROVAL, IN VIOLATION OF CALIFORNIA LAW**

23.     As a California company with its headquarters and principal place of business in San Francisco, Lambda is subject to the laws of the state of California. One of those laws, California Education Code § 94886, bars private postsecondary educational intuitions from doing business without "approval to operate."

24.     Another, Section 94917, provides that when educational institutions violate this law, any "note, instrument, or other evidence of indebtedness relating to payment" for its programs is "void and not enforceable."

25.     All Lambda tuition payment plans, including ISAs, are a "note, instrument, or other evidence of indebtedness relating to payment for educational program[s]," under the California Education Code.

26.     On March 20, 2019, the BPPE issued a "Citation: Assessment of Fine and Order of Abatement" ("Citation") to Lambda. The Citation found that Lambda was "operating without

---

[6] Y Combinator Interview at 47:50.
[7] Vincent Woo, *Interview with Austen Allred*, Soundcloud (Jan. 22, 2020) at 42:10 (hereinafter "Woo Interview"), https://soundcloud.com/vwoo/interview-with-austen-allred.
[8] Y Combinator Interview at 22:25.

Bureau approval," in violation of the California Education Code. A copy of the Citation is attached hereto as <u>Exhibit B</u>.

27.    In the Citation, the BPPE ordered that Lambda "cease to operate as a private postsecondary educational institution" and "submit a school closure plan." The Citation further required Lambda to "discontinue recruiting or enrolling students and cease all instructional services and advertising in any form or type of media, including the https://lambdaschool.com and any other websites not identified here that are associated with the Institution, until such time as an approval to operate is obtained from the Bureau."

28.    On May 14, 2019, Lambda submitted its application to the BPPE seeking approval to operate.

29.    Lambda appealed the Citation and, on July 24, 2019, the BPPE issued an "Appeal of Citation Informal Conference Decision: Citation Affirmed" (the "Citation Affirmance"). The BPPE affirmed the Citation because "[n]o new substantive facts were presented," and thus, Lambda was required to "comply with the orders described in the 'Violation Code Sections' of this document and submit evidence of compliance within 30 days from the date of this decision." Citation Affirmance at 1–3. A copy of the Citation Affirmance is attached hereto as <u>Exhibit C</u>.

30.    In direct violation of California law, the Citation, and the Citation Affirmance, Lambda continued to operate, advertise its educational services to the public, and enroll students.

31.    On August 21, 2019, the BPPE denied Lambda's May 14, 2019 application, stating in a letter to Lambda that it was "unable to grant approval." A copy of the August 21 order is attached hereto as <u>Exhibit D</u>.

32.    On November 25, 2019, the BPPE issued an order denying Lambda's updated application for approval, explaining that "at this time the Bureau is unable to grant approval, based on the requirements of the California Education Code." A copy of the November 25 order is attached hereto as <u>Exhibit E</u>.

33.    On June 22, 2020, the BPPE issued yet another order denying Lambda's further updated application for approval to operate, stating that "the Bureau cannot at this time approve Lambda's application." A copy of the June 22 order is attached hereto as Exhibit F.

34.    The June 22, 2020 order also found that Lambda's ISAs constitute "an instrument or evidence of indebtedness" under the California Education Code. *Id.* at 5.

35.    On August 17, 2020, the BPPE issued an order approving Lambda's application. The approval letter stated that the BPPE had completed its review of Lambda's "Application for Approval to Operate," including "supplemental documentation" received on August 14, 2020. The BPPE found that "[a]pproval to operate is granted *effective August 17, 2020*." (emphasis added). A copy of the August 17 order is attached hereto as Exhibit G.

36.    From at least May 2019 until Lambda was approved on August 17, 2020, Lambda's publicly available course catalogs falsely stated that Lambda was approved by the BPPE. In at least three versions of the 2019 and 2020 catalogs—revised in May 2019, September 2019, and July 2020 (all prior to Lambda's approval)—Lambda falsely stated the following:

> **APPROVALS**
> Lambda School is a private institution *approved to operate* by the California Bureau for Private Postsecondary Education. Approval to operate means the institution is compliant with the minimum standards contained in the California Private Postsecondary Education Act of 2009 (as amended) and Division 7.5 of Title 5 of the California Code of Regulations.

*See* Exhibit H (Excerpts of Three Versions of Lambda Course Catalogs for 2019 and 2020 at 5) (emphasis added).

37.    During the time Lambda was seeking the BPPE's approval, Mr. Allred engaged in a public misinformation campaign about Lambda's legal status. For example, in August 2019, Mr. Allred told Business Insider that Lambda was working with the BPPE to obtain approval and

that the order had been stayed while the application was pending. Mr. Allred stated that "[b]ecause we're talking with BPPE, it doesn't affect students at all."[9] This was false.

38.     In truth, the Citation and Citation Affirmance were not stayed, multiple of Lambda's applications had been denied, and Lambda's future was uncertain. In August 2020, a public information officer with California's Department of Consumer Affairs told Business Insider "that there is no stay on the order, and that if Lambda School is still operating while its registration is pending, it would be in violation of state law."[10]

39.     Upon information and belief, Mr. Allred further commented to Lambda students over the Lambda Slack channel that any regulatory issues were mere technicalities that did not affect the school's ability to operate.

40.     At all times Mr. Allred knew or should have known that ISAs and other financing instruments issued by Lambda were void and unenforceable under California Law due to Lambda's lack of approval to operate.

41.     Throughout 2019 and 2020, prior to Lambda's August 17, 2020 approval, Lambda and Mr. Allred further misrepresented Lambda's approval status by using a number of recognized attributes of an approved academic institution in its advertising and promotional materials. During this period, Lambda's name, website, and the website URL itself – lambdaschool.com – used the term "school", and Lambda's website, ads, and social media continuously displayed the following school crest:

*Screenshot from Lambda's website on April 22, 2020.*



[9] Rosalie Chan, *The hot Silicon Valley coding bootcamp Lambda School is paying a $75,000 fine for not registering properly with the state of California*, Business Insider (Aug. 29, 2019, 6:32 PM), https://www.businessinsider.com/lambda-school-coding-bootcamp-california-bppe-2019-8.
[10] Rosalie Chan, *A California official says red-hot coding bootcamp Lambda School is violating state law if it operates without the right registration — but the company insists classes can go on*, Business Insider (Aug. 30, 2019, 8:54 PM), https://www.businessinsider.com/lambda-school-california-state-law-coding-bootcamp-y-combinator-2019-8.

42.    During this period, Lambda's website, online ads, and social media continuously and repeatedly referred to various features of an approved academic institution, including, for example, a "curriculum," "tuition," "students," "student body," being "enrolled," an academic "schedule," "graduates," "mentors," "grades," "lectures," "homework," and "career support": [11]

*Screenshot from Lambda's website on May 6, 2020.*





---

[11] *See, e.g.*, Lambda School (@LambdaSchool), Twitter (Dec. 10, 2019, 9:52 PM), https://twitter.com/bloomtech/status/1204609786718801922; Lambda School Instagram (Mar. 16, 2020), https://www.instagram.com/p/B9zG7NvjhyS/; *Curriculum*, Lambda School Website, [archived by the Wayback Machine (May 6, 2020), https://web.archive.org/web/20200506051614/https://lambdaschool.com/curriculum].

*Screenshot of a March 16, 2020 Lambda Instagram post.*



43.     Mr. Allred furthered the appearance that Lambda was approved to operate in similar terms. In his "Letter from the CEO" at the beginning of Lambda's March 2020 outcomes report (which was publicly available on the Lambda website), he refers to the Lambda "student body" growing to 2,900, with Lambda staff growing to 200, and moving the Lambda headquarters to an office building in downtown San Francisco based on that growth. He refers to a "curriculum" that is "mastery-based," "graduation," "career support," and "the school." He acknowledged that Lambda "students place great trust in Lambda School when they enroll, and they make incredible investments of time and energy while engaged in our programs."[12]

44.     Had Claimant been aware that Lambda was operating without a license, was not approved to operate, and that its future legal status was uncertain, Claimant would not have signed a tuition payment plan that indebted Claimant for up to $30,000 to Lambda. Indeed, no

---

[12] *See* Austen Allred, *Announcing the Release of Our H1 2019 Student Outcomes Report*, Lambda School Website (Mar. 27, 2020), [archived by the Wayback Machine (Apr. 23, 2020), https://web.archive.org/web/20200423031203/https://lambdaschool.com/the-commons/announcing-the-release-of-our-h1-2019-student-outcomes-report] (last visited November 27, 2023).

reasonable consumer would enroll and indebt themselves to a program operating unlawfully and under orders to close.

45.    Claimant's tuition payment plan constitutes a "note, instrument, or other evidence of indebtedness relating to payment for [students'] educational program," under the California Education Code, and therefore, as a matter of law, is "void and not enforceable." California Education Code § 94917.

### C.    LAMBDA'S FALSE AND MISLEADING JOB PLACEMENT RATES

46.    Lambda's selling point to Claimant and other students was that it would land them a job—and thus bring financial success. Mr. Allred described Lambda as "entirely vocational, we're a trade school basically, and we want to help you make as much money as you can."[13]

47.    Lambda's record of placing students in computer technology jobs was therefore a critical piece of information for Claimant and others considering attending Lambda. Respondents knew that students would only enroll if Lambda would help them secure a job. As Lambda described it, job placement is "the most critical component of Lambda's operations, not only in the School's obligation to its students, but to the prosperity of the company as a whole." *See* ¶ 53, *infra*.

48.    To that end, for the past six years, since Lambda's inception, and continuously through today, Lambda and Mr. Allred have engaged in an extensive and long-term campaign to advertise false and misleading job placement rates, intending that potential students like Claimant would review those rates and enroll at Lambda as a result of those rates.

49.    Lambda and Mr. Allred have prominently displayed false and misleading information on Lambda's purported record of job placement on the Lambda website, in marketing materials and outcomes reports, in a variety of online and social media advertisements (upon information and belief, including Google, YouTube, and various social media), and

---

[13] Y Combinator Interview at 13:00.

through social media postings and comments, including Mr. Allred's personal social media accounts.

### 1.    False and misleading job placement rates on Lambda's website and outcomes reports

50.    Throughout 2018 and 2019, Lambda's website advertised job placement rates of over 80%. Lambda and its executive leadership, including Mr. Allred, knew that these widely disseminated rates were false and misleading.

51.    On August 2, 2018, Mr. Allred, Ben Nelson (co-founder and CTO), and Ryan Holdaway (VP of Outcomes), stated the following in a post on the Lambda School Blog: *"[E]very single* Lambda School graduate who has been on the job market for six months is either employed in a full-time role as a software engineer or has joined an early startup working for equity."[14]

52.    Yet on August 3, 2018—the very next day—Lambda's executive leadership team reprimanded Lambda's Director of Career Readiness for poor job placement rate performance, sending her an "Employee Corrective Action Form." The form stated that the employee's "performance in recent months has not met the expectations for the Career Coach/Director of Career Readiness role at Lambda School. Overall placement numbers are low and the time to placement is much higher than desired."

53.    The Corrective Action Form continued:

Placements are the most critical component of Lambda's operations, not only in the School's obligation to its students, but to the prosperity of the company as a whole. A common discussion point in regards to Outcomes is that current placement rates are too low and time to placement is too high. Creative tactics and adjustments to current careers processes as well as follow through are needed to improve both of these measurements. . . .

CS1 students graduated on 1/19/18. Since then we've had a new class graduate approximately every five weeks. As of 8/1/18, only 16 students of the 48 graduated students assigned to [the Lambda career placement employee] have been placed.

---

[14] Austen Allred, *Introducing Lambda Next — Our Revolutionary New Job Search and Placement Program*, Medium: Lambda School Blog (Aug. 2, 2018), https://medium.com/lambda-school-blog/introducing-lambda-next-our-revolutionary-new-job-search-and-placement-program-603ef12f7d37 (emphasis added).

54.     Two months later, on October 8, 2018, Lambda continued to tout its high job placement rates, announcing on its website: "Since Lambda School's inception in April 2017, over 75 Lambda School graduates have been hired, including 83% of early cohorts, with an average salary increase of over $47,000 per hired graduate."

55.     Lambda's website contained the following statement across the top of the page:

*Screenshot from Lambda's website on December 13, 2018.*



56.     The representation of an 83% job placement rate remained on the Lambda website until on or about February 2019.

57.     From on or about April 2019 until at least December 2019, Lambda's website advertised an ever higher job placement rate: over 85%. For example, on April 18, 2019, Lambda's website contained the following statement across the top of the page:

*Screenshot from Lambda's website on April 18, 2019.*



58.     Yet in May of 2019—at the same time Lambda was advertising an 85.9% job placement rate on its website—Lambda executives sent a private memorandum to investor Y Combinator confirming the falsity of the rates it was publicly promoting. *See* Lambda

Memorandum to Investors, *Human Capital: The Last Unoptimized Asset Class* at 10 (May 2019), attached hereto as Exhibit I. The May 2019 memo stated:

> **We're unable to place students at scale**
> - We're at roughly 50% placement for cohorts that are 6 months graduated
> - Placement to date has been manual and one-off, which isn't possible at scale

Ex. I at 10.

59.    After the memorandum was published in news accounts two years later, Mr. Allred confirmed in a tweet from his personal account that he had told investors that Lambda had a 50% placement rate, stating: "The 50% came from me telling investors about what % of enrolled students get jobs that require repayment."

60.    Despite Mr. Allred's contrary statement to investors, Lambda's website continued to promote a 85.9% or 86% placement rate through the end of 2019. These rates were false and misleading.

61.    On December 14, 2019, Lambda's homepage stated:



*Screenshot from Lambda's website on December 14, 2019.*

62.    This statement was false and directly contrary to the true facts known to Lambda and Mr. Allred, which had privately been disclosed to investors, as described above.

63.    When asked in an interview to explain the discrepancy between the representations on Lambda's website and representations to its investors, Mr. Allred explained:

14

"I mean you're literally looking at what are the risks, right? Like,we're going to pick our lowest number for that – there are cohorts that have been at 50% placed within 6 months, yes."[15]

64.    When asked whether the advertised 86% job placement rate was accurate, he stated: "the way that that number was measured was an average across cohorts at a specific time. I don't know what it is right now, but that's directionally correct."[16]

65.    On February 19, 2020, New York Magazine published an article titled "Lambda School's Misleading Promises," in which the writer concluded that Lambda was "selling unprepared students an incomplete education, fueled by overpromising marketing and misleading, if not downright fraudulent, figures."[17] The story described Lambda's job placement rate misrepresentations and also recounted an interview with a former employee who "confirmed . . . that the company's own internal numbers, which the interviewee was provided as part of their interview process, seem to indicate a roughly 50 percent or lower placement rate."[18]

66.    Lambda nonetheless persisted in promoting false and misleading job placement statistics on its website and elsewhere.

67.    In 2020, Lambda started to promote its placement rates through "outcomes reports" published on its website and shared through social media. Multiple outcomes reports included an "Independent Accountants' Report" directed "To the Management" of "Lambda Inc." located at "250 Montgomery Street[,] San Francisco, CA 94104".

68.    The first outcomes report, titled "H1 2019 Outcomes Report," was published on March 27, 2020,[19] and reported a 79% placement rate.[20]

---

[15] Woo Interview at 13:00-14:30.

[16] *Id.* at 11:13-11:26.

[17] Vincent Woo, *Lambda School's Misleading Promises*, New York Magazine (Feb. 19, 2020), https://nymag.com/intelligencer/2020/02/lambda-schools-job-placement-rate-is-lower-than-claimed.html.

[18] *Id.*

[19] *See* Austen Allred, *Announcing the Release of Our H1 2019 Student Outcomes Report*, Lambda School Website (Mar. 27, 2020), [archived by the Wayback Machine (Apr. 23, 2020), https://web.archive.org/web/20200423031203/https://lambdaschool.com/the-commons/announcing-the-release-of-our-h1-2019-student-outcomes-report].

[20] *See H1 2019 Report Lambda School Outcomes Report*, Lambda School Website, [archived by

69. The 79% placement rate remained up on Lambda's website until December 3, 2020, when Lambda published its "H2 2019 Outcomes Report."[21] The H2 2019 report showed a 74% placement rate.[22]

70. The 74% rate announced in the H2 2019 report remained up on Lambda's website until November 7, 2021, when Lambda announced its 2020 outcomes.[23] In the 2020 outcomes report, Lambda announced that the placement rate remained at 74%.

71. Until November 1, 2022, Lambda continued to report the 74% placement rate from the 2020 outcomes report on its website:

# 74%

Job placement rate for BloomTech graduates

**BloomTech 2020 Outcomes Report**

*Screenshot from Lambda's homepage on September 30, 2022.*[24]

---

the Wayback Machine (Sept. 3, 2020),
https://web.archive.org/web/20200903023542/https:/lambdaschool.com/reports/2019-outcomes-report].

[21] *See* Austen Allred, *Announcing the Release of Our H2 2019 Student Outcomes Report*, Lambda School Website (Dec. 3, 2020), [archived by the Wayback Machine (Dec. 14, 2020), https://web.archive.org/web/20201214214247/https:/lambdaschool.com/the-commons/announcing-lambda-school-h2-2019-student-outcomes-report].

[22] *Id. See also H2 2019 Report Lambda School Outcomes Report*, Lambda School Website [archived by the Wayback Machine (Dec. 3, 2020), https://web.archive.org/web/20201203230224/https:/lambdaschool.com/reports/h2-2019-outcomes-report].

[23] *See Bloom Institute of Technology 2020 Outcomes Report,* Bloom Institute of Technology, [archived by the Wayback Machine (Nov. 25, 2021), https://web.archive.org/web/20211125162824/https:/www.bloomtech.com/reports/outcomes-report].
It appears that Lambda only published one outcomes report in 2020. *See BloomTech Reports*, Bloom Institute of Technology Website, https://www.bloomtech.com/reports/archive (last visited Mar. 14, 2023).

[24] *See Built For Your Success*, Bloom Institute of Technology Website, [archived by the Wayback Machine (Sept. 30, 2022) https://web.archive.org/web/20220930032702/https:/www.bloomtech.com/outcomes].

72.     On November 2, 2022, Lambda published the "BloomTech 2021 Outcomes Report," advertising a 90% placement rate. As of November 2, 2022, Lambda's website provided:

# 90%

Job placement rate for BloomTech graduates

**BloomTech 2021 Outcomes Report**

*Screenshot from Lambda's homepage on November 27, 2022.*[25]

73.     In a "Letter from the CEO" dated November 2, 2022, Mr. Allred wrote: "In this independently examined report, you'll gain a transparent view of how our learners and graduates fared in 2021. Our biggest takeaway: A full **90% of our 2021 graduates have landed jobs**, which is the highest rate in our company's history."[26]

74.     Lambda's homepage continued to advertise a 90% placement rate until January 2024, when it updated the rate, touting an "86% job placement rate in 2022 for job-seeking grads."[27]

75.     Like the earlier rates from 2018 and 2019, the rates Lambda published from 2020 to the present (including, but not limited to, the 79%, 74%, 90%, and 86% rates from the Lambda website and outcomes reports) were, and continue to be, false and misleading. Lambda and its executive leadership, including Mr. Allred, knew that these widely disseminated rates were false and misleading.

---

[25] *See Built For Your Success,* Bloom Institute of Technology Website, [archived by the Wayback Machine (Nov. 27, 2022), https://web.archive.org/web/20221127122732/https://www.bloomtech.com/outcomes].
[26] *See* Austen Allred, *Letter from the CEO*, Bloom Institute of Technology Website (Nov. 2, 2022), https://www.bloomtech.com/reports/outcomes-report#letter (last visited Mar. 14, 2023) (emphasis in original, internal citation omitted).
[27] *See* Bloom Institute of Technology Home Page, https://www.bloomtech.com/ (last visited December 6, 2023).

76.     Business Insider reported in October 2021 that documents from a Lambda "all-hands" staff meeting in January 2021 "showed that Lambda School placed only around 30% of its 2020 graduates in qualifying jobs during the first half of 2020. This figure is in stark contrast to the 74% placement rate it advertised for its 2019 graduates, the latest figure the school has made publicly available. . . ."[28]

77.     This "all hands" meeting took place one month after Lambda published the 74% placement rate in the H2 2019 Outcomes Report.

78.     A slide prepared by Lambda reveals that the H1 2020 placement rate was only 33% and the H2 2020 rate was 40%, a far cry from the 74% listed on the Lambda website until November 2, 2022. According to the same slide, Lambda's H1 2021 *goal* was 60% placement and H2 2021 *goal* was 80%:

## Long-Term Student Success Goals

|  | H1 2020 | H2 2020 | H1 2021 | H2 2021 | Metric | Description |
|---|---|---|---|---|---|---|
| **Admissions** | 1277 | 1450 | TBD | TBD | Unit 2 Starts | # students starting Unit 2. |
| **School** | 52% | 56% | 60% | 80% | % Graduating within 11 Units | % of students who start Unit 2 complete coursework within 11 units. |
| **Outcomes** | 33% | 40% | 60% | 80% | % Qualified Placement within 180 days | % of graduates get high paying jobs within 180 days. |
| **Repayment** | 72% | 79% | 85% | 87% | % Repaying within 60 days | % of qualified placed graduates have made a first payment within 60 days. |

79.     On information and belief, a Lambda executive presented the slide at the "all-hands" meeting at Lambda's headquarters in San Francisco, California.

---

[28] *See* Vincent Woo, *Lambda School promised a fast and cheap path to a lucrative tech career. Leaked documents and former students cast doubt on that claim*. Business Insider (Oct. 25, 2021, 7:30 AM), https://www.businessinsider.com/lambda-school-promised-lucrative-tech-coding-career-low-job-placement-2021-10.

80.     Another slide, titled "Lambda H1 Company OKRs," provided that the "actual" placement rate for H1 2020 was 33% of graduates placed within 180 days, and the actual rate for H2 2020 (as of October 2020) was 27% of graduates placed within 180 days. This slide also listed the H1 2021 goal as 60%:

## Lambda H1 Company OKRs

| | H1 2020 | H2 2020 | H1 2021 | Metric | Description |
|---|---|---|---|---|---|
| **Admissions Goal** Admissions Actual | n/a 1277 | 1450 ~850 | 1500 | Unit 2 Starts | # students starting Unit 2. |
| **School Goal** School Actual | n/a 52% | 56% 52% | 60% | Extended Grad Rate % | % of students who start Unit 2 complete coursework within expected time window |
| **Outcomes Goal** Outcomes Actual | n/a 33% | 40% 27% | 60% | % Qualified Placement within 180 days | % of graduates get high paying jobs within 180 days. |
| **Repayment Goal** Repayment Actual | n/a 41% | 75% 73% | 85% | % Repaying within 60 days | % of qualified placed graduates have made a first payment within 60 days. |
| **Alumni Goal** | n/a | n/a | 40% | % Alumni Giving back | % of hired alumni giving back |

*H2 2020 Actuals as of October 2020

81.     Another slide, reportedly used at another all-hands meeting in February 2021, broke out the 180-day placement rates by month, from February to July 2020, as follows:

| Graduation Month | Qualified Placed % (days elapsed since graduation) | | |
|---|---|---|---|
| Month | +90d | +180d | QP Now |
| Feb - 2020 | 20% | 31% | 41% |
| Mar - 2020 | 19% | 30% | 36% |
| April - 2020 | 17% | 24% | 32% |
| May - 2020 | 13% | 27% | 32% |
| Jun - 2020 | 15% | 25% | 27% |
| Jul - 2020 | 18% | 24% | 25% |
| Aug - 2020 | 16% | | 21% |
| Sept - 2020 | 13% | | 14% |
| Oct - 2020 | 10% | | 11% |
| Nov - 2020 | | | 11% |
| Jan - 2021 | | | 11% |
| Weighted Avg. | 16% | 27% | |
| H2 Goal | | 40% | |

82.    In yet another slide, reportedly also used at the "all hands" meeting on January 28, 2021, Lambda's H1 2021 "goal" was to enroll 500 students a month and place 50% to 70% in qualifying jobs. The graph also shows that, if Lambda enrolled 2,000 students per month, it could become profitable even if fewer than half of its students found jobs:



83.    Prior to signing a tuition payment plan, Claimant read Respondents' representations that Lambda's job placement rate was above 70%. Lambda's purported record of successfully placing students was critical to Claimaint's decision to enroll.

### 2.    Lambda's false and misleading statements about job placement in social media postings and comments.

84.    In addition to advertising job placement rates on its website and in outcomes reports, Lambda's job placement marketing campaign aimed at potential students expanded to social media posts and comments, including Twitter, Facebook, and Instagram. Like the rates on its website and in outcomes reports, these rates, ranging from 71% to at least 91%, were false and misleading. Lambda and its executive leadership, including Mr. Allred, knew that these widely disseminated rates were false and misleading, and intended that potential students like Claimant would review those rates and enroll at Lambda as a result of those rates.

85.    Examples of false and misleading job placement rates on Lambda's Twitter, Facebook, and Instagram accounts include:

a)    April 6, 2018, Lambda Twitter: "Time for another update on placement. Students hired by Lambda School are not included. Cs1: 75% hired within first two months of search."[29]

b)    March 5, 2019, Lambda's Twitter account linked to a report touting an 85.9% job placement rate and stated: "Lambda only succeeds when our students succeed, and we're committed to a transparent, no-surprises approach to education."[30]

c)    April 22, 2020, Lambda Instagram: "Percentage of H1 2019 graduates that have been placed into jobs. → 71%"[31]



---

[29] Lambda School (@LambdaSchool), Twitter (Apr. 6, 2018, 12:39 PM), https://twitter.com/bloomtech/status/982311747301330944.
[30] Lambda School (@LambdaSchool), Twitter (Mar. 5, 2019, 7:02 PM), https://twitter.com/bloomtech/status/1103083315945328640.
[31] Lambda School (@LambdaSchool), Instagram (Apr. 22, 2020), https://www.instagram.com/p/B_S2M-Llm2y/.

d) September 27, 2021, Lambda Instagram: "77% of H2 2019 job-seeking Data
Science graduates were hired. 94% [o]f those hired graduates go the job in the
first 180 days"[32]



e) November 3, 2022, Lambda Instagram: "90% of our 2021 alumni gained in-
demand skills and landed great jobs—our highest placement rates *ever*!"[33]



<hr />

[32] Lambda School (@LambdaSchool), Instagram (Sept. 27, 2021),
https://www.instagram.com/p/CUWJM1qJlEB/?img_index=4.
[33] Bloom Tech (@Bloomtechofficial), Instagram (Nov. 3, 2022),
https://www.instagram.com/p/CkgVeHBrmP9/.

f) November 3, 2022: Lambda Facebook: "90% of our 2021 alumni gained in-demand skills and landed great jobs—our highest placement rates *ever*!"[34]

g) November 3, 2022, Lambda Twitter: "90% of our 2021 alumni gained in-demand skills and landed great jobs—our highest placement rates *ever*!"[35]

h) November 4, 2022, Lambda Facebook: "Fun Fact: Did you know, 90% of our 2021 full Stack Web job-seeking graduates found a job after BloomTech?"[36]

i) November 7, 2022, Lambda Facebook: "91% of our 2021 job-seeking Data Science graduates found a job 😮"[37]

j) November 9, 2022, Lambda Instagram: "91% of 2021 job-seeking Data Science grads found a job after BloomTech"[38]

### 3. <u>Mr. Allred's false and misleading statements about job placement were a driving force behind Lambda's job placement rate marketing campaign.</u>

86.     At all times relevant to this complaint, Mr. Allred was the driving force behind Lambda's job placement rate marketing campaign. Rather than passively overseeing the campaign, he personally spearheaded Lambda's dissemination of false and misleading rates, oftentimes promoting the rates himself on his own social media accounts.

87.     For example, since March 2020, when Lambda first promoted its job placement rates through outcomes reports, each outcomes report has begun with a personalized letter from Mr. Allred titled "Letter from the CEO," vouching for the rates in the report. The reports end with Mr. Allred's signature.

---

[34]Bloom Tech (@BloomTech), Facebook (Nov. 3, 2022), https://www.facebook.com/BloomTech/posts/pfbid0C9MRRryV1zaMpSXa35QnogkPDAR984bjs9xmen4WJB4SWMtkWAn2kxZ7BRC11Kdhl.

[35] Bloom Tech (@BloomTech), Twitter (Nov. 3, 2022, 11:15 AM), https://twitter.com/bloomtech/status/1588203108013850629.

[36] Bloom Tech (@BloomTech), Facebook (Nov. 4, 2022), https://www.facebook.com/BloomTech/posts/pfbid025d3iVN2usd1eLKfwTMCh78a3kVNpsmUcRCsMXWinqtYX4tHqLbkDHQz9mhqUZuanl.

[37] Bloom Tech (@BloomTech), Facebook (Nov. 7, 2022), https://www.facebook.com/BloomTech/posts/pfbid0UpByQ5eFsctoNH51QuK1DPrTXYXvaU9cPbE2H6weYnnvR2YbpWF2m8vLGbuuoUhol.

[38] Bloom Tech (@Bloomtechofficial), Instagram (Nov. 9, 2022), https://www.instagram.com/p/CkwHe8ivDND/.

88.     Mr. Allred also advertised false and misleading rates on his personal Twitter account:

    a)  March 13, 2019: In response to a commenter asking about a $60,000 median salary and 83% 6-month employment rate for Lambda's main web track, Mr. Allred responded, "That's low now, but our average student increases his or her income by $47,000."[39]

    b)  March 15, 2019: "Lambda School's first iOS class graduates today. 66% of them are already **hired.**"[40]

    c)  November 16, 2019: "First track just graduated. Hit 100% hired but was VERY small sample size." Subsequent reporting revealed that this small sample size consisted of a single student.[41]

    d)  November 3, 2022: "I am so incredibly excited to finally be able to share BloomTech's 2021 Outcomes Report. Highlights: *All-time high 90% placement rate for job-seeking grads".[42]

89.     Other examples of false, misleading, and exaggerated claims on Mr. Allred's Twitter account include:

    a)  January 24, 2021: "I think we're like 2-3 solvable problems being solved away from 100% of Lambda School grads being hired. Still a lot of unknowns, but I think it will be possible." When a commenter asked what the problems were, Mr. Allred responded: "Boring stuff."[43]

    b)  April 22, 2021: "When I started Lambda School early detractors gave me hell because I said that Lambda School would cause thousands of people to become millionaires who wouldn't have otherwise been. It's now pretty clear that was very conservative."[44]

---

[39] Austen Allred (@Austen), Twitter (Mar. 13, 2019, 12:14 PM), https://twitter.com/Austen/status/1105879911036665856.

[40] Austen Allred (@Austen), Twitter (Mar. 15, 2019, 5:20 PM), https://twitter.com/Austen/status/1106681485275205634.

[41] *See* Zoe Schiffer & Megan Farokhmanesh, *The High Cost of a Free Coding Bootcamp*, The Verge (Feb. 11, 2020, 11:15 EST), https://www.theverge.com/2020/2/11/21131848/lambda-school-coding-bootcamp-isa-tuition-cost-free; Ryan Mac (@RMac18), Twitter (Feb. 11, 2020, 1:59 PM), https://twitter.com/RMac18/status/1227306243733295108.

[42] Austen Allred (@Austen), Twitter (Nov. 3, 2022, 12:20 PM), https://twitter.com/Austen/status/1588219699157905408.

[43] Austen Allred (@Austen), Twitter (Jan. 24, 2021, 1:55 AM), https://twitter.com/austen/status/1353234915643568128.

[44] Austen Allred (@Austen), Twitter (Apr. 22, 2021, 10:24 AM), https://twitter.com/Austen/status/1385238109185396740.

    c) May 4, 2021: "I get to watch a bunch of people double their income (or more) every single day. Even the worst days are punctuated by a bunch of people changing their lives and the lives of their families forever."[45]

    d) May 4, 2021: "You can go from near poverty to huge future wealth in just a few months."[46]

    e) November 24, 2022: "Thankful today for all those who have worked so hard for BloomTech (by current name or by Lambda School). So many people working so diligently. Thousands of lives changed, billions in increased earnings."[47]

90.    Mr. Allred and Lambda acted willfully and knowingly to disseminate Lambda's job placement representations to the public—including applicants to their school such as Claimant—with knowledge that they were, and continue to be, false and misleading.
.

### D.    LAMBDA MISREPRESENTS THAT IT ONLY GETS PAID ONCE STUDENTS DO

91.    In addition to the placement rates, Lambda and Mr. Allred misled potential students like Claimant with the frequently repeated declaration that: "We don't get paid until you do, so we're in this together, from your first day of classes to your first day on the job."[48] For example, on June 27, 2019, Lambda's homepage stated:



## Higher learning. Higher earning.

Lambda is designed for student success. We don't get paid until you do, so we're in this together, from your first day of classes to your first day on the job — and beyond.

*Screenshot from Lambda's homepage on June 27, 2019.*

---

[45] Austen Allred (@Austen), Twitter (May 4, 2021, 11:50 PM), https://twitter.com/Austen/status/1389789532761956352.
[46] Austen Allred (@Austen), Twitter (May 4, 2021, 11:53 PM), https://twitter.com/Austen/status/1389790386659364868.
[47] Austen Allred (@Austen), Twitter (Nov. 24, 2022, 9:51 AM), https://twitter.com/austen/status/1595822473781485568.
[48] *See, e.g.*, Apply Now Pages, Lambda School Website [archived by the Wayback Machine (June 27, 2019), https://web.archive.org/web/20190627024024/https://lambdaschool.com/].

92.     Mr. Allred regularly touted that Lambda only gets paid when students do on his personal social media accounts and the Lambda website, describing Lambda's business as based on shared and aligned incentives between Lambda and its students:

    a)  "The main directive in everything we did can be summed up in two words: incentive alignment."[49]

    b)  "Our mission from day one has been to **align the incentives of school and student**, giving more people the opportunity they deserve to land a great job with a higher income. If our students don't succeed, our school shouldn't either."[50]

93.     In reality, Lambda packaged and sold its tuition payment plans, including ISAs, to investors long before students obtained employment. As early as May 2019, Lambda privately told investor Y Combinator: "Currently we sell some income share agreements to hedge funds." Exhibit I at 2.

94.     To facilitate the sale of ISAs, Lambda partnered with Edly, a digital marketplace that helps schools sell ISAs to third-party investors. On December 11, 2019, Edly tweeted: "Pleased to announce our latest offering [–] a Lambda School ISA Pool. We @edlyISA are excited to work with the amazing team @LambdaSchool[], one of the most impactful ISA programs in the country."[51] To learn how to participate, Edly invited interested investors to join a webinar that night with Mr. Allred.[52]

---

[49] Austen Allred, LinkedIn (2019), https://www.linkedin.com/posts/austenallred_announcing-our-new-isa-financing-blueprint-activity-6636140633306333184-dkOh?utm_source=share&utm_medium=member_desktop.

[50] *See* Austen Allred, *Announcing the Release of Our H1 2019 Student Outcomes Report*, Lambda School Website (Mar. 27, 2020), [archived by the Wayback Machine (Apr. 23, 2020), https://web.archive.org/web/20200423031203/https:/lambdaschool.com/the-commons/announcing-the-release-of-our-h1-2019-student-outcomes-report] (emphasis in original).

[51] @edlyISA, Twitter (Dec. 11, 2019, 3:01 PM), https://twitter.com/edlyISA/status/1204853625459216385 (on file with Claimant's counsel).

[52] @edlyISA, Twitter (Dec. 11, 2019, 3:02 PM), https://twitter.com/edlyISA/status/1204853900177743872(on file with Claimant's counsel).

95.     Lambda did not disclose this fact to students until public reporting exposed it, and for many months Mr. Allred flatly denied it, stating in October 2019 on Twitter that "We never, ever get paid up front for ISAs."[53]

96.     Claimant read the false and misleading statement on the Lambda website that Lambda only got paid once the student does and, as a result, believed that Lambda would only get paid once Claimant secured a qualifying job. Knowing that Lambda only got paid if Claimant obtained employment was important to Claimant's decision to attend.

E.     **LAMBDA ENGAGED—AND STILL ENGAGES—IN THE UNLAWFUL BUSINESS PRACTICE OF UNLICENSED LENDING**

97.     The California Financing Law "shall be liberally construed and applied to promote its underlying purposes and policies," which include "protect[ing] borrowers against unfair practices by some lenders, having due regard for the interests of legitimate and scrupulous lenders." Cal. Fin. Code § 22001(a)(4).

98.     Pursuant to the California Financing Law: "No person shall engage in the business of a finance lender or broker without obtaining a license from the commissioner." Cal. Fin. Code § 22100(a).

99.     Lambda is not and never has been registered in California as a finance lender or broker under the Financing Law.

100.     Since its inception, Lambda has operated as a "finance lender" because its tuition payment plans qualify as either consumer or commercial loans under the Financing Law. *See generally* Cal. Fin. Code § 22203-04 (defining consumer loans); Cal. Fin. Code § 22502 (defining commercial loans).

101.     Lambda's Meratas ISA provides:

> THIS IS NOT A LOAN
> In making monthly payments to Lambda School, you will not be repaying a student loan. In the case of a student loan, a student borrows a set amount and repays the principal amount of the loan plus interest or a finance charge, or both. Under this agreement, you

---

[53] Woo Interview at 6:30 (wherein Mr. Allred confirms that this tweet was "totally correct").

will instead pay a fixed percentage of your income each month for
up to a maximum number of payments.

102.    Contrary to this representation, ISAs are a form of student loan.

103.    According to the United States Consumer Financial Protection Bureau ("CFPB"),
a representation that an ISA is "not a loan" is deceptive and misleading under the Consumer
Financial Protection Act because "ISAs are loans and do create debt."[54]

104.    The California Department of Financial Protection and Innovation ("DFPI")
agrees, holding that ISAs are student loans: "ISAs made solely for use to finance a postsecondary
education are 'student loans' for the purposes of the SLSA [California Student Loan Servicing
Act]."[55]

105.    The United States Department of Education concurs, finding that ISAs "used to
finance expenses for postsecondary education are private education loans under 34 C.F.R.
601.2(b)."[56]

106.    The BPPE also found in its June 22, 2020, order denying Lambda approval to
operate that Lambda's ISA is "an instrument or evidence of indebtedness" under the California
Education Code. *See* June 22, 2020 Letter from BPPE to Lambda at 5, attached hereto as Exhibit
F.

---

[54] *See* Better Future Forward, Inc., et al., CFPB No. 2021-CFPB-0005, Consent Order at ¶ 23
(Sept. 7, 2021) (finding *available at:* https://files.consumerfinance.gov/f/documents/cfpb_better-
future-forward-inc_consent-order_2021-09.pdf).
[55] *See In the Matter of Student Loan Servicing Act License Application of Meratas Inc.* NMLS
No. 2120180, Consent Order at ¶ M (Ca. Dep't of Fin. Prot. and Innovation Aug. 5, 2021),
*available at:* https://dfpi.ca.gov/wp-content/uploads/sites/337/2021/08/Meratas-Consent-
Order.pdf; *see also* Press Release, California Dep't of Fin. Prot. and Innovation, "California
DFPI Enters Groundbreaking Consent Order with NY-Based Income Share Agreements
Servicer" (Aug. 5, 2020), https://dfpi.ca.gov/2021/08/05/california-dfpi-enters-groundbreaking-
consent-order-with-ny-based-income-share-agreements-servicer/.
[56] *See* FSA Announcement, General-22-12, *Income Share Agreements and Private Education
Loan Requirements* (Mar. 2, 2022), https://fsapartners.ed.gov/knowledge-
center/library/electronic-announcements/2022-03-02/income-share-agreements-and-private-
education-loan-requirements. *See also* 87 Fed. Reg. 65,453 ("[T]he Department clarifies that
ISAs and other alternative financing products should be treated like institutional loans.").

107.    Because Lambda is in the business of making ISAs and other tuition payment plans, it is operating as a finance lender under the California Financing Law.

108.    Lambda's failure to register as a finance lender deprived Claimant of the borrower protections provided by the California Financing Law.

109.    Lambda has therefore engaged in the unlawful business practice of making a loan without a license in violation of California Financial Code § 22100, and, in turn, in violation of the unlawful prong of the UCL.

110.    Had Claimant been aware that Lambda was acting as an unlicensed finance lender, Claimant would not have signed a tuition payment plan that indebted Claimant for up to $30,000 to Lambda.

**F.    CLAIMANT'S ENROLLMENT AND ATTENDANCE AT LAMBDA, AND THE AFTERMATH**

111.    Claimant Matthew Means was working in the HVAC field when he decided to pursue a career change towards data science in 2020. He had dabbled in coding and analysis tools in his free time but knew he would need more formal education to acquire the necessary skills. He researched his options for continuing education in data science and first heard of Lambda through a friend.

112.    As he was weighing his educational options, Mr. Means reviewed the Lambda website for more information throughout April and May 2020. He reviewed, and was impressed by, the 79% job placement rate on the website at the time, as well as additional statements that approximately 70% of students make over $70,000. He further valued that Lambda's program involved daily one-on-ones with instructors.

113.    Mr. Means saw that Lambda did not require tuition payments up front, and that, through an ISA, Lambda was invested in student outcomes. He reviewed the statement on the Lambda website that Lambda did not get paid until the student did, convincing Mr. Means that Lambda was equally invested in student outcomes, including his.

29

114.    The high 79% and approximately 70% placement rates and the representation that Lambda only got paid once students do were critical to Mr. Means's decision to enroll, convincing him that enrolling at Lambda would maximize his chance of landing a data science job after completing Lambda coursework.

115.    But the 79% and approximately 70% job placement rates and the statement that Lambda only got paid once students do were false and misleading, and both Lambda and Mr. Allred knew these representations were false and misleading. (*See* ¶¶ 46–90, *supra*.)

116.    Mr. Means further believed that Lambda was approved to operate due to Respondents' continuous and repeated descriptions of the school and its programs on the Lambda website and Lambda ads of various features of Lambda that conveyed that it was a credible, legitimate, and lawfully operating school. These included, but were not limited to, descriptions of Lambda's program structure that involved daily instructor discussions, structured feedback, the ability to work in different student teams, the availability of career services, and Lambda connecting students with "graduates" for more information.

117.    Swayed by Respondents' false job placement rates, their false statements that they only got paid once students do, and their false representations that Lambda was a government-approved school, Mr. Means signed an ISA with Lambda on May 20, 2020 (Exhibit A).

118.    Had Respondents truthfully represented Lambda's job placement rates, or they truthfully represented their actual financial interest in students' success, or had Mr. Means known that Lambda was not lawfully approved to operate, he would not have enrolled in Lambda's educational services, or signed an ISA that indebted him up to $30,000 of tuition to Lambda.

119.    Mr. Means began attending Lambda in June 2020. He finished (although without Lambda providing a certificate of completion) in May 2021 after discovering that the program was nothing like he imagined when researching it. Lambda eliminated one-on-one supports months into the program, his cohort shrank as peers withdrew, and testing seemed less designed to evaluate and hone skills, and more designed to push through unprepared students.

120.     After Lambda, Mr. Means tried without success to get a data science position. In any interview he got, it became clear that the employer would favor other candidates with bachelor's and master's degrees. While applying, Mr. Means continued to work side jobs in HVAC. He ultimately settled for working in IT in 2022. Along the way, Lambda did not connect him with any meaningful job leads or an interview, and there was no indication that employers placed any value on the Lambda data science program. Mr. Means does not use any skills learned at Lambda in his current IT role.

121.     Mr. Means has not made any payments pursuant to his ISA, based on the salary level of his post-Lambda roles.

## IV.     CAUSES OF ACTION

### FIRST CAUSE OF ACTION
Violations of California's Consumer Legal Remedies Act
Cal. Civ. Code §§ 1750, *et seq.*
(All Respondents)

122.     Claimant hereby reincorporates the allegations in the foregoing paragraphs as though fully set forth herein.

123.     The CLRA makes unlawful "unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or that results in the sale or lease of goods or services to any consumer." Cal. Civ. Code § 1770(a).

124.     The CLRA covers transactions involving the sale of services—such as education—to consumers.

125.     Claimant is a "consumer" within the meaning of Section 1761(d) of the CLRA, seeking Lambda's education services for personal, family, or household purposes, and Claimant engaged in "transactions" within the meaning of sections 1761(e)and 1770 of the CLRA.

126.     Education is a "service" within the meaning of Section 1761(b) of the CLRA.

127.     The CLRA enumerates numerous unlawful acts or practices, including:

    a)     "Misrepresenting the source, sponsorship, approval, or certification of goods or services." Cal. Civ. Code § 1770(a)(2).

b) "Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that the person does not have." *Id.* § 1770(a)(5).

c) "Representing that goods or services are of a particular standard, quality, or grade" when they are not. *Id.* § 1770(a)(7).

d) "Advertising goods or services with intent not to sell them as advertised." *Id.* § 1770(a)(9).

128.    In violation of these provisions, Respondents misrepresented to the public, prospective students, and current students, including Claimant, at least the following: (i) its job placement rates; and (ii) that it had approval to operate and enroll students.

129.    Respondents did so in order to induce prospective students, like Claimant, to enroll in Lambda's program—Claimant did so enroll as a result of Respondents' misrepresentations.

**SECOND CAUSE OF ACTION**
**Violations of California's Unfair Competition Law**
**Cal. Bus. & Prof. Code §§ 17200, *et seq.***
**(All Respondents)**

130.    Claimant hereby reincorporates the allegations in the foregoing paragraphs as though fully set forth herein.

131.    Respondents have engaged in business acts or practices that constitute unfair competition as defined in the UCL, in that such business acts and practices are unlawful, unfair, and fraudulent within the meaning of that statute.

132.    The business acts and practices include:

a) publishing and/or providing the public, prospective students, and current students, including Claimant, with false, misleading, unreliable, and/or inaccurate job placement rate information;

b) conducting business without BPPE approval and in violation of multiple BPPE orders requiring it to cease operations;

c) knowingly operating a private postsecondary institution without approval to do so and knowingly conveying to the public that it is an approved institution;

d) misrepresenting to the public, prospective students, and current students that in March and July of 2019, the BPPE ordered Lambda to cease operations, stop enrolling students, cease all instructional services, and submit a closure plan, and misrepresenting material facts related to those BPPE orders, including representing that they were stayed when they were not.

133.    Claimant's tuition payment plans constitute "lost money or property" within the meaning of the UCL.

Unlawful Prong

134.    The UCL bars business practices that are forbidden by law. If a business practice violates any law, it is *per se* a UCL violation.

135.    The business acts and practices described above are unlawful because they violate numerous state and federal laws, including but not limited to:

a) The Federal Trade Commission Act ("FTC Act"), which prohibits "unfair or deceptive acts or practices."[57]

b) Cal Educ. Code § 94897(b), which provides that institutions shall not "[p]romise or guarantee employment, or otherwise overstate the availability of jobs upon graduation."

c) The CLRA, *see supra*;

d) The FAL, *see infra*;

e) Cal. Educ. Code § 94886, which provides in relevant part that "a person shall not open, conduct, or do business as a private postsecondary educational institution in this state without obtaining an approval to operate under this chapter."

---

[57] *See* U.S.C.§ 45(a)(I); 15 U.S.C. § 52(a).

Lambda violated this provision, and therefore the UCL's unlawful prong, when it enrolled Claimant without obtaining approval to operate.

f) Cal. Educ. Code § 94943, which provides that it is a crime to "[k]nowingly operat[e] a private postsecondary institution without an approval to operate." Lambda violated this provision, and therefore the UCL's unlawful prong, when it knowingly enrolled Claimant without approval by the BPPE to operate.

g) Cal. Educ. Code § 94917, which provides that "[a] note, instrument, or other evidence of indebtedness relating to payment for an educational program is void and not enforceable unless, at the time of execution of the note, instrument, or other evidence of indebtedness, the institution held an approval to operate … ."

h) Cal. Educ. Code § 94902(b)(2), which provides that an enrollment agreement is enforceable only if "[a]t the time of the execution of the enrollment agreement, the institution held a valid approval to operate.

i) The California Financing Law, which provides that "[n]o person shall engage in the business of a finance lender or broker without obtaining a license from the commissioner." Cal. Fin. Code § 22100(a).

j) The Consumer Financial Protection Act of 2010, 12 U.S.C. §§ 5531(a), 5536(a)(1)(B), which prohibits covered persons from engaging in unfair, deceptive, or abusive acts or practices.

136.   By violating these and other state and federal laws, Lambda violated the unlawful prong of the UCL.

Fraud Prong

137.   To show that a business practice is fraudulent, it is necessary only to show that members of the public are likely to be deceived.

138.   Respondents' business acts and practices—including its false job placement rate representations and false representations to the Subclass about BPPE approval—are fraudulent in that they are likely to deceive the public.

139.     Each of these false and misleading representations, all of which were material, were substantial factors influencing Claimant to attend Lambda and take out a tuition payment plan that indebted Claimant for up to $30,000.

**THIRD CAUSE OF ACTION**
**Violations of California's False Advertising Law**
**Cal. Bus. & Prof. Code §§ 17500,** *et seq.*
**(All Respondents)**

140.     Claimant hereby reincorporates the allegations in the foregoing paragraphs as though fully set forth herein.

141.     Respondents have also engaged in acts or practices that constitute violations of the FAL, Business and Professions Code section 17500, *et seq.*, by making or causing to be made untrue or misleading statements with the intent to induce members of the public to purchase Lambda's services. Respondents' untrue or misleading representations include, but are not limited to, the following:

a)   Respondents' statements regarding job placement rates, including but not limited to the published job placement rates prominently displayed on its website, social media, and advertisements;

b)   Respondents' statements, prominently displayed on Lambda's website and elsewhere, that Lambda does not get paid until students do;

c)   Respondents' statements and appearance to the public, prospective students, and current students that its operations were lawful, that BPPE had not ordered Lambda to cease advertising and instructional activities, and that it could lawfully enroll students. Lambda's and Mr. Allred's advertisements and marketing implicitly and explicitly misrepresented the lawfulness of its operations by encouraging the public and prospective students to apply for enrollment.

142.     At the time these representations were made, Respondents knew or by the exercise of reasonable care should have known that the representations were untrue or misleading.

**FOURTH CAUSE OF ACTION**
**Intentional Misrepresentation**
**(All Respondents)**

143.     Claimant hereby reincorporates the allegations in the foregoing paragraphs as though fully set forth herein.

144.     Respondents made statements to Claimant: (a) that were false representations of material fact; (b) that Respondents knew were false or were made recklessly and without regard for their truth; (c) that Respondents intended Claimant to rely upon; (d) that Claimant reasonably relied upon; (e) that Claimant's reliance upon was a substantial factor in causing Claimant damage; and (f) that caused Claimant damage.

145.     The intentional misrepresentations and omissions by Respondents consist of at least the following:

   a)   Respondents' job placement rate statements, prominently displayed on the Lambda website, in outcomes reports, and on social media. Respondents knew these statements were false.

   b)   Respondents' statements, prominently displayed on Lambda's website and elsewhere, that Lambda does not get paid until students do; Lambda knew this statement was false because it sold ISAs to investors long before students were placed in jobs.

   c)   Respondents' representations, both implied and explicit, that it was approved to operate, advertise, enroll, and teach students prior to August 2020. Respondents knew these representations were false because the BPPE had ordered Lambda to cease all operations (including all advertising and instructional activities) and submit a school closure plan. Respondents also knew that they were concealing

from students that Lambda was barred from advertising and from enrolling and
teaching students.

146.    Respondents intended Claimant to rely on these misrepresentations, as evidenced
by Lambda prominently featuring them on its website and on other widely disseminated
platforms, as well as by its efforts to avoid disclosing the truth.

147.    Claimant reasonably relied on these widely disseminated representations. Had
Claimant known the truth, Claimant would not have enrolled at Lambda.

148.    Lambda, Mr. Allred, and members of his executive leadership team acted
willfully and knowingly to disseminate these representations to the public with knowledge that
they were false and misleading.

149.    Claimant has been substantially harmed by Lambda's misconduct, which caused
Claimant to attend Lambda and take out an ISA that indebted Claimant for up to $30,000 in
tuition.

## FIFTH CAUSE OF ACTION
### Negligent Misrepresentation
### (All Respondents)

150.    Claimant hereby reincorporates the allegations in the foregoing paragraphs as
though fully set forth herein.

151.    Respondents have also engaged in acts or practices that constitute negligent
misrepresentation. *See supra* ¶143–49.

152.    Respondents prominently displayed these representations on the Lambda website,
in outcomes reports, on social media, and in advertisements for the purpose of encouraging
members of the public, like Claimant, to apply for enrollment.

153.    Respondents had no reasonable grounds to believe that these representations were
true.

154.    Respondents intended to induce Claimant to rely on these misrepresentations, as
evidenced by Lambda prominently featuring them on its website and on other widely
disseminated platforms, as well as by its efforts to avoid disclosing the truth.

155.    Claimant was justified in relying upon these widely disseminated representations. Had Claimant known the truth, Claimant would not have enrolled at Lambda.

156.    Claimant has been substantially harmed by Lambda's misconduct, which caused Claimant to attend Lambda and take out an ISA that indebted Claimant for up to $30,000 in tuition.

## V.    PRAYER FOR RELIEF

WHEREFORE, in accordance with the above claims, Claimant requests that the Arbitrator:

1.    Declare and order that the tuition payment plan entered into by Claimant is unlawful, void, and unenforceable pursuant to Cal. Educ. Code §§ 94886, 94902, 94917, and 94943, and the UCL, CLRA, and FAL.

2.    Declare that Respondents conducted business as a private postsecondary educational institution in California without obtaining approval to operate, in violation of Cal. Educ. Code § 94886 and the UCL.

3.    Declare that Respondents knowingly operated a private postsecondary institution without approval to operate, in violation of Cal. Educ. Code § 94943 and the UCL.

4.    Declare that Respondents' job placement rate representations at all times relevant to this Complaint were fraudulent and misleading, in violation of the UCL, FAL, and CLRA, and were intentional and/or negligence misrepresentations.

5.    Declare that Lambda "engage[d] in the business of a finance lender or broker without obtaining a license from the commissioner," and continues to do so, in violation of the California Financing Law, Cal. Fin. Code § 22100(a).

6.    Order Respondents—including Lambda, Mr. Allred, and any other owner of all or part of the tuition payment plans—to cancel Claimant's tuition payment plan and enjoin any effort to collect upon or otherwise enforce it.

7.  Order Respondents to pay restitution in the form of refunds for any and all payments made.

8.  Order prejudgment and post-judgment interest on any refunds for tuition payment plan payments to the maximum extent allowed by law.

9.  Order Respondents to pay reasonable attorneys' fees and costs.

10. Award damages to Claimant in an amount to be determined, including punitive damages pursuant to Cal. Civ. Code § 3294(a).

11. Order all such further relief as the Arbitrator deems just and proper.


Dated: March 12, 2024          **MINER, BARNHILL & GALLAND, P.C.**


By: ___/s/ *Ryan Miller*_____
        Deanna N. Pihos
        David Baltmanis
        Ryan Miller

        *Attorneys for Claimant*

BEFORE THE AMERICAN ARBITRATION ASSOCIATION
SAN FRANCISCO, CALIFORNIA

| | |
|---|---|
| YERALDINA ESTRELLA,<br><br>    Claimant,<br><br>  v.<br><br>BLOOM INSTITUTE OF TECHNOLOGY,<br>formerly d/b/a LAMBDA SCHOOL;<br>AUSTEN ALLRED, in his individual<br>capacity; and JOHN DOES 1-9,<br><br>    Respondents. | AAA Case No. _____ |

## DEMAND FOR ARBITRATION

1. Pursuant to the American Arbitration Association's Consumer Rules, Claimant Yeraldina Estrella submits this Demand for Arbitration against Bloom Institute of Technology, formerly d/b/a Lambda School ("Lambda"), Austin Allred, in his individual capacity, and John Does 1–9 (collectively, "Respondents") for violations of the California Consumer Legal Remedies Act ("CLRA"), California Civil Code § 1750, *et seq.*, Unfair Competition Law ("UCL"), California Business and Professional Code §17200, *et seq.*, and False Advertising Law ("FAL"), California Business and Professional Code § 17500, *et seq.*, as well as for intentional and negligent misrepresentation.

2. Ms. Estrella is a former student of Lambda School and brings this action to hold Respondents accountable for: (i) falsifying and misrepresenting Lambda's job placement rates; (ii) misrepresenting and concealing that, until August 17, 2020, Lambda did not have the necessary approval from the California Bureau for Postsecondary Education ("BPPE") to operate as a school, and was under order by the BPPE to cease operations, stop enrolling students, cease all instructional services, and submit a closure plan; (iii) in violation of California law, enrolling, signing tuition payment plans with, and providing educational services to students before Lambda obtained the BPPE's approval to operate; and (iv) in violation of California law,

1

engaging in the unlawful business practice of unlicensed lending; and (v) misrepresenting and concealing the true nature of Lambda's financial interest in students' success, including by falsely representing that Lambda only got paid after students found employment and got paid.

3.      Claimant would not have enrolled at Lambda had Plaintiff known the truth about Lambda's job placement rates, its lack of approval from BPPE, or the true nature of Lambda's financial interest in Claimant's success (or lack thereof). Through this action, Claimant seeks declaratory and injunctive relief to cancel Claimant's tuition payment plan and declare that payment plan null and void; a refund of any payments Claimant has made under that payment plan; damages; and additional relief.

I.      **THE PARTIES**

4.      Claimant Yerladina Estrella is a resident of Hackensack, Bergen County, New Jersey. Claimant signed a tuition payment plan on May 20, 2020. Claimant was enrolled as a student at Lambda starting in June 2020, and she completed Lambda's program in January 2023. Claimant's tuition payment plan is attached as Exhibit A.

5.      Respondent Lambda is a corporation organized and existing under the laws of the State of Delaware, having its principal place of business at 250 Montgomery Street, Floor 16, San Francisco, California 94104 and/or 149 New Montgomery Street, 4th floor, San Francisco, CA 94101.

6.      Respondent Austen Allred is Lambda's founder and CEO. Upon information and belief, Mr. Allred resides in San Francisco, California, and/or did so during times relevant to the events described herein.

7.      Respondents John Does 1-9 are officers and/or directors of Lambda as well as individuals, corporations, or other entities who may own all or a portion of Claimant's tuition payment plan or any other financial interest in that tuition payment plan.

II.      **JURISDICTION AND VENUE**

8.      The American Arbitration Association ("AAA") has jurisdiction over this action pursuant to Claimant's tuition payment plan, which specifies:

As the exclusive means of initiating adversarial proceedings to resolve any dispute arising out of this agreement, your Lambda School tuition, or your payments to Lambda School (other than any proceeding commenced by either party seeking an injunction, a restraining order, or any other equitable remedy or a proceeding commenced by either party in small claims court), either party may demand that the dispute be resolved by binding arbitration administered by the American Arbitration Association in accordance with its Consumer Arbitration Rules available at www.adr.org.

9.      Claimant's tuition payment plan further specifies, "Any such arbitration must be conducted by one arbitrator and must be conducted in San Francisco, California, the county with a major commercial airport nearest to where you live, or another mutually agreed location."

## III.    FACTUAL ALLEGATIONS

### A.    LAMBDA BACKGROUND

10.     Lambda is a private, for-profit online coding school founded in 2017 by its current CEO, Austen Allred. Mr. Allred was the Company's primary decision-maker, controlled its daily operations, and regularly promoted Lambda on social media and through other media. He benefitted financially from the tuition paid to Lambda by Claimant and all other students.

11.     Lambda provides online computer science courses of varying lengths. It is not a degree-granting institution, and is not accredited. Students cannot take out federal student loans to attend Lambda.

12.     Lambda marketed itself as a place where students learn the skills necessary to obtain employment in the competitive computer technology job market. In Mr. Allred's words, most students come to Lambda with "no network" and are "from either inner cities or rural areas."[1]

13.     Lambda touted its "experienced industry expert" instructors and a top-of-the-line curriculum that is "designed to get you hired." On April 3, 2019, Mr. Allred stated in an interview that Lambda's "educational experience is, I think, among the best in the world."[2]

---

[1] *See* Y Combinator, *A CS Education That's Free Until You Get a Job - Austen Allred of LambdaSchool*, YouTube (Apr. 3, 2019) at 9:10 (hereinafter "Y Combinator Interview"), https://www.youtube.com/watch?v=_yIAYZtdrfI&t=551s.
[2] *Id.* at 15:05.

3

14.     At all times relevant to this complaint, Lambda charged tens of thousands of dollars for its program, more than double the reported average price of online coding bootcamps.[3]

15.     Part of Lambda's business model has been predicated on convincing prospective students to agree to pay a large amount of tuition by promising them that they will not owe anything unless and until they find a job that pays $50,000 or more per year.

16.     Lambda carries out this model by entering into tuition payment plans with students. For example, as Lambda describes one of its tuition payment plan offerings, Income Share Agreements (ISAs): "A Lambda School ISA is a contract under which you agree to pay 17% of your post-Lambda School salary for 24 months, but only once you're making more than $50,000 per year (or the equivalent of $4,166.67 per month). The ISA is capped at a maximum repayment of $30,000, so you won't pay more than $30,000 under any circumstances."[4]

17.     Over time, Lambda expanded its tuition payment plan offerings to include, for example, retail installment contracts, deferred tuition plans, multi-part installment payment plans, financing through a third-party loan, a pre-instruction lump sum payment, or ISA varieties that combine an initial lump sum payment with payments from a proportion of future earnings.

18.     Some Lambda tuition payment plans are managed by third-party servicers who handle origination and payment processing.[5] Meratas, a loan-servicing company headquartered in Stamford, Connecticut, services Claimant's ISA.

19.     By April 2019, Lambda was growing at "an insane pace." As Mr. Allred explained:

> We agreed as a team to no longer share the number of students that we have enrolled, but it is not a small number and it is growing at an insane pace. We'll soon

---

[3] *See* Cecilia Clark, *How Much is Coding Boot Camp?* Nerdwallet (June 21, 2022, 10:53 AM), https://www.nerdwallet.com/article/loans/student-loans/how-much-is-coding-bootcamp.

[4] *The Lambda School Income Share Agreement*, Lambda School Website (scroll to FAQs "What is an ISA and how does it work"), [archived by the Wayback Machine (Dec. 16, 2020), https://web.archive.org/web/20201216131833/https://lambdaschool.com/tuition/isa].

[5] *The Lambda School Income Share Agreement*, Lambda School Website (scroll to FAQs "Who are Meratas and Leif"), [archived by the Wayback Machine (Dec. 16, 2020), https://web.archive.org/web/20201216131833/https://lambdaschool.com/tuition/isa].

be measuring Lambda School scale by percentage of the overall number of students learning to program every year, to give you some context. And being able to support that kind of scale effectively is what keeps me up at night. Mostly specifically hiring, mostly hiring executives right now who can build out 100, 150 person teams beneath them . . . and we need like 5 of them yesterday.[6]

20.    Mr. Allred attributed Lambda's growth in part to his active personal Twitter account, stating in January 2020 that his frequent tweets have "certainly helped Lambda school grow."[7]

21.    Mr. Allred also stated: "If there's one thing I'm good at in life, it's growing something quickly, building hype for something quickly. That's kind of my superpower."[8]

22.    As described below, Lambda's rapid growth was fueled by the School's, and Mr. Allred's, public misrepresentations about the School's approval status and job placement rates.

## B.    UNTIL AUGUST 17, 2020, LAMBDA OPERATED WITHOUT STATE APPROVAL, IN VIOLATION OF CALIFORNIA LAW

23.    As a California company with its headquarters and principal place of business in San Francisco, Lambda is subject to the laws of the state of California. One of those laws, California Education Code § 94886, bars private postsecondary educational intuitions from doing business without "approval to operate."

24.    Another, Section 94917, provides that when educational institutions violate this law, any "note, instrument, or other evidence of indebtedness relating to payment" for its programs is "void and not enforceable."

25.    All Lambda tuition payment plans, including ISAs, are a "note, instrument, or other evidence of indebtedness relating to payment for educational program[s]," under the California Education Code.

26.    On March 20, 2019, the BPPE issued a "Citation: Assessment of Fine and Order of Abatement" ("Citation") to Lambda. The Citation found that Lambda was "operating without

---

[6] Y Combinator Interview at 47:50.

[7] Vincent Woo, *Interview with Austen Allred*, Soundcloud (Jan. 22, 2020) at 42:10 (hereinafter "Woo Interview"), https://soundcloud.com/vwoo/interview-with-austen-allred.

[8] Y Combinator Interview at 22:25.

Bureau approval," in violation of the California Education Code. A copy of the Citation is attached hereto as Exhibit B.

27.     In the Citation, the BPPE ordered that Lambda "cease to operate as a private postsecondary educational institution" and "submit a school closure plan." The Citation further required Lambda to "discontinue recruiting or enrolling students and cease all instructional services and advertising in any form or type of media, including the https://lambdaschool.com and any other websites not identified here that are associated with the Institution, until such time as an approval to operate is obtained from the Bureau."

28.     On May 14, 2019, Lambda submitted its application to the BPPE seeking approval to operate.

29.     Lambda appealed the Citation and, on July 24, 2019, the BPPE issued an "Appeal of Citation Informal Conference Decision: Citation Affirmed" (the "Citation Affirmance"). The BPPE affirmed the Citation because "[n]o new substantive facts were presented," and thus, Lambda was required to "comply with the orders described in the 'Violation Code Sections' of this document and submit evidence of compliance within 30 days from the date of this decision." Citation Affirmance at 1–3. A copy of the Citation Affirmance is attached hereto as Exhibit C.

30.     In direct violation of California law, the Citation, and the Citation Affirmance, Lambda continued to operate, advertise its educational services to the public, and enroll students.

31.     On August 21, 2019, the BPPE denied Lambda's May 14, 2019 application, stating in a letter to Lambda that it was "unable to grant approval." A copy of the August 21 order is attached hereto as Exhibit D.

32.     On November 25, 2019, the BPPE issued an order denying Lambda's updated application for approval, explaining that "at this time the Bureau is unable to grant approval, based on the requirements of the California Education Code." A copy of the November 25 order is attached hereto as Exhibit E.

33.     On June 22, 2020, the BPPE issued yet another order denying Lambda's further updated application for approval to operate, stating that "the Bureau cannot at this time approve Lambda's application." A copy of the June 22 order is attached hereto as Exhibit F.

34.     The June 22, 2020 order also found that Lambda's ISAs constitute "an instrument or evidence of indebtedness" under the California Education Code. *Id.* at 5.

35.     On August 17, 2020, the BPPE issued an order approving Lambda's application. The approval letter stated that the BPPE had completed its review of Lambda's "Application for Approval to Operate," including "supplemental documentation" received on August 14, 2020. The BPPE found that "[a]pproval to operate is granted *effective August 17, 2020*." (emphasis added). A copy of the August 17 order is attached hereto as Exhibit G.

36.     From at least May 2019 until Lambda was approved on August 17, 2020, Lambda's publicly available course catalogs falsely stated that Lambda was approved by the BPPE. In at least three versions of the 2019 and 2020 catalogs—revised in May 2019, September 2019, and July 2020 (all prior to Lambda's approval)—Lambda falsely stated the following:

> **APPROVALS**
> Lambda School is a private institution *approved to operate* by the California Bureau for Private Postsecondary Education. Approval to operate means the institution is compliant with the minimum standards contained in the California Private Postsecondary Education Act of 2009 (as amended) and Division 7.5 of Title 5 of the California Code of Regulations.

*See* Exhibit H (Excerpts of Three Versions of Lambda Course Catalogs for 2019 and 2020 at 5) (emphasis added).

37.     During the time Lambda was seeking the BPPE's approval, Mr. Allred engaged in a public misinformation campaign about Lambda's legal status. For example, in August 2019, Mr. Allred told Business Insider that Lambda was working with the BPPE to obtain approval and

that the order had been stayed while the application was pending. Mr. Allred stated that "[b]ecause we're talking with BPPE, it doesn't affect students at all."[9] This was false.

38.     In truth, the Citation and Citation Affirmance were not stayed, multiple of Lambda's applications had been denied, and Lambda's future was uncertain. In August 2020, a public information officer with California's Department of Consumer Affairs told Business Insider "that there is no stay on the order, and that if Lambda School is still operating while its registration is pending, it would be in violation of state law."[10]

39.     Upon information and belief, Mr. Allred further commented to Lambda students over the Lambda Slack channel that any regulatory issues were mere technicalities that did not affect the school's ability to operate.

40.     At all times Mr. Allred knew or should have known that ISAs and other financing instruments issued by Lambda were void and unenforceable under California Law due to Lambda's lack of approval to operate.

41.     Throughout 2019 and 2020, prior to Lambda's August 17, 2020 approval, Lambda and Mr. Allred further misrepresented Lambda's approval status by using a number of recognized attributes of an approved academic institution in its advertising and promotional materials. During this period, Lambda's name, website, and the website URL itself – lambdaschool.com – used the term "school", and Lambda's website, ads, and social media continuously displayed the following school crest:

*Screenshot from Lambda's website on April 22, 2020.*



---

[9] Rosalie Chan, *The hot Silicon Valley coding bootcamp Lambda School is paying a $75,000 fine for not registering properly with the state of California*, Business Insider (Aug. 29, 2019, 6:32 PM), https://www.businessinsider.com/lambda-school-coding-bootcamp-california-bppe-2019-8.
[10] Rosalie Chan, *A California official says red-hot coding bootcamp Lambda School is violating state law if it operates without the right registration — but the company insists classes can go on*, Business Insider (Aug. 30, 2019, 8:54 PM), https://www.businessinsider.com/lambda-school-california-state-law-coding-bootcamp-y-combinator-2019-8.

42.     During this period, Lambda's website, online ads, and social media continuously and repeatedly referred to various features of an approved academic institution, including, for example, a "curriculum," "tuition," "students," "student body," being "enrolled," an academic "schedule," "graduates," "mentors," "grades," "lectures," "homework," and "career support": [11]

*Screenshot from Lambda's website on May 6, 2020.*





---

[11] *See, e.g.*, Lambda School (@LambdaSchool), Twitter (Dec. 10, 2019, 9:52 PM), https://twitter.com/bloomtech/status/1204609786718801922; Lambda School Instagram (Mar. 16, 2020), https://www.instagram.com/p/B9zG7NvjhyS/; *Curriculum*, Lambda School Website, [archived by the Wayback Machine (May 6, 2020), https://web.archive.org/web/20200506051614/https://lambdaschool.com/curriculum].

*Screenshot of a March 16, 2020 Lambda Instagram post.*



43.      Mr. Allred furthered the appearance that Lambda was approved to operate in similar terms. In his "Letter from the CEO" at the beginning of Lambda's March 2020 outcomes report (which was publicly available on the Lambda website), he refers to the Lambda "student body" growing to 2,900, with Lambda staff growing to 200, and moving the Lambda headquarters to an office building in downtown San Francisco based on that growth. He refers to a "curriculum" that is "mastery-based," "graduation," "career support," and "the school." He acknowledged that Lambda "students place great trust in Lambda School when they enroll, and they make incredible investments of time and energy while engaged in our programs."[12]

44.      Had Claimant been aware that Lambda was operating without a license, was not approved to operate, and that its future legal status was uncertain, Claimant would not have signed a tuition payment plan that indebted Claimant for up to $30,000 to Lambda. Indeed, no

---

[12] *See* Austen Allred, *Announcing the Release of Our H1 2019 Student Outcomes Report*, Lambda School Website (Mar. 27, 2020), [archived by the Wayback Machine (Apr. 23, 2020), https://web.archive.org/web/20200423031203/https://lambdaschool.com/the-commons/announcing-the-release-of-our-h1-2019-student-outcomes-report] (last visited November 27, 2023).

reasonable consumer would enroll and indebt themselves to a program operating unlawfully and under orders to close.

45.     Claimant's tuition payment plan constitutes a "note, instrument, or other evidence of indebtedness relating to payment for [students'] educational program," under the California Education Code, and therefore, as a matter of law, is "void and not enforceable." California Education Code § 94917.

### C.     LAMBDA'S FALSE AND MISLEADING JOB PLACEMENT RATES

46.     Lambda's selling point to Claimant and other students was that it would land them a job—and thus bring financial success. Mr. Allred described Lambda as "entirely vocational, we're a trade school basically, and we want to help you make as much money as you can."[13]

47.     Lambda's record of placing students in computer technology jobs was therefore a critical piece of information for Claimant and others considering attending Lambda. Respondents knew that students would only enroll if Lambda would help them secure a job. As Lambda described it, job placement is "the most critical component of Lambda's operations, not only in the School's obligation to its students, but to the prosperity of the company as a whole." *See* ¶ 53, *infra*.

48.     To that end, for the past six years, since Lambda's inception, and continuously through today, Lambda and Mr. Allred have engaged in an extensive and long-term campaign to advertise false and misleading job placement rates, intending that potential students like Claimant would review those rates and enroll at Lambda as a result of those rates.

49.     Lambda and Mr. Allred have prominently displayed false and misleading information on Lambda's purported record of job placement on the Lambda website, in marketing materials and outcomes reports, in a variety of online and social media advertisements (upon information and belief, including Google, YouTube, and various social media), and

---

[13] Y Combinator Interview at 13:00.

through social media postings and comments, including Mr. Allred's personal social media accounts.

**1.    False and misleading job placement rates on Lambda's website and outcomes reports**

50.    Throughout 2018 and 2019, Lambda's website advertised job placement rates of over 80%. Lambda and its executive leadership, including Mr. Allred, knew that these widely disseminated rates were false and misleading.

51.    On August 2, 2018, Mr. Allred, Ben Nelson (co-founder and CTO), and Ryan Holdaway (VP of Outcomes), stated the following in a post on the Lambda School Blog: *"[E]very single* Lambda School graduate who has been on the job market for six months is either employed in a full-time role as a software engineer or has joined an early startup working for equity."[14]

52.    Yet on August 3, 2018—the very next day—Lambda's executive leadership team reprimanded Lambda's Director of Career Readiness for poor job placement rate performance, sending her an "Employee Corrective Action Form." The form stated that the employee's "performance in recent months has not met the expectations for the Career Coach/Director of Career Readiness role at Lambda School. Overall placement numbers are low and the time to placement is much higher than desired."

53.    The Corrective Action Form continued:

Placements are the most critical component of Lambda's operations, not only in the School's obligation to its students, but to the prosperity of the company as a whole. A common discussion point in regards to Outcomes is that current placement rates are too low and time to placement is too high. Creative tactics and adjustments to current careers processes as well as follow through are needed to improve both of these measurements. . . .

CS1 students graduated on 1/19/18. Since then we've had a new class graduate approximately every five weeks. As of 8/1/18, only 16 students of the 48 graduated students assigned to [the Lambda career placement employee] have been placed.

---

[14] Austen Allred, *Introducing Lambda Next — Our Revolutionary New Job Search and Placement Program*, Medium: Lambda School Blog (Aug. 2, 2018), https://medium.com/lambda-school-blog/introducing-lambda-next-our-revolutionary-new-job-search-and-placement-program-603ef12f7d37 (emphasis added).

54.     Two months later, on October 8, 2018, Lambda continued to tout its high job placement rates, announcing on its website: "Since Lambda School's inception in April 2017, over 75 Lambda School graduates have been hired, including 83% of early cohorts, with an average salary increase of over $47,000 per hired graduate."

55.     Lambda's website contained the following statement across the top of the page:

*Screenshot from Lambda's website on December 13, 2018.*



56.     The representation of an 83% job placement rate remained on the Lambda website until on or about February 2019.

57.     From on or about April 2019 until at least December 2019, Lambda's website advertised an ever higher job placement rate: over 85%. For example, on April 18, 2019, Lambda's website contained the following statement across the top of the page:

*Screenshot from Lambda's website on April 18, 2019.*



58.     Yet in May of 2019—at the same time Lambda was advertising an 85.9% job placement rate on its website—Lambda executives sent a private memorandum to investor Y Combinator confirming the falsity of the rates it was publicly promoting. *See* Lambda

Memorandum to Investors, *Human Capital: The Last Unoptimized Asset Class* at 10 (May 2019), attached hereto as Exhibit I. The May 2019 memo stated:

> **We're unable to place students at scale**
> - We're at roughly 50% placement for cohorts that are 6 months graduated
> - Placement to date has been manual and one-off, which isn't possible at scale

Ex. I at 10.

59.     After the memorandum was published in news accounts two years later, Mr. Allred confirmed in a tweet from his personal account that he had told investors that Lambda had a 50% placement rate, stating: "The 50% came from me telling investors about what % of enrolled students get jobs that require repayment."

60.     Despite Mr. Allred's contrary statement to investors, Lambda's website continued to promote a 85.9% or 86% placement rate through the end of 2019. These rates were false and misleading.

61.     On December 14, 2019, Lambda's homepage stated:



*Screenshot from Lambda's website on December 14, 2019.*

62.     This statement was false and directly contrary to the true facts known to Lambda and Mr. Allred, which had privately been disclosed to investors, as described above.

63.     When asked in an interview to explain the discrepancy between the representations on Lambda's website and representations to its investors, Mr. Allred explained:

14

"I mean you're literally looking at what are the risks, right? Like, we're going to pick our lowest number for that – there are cohorts that have been at 50% placed within 6 months, yes."[15]

64.    When asked whether the advertised 86% job placement rate was accurate, he stated: "the way that that number was measured was an average across cohorts at a specific time. I don't know what it is right now, but that's directionally correct."[16]

65.    On February 19, 2020, New York Magazine published an article titled "Lambda School's Misleading Promises," in which the writer concluded that Lambda was "selling unprepared students an incomplete education, fueled by overpromising marketing and misleading, if not downright fraudulent, figures."[17] The story described Lambda's job placement rate misrepresentations and also recounted an interview with a former employee who "confirmed . . . that the company's own internal numbers, which the interviewee was provided as part of their interview process, seem to indicate a roughly 50 percent or lower placement rate."[18]

66.    Lambda nonetheless persisted in promoting false and misleading job placement statistics on its website and elsewhere.

67.    In 2020, Lambda started to promote its placement rates through "outcomes reports" published on its website and shared through social media. Multiple outcomes reports included an "Independent Accountants' Report" directed "To the Management" of "Lambda Inc." located at "250 Montgomery Street[,] San Francisco, CA 94104".

68.    The first outcomes report, titled "H1 2019 Outcomes Report," was published on March 27, 2020,[19] and reported a 79% placement rate.[20]

---

[15] Woo Interview at 13:00-14:30.

[16] *Id.* at 11:13-11:26.

[17] Vincent Woo, *Lambda School's Misleading Promises*, New York Magazine (Feb. 19, 2020), https://nymag.com/intelligencer/2020/02/lambda-schools-job-placement-rate-is-lower-than-claimed.html.

[18] *Id.*

[19] *See* Austen Allred, *Announcing the Release of Our H1 2019 Student Outcomes Report*, Lambda School Website (Mar. 27, 2020), [archived by the Wayback Machine (Apr. 23, 2020), https://web.archive.org/web/20200423031203/https://lambdaschool.com/the-commons/announcing-the-release-of-our-h1-2019-student-outcomes-report].

[20] *See H1 2019 Report Lambda School Outcomes Report*, Lambda School Website, [archived by

69.     The 79% placement rate remained up on Lambda's website until December 3, 2020, when Lambda published its "H2 2019 Outcomes Report."[21] The H2 2019 report showed a 74% placement rate.[22]

70.     The 74% rate announced in the H2 2019 report remained up on Lambda's website until November 7, 2021, when Lambda announced its 2020 outcomes.[23] In the 2020 outcomes report, Lambda announced that the placement rate remained at 74%.

71.     Until November 1, 2022, Lambda continued to report the 74% placement rate from the 2020 outcomes report on its website:

# 74%

Job placement rate for BloomTech graduates

**BloomTech 2020 Outcomes Report**

*Screenshot from Lambda's homepage on September 30, 2022.*[24]

---

the Wayback Machine (Sept. 3, 2020),
https://web.archive.org/web/20200903023542/https:/lambdaschool.com/reports/2019-outcomes-report].

[21] *See* Austen Allred, *Announcing the Release of Our H2 2019 Student Outcomes Report*, Lambda School Website (Dec. 3, 2020), [archived by the Wayback Machine (Dec. 14, 2020), https://web.archive.org/web/20201214214247/https:/lambdaschool.com/the-commons/announcing-lambda-school-h2-2019-student-outcomes-report].

[22] *Id. See also H2 2019 Report Lambda School Outcomes Report*, Lambda School Website [archived by the Wayback Machine (Dec. 3, 2020), https://web.archive.org/web/20201203230224/https:/lambdaschool.com/reports/h2-2019-outcomes-report].

[23] *See Bloom Institute of Technology 2020 Outcomes Report,* Bloom Institute of Technology, [archived by the Wayback Machine (Nov. 25, 2021), https://web.archive.org/web/20211125162824/https:/www.bloomtech.com/reports/outcomes-report].
It appears that Lambda only published one outcomes report in 2020. *See BloomTech Reports*, Bloom Institute of Technology Website, https://www.bloomtech.com/reports/archive (last visited Mar. 14, 2023).

[24] *See Built For Your Success*, Bloom Institute of Technology Website, [archived by the Wayback Machine (Sept. 30, 2022) https://web.archive.org/web/20220930032702/https:/www.bloomtech.com/outcomes].

16

72.     On November 2, 2022, Lambda published the "BloomTech 2021 Outcomes Report," advertising a 90% placement rate. As of November 2, 2022, Lambda's website provided:

# 90%

Job placement rate for BloomTech graduates

**BloomTech 2021 Outcomes Report**

*Screenshot from Lambda's homepage on November 27, 2022.*[25]

73.     In a "Letter from the CEO" dated November 2, 2022, Mr. Allred wrote: "In this independently examined report, you'll gain a transparent view of how our learners and graduates fared in 2021. Our biggest takeaway: A full **90% of our 2021 graduates have landed jobs**, which is the highest rate in our company's history."[26]

74.     Lambda's homepage continued to advertise a 90% placement rate until January 2024, when it updated the rate, touting an "86% job placement rate in 2022 for job-seeking grads."[27]

75.     Like the earlier rates from 2018 and 2019, the rates Lambda published from 2020 to the present (including, but not limited to, the 79%, 74%, 90%, and 86% rates from the Lambda website and outcomes reports) were, and continue to be, false and misleading. Lambda and its executive leadership, including Mr. Allred, knew that these widely disseminated rates were false and misleading.

---

[25] *See Built For Your Success,* Bloom Institute of Technology Website, [archived by the Wayback Machine (Nov. 27, 2022), https://web.archive.org/web/20221127122732/https://www.bloomtech.com/outcomes].
[26] *See* Austen Allred, *Letter from the CEO*, Bloom Institute of Technology Website (Nov. 2, 2022), https://www.bloomtech.com/reports/outcomes-report#letter (last visited Mar. 14, 2023) (emphasis in original, internal citation omitted).
[27] *See* Bloom Institute of Technology Home Page, https://www.bloomtech.com/ (last visited December 6, 2023).

76.     Business Insider reported in October 2021 that documents from a Lambda "all-hands" staff meeting in January 2021 "showed that Lambda School placed only around 30% of its 2020 graduates in qualifying jobs during the first half of 2020. This figure is in stark contrast to the 74% placement rate it advertised for its 2019 graduates, the latest figure the school has made publicly available. . . ."[28]

77.     This "all hands" meeting took place one month after Lambda published the 74% placement rate in the H2 2019 Outcomes Report.

78.     A slide prepared by Lambda reveals that the H1 2020 placement rate was only 33% and the H2 2020 rate was 40%, a far cry from the 74% listed on the Lambda website until November 2, 2022. According to the same slide, Lambda's H1 2021 *goal* was 60% placement and H2 2021 *goal* was 80%:

## Long-Term Student Success Goals

|  | H1 2020 | H2 2020 | H1 2021 | H2 2021 | Metric | Description |
|---|---|---|---|---|---|---|
| **Admissions** | 1277 | 1450 | TBD | TBD | Unit 2 Starts | # students starting Unit 2. |
| **School** | 52% | 56% | 60% | 80% | % Graduating within 11 Units | % of students who start Unit 2 complete coursework within 11 units. |
| **Outcomes** | 33% | 40% | 60% | 80% | % Qualified Placement within 180 days | % of graduates get high paying jobs within 180 days. |
| **Repayment** | 72% | 79% | 85% | 87% | % Repaying within 60 days | % of qualified placed graduates have made a first payment within 60 days. |

79.     On information and belief, a Lambda executive presented the slide at the "all-hands" meeting at Lambda's headquarters in San Francisco, California.

---

[28] *See* Vincent Woo, *Lambda School promised a fast and cheap path to a lucrative tech career. Leaked documents and former students cast doubt on that claim*. Business Insider (Oct. 25, 2021, 7:30 AM), https://www.businessinsider.com/lambda-school-promised-lucrative-tech-coding-career-low-job-placement-2021-10.

80.     Another slide, titled "Lambda H1 Company OKRs," provided that the "actual" placement rate for H1 2020 was 33% of graduates placed within 180 days, and the actual rate for H2 2020 (as of October 2020) was 27% of graduates placed within 180 days. This slide also listed the H1 2021 goal as 60%:

## Lambda H1 Company OKRs

| | H1 2020 | H2 2020 | H1 2021 | Metric | Description |
|---|---|---|---|---|---|
| **Admissions Goal** Admissions Actual | n/a 1277 | 1450 ~850 | 1500 | Unit 2 Starts | # students starting Unit 2. |
| **School Goal** School Actual | n/a 52% | 56% 52% | 60% | Extended Grad Rate % | % of students who start Unit 2 complete coursework within expected time window |
| **Outcomes Goal** Outcomes Actual | n/a 33% | 40% 27% | 60% | % Qualified Placement within 180 days | % of graduates get high paying jobs within 180 days. |
| **Repayment Goal** Repayment Actual | n/a 41% | 75% 73% | 85% | % Repaying within 60 days | % of qualified placed graduates have made a first payment within 60 days. |
| **Alumni Goal** | n/a | n/a | 40% | % Alumni Giving back | % of hired alumni giving back |

*H2 2020 Actuals as of October 2020

81.     Another slide, reportedly used at another all-hands meeting in February 2021, broke out the 180-day placement rates by month, from February to July 2020, as follows:

| Graduation Month | Qualified Placed % (days elapsed since graduation) | | |
|---|---|---|---|
| **Month** | **+90d** | **+180d** | **QP Now** |
| Feb - 2020 | 20% | 31% | 41% |
| Mar - 2020 | 19% | 30% | 36% |
| April - 2020 | 17% | 24% | 32% |
| May - 2020 | 13% | 27% | 32% |
| Jun - 2020 | 15% | 25% | 27% |
| Jul - 2020 | 18% | 24% | 25% |
| Aug - 2020 | 16% | | 21% |
| Sept - 2020 | 13% | | 14% |
| Oct - 2020 | 10% | | 11% |
| Nov - 2020 | | | 11% |
| Jan - 2021 | | | 11% |
| **Weighted Avg.** | 16% | 27% | |
| **H2 Goal** | | 40% | |

82.    In yet another slide, reportedly also used at the "all hands" meeting on January 28, 2021, Lambda's H1 2021 "goal" was to enroll 500 students a month and place 50% to 70% in qualifying jobs. The graph also shows that, if Lambda enrolled 2,000 students per month, it could become profitable even if fewer than half of its students found jobs:



83.    Prior to signing a tuition payment plan, Claimant read Respondents' representations that Lambda's job placement rate was above 70%. Lambda's purported record of successfully placing students was critical to Claimaint's decision to enroll.

**2.    Lambda's false and misleading statements about job placement in social media postings and comments.**

84.    In addition to advertising job placement rates on its website and in outcomes reports, Lambda's job placement marketing campaign aimed at potential students expanded to social media posts and comments, including Twitter, Facebook, and Instagram. Like the rates on its website and in outcomes reports, these rates, ranging from 71% to at least 91%, were false and misleading. Lambda and its executive leadership, including Mr. Allred, knew that these widely disseminated rates were false and misleading, and intended that potential students like Claimant would review those rates and enroll at Lambda as a result of those rates.

85.    Examples of false and misleading job placement rates on Lambda's Twitter, Facebook, and Instagram accounts include:

a)    April 6, 2018, Lambda Twitter: "Time for another update on placement. Students hired by Lambda School are not included. Cs1: 75% hired within first two months of search."[29]

b)    March 5, 2019, Lambda's Twitter account linked to a report touting an 85.9% job placement rate and stated: "Lambda only succeeds when our students succeed, and we're committed to a transparent, no-surprises approach to education."[30]

c)    April 22, 2020, Lambda Instagram: "Percentage of H1 2019 graduates that have been placed into jobs. → 71%"[31]



---

[29] Lambda School (@LambdaSchool), Twitter (Apr. 6, 2018, 12:39 PM), https://twitter.com/bloomtech/status/982311747301330944.
[30] Lambda School (@LambdaSchool), Twitter (Mar. 5, 2019, 7:02 PM), https://twitter.com/bloomtech/status/1103083315945328640.
[31] Lambda School (@LambdaSchool), Instagram (Apr. 22, 2020), https://www.instagram.com/p/B_S2M-Llm2y/.

21

d) September 27, 2021, Lambda Instagram: "77% of H2 2019 job-seeking Data Science graduates were hired. 94% [o]f those hired graduates go the job in the first 180 days"[32]



e) November 3, 2022, Lambda Instagram: "90% of our 2021 alumni gained in-demand skills and landed great jobs—our highest placement rates *ever*!"[33]



---

[32] Lambda School (@LambdaSchool), Instagram (Sept. 27, 2021), https://www.instagram.com/p/CUWJM1qJlEB/?img_index=4.

[33] Bloom Tech (@Bloomtechofficial), Instagram (Nov. 3, 2022), https://www.instagram.com/p/CkgVeHBrmP9/.

f) November 3, 2022: Lambda Facebook: "90% of our 2021 alumni gained in-demand skills and landed great jobs—our highest placement rates *ever*!"[34]

g) November 3, 2022, Lambda Twitter: "90% of our 2021 alumni gained in-demand skills and landed great jobs—our highest placement rates *ever*!"[35]

h) November 4, 2022, Lambda Facebook: "Fun Fact: Did you know, 90% of our 2021 full Stack Web job-seeking graduates found a job after BloomTech?"[36]

i) November 7, 2022, Lambda Facebook: "91% of our 2021 job-seeking Data Science graduates found a job 😮"[37]

j) November 9, 2022, Lambda Instagram: "91% of 2021 job-seeking Data Science grads found a job after BloomTech"[38]

### 3. <u>Mr. Allred's false and misleading statements about job placement were a driving force behind Lambda's job placement rate marketing campaign.</u>

86.     At all times relevant to this complaint, Mr. Allred was the driving force behind Lambda's job placement rate marketing campaign. Rather than passively overseeing the campaign, he personally spearheaded Lambda's dissemination of false and misleading rates, oftentimes promoting the rates himself on his own social media accounts.

87.     For example, since March 2020, when Lambda first promoted its job placement rates through outcomes reports, each outcomes report has begun with a personalized letter from Mr. Allred titled "Letter from the CEO," vouching for the rates in the report. The reports end with Mr. Allred's signature.

---

[34]Bloom Tech (@BloomTech), Facebook (Nov. 3, 2022), https://www.facebook.com/BloomTech/posts/pfbid0C9MRRryV1zaMpSXa35QnogkPDAR984bjs9xmen4WJB4SWMtkWAn2kxZ7BRC11Kdhl.

[35] Bloom Tech (@BloomTech), Twitter (Nov. 3, 2022, 11:15 AM), https://twitter.com/bloomtech/status/1588203108013850629.

[36] Bloom Tech (@BloomTech), Facebook (Nov. 4, 2022), https://www.facebook.com/BloomTech/posts/pfbid025d3iVN2usd1eLKfwTMCh78a3kVNpsmUcRCsMXWinqtYX4tHqLbkDHQz9mhqUZuanl.

[37] Bloom Tech (@BloomTech), Facebook (Nov. 7, 2022), https://www.facebook.com/BloomTech/posts/pfbid0UpByQ5eFsctoNH51QuK1DPrTXYXvaU9cPbE2H6weYnnvR2YbpWF2m8vLGbuuoUhol.

[38] Bloom Tech (@Bloomtechofficial), Instagram (Nov. 9, 2022), https://www.instagram.com/p/CkwHe8ivDND/.

88.    Mr. Allred also advertised false and misleading rates on his personal Twitter

account:

a)    March 13, 2019: In response to a commenter asking about a $60,000 median
salary and 83% 6-month employment rate for Lambda's main web track, Mr.
Allred responded, "That's low now, but our average student increases his or her
income by $47,000."[39]

b)    March 15, 2019: "Lambda School's first iOS class graduates today. 66% of them
are already **hired.**"[40]

c)    November 16, 2019: "First track just graduated. Hit 100% hired but was VERY
small sample size." Subsequent reporting revealed that this small sample size
consisted of a single student.[41]

d)    November 3, 2022: "I am so incredibly excited to finally be able to share
BloomTech's 2021 Outcomes Report. Highlights: *All-time high 90%
placement rate for job-seeking grads".[42]

89.    Other examples of false, misleading, and exaggerated claims on Mr. Allred's

Twitter account include:

a)    January 24, 2021: "I think we're like 2-3 solvable problems being solved away
from 100% of Lambda School grads being hired. Still a lot of unknowns, but I
think it will be possible." When a commenter asked what the problems were, Mr.
Allred responded: "Boring stuff."[43]

b)    April 22, 2021: "When I started Lambda School early detractors gave me hell
because I said that Lambda School would cause thousands of people to become
millionaires who wouldn't have otherwise been. It's now pretty clear that was
very conservative."[44]

---

[39] Austen Allred (@Austen), Twitter (Mar. 13, 2019, 12:14 PM),
https://twitter.com/Austen/status/1105879911036665856.

[40] Austen Allred (@Austen), Twitter (Mar. 15, 2019, 5:20 PM),
https://twitter.com/Austen/status/1106681485275205634.

[41] *See* Zoe Schiffer & Megan Farokhmanesh, *The High Cost of a Free Coding Bootcamp*, The
Verge (Feb. 11, 2020, 11:15 EST), https://www.theverge.com/2020/2/11/21131848/lambda-
school-coding-bootcamp-isa-tuition-cost-free; Ryan Mac (@RMac18), Twitter (Feb. 11, 2020,
1:59 PM), https://twitter.com/RMac18/status/1227306243733295108.

[42] Austen Allred (@Austen), Twitter (Nov. 3, 2022, 12:20 PM),
https://twitter.com/Austen/status/1588219699157905408.

[43] Austen Allred (@Austen), Twitter (Jan. 24, 2021, 1:55 AM),
https://twitter.com/austen/status/1353234915643568128.

[44] Austen Allred (@Austen), Twitter (Apr. 22, 2021, 10:24 AM),
https://twitter.com/Austen/status/1385238109185396740.

    c) May 4, 2021: "I get to watch a bunch of people double their income (or more) every single day. Even the worst days are punctuated by a bunch of people changing their lives and the lives of their families forever."[45]

    d) May 4, 2021: "You can go from near poverty to huge future wealth in just a few months."[46]

    e) November 24, 2022: "Thankful today for all those who have worked so hard for BloomTech (by current name or by Lambda School). So many people working so diligently. Thousands of lives changed, billions in increased earnings."[47]

90.    Mr. Allred and Lambda acted willfully and knowingly to disseminate Lambda's job placement representations to the public—including applicants to their school such as Claimant—with knowledge that they were, and continue to be, false and misleading.
.

### D.    LAMBDA MISREPRESENTS THAT IT ONLY GETS PAID ONCE STUDENTS DO

91.    In addition to the placement rates, Lambda and Mr. Allred misled potential students like Claimant with the frequently repeated declaration that: "We don't get paid until you do, so we're in this together, from your first day of classes to your first day on the job."[48] For example, on June 27, 2019, Lambda's homepage stated:



## Higher learning. Higher earning.

Lambda is designed for student success. We don't get paid until you do, so we're in this together, from your first day of classes to your first day on the job — and beyond.

*Screenshot from Lambda's homepage on June 27, 2019.*

---

[45] Austen Allred (@Austen), Twitter (May 4, 2021, 11:50 PM), https://twitter.com/Austen/status/1389789532761956352.
[46] Austen Allred (@Austen), Twitter (May 4, 2021, 11:53 PM), https://twitter.com/Austen/status/1389790386659364868.
[47] Austen Allred (@Austen), Twitter (Nov. 24, 2022, 9:51 AM), https://twitter.com/austen/status/1595822473781485568.
[48] *See, e.g.*, Apply Now Pages, Lambda School Website [archived by the Wayback Machine (June 27, 2019), https://web.archive.org/web/20190627024024/https://lambdaschool.com/].

92.    Mr. Allred regularly touted that Lambda only gets paid when students do on his personal social media accounts and the Lambda website, describing Lambda's business as based on shared and aligned incentives between Lambda and its students:

a)  "The main directive in everything we did can be summed up in two words: incentive alignment."[49]

b)  "Our mission from day one has been to **align the incentives of school and student**, giving more people the opportunity they deserve to land a great job with a higher income. If our students don't succeed, our school shouldn't either."[50]

93.    In reality, Lambda packaged and sold its tuition payment plans, including ISAs, to investors long before students obtained employment. As early as May 2019, Lambda privately told investor Y Combinator: "Currently we sell some income share agreements to hedge funds." Exhibit I at 2.

94.    To facilitate the sale of ISAs, Lambda partnered with Edly, a digital marketplace that helps schools sell ISAs to third-party investors. On December 11, 2019, Edly tweeted: "Pleased to announce our latest offering [–] a Lambda School ISA Pool. We @edlyISA are excited to work with the amazing team @LambdaSchool[], one of the most impactful ISA programs in the country."[51] To learn how to participate, Edly invited interested investors to join a webinar that night with Mr. Allred.[52]

---

[49] Austen Allred, LinkedIn (2019), https://www.linkedin.com/posts/austenallred_announcing-our-new-isa-financing-blueprint-activity-6636140633306333184-dkOh?utm_source=share&utm_medium=member_desktop.
[50] *See* Austen Allred, *Announcing the Release of Our H1 2019 Student Outcomes Report*, Lambda School Website (Mar. 27, 2020), [archived by the Wayback Machine (Apr. 23, 2020), https://web.archive.org/web/20200423031203/https:/lambdaschool.com/the-commons/announcing-the-release-of-our-h1-2019-student-outcomes-report] (emphasis in original).
[51] @edlyISA, Twitter (Dec. 11, 2019, 3:01 PM), https://twitter.com/edlyISA/status/1204853625459216385 (on file with Claimant's counsel).
[52] @edlyISA, Twitter (Dec. 11, 2019, 3:02 PM), https://twitter.com/edlyISA/status/1204853900177743872(on file with Claimant's counsel).

95.     Lambda did not disclose this fact to students until public reporting exposed it, and for many months Mr. Allred flatly denied it, stating in October 2019 on Twitter that "We never, ever get paid up front for ISAs."[53]

96.     Claimant read the false and misleading statement on the Lambda website that Lambda only got paid once the student does and, as a result, believed that Lambda would only get paid once Claimant secured a qualifying job. Knowing that Lambda only got paid if Claimant obtained employment was important to Claimant's decision to attend.

### E.     LAMBDA ENGAGED—AND STILL ENGAGES—IN THE UNLAWFUL BUSINESS PRACTICE OF UNLICENSED LENDING

97.     The California Financing Law "shall be liberally construed and applied to promote its underlying purposes and policies," which include "protect[ing] borrowers against unfair practices by some lenders, having due regard for the interests of legitimate and scrupulous lenders." Cal. Fin. Code § 22001(a)(4).

98.     Pursuant to the California Financing Law: "No person shall engage in the business of a finance lender or broker without obtaining a license from the commissioner." Cal. Fin. Code § 22100(a).

99.     Lambda is not and never has been registered in California as a finance lender or broker under the Financing Law.

100.     Since its inception, Lambda has operated as a "finance lender" because its tuition payment plans qualify as either consumer or commercial loans under the Financing Law. *See generally* Cal. Fin. Code § 22203-04 (defining consumer loans); Cal. Fin. Code § 22502 (defining commercial loans).

101.     Lambda's Meratas ISA provides:

> THIS IS NOT A LOAN
> In making monthly payments to Lambda School, you will not be repaying a student loan. In the case of a student loan, a student borrows a set amount and repays the principal amount of the loan plus interest or a finance charge, or both. Under this agreement, you

---

[53] Woo Interview at 6:30 (wherein Mr. Allred confirms that this tweet was "totally correct").

will instead pay a fixed percentage of your income each month for
up to a maximum number of payments.

102.    Contrary to this representation, ISAs are a form of student loan.

103.    According to the United States Consumer Financial Protection Bureau ("CFPB"),
a representation that an ISA is "not a loan" is deceptive and misleading under the Consumer
Financial Protection Act because "ISAs are loans and do create debt."[54]

104.    The California Department of Financial Protection and Innovation ("DFPI")
agrees, holding that ISAs are student loans: "ISAs made solely for use to finance a postsecondary
education are 'student loans' for the purposes of the SLSA [California Student Loan Servicing
Act]."[55]

105.    The United States Department of Education concurs, finding that ISAs "used to
finance expenses for postsecondary education are private education loans under 34 C.F.R.
601.2(b)."[56]

106.    The BPPE also found in its June 22, 2020, order denying Lambda approval to
operate that Lambda's ISA is "an instrument or evidence of indebtedness" under the California
Education Code. *See* June 22, 2020 Letter from BPPE to Lambda at 5, attached hereto as Exhibit
F.

---

[54] *See* Better Future Forward, Inc., et al., CFPB No. 2021-CFPB-0005, Consent Order at ¶ 23
(Sept. 7, 2021) (finding *available at:* https://files.consumerfinance.gov/f/documents/cfpb_better-future-forward-inc_consent-order_2021-09.pdf).
[55] *See In the Matter of Student Loan Servicing Act License Application of Meratas Inc.* NMLS
No. 2120180, Consent Order at ¶ M (Ca. Dep't of Fin. Prot. and Innovation Aug. 5, 2021),
*available at:* https://dfpi.ca.gov/wp-content/uploads/sites/337/2021/08/Meratas-Consent-Order.pdf; *see also* Press Release, California Dep't of Fin. Prot. and Innovation, "California
DFPI Enters Groundbreaking Consent Order with NY-Based Income Share Agreements
Servicer" (Aug. 5, 2020), https://dfpi.ca.gov/2021/08/05/california-dfpi-enters-groundbreaking-consent-order-with-ny-based-income-share-agreements-servicer/.
[56] *See* FSA Announcement, General-22-12, *Income Share Agreements and Private Education
Loan Requirements* (Mar. 2, 2022), https://fsapartners.ed.gov/knowledge-center/library/electronic-announcements/2022-03-02/income-share-agreements-and-private-education-loan-requirements. *See also* 87 Fed. Reg. 65,453 ("[T]he Department clarifies that
ISAs and other alternative financing products should be treated like institutional loans.").

107.    Because Lambda is in the business of making ISAs and other tuition payment plans, it is operating as a finance lender under the California Financing Law.

108.    Lambda's failure to register as a finance lender deprived Claimant of the borrower protections provided by the California Financing Law.

109.    Lambda has therefore engaged in the unlawful business practice of making a loan without a license in violation of California Financial Code § 22100, and, in turn, in violation of the unlawful prong of the UCL.

110.    Had Claimant been aware that Lambda was acting as an unlicensed finance lender, Claimant would not have signed a tuition payment plan that indebted Claimant for up to $30,000 to Lambda.

### F.    CLAIMANT'S ENROLLMENT AND ATTENDANCE AT LAMBDA, AND THE AFTERMATH

111.    At the onset of the COVID-19 pandemic in 2020, Claimant Estrella had become interested in transitioning to a career in data science. She had been working in the construction and lighting industry as a field engineer since graduating college with a degree in computer engineering technology, but she no longer wanted to work in the field. She began researching programs and initially applied to, and was accepted to, Syracuse's data science master's program. She also learned about Lambda from an acquaintance while considering multiple online coding bootcamps as an alternative to traditional data science programs.

112.    As she was weighing her educational options, Ms. Estrella reviewed the Lambda website for more information during April and May 2020. She saw, and was impressed by, job placement rates above 70% on the website and Lambda advertisements on social media, including Facebook. Lambda's claim that students receive regular one-on-one help throughout the program was also appealing to her.

113.    As she researched how to finance her continuing education, Ms. Estrella liked that Lambda did not require tuition payments up front, and that, through an ISA, Lambda was invested in student outcomes. She reviewed the statement on the Lambda website that Lambda

29

did not get paid until the student did, convincing Ms. Estrella that Lambda was equally invested in student outcomes, including hers.

114.    The high job placement rates of over 70% and the representation that Lambda only got paid once students do were critical to Ms. Estrella's decision to enroll, convincing her that enrolling at Lambda would maximize her chance of landing a tech job after completing Lambda coursework.

115.    But both the job placement rates over 70% and the statement that Lambda only got paid once students do were false and misleading, and both Lambda and Mr. Allred knew these representations were false and misleading. (*See* ¶¶ 46–90, *supra*.)

116.    Ms. Estrella further believed that Lambda was approved to operate due to Respondents' continuous and repeated descriptions of the school and its programs on the Lambda website, Lambda ads, and social media of various features of Lambda that conveyed that it was a credible, legitimate, and lawfully operating school. These included, but were not limited to, descriptions of Lambda's students and their successes, career support services, the curriculum and program structure that included "sprints" every four weeks, the role of lectures and assignments in that curriculum, one-on-one student assistance, and the application process, which was reminiscent of applying to college.

117.    Swayed by Respondents' false job placement rates, their false statements that they only got paid once students do, and their false representations that Lambda was a government-approved school, Ms. Estrella signed an ISA with Lambda on May 20, 2020 (Exhibit A).

118.    Had Respondents truthfully represented Lambda's job placement rates, or had they truthfully represented their actual financial interest in students' success, or had Ms. Estrella known that Lambda was not lawfully approved to operate, she would not have enrolled in Lambda's educational services, or signed an ISA that indebted her up to $30,000 of tuition to Lambda.

119.    Ms. Estrella began attending Lambda part-time during evenings in June 2020 while continuing to work during the day. She soon discovered that the program was not at all

what she had anticipated based on her reviews of Lambda's website and promotional materials. While she initially found one-on-ones and team meetings with other students helpful, Lambda removed those features of the program after a few months. Lectures on the same topic involved a rotating cast of instructors often providing conflicting information. Students disappeared from her classes as they dropped the program. Lambda even temporarily dropped Ms. Estrella from the program at one point, without explanation. After rejoining, she eventually graduated in January 2023.

120.    Since graduating, Ms. Estrella has applied to data science jobs without success. She is not aware of any prospective employer valuing her Lambda data science certificate or experience. In the meantime, she has continued working in the lighting and construction industries. Her two positions since graduating Lambda have had nothing to do with data science, Ms. Estrella has not used anything she learned at Lambda, and Lambda did not help her get either job. Nevertheless, Meratas requested payments on her ISA until Ms. Estrella appealed multiple times.

## IV.    CAUSES OF ACTION

### FIRST CAUSE OF ACTION
**Violations of California's Consumer Legal Remedies Act
Cal. Civ. Code §§ 1750, *et seq.*
(All Respondents)**

121.    Claimant hereby reincorporates the allegations in the foregoing paragraphs as though fully set forth herein.

122.    The CLRA makes unlawful "unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or that results in the sale or lease of goods or services to any consumer." Cal. Civ. Code § 1770(a).

123.    The CLRA covers transactions involving the sale of services—such as education—to consumers.

124.    Claimant is a "consumer" within the meaning of Section 1761(d) of the CLRA, seeking Lambda's education services for personal, family, or household purposes, and Claimant engaged in "transactions" within the meaning of sections 1761(e)and 1770 of the CLRA.

125.    Education is a "service" within the meaning of Section 1761(b) of the CLRA.

126.    The CLRA enumerates numerous unlawful acts or practices, including:

a)    "Misrepresenting the source, sponsorship, approval, or certification of goods or services." Cal. Civ. Code § 1770(a)(2).

b)    "Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that the person does not have." *Id.* § 1770(a)(5).

c)    "Representing that goods or services are of a particular standard, quality, or grade" when they are not. *Id.* § 1770(a)(7).

d)    "Advertising goods or services with intent not to sell them as advertised." *Id.* § 1770(a)(9).

127.    In violation of these provisions, Respondents misrepresented to the public, prospective students, and current students, including Claimant, at least the following: (i) its job placement rates; and (ii) that it had approval to operate and enroll students.

128.    Respondents did so in order to induce prospective students, like Claimant, to enroll in Lambda's program—Claimant did so enroll as a result of Respondents' misrepresentations.

**SECOND CAUSE OF ACTION**
**Violations of California's Unfair Competition Law**
**Cal. Bus. & Prof. Code §§ 17200, *et seq.***
**(All Respondents)**

129.    Claimant hereby reincorporates the allegations in the foregoing paragraphs as though fully set forth herein.

130.    Respondents have engaged in business acts or practices that constitute unfair competition as defined in the UCL, in that such business acts and practices are unlawful, unfair, and fraudulent within the meaning of that statute.

131.    The business acts and practices include:

    a)  publishing and/or providing the public, prospective students, and current students, including Claimant, with false, misleading, unreliable, and/or inaccurate job placement rate information;

    b)  conducting business without BPPE approval and in violation of multiple BPPE orders requiring it to cease operations;

    c)  knowingly operating a private postsecondary institution without approval to do so and knowingly conveying to the public that it is an approved institution;

    d)  misrepresenting to the public, prospective students, and current students that in March and July of 2019, the BPPE ordered Lambda to cease operations, stop enrolling students, cease all instructional services, and submit a closure plan, and misrepresenting material facts related to those BPPE orders, including representing that they were stayed when they were not.

132.    Claimant's tuition payment plans constitute "lost money or property" within the meaning of the UCL.

Unlawful Prong

133.    The UCL bars business practices that are forbidden by law. If a business practice violates any law, it is *per se* a UCL violation.

134.    The business acts and practices described above are unlawful because they violate numerous state and federal laws, including but not limited to:

    a)  The Federal Trade Commission Act ("FTC Act"), which prohibits "unfair or deceptive acts or practices."[57]

[57] *See* U.S.C.§ 45(a)(I); 15 U.S.C. § 52(a).

33

b) Cal Educ. Code § 94897(b), which provides that institutions shall not "[p]romise or guarantee employment, or otherwise overstate the availability of jobs upon graduation."

c) The CLRA, *see supra*;

d) The FAL, *see infra*;

e) Cal. Educ. Code § 94886, which provides in relevant part that "a person shall not open, conduct, or do business as a private postsecondary educational institution in this state without obtaining an approval to operate under this chapter." Lambda violated this provision, and therefore the UCL's unlawful prong, when it enrolled Claimant without obtaining approval to operate.

f) Cal. Educ. Code § 94943, which provides that it is a crime to "[k]nowingly operat[e] a private postsecondary institution without an approval to operate." Lambda violated this provision, and therefore the UCL's unlawful prong, when it knowingly enrolled Claimant without approval by the BPPE to operate.

g) Cal. Educ. Code § 94917, which provides that "[a] note, instrument, or other evidence of indebtedness relating to payment for an educational program is void and not enforceable unless, at the time of execution of the note, instrument, or other evidence of indebtedness, the institution held an approval to operate … ."

h) Cal. Educ. Code § 94902(b)(2), which provides that an enrollment agreement is enforceable only if "[a]t the time of the execution of the enrollment agreement, the institution held a valid approval to operate.

i) The California Financing Law, which provides that "[n]o person shall engage in the business of a finance lender or broker without obtaining a license from the commissioner." Cal. Fin. Code § 22100(a).

j) The Consumer Financial Protection Act of 2010, 12 U.S.C. §§ 5531(a), 5536(a)(1)(B), which prohibits covered persons from engaging in unfair, deceptive, or abusive acts or practices.

135.    By violating these and other state and federal laws, Lambda violated the unlawful prong of the UCL.

Fraud Prong

136.    To show that a business practice is fraudulent, it is necessary only to show that members of the public are likely to be deceived.

137.    Respondents' business acts and practices—including its false job placement rate representations and false representations to the Subclass about BPPE approval—are fraudulent in that they are likely to deceive the public.

138.    Each of these false and misleading representations, all of which were material, were substantial factors influencing Claimant to attend Lambda and take out a tuition payment plan that indebted Claimant for up to $30,000.

**THIRD CAUSE OF ACTION**
**Violations of California's False Advertising Law**
**Cal. Bus. & Prof. Code §§ 17500, *et seq.***
**(All Respondents)**

139.    Claimant hereby reincorporates the allegations in the foregoing paragraphs as though fully set forth herein.

140.    Respondents have also engaged in acts or practices that constitute violations of the FAL, Business and Professions Code section 17500, *et seq.*, by making or causing to be made untrue or misleading statements with the intent to induce members of the public to purchase Lambda's services. Respondents' untrue or misleading representations include, but are not limited to, the following:

a)    Respondents' statements regarding job placement rates, including but not limited to the published job placement rates prominently displayed on its website, social media, and advertisements;

b)    Respondents' statements, prominently displayed on Lambda's website and elsewhere, that Lambda does not get paid until students do;

c) Respondents' statements and appearance to the public, prospective students, and current students that its operations were lawful, that BPPE had not ordered Lambda to cease advertising and instructional activities, and that it could lawfully enroll students. Lambda's and Mr. Allred's advertisements and marketing implicitly and explicitly misrepresented the lawfulness of its operations by encouraging the public and prospective students to apply for enrollment.

141.    At the time these representations were made, Respondents knew or by the exercise of reasonable care should have known that the representations were untrue or misleading.

### FOURTH CAUSE OF ACTION
**Intentional Misrepresentation**
**(All Respondents)**

142.    Claimant hereby reincorporates the allegations in the foregoing paragraphs as though fully set forth herein.

143.    Respondents made statements to Claimant: (a) that were false representations of material fact; (b) that Respondents knew were false or were made recklessly and without regard for their truth; (c) that Respondents intended Claimant to rely upon; (d) that Claimant reasonably relied upon; (e) that Claimant's reliance upon was a substantial factor in causing Claimant damage; and (f) that caused Claimant damage.

144.    The intentional misrepresentations and omissions by Respondents consist of at least the following:

a) Respondents' job placement rate statements, prominently displayed on the Lambda website, in outcomes reports, and on social media. Respondents knew these statements were false.

b) Respondents' statements, prominently displayed on Lambda's website and elsewhere, that Lambda does not get paid until students do; Lambda knew this

statement was false because it sold ISAs to investors long before students were placed in jobs.

c) Respondents' representations, both implied and explicit, that it was approved to operate, advertise, enroll, and teach students prior to August 2020. Respondents knew these representations were false because the BPPE had ordered Lambda to cease all operations (including all advertising and instructional activities) and submit a school closure plan. Respondents also knew that they were concealing from students that Lambda was barred from advertising and from enrolling and teaching students.

145.    Respondents intended Claimant to rely on these misrepresentations, as evidenced by Lambda prominently featuring them on its website and on other widely disseminated platforms, as well as by its efforts to avoid disclosing the truth.

146.    Claimant reasonably relied on these widely disseminated representations. Had Claimant known the truth, Claimant would not have enrolled at Lambda.

147.    Lambda, Mr. Allred, and members of his executive leadership team acted willfully and knowingly to disseminate these representations to the public with knowledge that they were false and misleading.

148.    Claimant has been substantially harmed by Lambda's misconduct, which caused Claimant to attend Lambda and take out an ISA that indebted Claimant for up to $30,000 in tuition.

### FIFTH CAUSE OF ACTION
### Negligent Misrepresentation
### (All Respondents)

149.    Claimant hereby reincorporates the allegations in the foregoing paragraphs as though fully set forth herein.

150.    Respondents have also engaged in acts or practices that constitute negligent misrepresentation. *See supra* ¶142–48.

151.     Respondents prominently displayed these representations on the Lambda website, in outcomes reports, on social media, and in advertisements for the purpose of encouraging members of the public, like Claimant, to apply for enrollment.

152.     Respondents had no reasonable grounds to believe that these representations were true.

153.     Respondents intended to induce Claimant to rely on these misrepresentations, as evidenced by Lambda prominently featuring them on its website and on other widely disseminated platforms, as well as by its efforts to avoid disclosing the truth.

154.     Claimant was justified in relying upon these widely disseminated representations. Had Claimant known the truth, Claimant would not have enrolled at Lambda.

155.     Claimant has been substantially harmed by Lambda's misconduct, which caused Claimant to attend Lambda and take out an ISA that indebted Claimant for up to $30,000 in tuition.

## V.     <u>PRAYER FOR RELIEF</u>

WHEREFORE, in accordance with the above claims, Claimant requests that the Arbitrator:

1.     Declare and order that the tuition payment plan entered into by Claimant is unlawful, void, and unenforceable pursuant to Cal. Educ. Code §§ 94886, 94902, 94917, and 94943, and the UCL, CLRA, and FAL.

2.     Declare that Respondents conducted business as a private postsecondary educational institution in California without obtaining approval to operate, in violation of Cal. Educ. Code § 94886 and the UCL.

3.     Declare that Respondents knowingly operated a private postsecondary institution without approval to operate, in violation of Cal. Educ. Code § 94943 and the UCL.

4.    Declare that Respondents' job placement rate representations at all times relevant to this Complaint were fraudulent and misleading, in violation of the UCL, FAL, and CLRA, and were intentional and/or negligence misrepresentations.

5.    Declare that Lambda "engage[d] in the business of a finance lender or broker without obtaining a license from the commissioner," and continues to do so, in violation of the California Financing Law, Cal. Fin. Code § 22100(a).

6.    Order Respondents—including Lambda, Mr. Allred, and any other owner of all or part of the tuition payment plans—to cancel Claimant's tuition payment plan and enjoin any effort to collect upon or otherwise enforce it.

7.    Order Respondents to pay restitution in the form of refunds for any and all payments made.

8.    Order prejudgment and post-judgment interest on any refunds for tuition payment plan payments to the maximum extent allowed by law.

9.    Order Respondents to pay reasonable attorneys' fees and costs.

10.    Award damages to Claimant in an amount to be determined, including punitive damages pursuant to Cal. Civ. Code § 3294(a).

11.    Order all such further relief as the Arbitrator deems just and proper.

Dated: March 12, 2020          **MINER, BARNHILL & GALLAND, P.C.**

By:    /s/ *Ryan Miller*
          Deanna N. Pihos
          David Baltmanis
          Ryan Miller

          *Attorneys for Claimant*

**BEFORE THE AMERICAN ARBITRATION ASSOCIATION**
**SAN FRANCISCO, CALIFORNIA**

| | |
|---|---|
| BRETT MCADAMS,<br><br>            Claimant,<br><br>    v.<br><br>BLOOM INSTITUTE OF TECHNOLOGY,<br>formerly d/b/a LAMBDA SCHOOL;<br>AUSTEN ALLRED, in his individual<br>capacity; and JOHN DOES 1-9,<br><br>            Respondents. | AAA Case No. _____ |

## DEMAND FOR ARBITRATION

1.      Pursuant to the American Arbitration Association's Consumer Rules, Claimant Brett McAdams submits this Demand for Arbitration against Bloom Institute of Technology, formerly d/b/a Lambda School ("Lambda"), Austin Allred, in his individual capacity, and John Does 1–9 (collectively, "Respondents") for violations of the California Consumer Legal Remedies Act ("CLRA"), California Civil Code § 1750, *et seq.*, Unfair Competition Law ("UCL"), California Business and Professional Code §17200, *et seq.*, and False Advertising Law ("FAL"), California Business and Professional Code § 17500, *et seq.*, as well as for intentional and negligent misrepresentation.

2.      Brett McAdams is a former student of Lambda School and brings this action to hold Respondents accountable for: (i) falsifying and misrepresenting Lambda's job placement rates; (ii) misrepresenting and concealing that, until August 17, 2020, Lambda did not have the necessary approval from the California Bureau for Postsecondary Education ("BPPE") to operate as a school, and was under order by the BPPE to cease operations, stop enrolling students, cease all instructional services, and submit a closure plan; (iii) in violation of California law, enrolling, signing tuition payment plans with, and providing educational services to students before Lambda obtained the BPPE's approval to operate; (iv) in violation of California law, engaging in

1

the unlawful business practice of unlicensed lending; and (v) misrepresenting and concealing the true nature of Lambda's financial interest in students' success, including by falsely representing that Lambda only got paid after students found employment and got paid.

3.     Claimant would not have enrolled at Lambda had Plaintiff known the truth about Lambda's job placement rates, its lack of approval from BPPE, or the true nature of Lambda's financial interest in Claimant's success (or lack thereof). Through this action, Claimant seeks declaratory and injunctive relief to cancel Claimant's tuition payment plan and declare that payment plan null and void; a refund of any payments Claimant has made under that payment plan; damages; and additional relief.

## I.     THE PARTIES

4.     Claimant Brett McAdams is a resident of Apopka, Orange County, Florida. Claimant signed a tuition payment plan on June 15, 2020. Claimant was enrolled as a student at Lambda from July 2020 until March 2021, at which point Claimant completed Lambda's program. Claimant's tuition payment plan is attached as Exhibit A.

5.     Respondent Lambda is a corporation organized and existing under the laws of the State of Delaware, having its principal place of business at 250 Montgomery Street, Floor 16, San Francisco, California 94104 and/or 149 New Montgomery Street, 4th floor, San Francisco, CA 94101.

6.     Respondent Austen Allred is Lambda's founder and CEO. Upon information and belief, Mr. Allred resides in San Francisco, California, and/or did so during times relevant to the events described herein.

7.     Respondents John Does 1-9 are officers and/or directors of Lambda as well as individuals, corporations, or other entities who may own all or a portion of Claimant's tuition payment plan or any other financial interest in that tuition payment plan.

## II.    JURISDICTION AND VENUE

8.     The American Arbitration Association ("AAA") has jurisdiction over this action pursuant to Claimant's tuition payment plan, which specifies:

As the exclusive means of initiating adversarial proceedings to resolve any dispute arising out of this agreement, your Lambda School tuition, or your payments to Lambda School (other than any proceeding commenced by either party seeking an injunction, a restraining order, or any other equitable remedy or a proceeding commenced by either party in small claims court), either party may demand that the dispute be resolved by binding arbitration administered by the American Arbitration Association in accordance with its Consumer Arbitration Rules available at www.adr.org.

9.    Claimant's tuition payment plan further specifies, "Any such arbitration must be conducted by one arbitrator and must be conducted in San Francisco, California, the county with a major commercial airport nearest to where you live, or another mutually agreed location."

## III.    FACTUAL ALLEGATIONS

### A.    LAMBDA BACKGROUND

10.    Lambda is a private, for-profit online coding school founded in 2017 by its current CEO, Austen Allred. Mr. Allred was the Company's primary decision-maker, controlled its daily operations, and regularly promoted Lambda on social media and through other media. He benefitted financially from the tuition paid to Lambda by Claimant and all other students.

11.    Lambda provides online computer science courses of varying lengths. It is not a degree-granting institution, and is not accredited. Students cannot take out federal student loans to attend Lambda.

12.    Lambda marketed itself as a place where students learn the skills necessary to obtain employment in the competitive computer technology job market. In Mr. Allred's words, most students come to Lambda with "no network" and are "from either inner cities or rural areas."[1]

13.    Lambda touted its "experienced industry expert" instructors and a top-of-the-line curriculum that is "designed to get you hired." On April 3, 2019, Mr. Allred stated in an interview that Lambda's "educational experience is, I think, among the best in the world."[2]

---

[1] *See* Y Combinator, *A CS Education That's Free Until You Get a Job - Austen Allred of LambdaSchool*, YouTube (Apr. 3, 2019) at 9:10 (hereinafter "Y Combinator Interview"), https://www.youtube.com/watch?v=_yIAYZtdrfI&t=551s.
[2] *Id.* at 15:05.

3

14.      At all times relevant to this complaint, Lambda charged tens of thousands of dollars for its program, more than double the reported average price of online coding bootcamps.[3]

15.      Part of Lambda's business model has been predicated on convincing prospective students to agree to pay a large amount of tuition by promising them that they will not owe anything unless and until they find a job that pays $50,000 or more per year.

16.      Lambda carries out this model by entering into tuition payment plans with students. For example, as Lambda describes one of its tuition payment plan offerings, Income Share Agreements (ISAs): "A Lambda School ISA is a contract under which you agree to pay 17% of your post-Lambda School salary for 24 months, but only once you're making more than $50,000 per year (or the equivalent of $4,166.67 per month). The ISA is capped at a maximum repayment of $30,000, so you won't pay more than $30,000 under any circumstances."[4]

17.      Over time, Lambda expanded its tuition payment plan offerings to include, for example, retail installment contracts, deferred tuition plans, multi-part installment payment plans, financing through a third-party loan, a pre-instruction lump sum payment, or ISA varieties that combine an initial lump sum payment with payments from a proportion of future earnings.

18.      Some Lambda tuition payment plans are managed by third-party servicers who handle origination and payment processing.[5] Meratas, a loan-servicing company headquartered in Stamford, Connecticut, services Claimant's ISA.

19.      By April 2019, Lambda was growing at "an insane pace." As Mr. Allred explained:

> We agreed as a team to no longer share the number of students that we have enrolled, but it is not a small number and it is growing at an insane pace. We'll soon

---

[3] *See* Cecilia Clark, *How Much is Coding Boot Camp?* Nerdwallet (June 21, 2022, 10:53 AM), https://www.nerdwallet.com/article/loans/student-loans/how-much-is-coding-bootcamp.

[4] *The Lambda School Income Share Agreement*, Lambda School Website (scroll to FAQs "What is an ISA and how does it work"), [archived by the Wayback Machine (Dec. 16, 2020), https://web.archive.org/web/20201216131833/https:/lambdaschool.com/tuition/isa].

[5] *The Lambda School Income Share Agreement*, Lambda School Website (scroll to FAQs "Who are Meratas and Leif"), [archived by the Wayback Machine (Dec. 16, 2020), https://web.archive.org/web/20201216131833/https:/lambdaschool.com/tuition/isa].

4

be measuring Lambda School scale by percentage of the overall number of students learning to program every year, to give you some context. And being able to support that kind of scale effectively is what keeps me up at night. Mostly specifically hiring, mostly hiring executives right now who can build out 100, 150 person teams beneath them . . . and we need like 5 of them yesterday.[6]

20.    Mr. Allred attributed Lambda's growth in part to his active personal Twitter account, stating in January 2020 that his frequent tweets have "certainly helped Lambda school grow."[7]

21.    Mr. Allred also stated: "If there's one thing I'm good at in life, it's growing something quickly, building hype for something quickly. That's kind of my superpower."[8]

22.    As described below, Lambda's rapid growth was fueled by the School's, and Mr. Allred's, public misrepresentations about the School's approval status and job placement rates.

## B.    UNTIL AUGUST 17, 2020, LAMBDA OPERATED WITHOUT STATE APPROVAL, IN VIOLATION OF CALIFORNIA LAW

23.    As a California company with its headquarters and principal place of business in San Francisco, Lambda is subject to the laws of the state of California. One of those laws, California Education Code § 94886, bars private postsecondary educational intuitions from doing business without "approval to operate."

24.    Another, Section 94917, provides that when educational institutions violate this law, any "note, instrument, or other evidence of indebtedness relating to payment" for its programs is "void and not enforceable."

25.    All Lambda tuition payment plans, including ISAs, are a "note, instrument, or other evidence of indebtedness relating to payment for educational program[s]," under the California Education Code.

26.    On March 20, 2019, the BPPE issued a "Citation: Assessment of Fine and Order of Abatement" ("Citation") to Lambda. The Citation found that Lambda was "operating without

---

[6] Y Combinator Interview at 47:50.
[7] Vincent Woo, *Interview with Austen Allred*, Soundcloud (Jan. 22, 2020) at 42:10 (hereinafter "Woo Interview"), https://soundcloud.com/vwoo/interview-with-austen-allred.
[8] Y Combinator Interview at 22:25.

Bureau approval," in violation of the California Education Code. A copy of the Citation is attached hereto as Exhibit B.

27.    In the Citation, the BPPE ordered that Lambda "cease to operate as a private postsecondary educational institution" and "submit a school closure plan." The Citation further required Lambda to "discontinue recruiting or enrolling students and cease all instructional services and advertising in any form or type of media, including the https://lambdaschool.com and any other websites not identified here that are associated with the Institution, until such time as an approval to operate is obtained from the Bureau."

28.    On May 14, 2019, Lambda submitted its application to the BPPE seeking approval to operate.

29.    Lambda appealed the Citation and, on July 24, 2019, the BPPE issued an "Appeal of Citation Informal Conference Decision: Citation Affirmed" (the "Citation Affirmance"). The BPPE affirmed the Citation because "[n]o new substantive facts were presented," and thus, Lambda was required to "comply with the orders described in the 'Violation Code Sections' of this document and submit evidence of compliance within 30 days from the date of this decision." Citation Affirmance at 1–3. A copy of the Citation Affirmance is attached hereto as Exhibit C.

30.    In direct violation of California law, the Citation, and the Citation Affirmance, Lambda continued to operate, advertise its educational services to the public, and enroll students.

31.    On August 21, 2019, the BPPE denied Lambda's May 14, 2019 application, stating in a letter to Lambda that it was "unable to grant approval." A copy of the August 21 order is attached hereto as Exhibit D.

32.    On November 25, 2019, the BPPE issued an order denying Lambda's updated application for approval, explaining that "at this time the Bureau is unable to grant approval, based on the requirements of the California Education Code." A copy of the November 25 order is attached hereto as Exhibit E.

33.     On June 22, 2020, the BPPE issued yet another order denying Lambda's further updated application for approval to operate, stating that "the Bureau cannot at this time approve Lambda's application." A copy of the June 22 order is attached hereto as Exhibit F.

34.     The June 22, 2020 order also found that Lambda's ISAs constitute "an instrument or evidence of indebtedness" under the California Education Code. *Id.* at 5.

35.     On August 17, 2020, the BPPE issued an order approving Lambda's application. The approval letter stated that the BPPE had completed its review of Lambda's "Application for Approval to Operate," including "supplemental documentation" received on August 14, 2020. The BPPE found that "[a]pproval to operate is granted *effective August 17, 2020*." (emphasis added). A copy of the August 17 order is attached hereto as Exhibit G.

36.     From at least May 2019 until Lambda was approved on August 17, 2020, Lambda's publicly available course catalogs falsely stated that Lambda was approved by the BPPE. In at least three versions of the 2019 and 2020 catalogs—revised in May 2019, September 2019, and July 2020 (all prior to Lambda's approval)—Lambda falsely stated the following:

> **APPROVALS**
> Lambda School is a private institution *approved to operate* by the California Bureau for Private Postsecondary Education. Approval to operate means the institution is compliant with the minimum standards contained in the California Private Postsecondary Education Act of 2009 (as amended) and Division 7.5 of Title 5 of the California Code of Regulations.

*See* Exhibit H (Excerpts of Three Versions of Lambda Course Catalogs for 2019 and 2020 at 5) (emphasis added).

37.     During the time Lambda was seeking the BPPE's approval, Mr. Allred engaged in a public misinformation campaign about Lambda's legal status. For example, in August 2019, Mr. Allred told Business Insider that Lambda was working with the BPPE to obtain approval and

that the order had been stayed while the application was pending. Mr. Allred stated that "[b]ecause we're talking with BPPE, it doesn't affect students at all."[9] This was false.

38.    In truth, the Citation and Citation Affirmance were not stayed, multiple of Lambda's applications had been denied, and Lambda's future was uncertain. In August 2020, a public information officer with California's Department of Consumer Affairs told Business Insider "that there is no stay on the order, and that if Lambda School is still operating while its registration is pending, it would be in violation of state law."[10]

39.    Upon information and belief, Mr. Allred further commented to Lambda students over the Lambda Slack channel that any regulatory issues were mere technicalities that did not affect the school's ability to operate.

40.    At all times Mr. Allred knew or should have known that ISAs and other financing instruments issued by Lambda were void and unenforceable under California Law due to Lambda's lack of approval to operate.

41.    Throughout 2019 and 2020, prior to Lambda's August 17, 2020 approval, Lambda and Mr. Allred further misrepresented Lambda's approval status by using a number of recognized attributes of an approved academic institution in its advertising and promotional materials. During this period, Lambda's name, website, and the website URL itself – lambdaschool.com – used the term "school", and Lambda's website, ads, and social media continuously displayed the following school crest:

*Screenshot from Lambda's website on April 22, 2020.*



---

[9] Rosalie Chan, *The hot Silicon Valley coding bootcamp Lambda School is paying a $75,000 fine for not registering properly with the state of California*, Business Insider (Aug. 29, 2019, 6:32 PM), https://www.businessinsider.com/lambda-school-coding-bootcamp-california-bppe-2019-8.

[10] Rosalie Chan, *A California official says red-hot coding bootcamp Lambda School is violating state law if it operates without the right registration — but the company insists classes can go on*, Business Insider (Aug. 30, 2019, 8:54 PM), https://www.businessinsider.com/lambda-school-california-state-law-coding-bootcamp-y-combinator-2019-8.

42. During this period, Lambda's website, online ads, and social media continuously and repeatedly referred to various features of an approved academic institution, including, for example, a "curriculum," "tuition," "students," "student body," being "enrolled," an academic "schedule," "graduates," "mentors," "grades," "lectures," "homework," and "career support": [11]

*Screenshot from Lambda's website on May 6, 2020.*





---

[11] *See, e.g.*, Lambda School (@LambdaSchool), Twitter (Dec. 10, 2019, 9:52 PM), https://twitter.com/bloomtech/status/1204609786718801922; Lambda School Instagram (Mar. 16, 2020), https://www.instagram.com/p/B9zG7NvjhyS/; *Curriculum*, Lambda School Website, [archived by the Wayback Machine (May 6, 2020), https://web.archive.org/web/20200506051614/https://lambdaschool.com/curriculum].

*Screenshot of a March 16, 2020 Lambda Instagram post.*



43.    Mr. Allred furthered the appearance that Lambda was approved to operate in similar terms. In his "Letter from the CEO" at the beginning of Lambda's March 2020 outcomes report (which was publicly available on the Lambda website), he refers to the Lambda "student body" growing to 2,900, with Lambda staff growing to 200, and moving the Lambda headquarters to an office building in downtown San Francisco based on that growth. He refers to a "curriculum" that is "mastery-based," "graduation," "career support," and "the school." He acknowledged that Lambda "students place great trust in Lambda School when they enroll, and they make incredible investments of time and energy while engaged in our programs."[12]

44.    Had Claimant been aware that Lambda was operating without a license, was not approved to operate, and that its future legal status was uncertain, Claimant would not have signed a tuition payment plan that indebted Claimant for up to $30,000 to Lambda. Indeed, no

---

[12] *See* Austen Allred, *Announcing the Release of Our H1 2019 Student Outcomes Report*, Lambda School Website (Mar. 27, 2020), [archived by the Wayback Machine (Apr. 23, 2020), https://web.archive.org/web/20200423031203/https://lambdaschool.com/the-commons/announcing-the-release-of-our-h1-2019-student-outcomes-report] (last visited November 27, 2023).

reasonable consumer would enroll and indebt themselves to a program operating unlawfully and under orders to close.

45.    Claimant's tuition payment plan constitutes a "note, instrument, or other evidence of indebtedness relating to payment for [students'] educational program," under the California Education Code, and therefore, as a matter of law, is "void and not enforceable." California Education Code § 94917.

## C.    LAMBDA'S FALSE AND MISLEADING JOB PLACEMENT RATES

46.    Lambda's selling point to Claimant and other students was that it would land them a job—and thus bring financial success. Mr. Allred described Lambda as "entirely vocational, we're a trade school basically, and we want to help you make as much money as you can."[13]

47.    Lambda's record of placing students in computer technology jobs was therefore a critical piece of information for Claimant and others considering attending Lambda. Respondents knew that students would only enroll if Lambda would help them secure a job. As Lambda described it, job placement is "the most critical component of Lambda's operations, not only in the School's obligation to its students, but to the prosperity of the company as a whole." *See* ¶ 53, *infra*.

48.    To that end, for the past six years, since Lambda's inception, and continuously through today, Lambda and Mr. Allred have engaged in an extensive and long-term campaign to advertise false and misleading job placement rates, intending that potential students like Claimant would review those rates and enroll at Lambda as a result of those rates.

49.    Lambda and Mr. Allred have prominently displayed false and misleading information on Lambda's purported record of job placement on the Lambda website, in marketing materials and outcomes reports, in a variety of online and social media advertisements (upon information and belief, including Google, YouTube, and various social media), and

---

[13] Y Combinator Interview at 13:00.

through social media postings and comments, including Mr. Allred's personal social media accounts.

**1.     False and misleading job placement rates on Lambda's website and outcomes reports**

50.     Throughout 2018 and 2019, Lambda's website advertised job placement rates of over 80%. Lambda and its executive leadership, including Mr. Allred, knew that these widely disseminated rates were false and misleading.

51.     On August 2, 2018, Mr. Allred, Ben Nelson (co-founder and CTO), and Ryan Holdaway (VP of Outcomes), stated the following in a post on the Lambda School Blog: *"[E]very single* Lambda School graduate who has been on the job market for six months is either employed in a full-time role as a software engineer or has joined an early startup working for equity."[14]

52.     Yet on August 3, 2018—the very next day—Lambda's executive leadership team reprimanded Lambda's Director of Career Readiness for poor job placement rate performance, sending her an "Employee Corrective Action Form." The form stated that the employee's "performance in recent months has not met the expectations for the Career Coach/Director of Career Readiness role at Lambda School. Overall placement numbers are low and the time to placement is much higher than desired."

53.     The Corrective Action Form continued:

Placements are the most critical component of Lambda's operations, not only in the School's obligation to its students, but to the prosperity of the company as a whole. A common discussion point in regards to Outcomes is that current placement rates are too low and time to placement is too high. Creative tactics and adjustments to current careers processes as well as follow through are needed to improve both of these measurements. . . .

CS1 students graduated on 1/19/18. Since then we've had a new class graduate approximately every five weeks. As of 8/1/18, only 16 students of the 48 graduated students assigned to [the Lambda career placement employee] have been placed.

---

[14] Austen Allred, *Introducing Lambda Next — Our Revolutionary New Job Search and Placement Program*, Medium: Lambda School Blog (Aug. 2, 2018), https://medium.com/lambda-school-blog/introducing-lambda-next-our-revolutionary-new-job-search-and-placement-program-603ef12f7d37 (emphasis added).

54.    Two months later, on October 8, 2018, Lambda continued to tout its high job placement rates, announcing on its website: "Since Lambda School's inception in April 2017, over 75 Lambda School graduates have been hired, including 83% of early cohorts, with an average salary increase of over $47,000 per hired graduate."

55.    Lambda's website contained the following statement across the top of the page:

*Screenshot from Lambda's website on December 13, 2018.*



56.    The representation of an 83% job placement rate remained on the Lambda website until on or about February 2019.

57.    From on or about April 2019 until at least December 2019, Lambda's website advertised an ever higher job placement rate: over 85%. For example, on April 18, 2019, Lambda's website contained the following statement across the top of the page:

*Screenshot from Lambda's website on April 18, 2019.*



58.    Yet in May of 2019—at the same time Lambda was advertising an 85.9% job placement rate on its website—Lambda executives sent a private memorandum to investor Y Combinator confirming the falsity of the rates it was publicly promoting. *See* Lambda

Memorandum to Investors, *Human Capital: The Last Unoptimized Asset Class* at 10 (May 2019), attached hereto as Exhibit I. The May 2019 memo stated:

> **We're unable to place students at scale**
> - We're at roughly 50% placement for cohorts that are 6 months graduated
> - Placement to date has been manual and one-off, which isn't possible at scale

Ex. I at 10.

59.     After the memorandum was published in news accounts two years later, Mr. Allred confirmed in a tweet from his personal account that he had told investors that Lambda had a 50% placement rate, stating: "The 50% came from me telling investors about what % of enrolled students get jobs that require repayment."

60.     Despite Mr. Allred's contrary statement to investors, Lambda's website continued to promote a 85.9% or 86% placement rate through the end of 2019. These rates were false and misleading.

61.     On December 14, 2019, Lambda's homepage stated:



*Screenshot from Lambda's website on December 14, 2019.*

62.     This statement was false and directly contrary to the true facts known to Lambda and Mr. Allred, which had privately been disclosed to investors, as described above.

63.     When asked in an interview to explain the discrepancy between the representations on Lambda's website and representations to its investors, Mr. Allred explained:

14

"I mean you're literally looking at what are the risks, right? Like, we're going to pick our lowest number for that – there are cohorts that have been at 50% placed within 6 months, yes."[15]

64.    When asked whether the advertised 86% job placement rate was accurate, he stated: "the way that that number was measured was an average across cohorts at a specific time. I don't know what it is right now, but that's directionally correct."[16]

65.    On February 19, 2020, New York Magazine published an article titled "Lambda School's Misleading Promises," in which the writer concluded that Lambda was "selling unprepared students an incomplete education, fueled by overpromising marketing and misleading, if not downright fraudulent, figures."[17] The story described Lambda's job placement rate misrepresentations and also recounted an interview with a former employee who "confirmed . . . that the company's own internal numbers, which the interviewee was provided as part of their interview process, seem to indicate a roughly 50 percent or lower placement rate."[18]

66.    Lambda nonetheless persisted in promoting false and misleading job placement statistics on its website and elsewhere.

67.    In 2020, Lambda started to promote its placement rates through "outcomes reports" published on its website and shared through social media. Multiple outcomes reports included an "Independent Accountants' Report" directed "To the Management" of "Lambda Inc." located at "250 Montgomery Street[,] San Francisco, CA 94104".

68.    The first outcomes report, titled "H1 2019 Outcomes Report," was published on March 27, 2020,[19] and reported a 79% placement rate.[20]

---

[15] Woo Interview at 13:00-14:30.

[16] *Id.* at 11:13-11:26.

[17] Vincent Woo, *Lambda School's Misleading Promises*, New York Magazine (Feb. 19, 2020), https://nymag.com/intelligencer/2020/02/lambda-schools-job-placement-rate-is-lower-than-claimed.html.

[18] *Id.*

[19] *See* Austen Allred, *Announcing the Release of Our H1 2019 Student Outcomes Report*, Lambda School Website (Mar. 27, 2020), [archived by the Wayback Machine (Apr. 23, 2020), https://web.archive.org/web/20200423031203/https://lambdaschool.com/the-commons/announcing-the-release-of-our-h1-2019-student-outcomes-report].

[20] *See H1 2019 Report Lambda School Outcomes Report*, Lambda School Website, [archived by

69.    The 79% placement rate remained up on Lambda's website until December 3, 2020, when Lambda published its "H2 2019 Outcomes Report."[21] The H2 2019 report showed a 74% placement rate.[22]

70.    The 74% rate announced in the H2 2019 report remained up on Lambda's website until November 7, 2021, when Lambda announced its 2020 outcomes.[23] In the 2020 outcomes report, Lambda announced that the placement rate remained at 74%.

71.    Until November 1, 2022, Lambda continued to report the 74% placement rate from the 2020 outcomes report on its website:

# 74%

Job placement rate for BloomTech graduates

**BloomTech 2020 Outcomes Report**

*Screenshot from Lambda's homepage on September 30, 2022.*[24]

---

the Wayback Machine (Sept. 3, 2020),
https://web.archive.org/web/20200903023542/https:/lambdaschool.com/reports/2019-outcomes-report].

[21] *See* Austen Allred, *Announcing the Release of Our H2 2019 Student Outcomes Report*, Lambda School Website (Dec. 3, 2020), [archived by the Wayback Machine (Dec. 14, 2020), https://web.archive.org/web/20201214214247/https:/lambdaschool.com/the-commons/announcing-lambda-school-h2-2019-student-outcomes-report].

[22] *Id. See also H2 2019 Report Lambda School Outcomes Report*, Lambda School Website [archived by the Wayback Machine (Dec. 3, 2020), https://web.archive.org/web/20201203230224/https:/lambdaschool.com/reports/h2-2019-outcomes-report].

[23] *See Bloom Institute of Technology 2020 Outcomes Report,* Bloom Institute of Technology, [archived by the Wayback Machine (Nov. 25, 2021), https://web.archive.org/web/20211125162824/https:/www.bloomtech.com/reports/outcomes-report].
It appears that Lambda only published one outcomes report in 2020. *See BloomTech Reports*, Bloom Institute of Technology Website, https://www.bloomtech.com/reports/archive (last visited Mar. 14, 2023).

[24] *See Built For Your Success*, Bloom Institute of Technology Website, [archived by the Wayback Machine (Sept. 30, 2022) https://web.archive.org/web/20220930032702/https:/www.bloomtech.com/outcomes].

72.     On November 2, 2022, Lambda published the "BloomTech 2021 Outcomes Report," advertising a 90% placement rate. As of November 2, 2022, Lambda's website provided:

# 90%

Job placement rate for BloomTech graduates

**BloomTech 2021 Outcomes Report**

*Screenshot from Lambda's homepage on November 27, 2022.*[25]

73.     In a "Letter from the CEO" dated November 2, 2022, Mr. Allred wrote: "In this independently examined report, you'll gain a transparent view of how our learners and graduates fared in 2021. Our biggest takeaway: A full **90% of our 2021 graduates have landed jobs**, which is the highest rate in our company's history."[26]

74.     Lambda's homepage continued to advertise a 90% placement rate until January 2024, when it updated the rate, touting an "86% job placement rate in 2022 for job-seeking grads."[27]

75.     Like the earlier rates from 2018 and 2019, the rates Lambda published from 2020 to the present (including, but not limited to, the 79%, 74%, 90%, and 86% rates from the Lambda website and outcomes reports) were, and continue to be, false and misleading. Lambda and its executive leadership, including Mr. Allred, knew that these widely disseminated rates were false and misleading.

---

[25] *See Built For Your Success,* Bloom Institute of Technology Website, [archived by the Wayback Machine (Nov. 27, 2022), https://web.archive.org/web/20221127122732/https://www.bloomtech.com/outcomes].
[26] *See* Austen Allred, *Letter from the CEO*, Bloom Institute of Technology Website (Nov. 2, 2022), https://www.bloomtech.com/reports/outcomes-report#letter (last visited Mar. 14, 2023) (emphasis in original, internal citation omitted).
[27] *See* Bloom Institute of Technology Home Page, https://www.bloomtech.com/ (last visited December 6, 2023).

76.    Business Insider reported in October 2021 that documents from a Lambda "all-hands" staff meeting in January 2021 "showed that Lambda School placed only around 30% of its 2020 graduates in qualifying jobs during the first half of 2020. This figure is in stark contrast to the 74% placement rate it advertised for its 2019 graduates, the latest figure the school has made publicly available. . . ."[28]

77.    This "all hands" meeting took place one month after Lambda published the 74% placement rate in the H2 2019 Outcomes Report.

78.    A slide prepared by Lambda reveals that the H1 2020 placement rate was only 33% and the H2 2020 rate was 40%, a far cry from the 74% listed on the Lambda website until November 2, 2022. According to the same slide, Lambda's H1 2021 *goal* was 60% placement and H2 2021 *goal* was 80%:

## Long-Term Student Success Goals

| | H1 2020 | H2 2020 | H1 2021 | H2 2021 | Metric | Description |
|---|---|---|---|---|---|---|
| **Admissions** | 1277 | 1450 | TBD | TBD | Unit 2 Starts | # students starting Unit 2. |
| **School** | 52% | 56% | 60% | 80% | % Graduating within 11 Units | % of students who start Unit 2 complete coursework within 11 units. |
| **Outcomes** | 33% | 40% | 60% | 80% | % Qualified Placement within 180 days | % of graduates get high paying jobs within 180 days. |
| **Repayment** | 72% | 79% | 85% | 87% | % Repaying within 60 days | % of qualified placed graduates have made a first payment within 60 days. |

79.    On information and belief, a Lambda executive presented the slide at the "all-hands" meeting at Lambda's headquarters in San Francisco, California.

---

[28] *See* Vincent Woo, *Lambda School promised a fast and cheap path to a lucrative tech career. Leaked documents and former students cast doubt on that claim*. Business Insider (Oct. 25, 2021, 7:30 AM), https://www.businessinsider.com/lambda-school-promised-lucrative-tech-coding-career-low-job-placement-2021-10.

80.     Another slide, titled "Lambda H1 Company OKRs," provided that the "actual" placement rate for H1 2020 was 33% of graduates placed within 180 days, and the actual rate for H2 2020 (as of October 2020) was 27% of graduates placed within 180 days. This slide also listed the H1 2021 goal as 60%:

## Lambda H1 Company OKRs

| | H1 2020 | H2 2020 | H1 2021 | Metric | Description |
|---|---|---|---|---|---|
| **Admissions Goal**<br>Admissions Actual | n/a<br>1277 | 1450<br>~850 | 1500 | Unit 2 Starts | # students starting Unit 2. |
| **School Goal**<br>School Actual | n/a<br>52% | 56%<br>52% | 60% | Extended Grad Rate % | % of students who start Unit 2 complete coursework within expected time window |
| **Outcomes Goal**<br>Outcomes Actual | n/a<br>33% | 40%<br>27% | 60% | % Qualified Placement within 180 days | % of graduates get high paying jobs within 180 days. |
| **Repayment Goal**<br>Repayment Actual | n/a<br>41% | 75%<br>73% | 85% | % Repaying within 60 days | % of qualified placed graduates have made a first payment within 60 days. |
| **Alumni Goal** | n/a | n/a | 40% | % Alumni Giving back | % of hired alumni giving back |

*H2 2020 Actuals as of October 2020

81.     Another slide, reportedly used at another all-hands meeting in February 2021, broke out the 180-day placement rates by month, from February to July 2020, as follows:

| Graduation Month | Qualified Placed % (days elapsed since graduation) | | |
|---|---|---|---|
| Month | +90d | +180d | QP Now |
| Feb - 2020 | 20% | 31% | 41% |
| Mar - 2020 | 19% | 30% | 36% |
| April - 2020 | 17% | 24% | 32% |
| May - 2020 | 13% | 27% | 32% |
| Jun - 2020 | 15% | 25% | 27% |
| Jul - 2020 | 18% | 24% | 25% |
| Aug - 2020 | 16% | | 21% |
| Sept - 2020 | 13% | | 14% |
| Oct - 2020 | 10% | | 11% |
| Nov - 2020 | | | 11% |
| Jan - 2021 | | | 11% |
| **Weighted Avg.** | 16% | 27% | |
| **H2 Goal** | | 40% | |

82.     In yet another slide, reportedly also used at the "all hands" meeting on January 28, 2021, Lambda's H1 2021 "goal" was to enroll 500 students a month and place 50% to 70% in qualifying jobs. The graph also shows that, if Lambda enrolled 2,000 students per month, it could become profitable even if fewer than half of its students found jobs:



83.     Prior to signing a tuition payment plan, Claimant read Respondents' representations that Lambda's job placement rate was above 70%. Lambda's purported record of successfully placing students was critical to Claimant's decision to enroll.

**2.     Lambda's false and misleading statements about job placement in social media postings and comments.**

84.     In addition to advertising job placement rates on its website and in outcomes reports, Lambda's job placement marketing campaign aimed at potential students expanded to social media posts and comments, including Twitter, Facebook, and Instagram. Like the rates on its website and in outcomes reports, these rates, ranging from 71% to at least 91%, were false and misleading. Lambda and its executive leadership, including Mr. Allred, knew that these widely disseminated rates were false and misleading, and intended that potential students like Claimant would review those rates and enroll at Lambda as a result of those rates.

85.     Examples of false and misleading job placement rates on Lambda's Twitter, Facebook, and Instagram accounts include:

a) April 6, 2018, Lambda Twitter: "Time for another update on placement. Students hired by Lambda School are not included. Cs1: 75% hired within first two months of search."[29]

b) March 5, 2019, Lambda's Twitter account linked to a report touting an 85.9% job placement rate and stated: "Lambda only succeeds when our students succeed, and we're committed to a transparent, no-surprises approach to education."[30]

c) April 22, 2020, Lambda Instagram: "Percentage of H1 2019 graduates that have been placed into jobs. → 71%"[31]



---

[29] Lambda School (@LambdaSchool), Twitter (Apr. 6, 2018, 12:39 PM), https://twitter.com/bloomtech/status/982311747301330944.

[30] Lambda School (@LambdaSchool), Twitter (Mar. 5, 2019, 7:02 PM), https://twitter.com/bloomtech/status/1103083315945328640.

[31] Lambda School (@LambdaSchool), Instagram (Apr. 22, 2020), https://www.instagram.com/p/B_S2M-Llm2y/.

d) September 27, 2021, Lambda Instagram: "77% of H2 2019 job-seeking Data Science graduates were hired. 94% [o]f those hired graduates go the job in the first 180 days"[32]



e) November 3, 2022, Lambda Instagram: "90% of our 2021 alumni gained in-demand skills and landed great jobs—our highest placement rates *ever*!"[33]



[32] Lambda School (@LambdaSchool), Instagram (Sept. 27, 2021), https://www.instagram.com/p/CUWJM1qJlEB/?img_index=4.
[33] Bloom Tech (@Bloomtechofficial), Instagram (Nov. 3, 2022), https://www.instagram.com/p/CkgVeHBrmP9/.

f)  November 3, 2022: Lambda Facebook: "90% of our 2021 alumni gained in-demand skills and landed great jobs—our highest placement rates *ever*!"[34]

g)  November 3, 2022, Lambda Twitter: "90% of our 2021 alumni gained in-demand skills and landed great jobs—our highest placement rates *ever*!"[35]

h)  November 4, 2022, Lambda Facebook: "Fun Fact: Did you know, 90% of our 2021 full Stack Web job-seeking graduates found a job after BloomTech?"[36]

i)  November 7, 2022, Lambda Facebook: "91% of our 2021 job-seeking Data Science graduates found a job 😮"[37]

j)  November 9, 2022, Lambda Instagram: "91% of 2021 job-seeking Data Science grads found a job after BloomTech"[38]

### 3.  Mr. Allred's false and misleading statements about job placement were a driving force behind Lambda's job placement rate marketing campaign.

86.     At all times relevant to this complaint, Mr. Allred was the driving force behind Lambda's job placement rate marketing campaign. Rather than passively overseeing the campaign, he personally spearheaded Lambda's dissemination of false and misleading rates, oftentimes promoting the rates himself on his own social media accounts.

87.     For example, since March 2020, when Lambda first promoted its job placement rates through outcomes reports, each outcomes report has begun with a personalized letter from Mr. Allred titled "Letter from the CEO," vouching for the rates in the report. The reports end with Mr. Allred's signature.

---

[34]Bloom Tech (@BloomTech), Facebook (Nov. 3, 2022), https://www.facebook.com/BloomTech/posts/pfbid0C9MRRryV1zaMpSXa35QnogkPDAR984b js9xmen4WJB4SWMtkWAn2kxZ7BRC11Kdhl.

[35] Bloom Tech (@BloomTech), Twitter (Nov. 3, 2022, 11:15 AM), https://twitter.com/bloomtech/status/1588203108013850629.

[36] Bloom Tech (@BloomTech), Facebook (Nov. 4, 2022), https://www.facebook.com/BloomTech/posts/pfbid025d3iVN2usd1eLKfwTMCh78a3kVNpsmU cRCsMXWinqtYX4tHqLbkDHQz9mhqUZuanl.

[37] Bloom Tech (@BloomTech), Facebook (Nov. 7, 2022), https://www.facebook.com/BloomTech/posts/pfbid0UpByQ5eFsctoNH51QuK1DPrTXYXvaU9 cPbE2H6weYnnvR2YbpWF2m8vLGbuuoUhol.

[38] Bloom Tech (@Bloomtechofficial), Instagram (Nov. 9, 2022), https://www.instagram.com/p/CkwHe8ivDND/.

88.    Mr. Allred also advertised false and misleading rates on his personal Twitter

account:

     a)    March 13, 2019: In response to a commenter asking about a $60,000 median
        salary and 83% 6-month employment rate for Lambda's main web track, Mr.
        Allred responded, "That's low now, but our average student increases his or her
        income by $47,000."[39]

     b)    March 15, 2019: "Lambda School's first iOS class graduates today. 66% of them
        are already **hired.**"[40]

     c)    November 16, 2019: "First track just graduated. Hit 100% hired but was VERY
        small sample size." Subsequent reporting revealed that this small sample size
        consisted of a single student.[41]

     d)    November 3, 2022: "I am so incredibly excited to finally be able to share
        BloomTech's 2021 Outcomes Report. Highlights: *All-time high 90%
        placement rate for job-seeking grads".[42]

89.    Other examples of false, misleading, and exaggerated claims on Mr. Allred's

Twitter account include:

     a)    January 24, 2021: "I think we're like 2-3 solvable problems being solved away
        from 100% of Lambda School grads being hired. Still a lot of unknowns, but I
        think it will be possible." When a commenter asked what the problems were, Mr.
        Allred responded: "Boring stuff."[43]

     b)    April 22, 2021: "When I started Lambda School early detractors gave me hell
        because I said that Lambda School would cause thousands of people to become
        millionaires who wouldn't have otherwise been. It's now pretty clear that was
        very conservative."[44]

---

[39] Austen Allred (@Austen), Twitter (Mar. 13, 2019, 12:14 PM),
https://twitter.com/Austen/status/1105879911036665856.
[40] Austen Allred (@Austen), Twitter (Mar. 15, 2019, 5:20 PM),
https://twitter.com/Austen/status/1106681485275205634.
[41] *See* Zoe Schiffer & Megan Farokhmanesh, *The High Cost of a Free Coding Bootcamp*, The
Verge (Feb. 11, 2020, 11:15 EST), https://www.theverge.com/2020/2/11/21131848/lambda-
school-coding-bootcamp-isa-tuition-cost-free; Ryan Mac (@RMac18), Twitter (Feb. 11, 2020,
1:59 PM), https://twitter.com/RMac18/status/1227306243733295108.
[42] Austen Allred (@Austen), Twitter (Nov. 3, 2022, 12:20 PM),
https://twitter.com/Austen/status/1588219699157905408.
[43] Austen Allred (@Austen), Twitter (Jan. 24, 2021, 1:55 AM),
https://twitter.com/austen/status/1353234915643568128.
[44] Austen Allred (@Austen), Twitter (Apr. 22, 2021, 10:24 AM),
https://twitter.com/Austen/status/1385238109185396740.

      c) May 4, 2021: "I get to watch a bunch of people double their income (or more) every single day. Even the worst days are punctuated by a bunch of people changing their lives and the lives of their families forever."[45]

      d) May 4, 2021: "You can go from near poverty to huge future wealth in just a few months."[46]

      e) November 24, 2022: "Thankful today for all those who have worked so hard for BloomTech (by current name or by Lambda School). So many people working so diligently. Thousands of lives changed, billions in increased earnings."[47]

90.     Mr. Allred and Lambda acted willfully and knowingly to disseminate Lambda's job placement representations to the public—including applicants to their school such as Claimant—with knowledge that they were, and continue to be, false and misleading.
.

### D.   LAMBDA MISREPRESENTS THAT IT ONLY GETS PAID ONCE STUDENTS DO

91.     In addition to the placement rates, Lambda and Mr. Allred misled potential students like Claimant with the frequently repeated declaration that: "We don't get paid until you do, so we're in this together, from your first day of classes to your first day on the job."[48] For example, on June 27, 2019, Lambda's homepage stated:



## Higher learning. Higher earning.

Lambda is designed for student success. We don't get paid until you do, so we're in this together, from your first day of classes to your first day on the job — and beyond.

*Screenshot from Lambda's homepage on June 27, 2019.*

---

[45] Austen Allred (@Austen), Twitter (May 4, 2021, 11:50 PM), https://twitter.com/Austen/status/1389789532761956352.
[46] Austen Allred (@Austen), Twitter (May 4, 2021, 11:53 PM), https://twitter.com/Austen/status/1389790386659364868.
[47] Austen Allred (@Austen), Twitter (Nov. 24, 2022, 9:51 AM), https://twitter.com/austen/status/1595822473781485568.
[48] *See, e.g.*, Apply Now Pages, Lambda School Website [archived by the Wayback Machine (June 27, 2019), https://web.archive.org/web/20190627024024/https://lambdaschool.com/].

92.    Mr. Allred regularly touted that Lambda only gets paid when students do on his personal social media accounts and the Lambda website, describing Lambda's business as based on shared and aligned incentives between Lambda and its students:

    a)  "The main directive in everything we did can be summed up in two words: incentive alignment."[49]

    b)  "Our mission from day one has been to **align the incentives of school and student**, giving more people the opportunity they deserve to land a great job with a higher income. If our students don't succeed, our school shouldn't either."[50]

93.    In reality, Lambda packaged and sold its tuition payment plans, including ISAs, to investors long before students obtained employment. As early as May 2019, Lambda privately told investor Y Combinator: "Currently we sell some income share agreements to hedge funds." Exhibit I at 2.

94.    To facilitate the sale of ISAs, Lambda partnered with Edly, a digital marketplace that helps schools sell ISAs to third-party investors. On December 11, 2019, Edly tweeted: "Pleased to announce our latest offering [–] a Lambda School ISA Pool. We @edlyISA are excited to work with the amazing team @LambdaSchool[], one of the most impactful ISA programs in the country."[51] To learn how to participate, Edly invited interested investors to join a webinar that night with Mr. Allred.[52]

---

[49] Austen Allred, LinkedIn (2019), https://www.linkedin.com/posts/austenallred_announcing-our-new-isa-financing-blueprint-activity-6636140633306333184-dkOh?utm_source=share&utm_medium=member_desktop.

[50] *See* Austen Allred, *Announcing the Release of Our H1 2019 Student Outcomes Report*, Lambda School Website (Mar. 27, 2020), [archived by the Wayback Machine (Apr. 23, 2020), https://web.archive.org/web/20200423031203/https:/lambdaschool.com/the-commons/announcing-the-release-of-our-h1-2019-student-outcomes-report] (emphasis in original).

[51] @edlyISA, Twitter (Dec. 11, 2019, 3:01 PM), https://twitter.com/edlyISA/status/1204853625459216385 (on file with Claimant's counsel).

[52] @edlyISA, Twitter (Dec. 11, 2019, 3:02 PM), https://twitter.com/edlyISA/status/1204853900177743872(on file with Claimant's counsel).

95.     Lambda did not disclose this fact to students until public reporting exposed it, and for many months Mr. Allred flatly denied it, stating in October 2019 on Twitter that "We never, ever get paid up front for ISAs."[53]

96.     Claimant read the false and misleading statement on the Lambda website that Lambda only got paid once the student does and, as a result, believed that Lambda would only get paid once Claimant secured a qualifying job. Knowing that Lambda only got paid if Claimant obtained employment was important to Claimant's decision to attend.

### E.     LAMBDA ENGAGED—AND STILL ENGAGES—IN THE UNLAWFUL BUSINESS PRACTICE OF UNLICENSED LENDING

97.     The California Financing Law "shall be liberally construed and applied to promote its underlying purposes and policies," which include "protect[ing] borrowers against unfair practices by some lenders, having due regard for the interests of legitimate and scrupulous lenders." Cal. Fin. Code § 22001(a)(4).

98.     Pursuant to the California Financing Law: "No person shall engage in the business of a finance lender or broker without obtaining a license from the commissioner." Cal. Fin. Code § 22100(a).

99.     Lambda is not and never has been registered in California as a finance lender or broker under the Financing Law.

100.     Since its inception, Lambda has operated as a "finance lender" because its tuition payment plans qualify as either consumer or commercial loans under the Financing Law. *See generally* Cal. Fin. Code § 22203-04 (defining consumer loans); Cal. Fin. Code § 22502 (defining commercial loans).

101.     Lambda's Meratas ISA provides:

> THIS IS NOT A LOAN
> In making monthly payments to Lambda School, you will not be repaying a student loan. In the case of a student loan, a student borrows a set amount and repays the principal amount of the loan plus interest or a finance charge, or both. Under this agreement, you

---

[53] Woo Interview at 6:30 (wherein Mr. Allred confirms that this tweet was "totally correct").

will instead pay a fixed percentage of your income each month for up to a maximum number of payments.

102.    Contrary to this representation, ISAs are a form of student loan.

103.    According to the United States Consumer Financial Protection Bureau ("CFPB"), a representation that an ISA is "not a loan" is deceptive and misleading under the Consumer Financial Protection Act because "ISAs are loans and do create debt."[54]

104.    The California Department of Financial Protection and Innovation ("DFPI") agrees, holding that ISAs are student loans: "ISAs made solely for use to finance a postsecondary education are 'student loans' for the purposes of the SLSA [California Student Loan Servicing Act]."[55]

105.    The United States Department of Education concurs, finding that ISAs "used to finance expenses for postsecondary education are private education loans under 34 C.F.R. 601.2(b)."[56]

106.    The BPPE also found in its June 22, 2020, order denying Lambda approval to operate that Lambda's ISA is "an instrument or evidence of indebtedness" under the California Education Code. *See* June 22, 2020 Letter from BPPE to Lambda at 5, attached hereto as <u>Exhibit F</u>.

---

[54] *See* Better Future Forward, Inc., et al., CFPB No. 2021-CFPB-0005, Consent Order at ¶ 23 (Sept. 7, 2021) (finding *available at:* https://files.consumerfinance.gov/f/documents/cfpb_better-future-forward-inc_consent-order_2021-09.pdf).

[55] *See In the Matter of Student Loan Servicing Act License Application of Meratas Inc.* NMLS No. 2120180, Consent Order at ¶ M (Ca. Dep't of Fin. Prot. and Innovation Aug. 5, 2021), *available at:* https://dfpi.ca.gov/wp-content/uploads/sites/337/2021/08/Meratas-Consent-Order.pdf; *see also* Press Release, California Dep't of Fin. Prot. and Innovation, "California DFPI Enters Groundbreaking Consent Order with NY-Based Income Share Agreements Servicer" (Aug. 5, 2020), https://dfpi.ca.gov/2021/08/05/california-dfpi-enters-groundbreaking-consent-order-with-ny-based-income-share-agreements-servicer/.

[56] *See* FSA Announcement, General-22-12, *Income Share Agreements and Private Education Loan Requirements* (Mar. 2, 2022), https://fsapartners.ed.gov/knowledge-center/library/electronic-announcements/2022-03-02/income-share-agreements-and-private-education-loan-requirements. *See also* 87 Fed. Reg. 65,453 ("[T]he Department clarifies that ISAs and other alternative financing products should be treated like institutional loans.").

107.    Because Lambda is in the business of making ISAs and other tuition payment plans, it is operating as a finance lender under the California Financing Law.

108.    Lambda's failure to register as a finance lender deprived Claimant of the borrower protections provided by the California Financing Law.

109.    Lambda has therefore engaged in the unlawful business practice of making a loan without a license in violation of California Financial Code § 22100, and, in turn, in violation of the unlawful prong of the UCL.

110.    Had Claimant been aware that Lambda was acting as an unlicensed finance lender, Claimant would not have signed a tuition payment plan that indebted Claimant for up to $30,000 to Lambda.

**F.    CLAIMANT'S ENROLLMENT AND ATTENDANCE AT LAMBDA, AND THE AFTERMATH**

111.    Claimant McAdams's interest in coding was pragmatic, believing that people who learn to code get good-paying jobs. He first heard of Lambda while looking into coding programs in 2019. Soon after starting his research, he received targeted ads on Google, YouTube, and social media from Lambda. The ads touted a high job placement rate, how quickly students could get their certificate and a high-paying job, and the lack of an up-front cost or any repayment obligation unless students ultimately got a job. By the ads' telling, Lambda was a revolutionary alternative to college.

112.    When Mr. McAdams was laid off from his job in the spring of 2020 at the onset of the COVID-19 pandemic, he decided in April 2020 to consider attending a coding program to start a career in tech. He researched Lambda's website at that time, which prominently displayed a job placement rate approaching 80%, convincing him that Lambda was the best path forward. He also reviewed an outcomes report, either before signing his ISA or soon thereafter, reflecting a job placement rate approaching 80%.

113.    Mr. McAdams also liked that Lambda did not require tuition payments up front, and that, through an ISA, Lambda was invested in student outcomes. He saw the statement on

the Lambda website that Lambda did not get paid until the student did, convincing him that Lambda was equally invested in student outcomes, including his.

114.    The high job placement rate approaching 80% and the representation that Lambda only got paid once students do were critical to Mr. McAdams's decision to enroll, convincing him that enrolling at Lambda would maximize his chance of landing a tech job after completing Lambda coursework.

115.    But both the job placement rate approaching 80% and the statement that Lambda only got paid once students do were false and misleading, and both Lambda and Mr. Allred knew these representations were false and misleading. (*See* ¶¶ 46–90, *supra*.)

116.    Mr. McAdams further believed that Lambda was approved to operate due to Respondents' continuous and repeated descriptions on the Lambda website, Lambda ads, and social media of various features of Lambda that gave the appearance that it was a credible, legitimate, and lawfully operating school. These included, but were not limited to, descriptions of Lambda's curriculum, use of team leads that were marketed as an improvement over college TAs, tuition, the Lambda student body and its graduates, and a structured program and academic schedule that included grades, rubrics, lectures, and homework.

117.    Swayed by Respondents' false job placement rates, their false statements that they only got paid once students do, and their false representations that Lambda was a government-approved school, Mr. McAdams signed an ISA with Lambda on June 15, 2020 (Exhibit A).

118.    Had Respondents truthfully represented Lambda's job placement rates, or had they truthfully represented their actual financial interest in students' success, or had Mr. McAdams known that Lambda was not lawfully approved to operate, he would not have enrolled in Lambda's educational services, or signed an ISA that indebted him up to $30,000 of tuition to Lambda.

119.    Mr. McAdams began attending Lambda full-time in early July 2020. Soon thereafter, Lambda restructured his program by shortening it from nine to six months, removing the existing support structure for reviewing work, and eliminating team lead support. Since the

team leads had been an essential component of Lambda's education up to that point, Mr. McAdams thought their elimination seemed troubling. He decided to take a hiatus for the fall of 2020, picking up full-time hours as a bartender.

120.    Mr. McAdams returned in late 2020. While there was no sign Lambda had improved its program, he had already invested significant time and expense. Already on the hook, he resolved to learn as much as he could through Lambda.

121.    To his surprise, immediately upon returning, Lambda assigned Mr. McAdams as an unpaid team lead to fill the void left by their elimination. The assignment was not optional, Lambda provided no support on how to serve as a team lead, and Mr. McAdams did not find any educational value in the experience. After returning, he spent roughly a third of his Lambda education time mentoring *other* students.

122.    He finished the Lambda program in February 2021 and received his certificate of completion.

123.    Mr. McAdams immediately got to work trying to find a tech job, but Lambda's resources were unhelpful—a job portal lacking useful leads, and resume reviewers with no useful feedback. He continued bartending while looking for tech work and studying on his own what Lambda failed to teach him.

124.    After several months, Mr. McAdams was hired as a backend systems engineer contracting with Florida Blue in August 2021. He eventually moved up the ranks to become senior engineer. Lambda played no role in him finding out about the position, and played no role in him ultimately getting hired. As most of the skills and material discussed in Mr. McAdams's interview was self-taught *after* he had finished with Lambda, it was his own studying that landed him the job.

125.    Mr. McAdams made an ISA payment of approximately $1,000 in 2021, even though Lambda did not have approval to operate when he signed his ISA, and even though he would not have signed his ISA had Lambda truthfully represented its job placement rates. A collections agency has contacted him multiple times regarding his ISA.

IV.    **CAUSES OF ACTION**

**FIRST CAUSE OF ACTION**
**Violations of California's Consumer Legal Remedies Act**
**Cal. Civ. Code §§ 1750,** *et seq.*
**(All Respondents)**

126.    Claimant hereby reincorporates the allegations in the foregoing paragraphs as though fully set forth herein.

127.    The CLRA makes unlawful "unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or that results in the sale or lease of goods or services to any consumer." Cal. Civ. Code § 1770(a).

128.    The CLRA covers transactions involving the sale of services—such as education—to consumers.

129.    Claimant is a "consumer" within the meaning of Section 1761(d) of the CLRA, seeking Lambda's education services for personal, family, or household purposes, and Claimant engaged in "transactions" within the meaning of sections 1761(e)and 1770 of the CLRA.

130.    Education is a "service" within the meaning of Section 1761(b) of the CLRA.

131.    The CLRA enumerates numerous unlawful acts or practices, including:

a)    "Misrepresenting the source, sponsorship, approval, or certification of goods or services." Cal. Civ. Code § 1770(a)(2).

b)    "Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that the person does not have." *Id.* § 1770(a)(5).

c)    "Representing that goods or services are of a particular standard, quality, or grade" when they are not. *Id.* § 1770(a)(7).

d)    "Advertising goods or services with intent not to sell them as advertised." *Id.* § 1770(a)(9).

132.    In violation of these provisions, Respondents misrepresented to the public, prospective students, and current students, including Claimant, at least the following: (i) its job placement rates; and (ii) that it had approval to operate and enroll students.

133.    Respondents did so in order to induce prospective students, like Claimant, to enroll in Lambda's program—Claimant did so enroll as a result of Respondents' misrepresentations.

## SECOND CAUSE OF ACTION
### Violations of California's Unfair Competition Law
### Cal. Bus. & Prof. Code §§ 17200, *et seq.*
### (All Respondents)

134.    Claimant hereby reincorporates the allegations in the foregoing paragraphs as though fully set forth herein.

135.    Respondents have engaged in business acts or practices that constitute unfair competition as defined in the UCL, in that such business acts and practices are unlawful, unfair, and fraudulent within the meaning of that statute.

136.    The business acts and practices include:

    a)  publishing and/or providing the public, prospective students, and current students, including Claimant, with false, misleading, unreliable, and/or inaccurate job placement rate information;

    b)  conducting business without BPPE approval and in violation of multiple BPPE orders requiring it to cease operations;

    c)  knowingly operating a private postsecondary institution without approval to do so and knowingly conveying to the public that it is an approved institution;

    d)  misrepresenting to the public, prospective students, and current students that in March and July of 2019, the BPPE ordered Lambda to cease operations, stop enrolling students, cease all instructional services, and submit a closure plan, and misrepresenting material facts related to those BPPE orders, including representing that they were stayed when they were not.

137.    Claimant's tuition payment plans constitute "lost money or property" within the meaning of the UCL.

<u>Unlawful Prong</u>

138.    The UCL bars business practices that are forbidden by law. If a business practice violates any law, it is *per se* a UCL violation.

139.    The business acts and practices described above are unlawful because they violate numerous state and federal laws, including but not limited to:

   a)    The Federal Trade Commission Act ("FTC Act"), which prohibits "unfair or deceptive acts or practices."[57]

   b)    Cal Educ. Code § 94897(b), which provides that institutions shall not "[p]romise or guarantee employment, or otherwise overstate the availability of jobs upon graduation."

   c)    The CLRA, *see supra*;

   d)    The FAL, *see infra*;

   e)    Cal. Educ. Code § 94886, which provides in relevant part that "a person shall not open, conduct, or do business as a private postsecondary educational institution in this state without obtaining an approval to operate under this chapter." Lambda violated this provision, and therefore the UCL's unlawful prong, when it enrolled Claimant without obtaining approval to operate.

   f)    Cal. Educ. Code § 94943, which provides that it is a crime to "[k]nowingly operat[e] a private postsecondary institution without an approval to operate." Lambda violated this provision, and therefore the UCL's unlawful prong, when it knowingly enrolled Claimant without approval by the BPPE to operate.

   g)    Cal. Educ. Code § 94917, which provides that "[a] note, instrument, or other evidence of indebtedness relating to payment for an educational program is void

---

[57] *See* U.S.C.§ 45(a)(I); 15 U.S.C. § 52(a).

and not enforceable unless, at the time of execution of the note, instrument, or other evidence of indebtedness, the institution held an approval to operate … ."

    h)   Cal. Educ. Code § 94902(b)(2), which provides that an enrollment agreement is enforceable only if "[a]t the time of the execution of the enrollment agreement, the institution held a valid approval to operate."

    i)   The California Financing Law, which provides that "[n]o person shall engage in the business of a finance lender or broker without obtaining a license from the commissioner." Cal. Fin. Code § 22100(a).

    j)   The Consumer Financial Protection Act of 2010, 12 U.S.C. §§ 5531(a), 5536(a)(1)(B), which prohibits covered persons from engaging in unfair, deceptive, or abusive acts or practices.

140.    By violating these and other state and federal laws, Lambda violated the unlawful prong of the UCL.

   Fraud Prong

141.    To show that a business practice is fraudulent, it is necessary only to show that members of the public are likely to be deceived.

142.    Respondents' business acts and practices—including its false job placement rate representations and false representations to the Subclass about BPPE approval—are fraudulent in that they are likely to deceive the public.

143.    Each of these false and misleading representations, all of which were material, were substantial factors influencing Claimant to attend Lambda and take out a tuition payment plan that indebted Claimant for up to $30,000.

**THIRD CAUSE OF ACTION**
**Violations of California's False Advertising Law**
**Cal. Bus. & Prof. Code §§ 17500, *et seq.***
**(All Respondents)**

144.    Claimant hereby reincorporates the allegations in the foregoing paragraphs as though fully set forth herein.

145.     Respondents have also engaged in acts or practices that constitute violations of the FAL, Business and Professions Code section 17500, *et seq*., by making or causing to be made untrue or misleading statements with the intent to induce members of the public to purchase Lambda's services. Respondents' untrue or misleading representations include, but are not limited to, the following:

   a)  Respondents' statements regarding job placement rates, including but not limited to the published job placement rates prominently displayed on its website, social media, and advertisements;

   b)  Respondents' statements, prominently displayed on Lambda's website and elsewhere, that Lambda does not get paid until students do;

   c)  Respondents' statements and appearance to the public, prospective students, and current students that its operations were lawful, that BPPE had not ordered Lambda to cease advertising and instructional activities, and that it could lawfully enroll students. Lambda's and Mr. Allred's advertisements and marketing implicitly and explicitly misrepresented the lawfulness of its operations by encouraging the public and prospective students to apply for enrollment.

146.     At the time these representations were made, Respondents knew or by the exercise of reasonable care should have known that the representations were untrue or misleading.

## FOURTH CAUSE OF ACTION
### Intentional Misrepresentation
### (All Respondents)

147.     Claimant hereby reincorporates the allegations in the foregoing paragraphs as though fully set forth herein.

148.     Respondents made statements to Claimant: (a) that were false representations of material fact; (b) that Respondents knew were false or were made recklessly and without regard for their truth; (c) that Respondents intended Claimant to rely upon; (d) that Claimant reasonably

relied upon; (e) that Claimant's reliance upon was a substantial factor in causing Claimant damage; and (f) that caused Claimant damage.

149.    The intentional misrepresentations and omissions by Respondents consist of at least the following:

    a)  Respondents' job placement rate statements, prominently displayed on the Lambda website, in outcomes reports, and on social media. Respondents knew these statements were false.

    b)  Respondents' statements, prominently displayed on Lambda's website and elsewhere, that Lambda does not get paid until students do; Lambda knew this statement was false because it sold ISAs to investors long before students were placed in jobs.

    c)  Respondents' representations, both implied and explicit, that it was approved to operate, advertise, enroll, and teach students prior to August 2020. Respondents knew these representations were false because the BPPE had ordered Lambda to cease all operations (including all advertising and instructional activities) and submit a school closure plan. Respondents also knew that they were concealing from students that Lambda was barred from advertising and from enrolling and teaching students.

150.    Respondents intended Claimant to rely on these misrepresentations, as evidenced by Lambda prominently featuring them on its website and on other widely disseminated platforms, as well as by its efforts to avoid disclosing the truth.

151.    Claimant reasonably relied on these widely disseminated representations. Had Claimant known the truth, Claimant would not have enrolled at Lambda.

152.    Lambda, Mr. Allred, and members of his executive leadership team acted willfully and knowingly to disseminate these representations to the public with knowledge that they were false and misleading.

153.     Claimant has been substantially harmed by Lambda's misconduct, which caused Claimant to attend Lambda and take out an ISA that indebted Claimant for up to $30,000 in tuition.

## FIFTH CAUSE OF ACTION
### Negligent Misrepresentation
### (All Respondents)

154.     Claimant hereby reincorporates the allegations in the foregoing paragraphs as though fully set forth herein.

155.     Respondents have also engaged in acts or practices that constitute negligent misrepresentation. *See supra* ¶147–52.

156.     Respondents prominently displayed these representations on the Lambda website, in outcomes reports, on social media, and in advertisements for the purpose of encouraging members of the public, like Claimant, to apply for enrollment.

157.     Respondents had no reasonable grounds to believe that these representations were true.

158.     Respondents intended to induce Claimant to rely on these misrepresentations, as evidenced by Lambda prominently featuring them on its website and on other widely disseminated platforms, as well as by its efforts to avoid disclosing the truth.

159.     Claimant was justified in relying upon these widely disseminated representations. Had Claimant known the truth, Claimant would not have enrolled at Lambda.

160.     Claimant has been substantially harmed by Lambda's misconduct, which caused Claimant to attend Lambda and take out an ISA that indebted Claimant for up to $30,000 in tuition.

## V.     PRAYER FOR RELIEF

WHEREFORE, in accordance with the above claims, Claimant requests that the Arbitrator:

1.    Declare and order that the tuition payment plan entered into by Claimant is unlawful, void, and unenforceable pursuant to Cal. Educ. Code §§ 94886, 94902, 94917, and 94943, and the UCL, CLRA, and FAL.

2.    Declare that Respondents conducted business as a private postsecondary educational institution in California without obtaining approval to operate, in violation of Cal. Educ. Code § 94886 and the UCL.

3.    Declare that Respondents knowingly operated a private postsecondary institution without approval to operate, in violation of Cal. Educ. Code § 94943 and the UCL.

4.    Declare that Respondents' job placement rate representations at all times relevant to this Complaint were fraudulent and misleading, in violation of the UCL, FAL, and CLRA, and were intentional and/or negligence misrepresentations.

5.    Declare that Lambda "engage[d] in the business of a finance lender or broker without obtaining a license from the commissioner," and continues to do so, in violation of the California Financing Law, Cal. Fin. Code § 22100(a).

6.    Order Respondents—including Lambda, Mr. Allred, and any other owner of all or part of the tuition payment plans—to cancel Claimant's tuition payment plan and enjoin any effort to collect upon or otherwise enforce it.

7.    Order Respondents to pay restitution in the form of refunds for any and all payments made.

8.    Order prejudgment and post-judgment interest on any refunds for tuition payment plan payments to the maximum extent allowed by law.

9.    Order Respondents to pay reasonable attorneys' fees and costs.

10.    Award damages to Claimant in an amount to be determined, including punitive damages pursuant to Cal. Civ. Code § 3294(a).

11.    Order all such further relief as the Arbitrator deems just and proper.

Dated: April 5, 2024                    **MINER, BARNHILL & GALLAND, P.C.**


By:    /s/ *Ryan Miller*
             Deanna N. Pihos
             David Baltmanis
             Ryan Miller

             *Attorneys for Claimant*

## BEFORE THE AMERICAN ARBITRATION ASSOCIATION
## SAN FRANCISCO, CALIFORNIA

| | |
|---|---|
| KYLE WILLARD, | AAA Case No. _____ |
| Claimant, | |
| v. | |
| BLOOM INSTITUTE OF TECHNOLOGY, formerly d/b/a LAMBDA SCHOOL; AUSTEN ALLRED, in his individual capacity; and JOHN DOES 1-9, | |
| Respondents. | |

## <u>DEMAND FOR ARBITRATION</u>

1.      Pursuant to the American Arbitration Association's Consumer Rules, Claimant Kyle Willard submits this Demand for Arbitration against Bloom Institute of Technology, formerly d/b/a Lambda School ("Lambda"), Austin Allred, in his individual capacity, and John Does 1–9 (collectively, "Respondents") for violations of the California Consumer Legal Remedies Act ("CLRA"), California Civil Code § 1750, *et seq.*, Unfair Competition Law ("UCL"), California Business and Professional Code §17200, *et seq.*, and False Advertising Law ("FAL"), California Business and Professional Code § 17500, *et seq.*, as well as for intentional and negligent misrepresentation.

2.      Mr. Willard is a former student of Lambda School and brings this action to hold Respondents accountable for: (i) falsifying and misrepresenting Lambda's job placement rates; (ii) misrepresenting and concealing that, until August 17, 2020, Lambda did not have the necessary approval from the California Bureau for Private and Postsecondary Education ("BPPE") to operate as a school, and was under order by the BPPE to cease operations, stop enrolling students, cease all instructional services, and submit a closure plan; (iii) in violation of California law, enrolling, signing tuition payment plans with, and providing educational services to students before Lambda obtained the BPPE's approval to operate; and (iv) in violation of

1

California law, engaging in the unlawful business practice of unlicensed lending; and (v) misrepresenting and concealing the true nature of Lambda's financial interest in students' success, including by falsely representing that Lambda only got paid after students found employment and got paid.

3.      Claimant would not have enrolled at Lambda had Plaintiff known the truth about Lambda's job placement rates, its lack of approval from BPPE, or the true nature of Lambda's financial interest in Claimant's success (or lack thereof). Through this action, Claimant seeks declaratory and injunctive relief to cancel Claimant's tuition payment plan and declare that payment plan null and void; a refund of any payments Claimant has made under that payment plan; damages; and additional relief.

I.      **THE PARTIES**

4.      Claimant Kyle Willard is a resident of Albany, Linn County, Oregon. Claimant signed a tuition payment plan on August 5, 2020 (and later, as required by Lambda, signed another tuition payment plan backdated by Lambda to August 4, 2020). Claimant was enrolled as a student at Lambda from August 2020 until November 2021, at which point Claimant completed Lambda's program. Claimant's August 5, 2020 tuition payment plan is attached as Exhibit A.

5.      Respondent Lambda is a corporation organized and existing under the laws of the State of Delaware, having its principal place of business at 250 Montgomery Street, Floor 16, San Francisco, California 94104 and/or 149 New Montgomery Street, 4th floor, San Francisco, CA 94101.

6.      Respondent Austen Allred is Lambda's founder and CEO. Upon information and belief, Mr. Allred resides in San Francisco, California, and/or did so during times relevant to the events described herein.

7.      Respondents John Does 1-9 are officers and/or directors of Lambda as well as individuals, corporations, or other entities who may own all or a portion of Claimant's tuition payment plan or any other financial interest in that tuition payment plan.

## II.     JURISDICTION AND VENUE

8.     The American Arbitration Association ("AAA") has jurisdiction over this action

pursuant to Claimant's tuition payment plan, which specifies:

> As the exclusive means of initiating adversarial proceedings to resolve any dispute
> arising out of this agreement, your Lambda School tuition, or your payments to Lambda
> School (other than any proceeding commenced by either party seeking an injunction, a
> restraining order, or any other equitable remedy or a proceeding commenced by either
> party in small claims court), either party may demand that the dispute be resolved by
> binding arbitration administered by the American Arbitration Association in accordance
> with its Consumer Arbitration Rules available at www.adr.org.

9.     Claimant's tuition payment plan further specifies, "Any such arbitration must be

conducted by one arbitrator and must be conducted in San Francisco, California, the county with

a major commercial airport nearest to where you live, or another mutually agreed location."

## III.     FACTUAL ALLEGATIONS

### A.     LAMBDA BACKGROUND

10.     Lambda is a private, for-profit online coding school founded in 2017 by its

current CEO, Austen Allred. Mr. Allred was the Company's primary decision-maker, controlled

its daily operations, and regularly promoted Lambda on social media and through other media.

He benefitted financially from the tuition paid to Lambda by Claimant and all other students.

11.     Lambda provides online computer science courses of varying lengths. It is not a

degree-granting institution, and is not accredited. Students cannot take out federal student loans

to attend Lambda.

12.     Lambda marketed itself as a place where students learn the skills necessary to

obtain employment in the competitive computer technology job market. In Mr. Allred's words,

most students come to Lambda with "no network" and are "from either inner cities or rural

areas."[1]

---

[1] *See* Y Combinator, *A CS Education That's Free Until You Get a Job - Austen Allred of
LambdaSchool*, YouTube (Apr. 3, 2019) at 9:10 (hereinafter "Y Combinator Interview"),
https://www.youtube.com/watch?v=_yIAYZtdrfI&t=551s.

13.     Lambda touted its "experienced industry expert" instructors and a top-of-the-line curriculum that is "designed to get you hired." On April 3, 2019, Mr. Allred stated in an interview that Lambda's "educational experience is, I think, among the best in the world."[2]

14.     At all times relevant to this complaint, Lambda charged tens of thousands of dollars for its program, more than double the reported average price of online coding bootcamps.[3]

15.     Part of Lambda's business model has been predicated on convincing prospective students to agree to pay a large amount of tuition by promising them that they will not owe anything unless and until they find a job that pays $50,000 or more per year.

16.     Lambda carries out this model by entering into tuition payment plans with students. For example, as Lambda describes one of its tuition payment plan offerings, Income Share Agreements (ISAs): "A Lambda School ISA is a contract under which you agree to pay 17% of your post-Lambda School salary for 24 months, but only once you're making more than $50,000 per year (or the equivalent of $4,166.67 per month). The ISA is capped at a maximum repayment of $30,000, so you won't pay more than $30,000 under any circumstances."[4]

17.     Over time, Lambda expanded its tuition payment plan offerings to include, for example, retail installment contracts, deferred tuition plans, multi-part installment payment plans, financing through a third-party loan, a pre-instruction lump sum payment, or ISA varieties that combine an initial lump sum payment with payments from a proportion of future earnings.

18.     Some Lambda tuition payment plans are managed by third-party servicers who handle origination and payment processing.[5] Meratas, a loan-servicing company headquartered in Stamford, Connecticut, services Claimant's ISA.

---

[2] *Id.* at 15:05.

[3] *See* Cecilia Clark, *How Much is Coding Boot Camp?* Nerdwallet (June 21, 2022, 10:53 AM), https://www.nerdwallet.com/article/loans/student-loans/how-much-is-coding-bootcamp.

[4] *The Lambda School Income Share Agreement*, Lambda School Website (scroll to FAQs "What is an ISA and how does it work"), [archived by the Wayback Machine (Dec. 16, 2020), https://web.archive.org/web/20201216131833/https://lambdaschool.com/tuition/isa].

[5] *The Lambda School Income Share Agreement*, Lambda School Website (scroll to FAQs "Who are Meratas and Leif"), [archived by the Wayback Machine (Dec. 16, 2020), https://web.archive.org/web/20201216131833/https://lambdaschool.com/tuition/isa].

19.     By April 2019, Lambda was growing at "an insane pace." As Mr. Allred explained:

> We agreed as a team to no longer share the number of students that we have enrolled, but it is not a small number and it is growing at an insane pace. We'll soon be measuring Lambda School scale by percentage of the overall number of students learning to program every year, to give you some context. And being able to support that kind of scale effectively is what keeps me up at night. Mostly specifically hiring, mostly hiring executives right now who can build out 100, 150 person teams beneath them . . . and we need like 5 of them yesterday.[6]

20.     Mr. Allred attributed Lambda's growth in part to his active personal Twitter account, stating in January 2020 that his frequent tweets have "certainly helped Lambda school grow."[7]

21.     Mr. Allred also stated: "If there's one thing I'm good at in life, it's growing something quickly, building hype for something quickly. That's kind of my superpower."[8]

22.     As described below, Lambda's rapid growth was fueled by the School's, and Mr. Allred's, public misrepresentations about the School's approval status and job placement rates.

**B.     UNTIL AUGUST 17, 2020, LAMBDA OPERATED WITHOUT STATE APPROVAL, IN VIOLATION OF CALIFORNIA LAW**

23.     As a California company with its headquarters and principal place of business in San Francisco, Lambda is subject to the laws of the state of California. One of those laws, California Education Code § 94886, bars private postsecondary educational intuitions from doing business without "approval to operate."

24.     Another, Section 94917, provides that when educational institutions violate this law, any "note, instrument, or other evidence of indebtedness relating to payment" for its programs is "void and not enforceable."

---

[6] Y Combinator Interview at 47:50.
[7] Vincent Woo, *Interview with Austen Allred*, Soundcloud (Jan. 22, 2020) at 42:10 (hereinafter "Woo Interview"), https://soundcloud.com/vwoo/interview-with-austen-allred.
[8] Y Combinator Interview at 22:25.

25.     All Lambda tuition payment plans, including ISAs, are a "note, instrument, or other evidence of indebtedness relating to payment for educational program[s]," under the California Education Code.

26.     On March 20, 2019, the BPPE issued a "Citation: Assessment of Fine and Order of Abatement" ("Citation") to Lambda. The Citation found that Lambda was "operating without Bureau approval," in violation of the California Education Code. A copy of the Citation is attached hereto as <u>Exhibit B</u>.

27.     In the Citation, the BPPE ordered that Lambda "cease to operate as a private postsecondary educational institution" and "submit a school closure plan." The Citation further required Lambda to "discontinue recruiting or enrolling students and cease all instructional services and advertising in any form or type of media, including the https://lambdaschool.com and any other websites not identified here that are associated with the Institution, until such time as an approval to operate is obtained from the Bureau."

28.     On May 14, 2019, Lambda submitted its application to the BPPE seeking approval to operate.

29.     Lambda appealed the Citation and, on July 24, 2019, the BPPE issued an "Appeal of Citation Informal Conference Decision: Citation Affirmed" (the "Citation Affirmance"). The BPPE affirmed the Citation because "[n]o new substantive facts were presented," and thus, Lambda was required to "comply with the orders described in the 'Violation Code Sections' of this document and submit evidence of compliance within 30 days from the date of this decision." Citation Affirmance at 1–3. A copy of the Citation Affirmance is attached hereto as <u>Exhibit C</u>.

30.     In direct violation of California law, the Citation, and the Citation Affirmance, Lambda continued to operate, advertise its educational services to the public, and enroll students.

31.     On August 21, 2019, the BPPE denied Lambda's May 14, 2019 application, stating in a letter to Lambda that it was "unable to grant approval." A copy of the August 21 order is attached hereto as <u>Exhibit D</u>.

32.     On November 25, 2019, the BPPE issued an order denying Lambda's updated application for approval, explaining that "at this time the Bureau is unable to grant approval, based on the requirements of the California Education Code." A copy of the November 25 order is attached hereto as Exhibit E.

33.     On June 22, 2020, the BPPE issued yet another order denying Lambda's further updated application for approval to operate, stating that "the Bureau cannot at this time approve Lambda's application." A copy of the June 22 order is attached hereto as Exhibit F.

34.     The June 22, 2020 order also found that Lambda's ISAs constitute "an instrument or evidence of indebtedness" under the California Education Code. *Id.* at 5.

35.     On August 17, 2020, the BPPE issued an order approving Lambda's application. The approval letter stated that the BPPE had completed its review of Lambda's "Application for Approval to Operate," including "supplemental documentation" received on August 14, 2020. The BPPE found that "[a]pproval to operate is granted *effective August 17, 2020*." (emphasis added). A copy of the August 17 order is attached hereto as Exhibit G.

36.     From at least May 2019 until Lambda was approved on August 17, 2020, Lambda's publicly available course catalogs falsely stated that Lambda was approved by the BPPE. In at least three versions of the 2019 and 2020 catalogs—revised in May 2019, September 2019, and July 2020 (all prior to Lambda's approval)—Lambda falsely stated the following:

> **APPROVALS**
> Lambda School is a private institution *approved to operate* by the California Bureau for Private Postsecondary Education. Approval to operate means the institution is compliant with the minimum standards contained in the California Private Postsecondary Education Act of 2009 (as amended) and Division 7.5 of Title 5 of the California Code of Regulations.

*See* Exhibit H (Excerpts of Three Versions of Lambda Course Catalogs for 2019 and 2020 at 5) (emphasis added).

37.     During the time Lambda was seeking the BPPE's approval, Mr. Allred engaged in a public misinformation campaign about Lambda's legal status. For example, in August 2019, Mr. Allred told Business Insider that Lambda was working with the BPPE to obtain approval and

that the order had been stayed while the application was pending. Mr. Allred stated that "[b]ecause we're talking with BPPE, it doesn't affect students at all."[9] This was false.

38.    In truth, the Citation and Citation Affirmance were not stayed, multiple of Lambda's applications had been denied, and Lambda's future was uncertain. In August 2020, a public information officer with California's Department of Consumer Affairs told Business Insider "that there is no stay on the order, and that if Lambda School is still operating while its registration is pending, it would be in violation of state law."[10]

39.    Upon information and belief, Mr. Allred further commented to Lambda students over the Lambda Slack channel that any regulatory issues were mere technicalities that did not affect the school's ability to operate.

40.    At all times Mr. Allred knew or should have known that ISAs and other financing instruments issued by Lambda were void and unenforceable under California Law due to Lambda's lack of approval to operate.

41.    Throughout 2019 and 2020, prior to Lambda's August 17, 2020 approval, Lambda and Mr. Allred further misrepresented Lambda's approval status by using a number of recognized attributes of an approved academic institution in its advertising and promotional materials. During this period, Lambda's name, website, and the website URL itself – lambdaschool.com – used the term "school", and Lambda's website, ads, and social media continuously displayed the following school crest:

*Screenshot from Lambda's website on April 22, 2020.*



---

[9] Rosalie Chan, *The hot Silicon Valley coding bootcamp Lambda School is paying a $75,000 fine for not registering properly with the state of California*, Business Insider (Aug. 29, 2019, 6:32 PM), https://www.businessinsider.com/lambda-school-coding-bootcamp-california-bppe-2019-8.

[10] Rosalie Chan, *A California official says red-hot coding bootcamp Lambda School is violating state law if it operates without the right registration — but the company insists classes can go on*, Business Insider (Aug. 30, 2019, 8:54 PM), https://www.businessinsider.com/lambda-school-california-state-law-coding-bootcamp-y-combinator-2019-8.

42.    During this period, Lambda's website, online ads, and social media continuously and repeatedly referred to various features of an approved academic institution, including, for example, a "curriculum," "tuition," "students," "student body," being "enrolled," an academic "schedule," "graduates," "mentors," "grades," "lectures," "homework," and "career support": [11]

*Screenshot from Lambda's website on May 6, 2020.*





---

[11] *See, e.g.*, Lambda School (@LambdaSchool), Twitter (Dec. 10, 2019, 9:52 PM), https://twitter.com/bloomtech/status/1204609786718801922; Lambda School Instagram (Mar. 16, 2020), https://www.instagram.com/p/B9zG7NvjhyS/; *Curriculum*, Lambda School Website, [archived by the Wayback Machine (May 6, 2020), https://web.archive.org/web/20200506051614/https://lambdaschool.com/curriculum].

*Screenshot of a March 16, 2020 Lambda Instagram post.*



43.     Mr. Allred furthered the appearance that Lambda was approved to operate in similar terms. In his "Letter from the CEO" at the beginning of Lambda's March 2020 outcomes report (which was publicly available on the Lambda website), he refers to the Lambda "student body" growing to 2,900, with Lambda staff growing to 200, and moving the Lambda headquarters to an office building in downtown San Francisco based on that growth. He refers to a "curriculum" that is "mastery-based," "graduation," "career support," and "the school." He acknowledged that Lambda "students place great trust in Lambda School when they enroll, and they make incredible investments of time and energy while engaged in our programs."[12]

44.     Had Claimant been aware that Lambda was operating without a license, was not approved to operate, and that its future legal status was uncertain, Claimant would not have signed a tuition payment plan that indebted Claimant for up to $30,000 to Lambda. Indeed, no

---

[12] *See* Austen Allred, *Announcing the Release of Our H1 2019 Student Outcomes Report*, Lambda School Website (Mar. 27, 2020), [archived by the Wayback Machine (Apr. 23, 2020), https://web.archive.org/web/20200423031203/https://lambdaschool.com/the-commons/announcing-the-release-of-our-h1-2019-student-outcomes-report] (last visited November 27, 2023).

reasonable consumer would enroll and indebt themselves to a program operating unlawfully and under orders to close.

45.    Claimant's tuition payment plan constitutes a "note, instrument, or other evidence of indebtedness relating to payment for [students'] educational program," under the California Education Code, and therefore, as a matter of law, is "void and not enforceable." California Education Code § 94917.

## C.    LAMBDA'S FALSE AND MISLEADING JOB PLACEMENT RATES

46.    Lambda's selling point to Claimant and other students was that it would land them a job—and thus bring financial success. Mr. Allred described Lambda as "entirely vocational, we're a trade school basically, and we want to help you make as much money as you can."[13]

47.    Lambda's record of placing students in computer technology jobs was therefore a critical piece of information for Claimant and others considering attending Lambda. Respondents knew that students would only enroll if Lambda would help them secure a job. As Lambda described it, job placement is "the most critical component of Lambda's operations, not only in the School's obligation to its students, but to the prosperity of the company as a whole." *See* ¶ 53, *infra*.

48.    To that end, for the past six years, since Lambda's inception, and continuously through today, Lambda and Mr. Allred have engaged in an extensive and long-term campaign to advertise false and misleading job placement rates, intending that potential students like Claimant would review those rates and enroll at Lambda as a result of those rates.

49.    Lambda and Mr. Allred have prominently displayed false and misleading information on Lambda's purported record of job placement on the Lambda website, in marketing materials and outcomes reports, in a variety of online and social media advertisements (upon information and belief, including Google, YouTube, and various social media), and

---

[13] Y Combinator Interview at 13:00.

through social media postings and comments, including Mr. Allred's personal social media accounts.

### 1. False and misleading job placement rates on Lambda's website and outcomes reports

50.     Throughout 2018 and 2019, Lambda's website advertised job placement rates of over 80%. Lambda and its executive leadership, including Mr. Allred, knew that these widely disseminated rates were false and misleading.

51.     On August 2, 2018, Mr. Allred, Ben Nelson (co-founder and CTO), and Ryan Holdaway (VP of Outcomes), stated the following in a post on the Lambda School Blog: *"[E]very single* Lambda School graduate who has been on the job market for six months is either employed in a full-time role as a software engineer or has joined an early startup working for equity."[14]

52.     Yet on August 3, 2018—the very next day—Lambda's executive leadership team reprimanded Lambda's Director of Career Readiness for poor job placement rate performance, sending her an "Employee Corrective Action Form." The form stated that the employee's "performance in recent months has not met the expectations for the Career Coach/Director of Career Readiness role at Lambda School. Overall placement numbers are low and the time to placement is much higher than desired."

53.     The Corrective Action Form continued:

Placements are the most critical component of Lambda's operations, not only in the School's obligation to its students, but to the prosperity of the company as a whole. A common discussion point in regards to Outcomes is that current placement rates are too low and time to placement is too high. Creative tactics and adjustments to current careers processes as well as follow through are needed to improve both of these measurements. . . .

CS1 students graduated on 1/19/18. Since then we've had a new class graduate approximately every five weeks. As of 8/1/18, only 16 students of the 48 graduated students assigned to [the Lambda career placement employee] have been placed.

---

[14] Austen Allred, *Introducing Lambda Next — Our Revolutionary New Job Search and Placement Program*, Medium: Lambda School Blog (Aug. 2, 2018), https://medium.com/lambda-school-blog/introducing-lambda-next-our-revolutionary-new-job-search-and-placement-program-603ef12f7d37 (emphasis added).

54.     Two months later, on October 8, 2018, Lambda continued to tout its high job placement rates, announcing on its website: "Since Lambda School's inception in April 2017, over 75 Lambda School graduates have been hired, including 83% of early cohorts, with an average salary increase of over $47,000 per hired graduate."

55.     Lambda's website contained the following statement across the top of the page:

*Screenshot from Lambda's website on December 13, 2018.*



56.     The representation of an 83% job placement rate remained on the Lambda website until on or about February 2019.

57.     From on or about April 2019 until at least December 2019, Lambda's website advertised an ever higher job placement rate: over 85%. For example, on April 18, 2019, Lambda's website contained the following statement across the top of the page:

*Screenshot from Lambda's website on April 18, 2019.*



58.     Yet in May of 2019—at the same time Lambda was advertising an 85.9% job placement rate on its website—Lambda executives sent a private memorandum to investor Y Combinator confirming the falsity of the rates it was publicly promoting. *See* Lambda

Memorandum to Investors, *Human Capital: The Last Unoptimized Asset Class* at 10 (May 2019), attached hereto as <u>Exhibit I</u>. The May 2019 memo stated:

> **We're unable to place students at scale**
> - We're at roughly 50% placement for cohorts that are 6 months graduated
> - Placement to date has been manual and one-off, which isn't possible at scale

Ex. I at 10.

59.     After the memorandum was published in news accounts two years later, Mr. Allred confirmed in a tweet from his personal account that he had told investors that Lambda had a 50% placement rate, stating: "The 50% came from me telling investors about what % of enrolled students get jobs that require repayment."

60.     Despite Mr. Allred's contrary statement to investors, Lambda's website continued to promote a 85.9% or 86% placement rate through the end of 2019. These rates were false and misleading.

61.     On December 14, 2019, Lambda's homepage stated:



*Screenshot from Lambda's website on December 14, 2019.*

62.     This statement was false and directly contrary to the true facts known to Lambda and Mr. Allred, which had privately been disclosed to investors, as described above.

63.     When asked in an interview to explain the discrepancy between the representations on Lambda's website and representations to its investors, Mr. Allred explained:

14

"I mean you're literally looking at what are the risks, right? Like, we're going to pick our lowest number for that – there are cohorts that have been at 50% placed within 6 months, yes."[15]

64.     When asked whether the advertised 86% job placement rate was accurate, he stated: "the way that that number was measured was an average across cohorts at a specific time. I don't know what it is right now, but that's directionally correct."[16]

65.     On February 19, 2020, New York Magazine published an article titled "Lambda School's Misleading Promises," in which the writer concluded that Lambda was "selling unprepared students an incomplete education, fueled by overpromising marketing and misleading, if not downright fraudulent, figures."[17] The story described Lambda's job placement rate misrepresentations and also recounted an interview with a former employee who "confirmed . . . that the company's own internal numbers, which the interviewee was provided as part of their interview process, seem to indicate a roughly 50 percent or lower placement rate."[18]

66.     Lambda nonetheless persisted in promoting false and misleading job placement statistics on its website and elsewhere.

67.     In 2020, Lambda started to promote its placement rates through "outcomes reports" published on its website and shared through social media. Multiple outcomes reports included an "Independent Accountants' Report" directed "To the Management" of "Lambda Inc." located at "250 Montgomery Street[,] San Francisco, CA 94104".

68.     The first outcomes report, titled "H1 2019 Outcomes Report," was published on March 27, 2020,[19] and reported a 79% placement rate.[20]

---

[15] Woo Interview at 13:00-14:30.

[16] *Id.* at 11:13-11:26.

[17] Vincent Woo, *Lambda School's Misleading Promises*, New York Magazine (Feb. 19, 2020), https://nymag.com/intelligencer/2020/02/lambda-schools-job-placement-rate-is-lower-than-claimed.html.

[18] *Id.*

[19] *See* Austen Allred, *Announcing the Release of Our H1 2019 Student Outcomes Report*, Lambda School Website (Mar. 27, 2020), [archived by the Wayback Machine (Apr. 23, 2020), https://web.archive.org/web/20200423031203/https://lambdaschool.com/the-commons/announcing-the-release-of-our-h1-2019-student-outcomes-report].

[20] *See H1 2019 Report Lambda School Outcomes Report*, Lambda School Website, [archived by

69.     The 79% placement rate remained up on Lambda's website until December 3, 2020, when Lambda published its "H2 2019 Outcomes Report."[21] The H2 2019 report showed a 74% placement rate.[22]

70.     The 74% rate announced in the H2 2019 report remained up on Lambda's website until November 7, 2021, when Lambda announced its 2020 outcomes.[23] In the 2020 outcomes report, Lambda announced that the placement rate remained at 74%.

71.     Until November 1, 2022, Lambda continued to report the 74% placement rate from the 2020 outcomes report on its website:

# 74%

Job placement rate for BloomTech graduates

**BloomTech 2020 Outcomes Report**

*Screenshot from Lambda's homepage on September 30, 2022.*[24]

---

the Wayback Machine (Sept. 3, 2020),
https://web.archive.org/web/20200903023542/https:/lambdaschool.com/reports/2019-outcomes-report].

[21] *See* Austen Allred, *Announcing the Release of Our H2 2019 Student Outcomes Report*, Lambda School Website (Dec. 3, 2020), [archived by the Wayback Machine (Dec. 14, 2020), https://web.archive.org/web/20201214214247/https:/lambdaschool.com/the-commons/announcing-lambda-school-h2-2019-student-outcomes-report].

[22] *Id. See also H2 2019 Report Lambda School Outcomes Report*, Lambda School Website [archived by the Wayback Machine (Dec. 3, 2020), https://web.archive.org/web/20201203230224/https:/lambdaschool.com/reports/h2-2019-outcomes-report].

[23] *See Bloom Institute of Technology 2020 Outcomes Report,* Bloom Institute of Technology, [archived by the Wayback Machine (Nov. 25, 2021), https://web.archive.org/web/20211125162824/https:/www.bloomtech.com/reports/outcomes-report].
It appears that Lambda only published one outcomes report in 2020. *See BloomTech Reports*, Bloom Institute of Technology Website, https://www.bloomtech.com/reports/archive (last visited Mar. 14, 2023).

[24] *See Built For Your Success*, Bloom Institute of Technology Website, [archived by the Wayback Machine (Sept. 30, 2022) https://web.archive.org/web/20220930032702/https:/www.bloomtech.com/outcomes].

16

72.     On November 2, 2022, Lambda published the "BloomTech 2021 Outcomes Report," advertising a 90% placement rate. As of November 2, 2022, Lambda's website provided:

# 90%

Job placement rate for BloomTech graduates

**BloomTech 2021 Outcomes Report**

*Screenshot from Lambda's homepage on November 27, 2022.*[25]

73.     In a "Letter from the CEO" dated November 2, 2022, Mr. Allred wrote: "In this independently examined report, you'll gain a transparent view of how our learners and graduates fared in 2021. Our biggest takeaway: A full **90% of our 2021 graduates have landed jobs**, which is the highest rate in our company's history."[26]

74.     Lambda's homepage continued to advertise a 90% placement rate until January 2024, when it updated the rate, touting an "86% job placement rate in 2022 for job-seeking grads."[27]

75.     Like the earlier rates from 2018 and 2019, the rates Lambda published from 2020 to the present (including, but not limited to, the 79%, 74%, 90%, and 86% rates from the Lambda website and outcomes reports) were, and continue to be, false and misleading. Lambda and its executive leadership, including Mr. Allred, knew that these widely disseminated rates were false and misleading.

---

[25] *See Built For Your Success,* Bloom Institute of Technology Website, [archived by the Wayback Machine (Nov. 27, 2022), https://web.archive.org/web/20221127122732/https://www.bloomtech.com/outcomes].
[26] *See* Austen Allred, *Letter from the CEO*, Bloom Institute of Technology Website (Nov. 2, 2022), https://www.bloomtech.com/reports/outcomes-report#letter (last visited Mar. 14, 2023) (emphasis in original, internal citation omitted).
[27] *See* Bloom Institute of Technology Home Page, https://www.bloomtech.com/ (last visited December 6, 2023).

76.     Business Insider reported in October 2021 that documents from a Lambda "all-hands" staff meeting in January 2021 "showed that Lambda School placed only around 30% of its 2020 graduates in qualifying jobs during the first half of 2020. This figure is in stark contrast to the 74% placement rate it advertised for its 2019 graduates, the latest figure the school has made publicly available. . . ."[28]

77.     This "all hands" meeting took place one month after Lambda published the 74% placement rate in the H2 2019 Outcomes Report.

78.     A slide prepared by Lambda reveals that the H1 2020 placement rate was only 33% and the H2 2020 rate was 40%, a far cry from the 74% listed on the Lambda website until November 2, 2022. According to the same slide, Lambda's H1 2021 *goal* was 60% placement and H2 2021 *goal* was 80%:

## Long-Term Student Success Goals

|  | H1 2020 | H2 2020 | H1 2021 | H2 2021 | Metric | Description |
|---|---|---|---|---|---|---|
| **Admissions** | 1277 | 1450 | TBD | TBD | Unit 2 Starts | # students starting Unit 2. |
| **School** | 52% | 56% | 60% | 80% | % Graduating within 11 Units | % of students who start Unit 2 complete coursework within 11 units. |
| **Outcomes** | 33% | 40% | 60% | 80% | % Qualified Placement within 180 days | % of graduates get high paying jobs within 180 days. |
| **Repayment** | 72% | 79% | 85% | 87% | % Repaying within 60 days | % of qualified placed graduates have made a first payment within 60 days. |

79.     On information and belief, a Lambda executive presented the slide at the "all-hands" meeting at Lambda's headquarters in San Francisco, California.

---

[28] *See* Vincent Woo, *Lambda School promised a fast and cheap path to a lucrative tech career. Leaked documents and former students cast doubt on that claim*. Business Insider (Oct. 25, 2021, 7:30 AM), https://www.businessinsider.com/lambda-school-promised-lucrative-tech-coding-career-low-job-placement-2021-10.

80.     Another slide, titled "Lambda H1 Company OKRs," provided that the "actual" placement rate for H1 2020 was 33% of graduates placed within 180 days, and the actual rate for H2 2020 (as of October 2020) was 27% of graduates placed within 180 days. This slide also listed the H1 2021 goal as 60%:

## Lambda H1 Company OKRs

|  | H1 2020 | H2 2020 | H1 2021 | Metric | Description |
|---|---|---|---|---|---|
| **Admissions Goal**<br>Admissions Actual | n/a<br>1277 | 1450<br>~850 | 1500 | Unit 2 Starts | # students starting Unit 2. |
| **School Goal**<br>School Actual | n/a<br>52% | 56%<br>52% | 60% | Extended Grad Rate % | % of students who start Unit 2 complete coursework within expected time window |
| **Outcomes Goal**<br>Outcomes Actual | n/a<br>33% | 40%<br>27% | 60% | % Qualified Placement within 180 days | % of graduates get high paying jobs within 180 days. |
| **Repayment Goal**<br>Repayment Actual | n/a<br>41% | 75%<br>73% | 85% | % Repaying within 60 days | % of qualified placed graduates have made a first payment within 60 days. |
| **Alumni Goal** | n/a | n/a | 40% | % Alumni Giving back | % of hired alumni giving back |

*H2 2020 Actuals as of October 2020

81.     Another slide, reportedly used at another all-hands meeting in February 2021, broke out the 180-day placement rates by month, from February to July 2020, as follows:

| Graduation Month | Qualified Placed % (days elapsed since graduation) | | |
|---|---|---|---|
| Month | +90d | +180d | QP Now |
| Feb - 2020 | 20% | 31% | 41% |
| Mar - 2020 | 19% | 30% | 36% |
| April - 2020 | 17% | 24% | 32% |
| May - 2020 | 13% | 27% | 32% |
| Jun - 2020 | 15% | 25% | 27% |
| Jul - 2020 | 18% | 24% | 25% |
| Aug - 2020 | 16% | | 21% |
| Sept - 2020 | 13% | | 14% |
| Oct - 2020 | 10% | | 11% |
| Nov - 2020 | | | 11% |
| Jan - 2021 | | | 11% |
| **Weighted Avg.** | 16% | 27% | |
| **H2 Goal** | | 40% | |

19

82.     In yet another slide, reportedly also used at the "all hands" meeting on January 28, 2021, Lambda's H1 2021 "goal" was to enroll 500 students a month and place 50% to 70% in qualifying jobs. The graph also shows that, if Lambda enrolled 2,000 students per month, it could become profitable even if fewer than half of its students found jobs:



83.     Prior to signing a tuition payment plan, Claimant read Respondents' representations that Lambda's job placement rate was above 70%. Lambda's purported record of successfully placing students was critical to Claimaint's decision to enroll.

**2.     Lambda's false and misleading statements about job placement in social media postings and comments.**

84.     In addition to advertising job placement rates on its website and in outcomes reports, Lambda's job placement marketing campaign aimed at potential students expanded to social media posts and comments, including Twitter, Facebook, and Instagram. Like the rates on its website and in outcomes reports, these rates, ranging from 71% to at least 91%, were false and misleading. Lambda and its executive leadership, including Mr. Allred, knew that these widely disseminated rates were false and misleading, and intended that potential students like Claimant would review those rates and enroll at Lambda as a result of those rates.

85.    Examples of false and misleading job placement rates on Lambda's Twitter, Facebook, and Instagram accounts include:

a)    April 6, 2018, Lambda Twitter: "Time for another update on placement. Students hired by Lambda School are not included. Cs1: 75% hired within first two months of search."[29]

b)    March 5, 2019, Lambda's Twitter account linked to a report touting an 85.9% job placement rate and stated: "Lambda only succeeds when our students succeed, and we're committed to a transparent, no-surprises approach to education."[30]

c)    April 22, 2020, Lambda Instagram: "Percentage of H1 2019 graduates that have been placed into jobs. → 71%"[31]



---

[29] Lambda School (@LambdaSchool), Twitter (Apr. 6, 2018, 12:39 PM), https://twitter.com/bloomtech/status/982311747301330944.

[30] Lambda School (@LambdaSchool), Twitter (Mar. 5, 2019, 7:02 PM), https://twitter.com/bloomtech/status/1103083315945328640.

[31] Lambda School (@LambdaSchool), Instagram (Apr. 22, 2020), https://www.instagram.com/p/B_S2M-Llm2y/.

d) September 27, 2021, Lambda Instagram: "77% of H2 2019 job-seeking Data Science graduates were hired. 94% [o]f those hired graduates go the job in the first 180 days"[32]



e) November 3, 2022, Lambda Instagram: "90% of our 2021 alumni gained in-demand skills and landed great jobs—our highest placement rates *ever*!"[33]



[32] Lambda School (@LambdaSchool), Instagram (Sept. 27, 2021), https://www.instagram.com/p/CUWJM1qJlEB/?img_index=4.

[33] Bloom Tech (@Bloomtechofficial), Instagram (Nov. 3, 2022), https://www.instagram.com/p/CkgVeHBrmP9/.

    f) November 3, 2022: Lambda Facebook: "90% of our 2021 alumni gained in-demand skills and landed great jobs—our highest placement rates *ever*!"[34]

    g) November 3, 2022, Lambda Twitter: "90% of our 2021 alumni gained in-demand skills and landed great jobs—our highest placement rates *ever*!"[35]

    h) November 4, 2022, Lambda Facebook: "Fun Fact: Did you know, 90% of our 2021 full Stack Web job-seeking graduates found a job after BloomTech?"[36]

    i) November 7, 2022, Lambda Facebook: "91% of our 2021 job-seeking Data Science graduates found a job 😮"[37]

    j) November 9, 2022, Lambda Instagram: "91% of 2021 job-seeking Data Science grads found a job after BloomTech"[38]

### 3.   Mr. Allred's false and misleading statements about job placement were a driving force behind Lambda's job placement rate marketing campaign.

86.    At all times relevant to this complaint, Mr. Allred was the driving force behind Lambda's job placement rate marketing campaign. Rather than passively overseeing the campaign, he personally spearheaded Lambda's dissemination of false and misleading rates, oftentimes promoting the rates himself on his own social media accounts.

87.    For example, since March 2020, when Lambda first promoted its job placement rates through outcomes reports, each outcomes report has begun with a personalized letter from Mr. Allred titled "Letter from the CEO," vouching for the rates in the report. The reports end with Mr. Allred's signature.

---

[34]Bloom Tech (@BloomTech), Facebook (Nov. 3, 2022), https://www.facebook.com/BloomTech/posts/pfbid0C9MRRryV1zaMpSXa35QnogkPDAR984bjs9xmen4WJB4SWMtkWAn2kxZ7BRC11Kdhl.

[35] Bloom Tech (@BloomTech), Twitter (Nov. 3, 2022, 11:15 AM), https://twitter.com/bloomtech/status/1588203108013850629.

[36] Bloom Tech (@BloomTech), Facebook (Nov. 4, 2022), https://www.facebook.com/BloomTech/posts/pfbid025d3iVN2usd1eLKfwTMCh78a3kVNpsmUcRCsMXWinqtYX4tHqLbkDHQz9mhqUZuanl.

[37] Bloom Tech (@BloomTech), Facebook (Nov. 7, 2022), https://www.facebook.com/BloomTech/posts/pfbid0UpByQ5eFsctoNH51QuK1DPrTXYXvaU9cPbE2H6weYnnvR2YbpWF2m8vLGbuuoUhol.

[38] Bloom Tech (@Bloomtechofficial), Instagram (Nov. 9, 2022), https://www.instagram.com/p/CkwHe8ivDND/.

88. Mr. Allred also advertised false and misleading rates on his personal Twitter account:

    a) March 13, 2019: In response to a commenter asking about a $60,000 median salary and 83% 6-month employment rate for Lambda's main web track, Mr. Allred responded, "That's low now, but our average student increases his or her income by $47,000."[39]

    b) March 15, 2019: "Lambda School's first iOS class graduates today. 66% of them are already **hired.**"[40]

    c) November 16, 2019: "First track just graduated. Hit 100% hired but was VERY small sample size." Subsequent reporting revealed that this small sample size consisted of a single student.[41]

    d) November 3, 2022: "I am so incredibly excited to finally be able to share BloomTech's 2021 Outcomes Report. Highlights: *All-time high 90% placement rate for job-seeking grads".[42]

89. Other examples of false, misleading, and exaggerated claims on Mr. Allred's Twitter account include:

    a) January 24, 2021: "I think we're like 2-3 solvable problems being solved away from 100% of Lambda School grads being hired. Still a lot of unknowns, but I think it will be possible." When a commenter asked what the problems were, Mr. Allred responded: "Boring stuff."[43]

    b) April 22, 2021: "When I started Lambda School early detractors gave me hell because I said that Lambda School would cause thousands of people to become millionaires who wouldn't have otherwise been. It's now pretty clear that was very conservative."[44]

---

[39] Austen Allred (@Austen), Twitter (Mar. 13, 2019, 12:14 PM), https://twitter.com/Austen/status/1105879911036665856.

[40] Austen Allred (@Austen), Twitter (Mar. 15, 2019, 5:20 PM), https://twitter.com/Austen/status/1106681485275205634.

[41] *See* Zoe Schiffer & Megan Farokhmanesh, *The High Cost of a Free Coding Bootcamp*, The Verge (Feb. 11, 2020, 11:15 EST), https://www.theverge.com/2020/2/11/21131848/lambda-school-coding-bootcamp-isa-tuition-cost-free; Ryan Mac (@RMac18), Twitter (Feb. 11, 2020, 1:59 PM), https://twitter.com/RMac18/status/1227306243733295108.

[42] Austen Allred (@Austen), Twitter (Nov. 3, 2022, 12:20 PM), https://twitter.com/Austen/status/1588219699157905408.

[43] Austen Allred (@Austen), Twitter (Jan. 24, 2021, 1:55 AM), https://twitter.com/austen/status/1353234915643568128.

[44] Austen Allred (@Austen), Twitter (Apr. 22, 2021, 10:24 AM), https://twitter.com/Austen/status/1385238109185396740.

c) May 4, 2021: "I get to watch a bunch of people double their income (or more) every single day. Even the worst days are punctuated by a bunch of people changing their lives and the lives of their families forever."[45]

d) May 4, 2021: "You can go from near poverty to huge future wealth in just a few months."[46]

e) November 24, 2022: "Thankful today for all those who have worked so hard for BloomTech (by current name or by Lambda School). So many people working so diligently. Thousands of lives changed, billions in increased earnings."[47]

90.     Mr. Allred and Lambda acted willfully and knowingly to disseminate Lambda's job placement representations to the public—including applicants to their school such as Claimant—with knowledge that they were, and continue to be, false and misleading.
.

### D.    LAMBDA MISREPRESENTS THAT IT ONLY GETS PAID ONCE STUDENTS DO

91.     In addition to the placement rates, Lambda and Mr. Allred misled potential students like Claimant with the frequently repeated declaration that: "We don't get paid until you do, so we're in this together, from your first day of classes to your first day on the job."[48] For example, on June 27, 2019, Lambda's homepage stated:



## Higher learning. Higher earning.

Lambda is designed for student success. We don't get paid until you do, so we're in this together, from your first day of classes to your first day on the job — and beyond.

*Screenshot from Lambda's homepage on June 27, 2019.*

---

[45] Austen Allred (@Austen), Twitter (May 4, 2021, 11:50 PM), https://twitter.com/Austen/status/1389789532761956352.
[46] Austen Allred (@Austen), Twitter (May 4, 2021, 11:53 PM), https://twitter.com/Austen/status/1389790386659364868.
[47] Austen Allred (@Austen), Twitter (Nov. 24, 2022, 9:51 AM), https://twitter.com/austen/status/1595822473781485568.
[48] *See, e.g.*, Apply Now Pages, Lambda School Website [archived by the Wayback Machine (June 27, 2019), https://web.archive.org/web/20190627024024/https://lambdaschool.com/].

92.    Mr. Allred regularly touted that Lambda only gets paid when students do on his personal social media accounts and the Lambda website, describing Lambda's business as based on shared and aligned incentives between Lambda and its students:

   a)  "The main directive in everything we did can be summed up in two words: incentive alignment."[49]

   b)  "Our mission from day one has been to **align the incentives of school and student**, giving more people the opportunity they deserve to land a great job with a higher income. If our students don't succeed, our school shouldn't either."[50]

93.    In reality, Lambda packaged and sold its tuition payment plans, including ISAs, to investors long before students obtained employment. As early as May 2019, Lambda privately told investor Y Combinator: "Currently we sell some income share agreements to hedge funds." Exhibit I at 2.

94.    To facilitate the sale of ISAs, Lambda partnered with Edly, a digital marketplace that helps schools sell ISAs to third-party investors. On December 11, 2019, Edly tweeted: "Pleased to announce our latest offering [–] a Lambda School ISA Pool. We @edlyISA are excited to work with the amazing team @LambdaSchool[], one of the most impactful ISA programs in the country."[51] To learn how to participate, Edly invited interested investors to join a webinar that night with Mr. Allred.[52]

---

[49] Austen Allred, LinkedIn (2019), https://www.linkedin.com/posts/austenallred_announcing-our-new-isa-financing-blueprint-activity-6636140633306333184-dkOh?utm_source=share&utm_medium=member_desktop.
[50] *See* Austen Allred, *Announcing the Release of Our H1 2019 Student Outcomes Report*, Lambda School Website (Mar. 27, 2020), [archived by the Wayback Machine (Apr. 23, 2020), https://web.archive.org/web/20200423031203/https:/lambdaschool.com/the-commons/announcing-the-release-of-our-h1-2019-student-outcomes-report] (emphasis in original).
[51] @edlyISA, Twitter (Dec. 11, 2019, 3:01 PM), https://twitter.com/edlyISA/status/1204853625459216385 (on file with Claimant's counsel).
[52] @edlyISA, Twitter (Dec. 11, 2019, 3:02 PM), https://twitter.com/edlyISA/status/1204853900177743872(on file with Claimant's counsel).

95.     Lambda did not disclose this fact to students until public reporting exposed it, and for many months Mr. Allred flatly denied it, stating in October 2019 on Twitter that "We never, ever get paid up front for ISAs."[53]

96.     Claimant read the false and misleading statement on the Lambda website that Lambda only got paid once the student does and, as a result, believed that Lambda would only get paid once Claimant secured a qualifying job. Knowing that Lambda only got paid if Claimant obtained employment was important to Claimant's decision to attend.

### E.     LAMBDA ENGAGED—AND STILL ENGAGES—IN THE UNLAWFUL BUSINESS PRACTICE OF UNLICENSED LENDING

97.     The California Financing Law "shall be liberally construed and applied to promote its underlying purposes and policies," which include "protect[ing] borrowers against unfair practices by some lenders, having due regard for the interests of legitimate and scrupulous lenders." Cal. Fin. Code § 22001(a)(4).

98.     Pursuant to the California Financing Law: "No person shall engage in the business of a finance lender or broker without obtaining a license from the commissioner." Cal. Fin. Code § 22100(a).

99.     Lambda is not and never has been registered in California as a finance lender or broker under the Financing Law.

100.     Since its inception, Lambda has operated as a "finance lender" because its tuition payment plans qualify as either consumer or commercial loans under the Financing Law. *See generally* Cal. Fin. Code § 22203-04 (defining consumer loans); Cal. Fin. Code § 22502 (defining commercial loans).

101.     Lambda's Meratas ISA provides:

THIS IS NOT A LOAN
In making monthly payments to Lambda School, you will not be repaying a student loan. In the case of a student loan, a student borrows a set amount and repays the principal amount of the loan plus interest or a finance charge, or both. Under this agreement, you

---

[53] Woo Interview at 6:30 (wherein Mr. Allred confirms that this tweet was "totally correct").

> will instead pay a fixed percentage of your income each month for
> up to a maximum number of payments.

102.    Contrary to this representation, ISAs are a form of student loan.

103.    According to the United States Consumer Financial Protection Bureau ("CFPB"), a representation that an ISA is "not a loan" is deceptive and misleading under the Consumer Financial Protection Act because "ISAs are loans and do create debt."[54]

104.    The California Department of Financial Protection and Innovation ("DFPI") agrees, holding that ISAs are student loans: "ISAs made solely for use to finance a postsecondary education are 'student loans' for the purposes of the SLSA [California Student Loan Servicing Act]."[55]

105.    The United States Department of Education concurs, finding that ISAs "used to finance expenses for postsecondary education are private education loans under 34 C.F.R. 601.2(b)."[56]

106.    The BPPE also found in its June 22, 2020, order denying Lambda approval to operate that Lambda's ISA is "an instrument or evidence of indebtedness" under the California Education Code. *See* June 22, 2020 Letter from BPPE to Lambda at 5, attached hereto as Exhibit F.

---

[54] *See* Better Future Forward, Inc., et al., CFPB No. 2021-CFPB-0005, Consent Order at ¶ 23 (Sept. 7, 2021) (finding *available at:* https://files.consumerfinance.gov/f/documents/cfpb_better-future-forward-inc_consent-order_2021-09.pdf).
[55] *See In the Matter of Student Loan Servicing Act License Application of Meratas Inc.* NMLS No. 2120180, Consent Order at ¶ M (Ca. Dep't of Fin. Prot. and Innovation Aug. 5, 2021), *available at:* https://dfpi.ca.gov/wp-content/uploads/sites/337/2021/08/Meratas-Consent-Order.pdf; *see also* Press Release, California Dep't of Fin. Prot. and Innovation, "California DFPI Enters Groundbreaking Consent Order with NY-Based Income Share Agreements Servicer" (Aug. 5, 2020), https://dfpi.ca.gov/2021/08/05/california-dfpi-enters-groundbreaking-consent-order-with-ny-based-income-share-agreements-servicer/.
[56] *See* FSA Announcement, General-22-12, *Income Share Agreements and Private Education Loan Requirements* (Mar. 2, 2022), https://fsapartners.ed.gov/knowledge-center/library/electronic-announcements/2022-03-02/income-share-agreements-and-private-education-loan-requirements. *See also* 87 Fed. Reg. 65,453 ("[T]he Department clarifies that ISAs and other alternative financing products should be treated like institutional loans.").

107.    Because Lambda is in the business of making ISAs and other tuition payment plans, it is operating as a finance lender under the California Financing Law.

108.    Lambda's failure to register as a finance lender deprived Claimant of the borrower protections provided by the California Financing Law.

109.    Lambda has therefore engaged in the unlawful business practice of making a loan without a license in violation of California Financial Code § 22100, and, in turn, in violation of the unlawful prong of the UCL.

110.    Had Claimant been aware that Lambda was acting as an unlicensed finance lender, Claimant would not have signed a tuition payment plan that indebted Claimant for up to $30,000 to Lambda.

**F.    CLAIMANT'S ENROLLMENT AND ATTENDANCE AT LAMBDA, AND THE AFTERMATH**

111.    Claimant Willard decided to pursue a career change following the onset of the COVID-19 pandemic. Previously working in customer service and sales, he wanted to transition to remote tech work by building off of his website-building experience dating back to high school and college coursework. He researched his options for continuing tech education and quickly heard about Lambda from Google ads and social media.

112.    As he was weighing his educational options, Mr. Willard reviewed the Lambda website and Lambda-related social media posts for more information throughout June and July 2020. He reviewed, and was impressed by, job placement rates in the high 70s to 80s on the Lambda website, in a Lambda outcomes report linked on the website, and in Twitter posts/comments by both Lambda and Mr. Allred. In researching Lambda's competitors, Mr. Willard concluded that Lambda's job placement rates were significantly higher.

113.    Mr. Willard also saw that Lambda did not require tuition payments up front, and that, through an ISA, Lambda was invested in student outcomes. He reviewed the statement on the Lambda website that Lambda did not get paid until the student did, convincing Mr. Willard that Lambda was equally invested in student outcomes, including his.

114.    The high placement rates and the representation that Lambda only got paid once students do were critical to Mr. Willard's decision to enroll, convincing him that enrolling at Lambda would maximize his chance of landing a tech job after completing Lambda coursework.

115.    But the job placement rates and the statement that Lambda only got paid once students do were false and misleading, and both Lambda and Mr. Allred knew these representations were false and misleading. (*See* ¶¶ 46–90, *supra*.)

116.    Mr. Willard further believed that Lambda was approved to operate due to Respondents' continuous and repeated descriptions of the school and its programs on the Lambda website and Lambda ads of various features of Lambda that conveyed that it was a credible, legitimate, and lawfully operating school. These included, but were not limited to, descriptions of Lambda's program as a "school," its history and years of operation, success stories of students, and career placement services.

117.    Swayed by Respondents' false job placement rates, their false statements that they only got paid once students do, and their false representations that Lambda was a government-approved school, Mr. Willard signed an ISA with Lambda on August 5, 2020 (Exhibit A). (Months later, Lambda required that Mr. Willard sign a second ISA backdated to August 4, 2020, attached hereto as Exhibit J.)

118.    Had Respondents truthfully represented Lambda's job placement rates, or had they truthfully represented their actual financial interest in students' success, or had Mr. Willard known that Lambda was not lawfully approved to operate, he would not have enrolled in Lambda's educational services, or signed an ISA that indebted him up to $30,000 of tuition to Lambda.

119.    Mr. Willard began attending Lambda part-time in August 2020 and soon discovered that the program was nothing like he imagined when researching it. While Lambda initially provided one-on-one learning support from paid team leads, it quickly eliminated those team leads in favor of an unpaid mentor/mentee system. Under this system, Mr. Willard lost one-on-one support and was suddenly required to spend time "mentoring" other students. Lambda

also shortened Mr. Willard's part-time program from 18 to 12 months, dropping essential

programming languages from the curriculum. Although Mr. Willard's cohort shrank as peers

withdrew over the months, he ultimately completed coursework in October 2021 and received

his certificate of completion the following month.

120.    Mr. Willard started applying to tech jobs in the final months of his Lambda

coursework and continued long after completing the program. Along the way, Lambda did not

connect him with any meaningful job leads, and there was no indication that employers placed

any value on his Lambda education. Needing to bring in an income, Mr. Willard ultimately

returned to working in sales, including at the same job from before he started at Lambda.

121.    Mr. Willard has not made any payments pursuant to his ISA, as he has not held a

qualifying position.

## G.    THE U.S. CONSUMER FINANCIAL PROTECTION BUREAU TAKES ACTION.

122.    On April 17, 2024, the U.S. Consumer Financial Protection Bureau (CFPB)

entered into a Consent Order with Lambda and Mr. Allred. A copy of the Consent Order is

attached hereto as Exhibit K.

123.    After reviewing Lambda's and Mr. Allred's student-lending activities, the CFPB

identified that Lambda and Allred had violated the law in numerous ways and, in part, concluded

as follows:

> []BloomTech encouraged prospective students to take out ISAs by making
> a number of misleading statements about the ISAs and the benefits students would
> receive. BloomTech told students that its ISA was not a loan, did not create debt,
> carried no finance charge, and was risk-free. BloomTech also told students that it
> provided top-notch curricula and instructors and had high job-placement rates,
> often trading on the names and logos of famous technology companies, like
> Amazon, Apple, and Microsoft. And BloomTech claimed that students should take
> comfort in taking out an ISA because BloomTech's interests were aligned with the
> students' interests—unlike other forms of debt, BloomTech said it got paid only
> when a student got a high-enough paying job. Allred was involved in making these
> representations.
>
> []All of these claims were misleading. BloomTech's ISAs are loans that
> create a debt to be repaid, through an income-based repayment plan. BloomTech's
> ISAs carry a finance charge (that for some students can be in the thousands of
> dollars) and have many of the same risks as other credit products, such as the risk
> of defaulting on the loan and going into collections, with all the negative

consequences collections can bring. And BloomTech did not provide the job placements that it advertised to prospective students.

[]Further, BloomTech's interests were often not aligned with those of its students: it often sold its ISAs to investors right after originating them. In these cases, BloomTech got paid regardless of whether students secured a job and were able to pay back the ISA.

[]Students relied on BloomTech's representations and so entered into ISAs to improve their financial lives. BloomTech and Allred took advantage of that reliance by turning around and selling ISAs to investors.

CFPB Consent Order at 3–4.

124.    The Consent Order continues:

[] BloomTech and Allred made many deceptive representations, expressly and implicitly, about BloomTech's ISAs and the benefits students would receive if they entered into them, including:
> …
> [] representations that BloomTech successfully placed its graduates at high rates in careers at large, high-paying companies; and
> [] representations that BloomTech's financial incentives were aligned with its students' and that BloomTech got paid only when students got paid.

[] BloomTech's and Allred's misrepresentations were likely to mislead consumers acting reasonably because they were false.

[] These misrepresentations were material because they were express, they involved important information that was likely to affect consumer choice or conduct, and they related to central characteristics of BloomTech's ISAs.
….
[] Allred participated directly in the deceptive acts and had authority to control BloomTech, which also engaged in deceptive acts or practices.

[] Allred had actual knowledge of or was recklessly indifferent to the truth or falsity of BloomTech's claims and failed to prevent such conduct from occurring even though he had the authority to do so. Allred approved all aspects of BloomTech's business model and policies, and procedures, including the particular acts and practices that underlie this claim.

CFPB Consent Order at 21–22.

125.    The Consent Order provided for the rescission or reformation of certain Lambda students' ISAs, requiring that Lambda and Mr. Allred inform qualifying students within three days of April 17, 2024. Mr. Willard has not received any notification from Lambda that he qualifies for relief under the Consent Order.

## IV.    CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### Violations of California's Consumer Legal Remedies Act
### Cal. Civ. Code §§ 1750, *et seq.*
### (All Respondents)

126. Claimant hereby reincorporates the allegations in the foregoing paragraphs as though fully set forth herein.

127. The CLRA makes unlawful "unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or that results in the sale or lease of goods or services to any consumer." Cal. Civ. Code § 1770(a).

128. The CLRA covers transactions involving the sale of services—such as education—to consumers.

129. Claimant is a "consumer" within the meaning of Section 1761(d) of the CLRA, seeking Lambda's education services for personal, family, or household purposes, and Claimant engaged in "transactions" within the meaning of sections 1761(e)and 1770 of the CLRA.

130. Education is a "service" within the meaning of Section 1761(b) of the CLRA.

131. The CLRA enumerates numerous unlawful acts or practices, including:

   a) "Misrepresenting the source, sponsorship, approval, or certification of goods or services." Cal. Civ. Code § 1770(a)(2).

   b) "Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that the person does not have." *Id.* § 1770(a)(5).

   c) "Representing that goods or services are of a particular standard, quality, or grade" when they are not. *Id.* § 1770(a)(7).

   d) "Advertising goods or services with intent not to sell them as advertised." *Id.* § 1770(a)(9).

132. In violation of these provisions, Respondents misrepresented to the public, prospective students, and current students, including Claimant, at least the following: (i) its job placement rates; and (ii) that it had approval to operate and enroll students.

133.     Respondents did so in order to induce prospective students, like Claimant, to enroll in Lambda's program—Claimant did so enroll as a result of Respondents' misrepresentations.

**SECOND CAUSE OF ACTION**
**Violations of California's Unfair Competition Law**
**Cal. Bus. & Prof. Code §§ 17200,** *et seq.*
**(All Respondents)**

134.     Claimant hereby reincorporates the allegations in the foregoing paragraphs as though fully set forth herein.

135.     Respondents have engaged in business acts or practices that constitute unfair competition as defined in the UCL, in that such business acts and practices are unlawful, unfair, and fraudulent within the meaning of that statute.

136.     The business acts and practices include:

a)   publishing and/or providing the public, prospective students, and current students, including Claimant, with false, misleading, unreliable, and/or inaccurate job placement rate information;

b)   conducting business without BPPE approval and in violation of multiple BPPE orders requiring it to cease operations;

c)   knowingly operating a private postsecondary institution without approval to do so and knowingly conveying to the public that it is an approved institution;

d)   misrepresenting to the public, prospective students, and current students that in March and July of 2019, the BPPE ordered Lambda to cease operations, stop enrolling students, cease all instructional services, and submit a closure plan, and misrepresenting material facts related to those BPPE orders, including representing that they were stayed when they were not.

137.     Claimant's tuition payment plans constitute "lost money or property" within the meaning of the UCL.

Unlawful Prong

138.    The UCL bars business practices that are forbidden by law. If a business practice violates any law, it is *per se* a UCL violation.

139.    The business acts and practices described above are unlawful because they violate numerous state and federal laws, including but not limited to:

a)  The Federal Trade Commission Act ("FTC Act"), which prohibits "unfair or deceptive acts or practices."[57]

b)  Cal Educ. Code § 94897(b), which provides that institutions shall not "[p]romise or guarantee employment, or otherwise overstate the availability of jobs upon graduation."

c)  The CLRA, *see supra*;

d)  The FAL, *see infra*;

e)  Cal. Educ. Code § 94886, which provides in relevant part that "a person shall not open, conduct, or do business as a private postsecondary educational institution in this state without obtaining an approval to operate under this chapter." Lambda violated this provision, and therefore the UCL's unlawful prong, when it enrolled Claimant without obtaining approval to operate.

f)  Cal. Educ. Code § 94943, which provides that it is a crime to "[k]nowingly operat[e] a private postsecondary institution without an approval to operate." Lambda violated this provision, and therefore the UCL's unlawful prong, when it knowingly enrolled Claimant without approval by the BPPE to operate.

g)  Cal. Educ. Code § 94917, which provides that "[a] note, instrument, or other evidence of indebtedness relating to payment for an educational program is void and not enforceable unless, at the time of execution of the note, instrument, or other evidence of indebtedness, the institution held an approval to operate … ."

---

[57] *See* U.S.C.§ 45(a)(I); 15 U.S.C. § 52(a).

    h)  Cal. Educ. Code § 94902(b)(2), which provides that an enrollment agreement is enforceable only if "[a]t the time of the execution of the enrollment agreement, the institution held a valid approval to operate.

    i)  The California Financing Law, which provides that "[n]o person shall engage in the business of a finance lender or broker without obtaining a license from the commissioner." Cal. Fin. Code § 22100(a).

    j)  The Consumer Financial Protection Act of 2010, 12 U.S.C. §§ 5531(a), 5536(a)(1)(B), which prohibits covered persons from engaging in unfair, deceptive, or abusive acts or practices.

140.    By violating these and other state and federal laws, Lambda violated the unlawful prong of the UCL.

  Fraud Prong

141.    To show that a business practice is fraudulent, it is necessary only to show that members of the public are likely to be deceived.

142.    Respondents' business acts and practices—including its false job placement rate representations and false representations to the Subclass about BPPE approval—are fraudulent in that they are likely to deceive the public.

143.    Each of these false and misleading representations, all of which were material, were substantial factors influencing Claimant to attend Lambda and take out a tuition payment plan that indebted Claimant for up to $30,000.

## THIRD CAUSE OF ACTION
### Violations of California's False Advertising Law
### Cal. Bus. & Prof. Code §§ 17500, *et seq.*
### (All Respondents)

144.    Claimant hereby reincorporates the allegations in the foregoing paragraphs as though fully set forth herein.

145.    Respondents have also engaged in acts or practices that constitute violations of the FAL, Business and Professions Code section 17500, *et seq.*, by making or causing to be made

untrue or misleading statements with the intent to induce members of the public to purchase Lambda's services. Respondents' untrue or misleading representations include, but are not limited to, the following:

a) Respondents' statements regarding job placement rates, including but not limited to the published job placement rates prominently displayed on its website, social media, and advertisements;

b) Respondents' statements, prominently displayed on Lambda's website and elsewhere, that Lambda does not get paid until students do;

c) Respondents' statements and appearance to the public, prospective students, and current students that its operations were lawful, that BPPE had not ordered Lambda to cease advertising and instructional activities, and that it could lawfully enroll students. Lambda's and Mr. Allred's advertisements and marketing implicitly and explicitly misrepresented the lawfulness of its operations by encouraging the public and prospective students to apply for enrollment.

146.    At the time these representations were made, Respondents knew or by the exercise of reasonable care should have known that the representations were untrue or misleading.

## FOURTH CAUSE OF ACTION
### Intentional Misrepresentation
### (All Respondents)

147.    Claimant hereby reincorporates the allegations in the foregoing paragraphs as though fully set forth herein.

148.    Respondents made statements to Claimant: (a) that were false representations of material fact; (b) that Respondents knew were false or were made recklessly and without regard for their truth; (c) that Respondents intended Claimant to rely upon; (d) that Claimant reasonably relied upon; (e) that Claimant's reliance upon was a substantial factor in causing Claimant damage; and (f) that caused Claimant damage.

149.    The intentional misrepresentations and omissions by Respondents consist of at least the following:

a)  Respondents' job placement rate statements, prominently displayed on the Lambda website, in outcomes reports, and on social media. Respondents knew these statements were false.

b)  Respondents' statements, prominently displayed on Lambda's website and elsewhere, that Lambda does not get paid until students do; Lambda knew this statement was false because it sold ISAs to investors long before students were placed in jobs.

c)  Respondents' representations, both implied and explicit, that it was approved to operate, advertise, enroll, and teach students prior to August 2020. Respondents knew these representations were false because the BPPE had ordered Lambda to cease all operations (including all advertising and instructional activities) and submit a school closure plan. Respondents also knew that they were concealing from students that Lambda was barred from advertising and from enrolling and teaching students.

150.    Respondents intended Claimant to rely on these misrepresentations, as evidenced by Lambda prominently featuring them on its website and on other widely disseminated platforms, as well as by its efforts to avoid disclosing the truth.

151.    Claimant reasonably relied on these widely disseminated representations. Had Claimant known the truth, Claimant would not have enrolled at Lambda.

152.    Lambda, Mr. Allred, and members of his executive leadership team acted willfully and knowingly to disseminate these representations to the public with knowledge that they were false and misleading.

153.    Claimant has been substantially harmed by Lambda's misconduct, which caused Claimant to attend Lambda and take out an ISA that indebted Claimant for up to $30,000 in tuition.

**FIFTH CAUSE OF ACTION**
**Negligent Misrepresentation**
**(All Respondents)**

154.    Claimant hereby reincorporates the allegations in the foregoing paragraphs as though fully set forth herein.

155.    Respondents have also engaged in acts or practices that constitute negligent misrepresentation. *See supra* ¶¶ 147–53.

156.    Respondents prominently displayed these representations on the Lambda website, in outcomes reports, on social media, and in advertisements for the purpose of encouraging members of the public, like Claimant, to apply for enrollment.

157.    Respondents had no reasonable grounds to believe that these representations were true.

158.    Respondents intended to induce Claimant to rely on these misrepresentations, as evidenced by Lambda prominently featuring them on its website and on other widely disseminated platforms, as well as by its efforts to avoid disclosing the truth.

159.    Claimant was justified in relying upon these widely disseminated representations. Had Claimant known the truth, Claimant would not have enrolled at Lambda.

160.    Claimant has been substantially harmed by Lambda's misconduct, which caused Claimant to attend Lambda and take out an ISA that indebted Claimant for up to $30,000 in tuition.

## V.    PRAYER FOR RELIEF

WHEREFORE, in accordance with the above claims, Claimant requests that the Arbitrator:

1.    Declare and order that the tuition payment plan entered into by Claimant is unlawful, void, and unenforceable pursuant to Cal. Educ. Code §§ 94886, 94902, 94917, and 94943, and the UCL, CLRA, and FAL.

2.     Declare that Respondents conducted business as a private postsecondary educational institution in California without obtaining approval to operate, in violation of Cal. Educ. Code § 94886 and the UCL.

3.     Declare that Respondents knowingly operated a private postsecondary institution without approval to operate, in violation of Cal. Educ. Code § 94943 and the UCL.

4.     Declare that Respondents' job placement rate representations at all times relevant to this Complaint were fraudulent and misleading, in violation of the UCL, FAL, and CLRA, and were intentional and/or negligence misrepresentations.

5.     Declare that Lambda "engage[d] in the business of a finance lender or broker without obtaining a license from the commissioner," and continues to do so, in violation of the California Financing Law, Cal. Fin. Code § 22100(a).

6.     Order Respondents—including Lambda, Mr. Allred, and any other owner of all or part of the tuition payment plans—to cancel Claimant's tuition payment plan and enjoin any effort to collect upon or otherwise enforce it.

7.     Order Respondents to pay restitution in the form of refunds for any and all payments made.

8.     Order prejudgment and post-judgment interest on any refunds for tuition payment plan payments to the maximum extent allowed by law.

9.     Order Respondents to pay reasonable attorneys' fees and costs.

10.    Award damages to Claimant in an amount to be determined, including punitive damages pursuant to Cal. Civ. Code § 3294(a).

11.    Order all such further relief as the Arbitrator deems just and proper.


Dated: May 28, 2024                    **MINER, BARNHILL & GALLAND, P.C.**


                                       By: ___/s/ *Ryan Miller*_____
                                           Deanna N. Pihos

David Baltmanis
Ryan Miller

*Attorneys for Claimant*